Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FINEMAN FURNITURE CO. INC. and SEYMOUR FINEMAN, individually,<br><br>Plaintiffs,<br><br>v.<br><br>PLANNED FURNITURE PROMOTIONS, INC., GENE ROSENBERG AND ASSOCIATES, LLC, EUGENE ROSENBERG, LESTER ROY HESTER, PAUL COHEN, KURT EARLYWINE, FURNITURE AUCTIONS OF AMERICA, TODAY'S FURNITURE, and BH ASSOCIATES, INC.,<br><br>Defendants. | Civil Action No. 07 Civ. 9749 (JSR)<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Fineman Furniture Co. Inc. ("Fineman Furniture") and Seymour Fineman, by their attorneys, Kirkpatrick & Lockhart Preston Gates Ellis LLP, file this Amended Complaint against Planned Furniture Promotions, Inc., Gene Rosenberg and Associates, LLC, Eugene Rosenberg, Lester Roy Hester, Paul Cohen, Kurt Earlywine, Furniture Auctions of America, Today's Furniture, and BH Associates, Inc. and allege as follows:

## INTRODUCTION

1.     Plaintiff Fineman Furniture, a family-owned retail furniture store located in Harlem, was founded in 1937 by plaintiff Seymour Fineman's father and operated by the Fineman family for 70 years.  In 2006, Seymour Fineman decided to retire and close the store. After considering various closing options, he selected defendant Planned Furniture Promotions

("PFP"), a well-known—and supposedly reputable—national company, to conduct a going out of business sale.

2.     Thereafter, Defendant PFP put into play a well-rehearsed scheme, one they had used before in connection with other going out of business sales nationally, calculated to gain Plaintiffs' confidence and then defraud Plaintiffs of their money and merchandise.  To start, PFP and its representatives made numerous misrepresentations and concealed material facts with the specific intent of inducing Plaintiffs to contract with PFP.  These misrepresentations and omissions concerned PFP's experience and how it planned to maintain the reputation of Fineman Furniture and to maximize Fineman Furniture's return from the sale.  PFP did not tell Mr. Fineman the truth – that it had no intention of honoring these representations, that the State of California had permanently enjoined it from conducting certain liquidation sales within the State as a result of its unlawful practices, that it had been fined $270,000 by the State of Massachusetts for violations of its going-out-of-business laws, and that it had been sued at least twice by similarly-situated businesses for fraud and breach of contract in connection with going-out-of-business sales.  Plaintiffs reasonably relied on PFP's representations and omissions and agreed to relinquish control of its business and turn over the winding down of its operations to PFP.

3.     From the outset PFP and its officers, employees, consultants and affiliates conducted the Fineman sale to maximize PFP's rather than Plaintiff's profits and to deprive Plaintiffs of any meaningful return.  Among other things, PFP: repeatedly and flagrantly violated New York State and City laws governing going out of business sales, consumer protection, and auctions and auctioneers; breached its contract with Fineman Furniture; falsified inventories, product labels, invoices, reports, costs and expenses; illegally used the Fineman Furniture premises to display and sell PFP's own goods; made little or no effort to sell Fineman Furniture

inventory; and paid themselves and the other Defendants for fictitious fees and expenses. PFP's conduct subjected Mr. Fineman and Fineman Furniture to substantial financial damages, resulted in the destruction of their hard-earned and longstanding reputation, and exposed them to potential civil and criminal liability.

## THE PARTIES

4.      Plaintiff Fineman Furniture Co. Inc. is a corporation duly organized and existing under the laws of the State of New York with its principal place of business at 2182-2192 Third Avenue, New York, New York 10035. Fineman Furniture was a retailer of furniture and home furnishings.

5.      Seymour Fineman is an individual residing at 16 Woodedge Circle, Amagansett, New York 11930. Seymour Fineman is president of Fineman Furniture.

6.      Upon information and belief, defendant Planned Furniture Promotions, Inc. ("PFP") is a corporation duly organized and existing under the laws of the State of Pennsylvania with its principal place of business at 9 Moody Road, Bldg. D, Suites 17-18, Enfield, Connecticut 06082.

7.      Upon information and belief, defendant Gene Rosenberg Associates, LLC ("GRA") is a limited liability company, in the business of inventory liquidation, with a place of business at 9 Moody Road, Bldg. D, Suites 17-18, Enfield, Connecticut 06082. Upon information and belief, GRA is an affiliate of PFP.

8.      Upon information and belief, defendant Eugene Rosenberg, also known as Gene Rosenberg, is an individual residing in Connecticut.

9.      Upon information and belief, defendant Lester Roy Hester is an individual residing at 6107 Foxfield Court, Windermere, Florida 34786.

- 3 -

10.     Upon information and belief, defendant Paul Cohen is an individual residing at 77 Tennyson Drive, Longmeadow, Massachusetts 01106.

11.     Upon information and belief, defendant Kurt Earlywine is an individual residing at 1802 SE 28th Street, Cape Coral, Florida 33904.

12.     Upon information and belief, defendant Furniture Auctions of America is a company with a place of business at 9 Moody Road, Bldg. D, Suites 17-18, Enfield, Connecticut 06082.

13.     Upon information and belief, defendant BH Associates, Inc. is a Delaware corporation with a principal place of business at 369 South Main Street, Providence, Rhode Island 02903.

14.     Upon information and belief, defendant Today's Furniture is a company with a place of business at 9 Moody Road, Bldg. D, Suites 17-18, Enfield, Connecticut 06082.


## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 exclusive of interest and costs, and is between citizens of different States.

16.     This Court has personal jurisdiction over the defendants because (i) the defendants regularly transact business in the State of New York; (ii) many of the acts alleged in this Complaint have occurred in this district; and (iii) the defendants have caused injury to Fineman Furniture and Seymour Fineman in this district.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because (i) the defendants regularly transact business in this district; and (ii) a substantial part of the events giving rise to the claims herein occurred in this district.

## FACTS APPLICABLE TO ALL COUNTS

18.     Fineman Furniture, a family-owned retail furniture store located in Harlem at 2182–2192 Third Avenue, New York, New York, was founded in 1937 by Julius Fineman and operated by the Fineman family for 70 years until 2006.  Of 126 furniture stores operating within ten blocks of Fineman Furniture in the 1940s, only Fineman Furniture survived to 2006.  In 1960, Julius Fineman was disabled and his son Seymour, an 18 year old City College freshman, left school to run the business.  Fineman Furniture survived Harlem's tough times including the riots of the 60s and inner-city deterioration by providing fairly priced, high quality furniture with superior service and by building an excellent business and community reputation.  Fineman employed area residents, allowed mothers to bring children to work, mentored children with absentee fathers, sponsored school activities and health initiatives, donated time and furniture to charity, and furnished "dream rooms" for "Make a Wish."  Fineman provided free offices, supplies, warehousing, support staff and delivery services for the Walter Kaner Children's Foundation, serving needy disabled inner-city children.  Over 70 years, Fineman built its outstanding reputation and goodwill with the Harlem residents that it served; a reputation valued and honored by Plaintiffs.

19.     However, in 2005 Seymour Fineman, president of Fineman Furniture decided to retire and close the store.  He explored the following "exit" options:  (1) run a "going out of business" ("GOB") sale himself; (2) close the store immediately and sell off the inventory at a

loss; or (3) hire a furniture liquidation company to run a "GOB" sale and liquidate the remaining inventory.

20.    Mr. Fineman entered into discussions with several professional furniture liquidation companies, including PFP.

21.    In February 2006, in a meeting at Fineman Furniture between Mr. Fineman and Arvin and Bobbie Pine, representatives of PFP, Mr. Fineman expressed his concern that the GOB Sale be conducted in a manner which would maintain his fine reputation with vendors, customers and with the City of New York.  Mr. Fineman stressed to Mr. and Mrs. Pine that he wanted a clean and professionally run Sale.  Arvin Pine responded that this was not a problem, that "no one would get hurt" and that "PFP knew what it was doing."  The Pines stressed that GOB Sales were not regular sales and were very different than anything Mr. Fineman had done in his 40 years running Fineman Furniture.  They indicated that they had just run a GOB Sale for Huffman Koos, a much larger operation, in New York and that they had a lot of experience with New York GOB Sales.

22.    In February and March 2006, prior to entering into the Agreement, Mr. Fineman had several telephone conversations with PFP's Roy Hester.  In one telephone conversation, Mr. Fineman asked Hester specifically about PFP's GOB Sale experience in New York.  Hester advised him that PFP had been involved with the Huffman Koos Sale, the Eileen Vinocur sale, and a few other sales in New York.  Mr. Fineman specifically asked Hester about how the Vinocur Sale turned out, since Mr. Fineman was familiar with Eileen Vinocur.  Hester advised that it did not go as expected and that if Mr. Fineman spoke with Ms. Vinocur, she would tell him that the sale lost money.  Hester blamed the loss on Vinocur and assured that the Vinocur operation was "not a Fineman's.  Fineman's is totally different."

- 6 -

23.     In another telephone conversation between Mr. Fineman and Hester, prior to February 20, 2006, Mr. Fineman asked Hester about Sonny Cappetta's experience with New York GOB Sales. Hester indicated that Cappetta was highly experienced and familiar with the New York GOB market and that Mr. Fineman should sign the Agreement quickly because Cappetta would keep everything "on the up and up." He further assured that Cappetta did not have a learning curve for New York GOB Sales, as he had over twenty years experience.

24.     During a meeting at Fineman Furniture in mid-February 2006 between Mr. Fineman, Arvin and Bobbie Pine, Roy Hester and, upon information and belief, Rodney Wilkin, Mr. Fineman again expressed his concern that the handling of the GOB Sale had to be legitimate and maintain his reputation. Hester agreed and said that PFP had more to lose than Fineman if they did anything wrong. Hester stated that PFP was growing and had never been in trouble with any sale before. Hester and Arvin Pine stated that the advertising for the Sale would be customized for the Fineman Furniture store and New York City and that PFP's lawyers, who specialized in liquidation and going out of business sales, would review and check all advertising to make sure it complied with New York regulations.

25.     Prior to entering the Agreement, and on February 20, 2006, PFP's Roy Hester sent Mr. Fineman a letter and "Proposal for a Commission Sale to be Conducted for Fineman Furniture Company, Inc." (the "Proposal"). (Ex. 1). Hester assured Fineman that PFP would guarantee a gross margin of 44% on additional inventory provided at Fineman's request and that the additional inventory would be appropriate for Fineman's business and would not occupy more than a certain percentage of floor space to insure that Fineman Furniture's original inventory would not be prevented from selling. (Ex. 1).

- 7 -

26.     In the Proposal, Hester again assured Fineman that "[t]he promotion will be in keeping with the store's fine reputation and will be run in a professional manner. PFP's vast resources, expertise, customer service experience and close alliances with furniture manufacturers will further benefit the Company and help assure a successful sale." (Ex. 1). In addition, PFP's website, www.pfpromotions.com and marketing brochure boasted, "we never compromise your standards or your good name." PFP further assured that "PFP will provide a team of highly experienced furniture personnel for the sale...." (Ex. 1).

27.     PFP's oral representations, letters and Proposal to Fineman Furniture focused on Mr. Fineman's repeatedly expressed concerns about PFP's handling of Fineman Furniture's inventory from cataloging through sale and liquidation of all Fineman Furniture's inventory. To induce Mr. Fineman to sign the Agreement and convince him that PFP would properly handle Fineman's inventory, PFP gave Mr. Fineman an *original* 468 page Inventory Book from Rockford Furniture's PFP-run GOB sale and explained that PFP would prepare an identical inventory book and data base complete with Fineman's inventory. True and correct copies of representative pages from the Inventory Book are annexed hereto as Exhibit 2.

28.     On February 27, 2006, Mr. Fineman and Hester had a lengthy telephone conversation. They again discussed maintaining Fineman Furniture's reputation. Hester again pointed out that Mr. Fineman did not have any experience with GOB Sales, nor did he have the resources or expertise to run a GOB Sale at all, let alone a GOB Sale in New York City which had complex regulations. Hester again reassured Mr. Fineman that PFP was the best company to run Fineman Furniture's GOB Sale and that Fineman Furniture's reputation would be safeguarded. Hester also stated that Cappetta was the ideal manager to run the Sale because of his New York GOB Sale experience and that Arvin and Bobbie Pine's oversight was guaranteed

to make sure that everything about the GOB Sale was in compliance.  Hester even indicated that PFP had the perfect law firm to watch over everything PFP did and to advise them as to changes in even the most insignificant GOB Sale regulation.

29.    In a letter dated February 27, 2006, which confirmed the conversation between Hester and Mr. Fineman earlier that day, Hester assured: "[w]e know the fine reputation of both Fineman's Furniture and Seymour Fineman.  We know we are the firm who can maximize your return.  As I have stated, the most important factor is not maximizing sales but turning your inventory (the odds and ends as well as prime) into the maximum amount of cash."  (Ex. 3).

30.    PFP's business model seemingly encompassed the very values that Fineman wished to preserve in its last days in business: reputation and integrity coupled with financial goals.  All these representations were designed with the specific intent to induce Fineman Furniture into contracting with PFP and in furtherance of the defendants' preconceived scheme to defraud it.

31.    Plaintiffs relied on the representations from PFP, a company that touted its superior knowledge and expertise in the GOB Sale business.  [PFP intended that Plaintiffs so rely and knew that Plaintiffs did so.][?? Do we need this?]

32.    What PFP failed to disclose was that it had been permanently enjoined by the Superior Court of the State of California from conducting certain liquidation sales in the State of California as a result of unlawful conduct engaged in by PFP, including introducing their own merchandise during the course of conducting liquidation sales for the benefit of PFP's clients and that it had been fined $270,000 by the State of Massachusetts for violations of its going-out-of-business laws, including selling new furniture stock during a going out of business sale and for selling furniture with fictitious original prices and phony markdowns.  It also failed to disclose

that it had been sued at least twice by similarly-situated businesses for fraud and breach of

contract in connection with going-out-of-business sales. PFP also intentionally failed to disclose

that it had a hidden master plan to induce Fineman Furniture into an agreement so that it could

offload its own merchandise during the GOB Sale, steal from Fineman Furniture and unfairly

compete against it, all under the guise of a purportedly legitimate GOB Sale. PFP never had any

intention of conducting a legitimate GOB Sale that would maintain Fineman Furniture's

goodwill and reputation and maximize its profits.

33.    On March 27, 2006, Fineman Furniture and PFP entered into a Sale Promotion

Consulting Agreement (the "Agreement") prepared by PFP's counsel, Cohen Tauber Spievack &

Wagner ("CTSW"). A true and correct copy of the signed Agreement is annexed hereto as

Exhibit 4. Seymour Fineman and Fineman Furniture were not represented by counsel.

34.    Under the Agreement, PFP became Fineman's exclusive consultant to assist

Fineman Furniture in wrapping up its business. At PFP's advice, the parties agreed first to

conduct a high impact promotional theme sale to raise funds, liquidate excess inventory and

improve Fineman Furniture's financial condition. If the theme sale did not achieve those

objectives, PFP would conduct a "GOB" Sale (the "Sale"). (Ex. 4, ¶¶ 1, 4.1).

35.    On or about April 9, 2006, PFP commenced the theme sale.

36.    The theme sale did not meet its objective, therefore, on or about May 8, 2006,

PFP began the GOB Sale.

**PFP'S PREPARATION FOR THE GOB SALE**

37.     Under Paragraph 3.1 of the Agreement, PFP and Fineman Furniture were to take a complete physical count and inspection of the existing Fineman Furniture inventory, categorizing each item as follows:

- "Company Inventory" (referred to as "A" inventory), meaning Fineman Furniture's entire inventory of good, clean, matched sets of home furniture that is available for retail sale at the Sale and upon which no customer deposits have been made or taken;

- "Other Inventory" (referred to as "B" inventory), meaning accessories, odd and unmatched merchandise, clearance, distressed, damaged, unsaleable and/or used merchandise;

- "Electronics", and

- "Appliances". (Ex. 4, ¶ 3.1).

38.     PFP's Hester repeatedly assured Mr. Fineman orally and in print that PFP would take inventory. Despite these assurances, PFP failed to complete the inventory count or prepare an inventory database.

39.     Unbeknownst to Plaintiffs, in the limited inventory cataloging that PFP did complete, it assigned duplicate lot numbers to different items of inventory and consistently mislabeled Fineman Furniture inventory. By duplicating inventory lot numbers, inventory essentially vanished from the records. The inventory records available to Fineman Furniture did not reflect the existence of the more expensive inventory that had been assigned the duplicate lot numbers and this more expensive inventory was never brought to the showroom, offered for sale by PFP or credited to Fineman Furniture.

40.     PFP failed to complete the inventory or to update the inventory on a daily basis as required under both New York State and New York City law.

41.     PFP failed to determine the Cost Value of the Company Inventory as defined in the Paragraphs 3.1 and 2.1(d) of the Agreement. (Ex. 4, ¶¶3.1, 2.1(d)).

42.    PFP also failed to properly classify the inventory as "Company Inventory", "Other Inventory" or "Additional Inventory", pursuant to paragraph 3.1 of the Agreement.  (Ex. 4, ¶3.1).

43.    Under Paragraph 3.1 of the Agreement, Company Inventory ("A" inventory) was to be valued at "100% of its invoice cost plus billed freight (the "Cost Value")".  (Ex. 4, ¶3.1).

44.    Under Paragraph 3.3 of the Agreement, Fineman Other Inventory ("B" inventory) was to be valued at 50% of the proceeds (excluding sales tax) received from the *sale and delivery* of "B" inventory.  (Ex. 4, ¶3.3).

45.    A substantial portion of inventory that PFP should have classified as "Company Inventory" "A" was instead improperly classified as "Other Inventory" "B" (odd pieces and damages).  Thus, Fineman Furniture was significantly under-credited for this wrongly classified inventory.

46.    Additionally, PFP typically undervalued "Other" or "B" inventory sales incorrectly at 50% of the sale price and did not credit Fineman Furniture with 50% of the delivery as well.

47.    Moreover, because PFP only included a fraction of Fineman Furniture's merchandise in the inventory, most *sets* of furniture were never matched together.  Thus, PFP improperly classified individual pieces of matching sets of furniture as "B" rather than "A" inventory.  PFP then sold them as odd "B" inventory.  Thus, Fineman Furniture received less than half of what it was entitled to.

48.    For example, Fineman Furniture had over 150 matching Hart pieces in inventory, but PFP never counted them and never put them together as sets.  PFP displayed and sold Hart furniture as odd "B" pieces.  Most Hart sales were undervalued as "B" sales.

49.    PFP failed to merchandise, display, price or tag all Fineman Furniture Class "A"

and "B" inventory as required by paragraph 2.1(b) of the Agreement. (Ex. 4, ¶2.1 (b)).

50.    Edward "Sonny" Cappetta ("Cappetta"), the PFP on-site Manager, insisted on

personally and exclusively selecting, pricing and tagging Fineman Furniture inventory brought to

the sales floor.  Fineman input was ignored.  Cappetta was frequently unreachable and absent

from the store leaving most of the showroom vacant or with untagged, unpriced merchandise.

For example, the day before GOB Opening Day, the store was closed to the public. Cappetta had

asked Mr. Fineman not to come in, but the staff and additional workers came in for GOB

preparation under Cappetta's direction.  However, Cappetta could not be found, the store was

largely empty with items untagged and workers idle for hours until Mr. Fineman called for a

progress update. Mr. Fineman contacted Hester who designated a PFP consultant to make up

prices and tags for the merchandise until Cappetta was located late that day.

51.    PFP improperly tagged Fineman Furniture inventory throughout the Sale.

52.    By way of example, tags most often failed to specify manufacturer, model, style,

vendor, Fineman Furniture lot ("L") number, or other identifying characteristics so that many of

the items sold were not properly attributed to Fineman Furniture.

53.    PFP also placed encoded sales tags on Fineman Furniture inventory and

Additional Inventory with code letters and acronyms that had meaning only to PFP, such as

"10X", "OZY", R, W, O, Y and others.   These same codes also appeared on sales invoices to

customers.

54.    When customers were given sale receipts, PFP often listed a fictitious

manufacturer or model number on the receipt or only listed a SKU number fabricated by PFP

with meaning only to PFP.  PFP used "10X" to designate unknown or "whatever." This was

- 13 -

often done even when model and style were identified on inventory pages, cartons, sales tags or the item itself.

55.    PFP never removed a significant portion of Fineman Furniture inventory from its packaging or displayed it on showroom floors.  Instead, PFP moved inventory in sealed cartons from the main warehouse to other warehouse space created by PFP within the store and never entered it into inventory or assigned lot numbers to it.

56.    This moving of boxed and wrapped inventory from one place to another created significant labor costs for Fineman Furniture and the Sale, and had the effect of commingling un-inventoried Fineman Furniture merchandise with inventory belonging to PFP that PFP had wrongly brought to the Fineman premises, creating confusion as to who owned what.

57.    In violation of Paragraphs 2.1(b) and 4.10 of the Agreement, PFP continuously displayed Fineman Furniture inventory during the Sale by merely stacking unpriced, untagged, unopened cartons of furniture against the showroom walls and in the basement, so that Fineman Furniture inventory was never openly displayed to customers and could not sell.  Even proven sellers kept continuously in stock such as Lea Industries brand of children's furniture were never displayed despite significant backup inventory in Fineman Furniture's warehouse.

## PFP'S SALE OF THE INVENTORY

58.    Once the Sale began, PFP engaged in further misconduct.  Under the Agreement, Company "A" Inventory was to be valued at Cost Value (100% of invoice cost plus billed freight). (Ex. 4, ¶3.1).  However, usually when Fineman Furniture merchandise was sold at the Sale, PFP's on-site bookkeeper, Jeffrey Kaplan ("Kaplan") failed to determine the item's actual Cost Value and instead guessed, thereby applying incorrect lower Cost Values to Fineman Furniture's "A" inventory.

- 14 -

59.     By deliberately applying incorrect lower Cost Values to Fineman Furniture inventory, PFP profited to Fineman Furniture's detriment.

60.     Moreover, PFP consistently credited Fineman Furniture with only the cost of the item, without crediting it with the billed freight paid by Fineman which was usually 14-26% (but can be as high as 40%) of an item's cost, in violation of Paragraph 3.1 of the Agreement. (Ex. 4).

61.     Pursuant to Paragraph 5.1 of the Agreement, **at Fineman Furniture's request** and at PFP's discretion, Additional Inventory referred to as "C" or "PFP" inventory could be ordered by PFP on PFP's credit lines.  (Ex. 4, ¶5.1).

62.     Prior to the theme Sale's start, Fineman requested that PFP purchase only that merchandise necessary to fulfill previously placed orders from Fineman customers and a small amount of mattresses for sale with existing bedroom sets in Fineman Furniture inventory.

63.     The Additional Inventory requested by Mr. Fineman amounted to approximately $41,000 and was in full compliance with New York State and New York City GOB regulations.

64.     Despite Mr. Fineman's limited authorization regarding Additional Inventory purchases, PFP unilaterally purchased, without Fineman Furniture's request or consent, over $458,462 in Additional Inventory to supplement Fineman Furniture's existing furniture inventory in connection with the Sale.

65.     PFP illegally and without Fineman Furniture authorization augmented inventory for the GOB sale by ordering and purchasing from companies including but not limited to: Turano, Solo, Aryanna, Giovanni, American Eagle, Chintaly, FDR, Rex Bedding, Symbol, Fairmont, Best Buy, Levitz, Sandberg, Gold Bond, Stanley, Howard Miller, Fairmont, Merit, World Imports, United, Zimmer-Hester, Universal and Planned Furniture Promotions itself.

66.    By purchasing the Additional Inventory, PFP violated New York State and City laws prohibiting the introduction of new merchandise at GOB Sales.

67.    PFP also sold its own merchandise during the GOB Sale, in violation of New York State and City laws.

68.    During the GOB sale, PFP unfairly competed with Fineman Furniture, typically displaying and selling more of its own merchandise from the Fineman Furniture showroom, than Fineman Furniture.

69.    The unauthorized Additional Inventory purchased by PFP was often inappropriate for the Fineman Furniture store, despite repeated oral and written assurances that any additional inventory would be "appropriate for your operation."

70.    The unauthorized Additional Inventory brought in by PFP was largely leftover goods, damages, floor samples, odd pieces, outdated goods and discontinued styles from previous PFP liquidations and promotional sales, including but not limited to the goods from Levitz, Rhodes, Bob's Discount, Best Buy, Zimmer Hester's warehouse, PFP's warehouses, Howard Miller and others.  In short, PFP treated Fineman Furniture as a dumping ground.

71.    A substantial portion of Additional Inventory PFP purchased was inappropriate for Fineman Furniture's inner-city customer-base.  PFP brought in styles such as Florida leisure, Hamptons Shabby Chic, country farmhouse, beanbag, Southwestern and Cowboy Western, as well as patio, veranda and sunroom furnishings.  Furniture was often too massive to fit through the halls, doors and stairways of most Harlem apartments.  The display of inappropriate furnishings drove away Fineman Furniture's customers and wasted valuable selling space Fineman Furniture inventory should have occupied.

72.    PFP's salespersons gave the sale of unauthorized Additional Inventory precedence over the sale of Fineman Furniture inventory.

73.    PFP gave the display and promotion of PFP's Additional Inventory precedence over the display of Fineman Furniture inventory in direct violation of Paragraph 4.10 of the Agreement.  (Ex. 4, ¶4.10).

74.    PFP Additional Inventory generally occupied over half the available floor space utilized during the GOB sale and over 75% of prime retail space.

75.    For the most part, when Fineman Furniture inventory in Fineman Furniture's showroom was sold, it was replaced by PFP's Additional Inventory instead of Fineman Furniture inventory in direct violation of the Paragraph 4.10 of the Agreement, which states that as Fineman Furniture merchandise was sold and Showroom space made available, Fineman Furniture inventory would be taken from the Warehouse and displayed for sale in the Showroom. (Ex. 4, ¶4.10).  This was not done.

76.    Moreover, PFP defrauded Fineman Furniture with respect to the sale of and the payments for Additional Inventory.

77.    When PFP Additional Inventory was sold, pursuant to the Agreement, PFP was to be paid only for the landed factory cost of the Additional Inventory.  (Ex. 4, ¶4.3).

78.    However, PFP consistently overcharged Fineman Furniture more than the landed factory cost of the Additional Inventory in violation of the Agreement.  (Ex. 4, ¶4.3).

79.    Additional Inventory was to be purchased by PFP with benefit of all discounts, savings and price reductions resulting from PFP's superior buying power. (Ex. 4).  Yet, PFP consistently *claimed* to have paid higher prices for Additional Inventory than Fineman Furniture would have paid vendors directly, especially for the liquidations, floor samples, discontinued

models and old, outdated, shopworn goods PFP brought in. Cartons and labels on many PFP

items documented initial shipping dates several years ago and original destination stores long out

of business. When PFP shipped in leftovers from previous PFP promotions, PFP and its vendors

such as Howard Miller and Sandberg often created fictitious misleading invoices stating the

goods were new and shipped directly from the vendor to Fineman with prices reflecting that.

They weren't; they were used.

80.    Pursuant to the Agreement, the cost of the goods classified as "Additional

Inventory" or "C" inventory was credited to PFP upon its sale. (Ex. 4, ¶4.4(b)).

81.    Frequently, PFP wrongly marked items as Additional PFP Inventory when, in

fact, it was Fineman Furniture "A" inventory. Thus, PFP paid itself erroneously for the cost of

goods that were actually existing Fineman Furniture inventory.

82.    For a significant portion of sales of Additional Inventory, PFP credited itself a

cost significantly higher than PFP's actual cost of these goods in violation of the Agreement.

(Ex. 4, ¶4.4(b)).

83.    PFP misrepresented to Fineman Furniture the origin, condition, cost and second-

hand status of Additional Inventory purchased by PFP for the Sale, and provided fraudulent

invoices concerning these goods. For example, PFP ordered furniture from Sandberg Furniture

on March 10, 2006 *to be shipped to Fineman Furniture on March 13, 2006.* However, PFP and

Fineman Furniture did not have an Agreement until March 27, 2006, *17 days later.* Moreover,

the goods listed on Sandberg's fabricated March 10, 2006 Invoice were in fact shipped to

Fineman Furniture from Best Buy in Pompano Beach, FL on April 13, 2006. Upon information

and belief, PFP originally ordered these goods from Sandberg on January 30, 2006 for shipment

to Best Buy. PFP paid less for them originally when shipped from Sandberg to Best Buy than

when these used Best Buy leftovers, with missing drawers as noted on PFP's documents, were re-shipped from Best Buy to Fineman. PFP paid for the Sandberg used goods with Sale Account check # 1046 for $37,308.60 payable to itself, PFP as Consultant for Best Buy as part of a Best Buy truck purchase on May 1, 2006. After the Sale ended, on August 17, 2006, PFP paid Sandberg a second time for these goods.

84. Furthermore, during the Sale and specifically for example on May 12, 2006, twenty-six display rooms were "nailed to the floor" in retail vernacular, meaning they were floor models and not sold. PFP took orders for wall units, bedrooms, living rooms and dining rooms on display, but these floor models never left the floor and no inventory was needed. Ordered merchandise was shipped directly from factory to customer in violation of New York State and New York City laws.

85. PFP displayed pre-owned furniture for sale as new furniture. By way of example, Cappetta displayed his personal, used sofa on the showroom during the Sale and sold it as "new." Used furnishings from several PFP workers' apartments including bedding, living and dining rooms, bedrooms, electronics and air conditioners were brought into the store and offered for sale as new throughout the Sale and Auction. At the Auction after the GOB sale, PFP auctioned as new a loveseat that had been used in a PFP employee's apartment.

86. Selling "used" furniture contravenes representations made on PFP's website www.pfpromotions.com/resources.aspx and in its marketing book, which states "We sell only brand new, first quality merchandise in your store ...." The sale of used furniture without disclosing that the furniture is used is a violation of Section 5-36 of the Rules of the City of New York, Title 6, Chapter 5.

87.     PFP's violations of the going-out-of business laws of New York State and New York City exposed Plaintiffs to potential civil and criminal liability.

## THE SALE ACCOUNT

88.     PFP established and solely controlled a bank account into which all Sale proceeds were to be deposited (the "Sale Account").  Paragraph 4.3 of the Agreement governs what payments may be made from the Sale Account and the priority of payments.  (Ex. 4, ¶4.3).

89.     PFP made numerous payments from the Sale Account that were not legitimate Sale Expenses.

90.     By way of example, PFP made unauthorized payments from the Sale Account to unknown individuals and entities without explanation, including but not limited to: a $206 check for an unidentified "Rick", a $1000 check to Fred Mac as per Roy, a $1000 check to Katz, an $800 check to Alric Johnson, a $2767 check to Ettano Autobus, and a $2711.80 check to Jeff Kaplan.

91.     PFP management also wrote Sale Account checks for $8,000 for extra warehouse space to store PFP and Additional Inventory in violation of Paragraph 4.4(b) of the Agreement, which puts a cap on total rent and warehouse costs. (Ex. 4, ¶4.4(b)).

92.     In addition, PFP made unauthorized payments totaling over $282,943 from the Sale Account directly to PFP Chief Executive Officer Eugene Rosenberg, PFP Chief Financial Officer Paul Cohen, PFP Vice President of Sales Lester "Roy" Hester, and other entities which are, upon information and belief, related to PFP:  "ERTPC", "ER+PC",  "GRA", "*GRA Legal Fund*" and "BH Associates". "GRA" is believed to be Gene Rosenberg Associates, the parent company of PFP; "ER" is believed to be PFP's CEO Eugene Rosenberg; and "PC" is believed to be PFP's CFO Paul Cohen.

93.     From the Sale Account, PFP paid for personal items and employee expenses that were not legitimate Sale Expenses pursuant to Paragraph 4.4 of the Agreement.  For example, PFP wrote checks for an employee's new car tires, personal Con Edison bills, gas, tolls, railroad, taxi, personal FedEx, UPS, postage and travel expenses.  In addition, checks totaling $1,175.75 were issued for an unidentified Mark Wilson's travel and other bills.

94.     PFP wrote several Sale Account checks to CTSW, PFP's lawyers.  One check was payment for PFP's own legal fees for negotiating the Agreement with Fineman Furniture.  These negotiations took place prior to the Agreement and PFP's lawyers fees were plainly not a legitimate expense of the Sale.  PFP also paid CTSW from the Sale Account for an invoice with erroneous charges and excessive fees.  Additionally, PFP wrote another check from the Sale Account to CTSW for preparation of a form letter for PFP that was not necessarily attributable to work for the Fineman Furniture GOB sale.

95.     PFP paid unauthorized UPS bills from the Sale Account for overnight shipments. Additionally, the Fineman Furniture UPS and FedEx accounts were used fraudulently and without Fineman permission for unrelated PFP business during the Sale to stores including but not limited to:  Austin Home Furnishings, Rogers and Bob's Discount Furniture Store.  After Sale ended, PFP and Hester continued to use the Fineman Furniture UPS Account Number without authorization.

96.     Many other expenses paid by PFP from the Sale Account were for unexplained expenses, to unknown entities and/or not backed up by receipts, invoices or explanations.

97.     In addition, PFP neglected to pay valid Sale Expenses from the Sale Account as required by the Paragraph 4.3 of the Agreement.  (Ex. 4, ¶4.3).  For instance, PFP did not pay three months of ConEdison utility bills.  And, PFP requested an extension from Con Edison for

payment of the bills in direct violation of Paragraph 4.3 of the Agreement. In August 2006, Fineman Furniture received a Final Turnoff notice from Con Edison showing an outstanding balance of $19,693.21.

98.    In violation of Paragraph 4.4(b)(viii) of the Agreement, Sale Account check #1111 was issued to Cappetta for $5,196.80 for expenses for two Connecticut motel rooms dating prior to the Agreement's signing and prior to the Sale commencement. Additional lodging bills included post-Sale days. Payments included days for PFP workers and guests, violating PFP's official lodging agreement.

99.    PFP wrote Sale Account checks amounting to more than $750 for the delivery of furniture stolen from Fineman Furniture to PFP's workers' apartments.

100.    PFP carelessly overpaid vendors from the Sale Account for freight charges for Additional Inventory when delivery was free or lower than itemized on an invoice.

101.    PFP issued Sale Account checks to customers for damages done by independent contractors for which the Sale and Fineman Furniture had no liability.

102.    PFP accepted charge backs without merit from finance companies, credit cards and banks for delivered sales because of PFP's carelessness and negligence.

103.    Fineman Furniture and Mr. Fineman paid over $49,000 in other Sale Expenses that PFP should have paid from the Sale Account as "Sale Expenses," including but not limited to AT&T, Verizon, Amro, insurance companies, ConEd, Elevator Service, and Pitney Bowes.

104.    Sale Account checks made out to Fineman Furniture in excess of $ 3,200 for Seymour Fineman's contractual commissions were never endorsed by, signed by or given to Fineman Furniture or Seymour Fineman. These funds were never received by Fineman but checks were cashed by PFP without Fineman's endorsement.

- 22 -

105.    PFP wrote Sale Account Checks for over $35,000 in *post sale transport expenses.* PFP issued over $11,580 in Sale Account checks to Furniture Delivery companies such as ER Furniture Delivery for *post sale transport*, truckers' motels, fuel, detention charges, transport, administrative fees, labor packing and unloading the trucks.  The sale was over at this time. These were not legitimate expenses of the Sale and the charges were not for the benefit of Fineman Furniture.

106.    PFP also paid Sale Account checks to Today's Furniture, located in PFP offices, using PFP's telephone number and PFP employees but for Corp Service Corp (CSC) invoices for work done prior to the Agreement.

107.    Customers sometimes paid with cash at the Sale.  Many cash payments from the Sale were unaccounted for by PFP and were not deposited in the Sale Account.

108.    PFP falsely charged the Sale Account $1,429.98 for damages Cappetta, Kaplan and PFP personnel did to their New York rental apartments.

109.    Sales tax was deposited into the Sale Account controlled exclusively by PFP pursuant to the Agreement, paragraph 4.3. (Ex. 4, ¶4.3).  PFP failed to transfer the sales tax amount collected to Fineman Furniture in violation of the Paragraph 4.5 of the Agreement for the Sale's final month.  (Ex. 4, ¶4.5).  Hester informed Mr. Fineman the collected tax in PFP's possession would not be released to New York State until Mr. Fineman signed a PFP prepared general release of PFP.  Mr. Fineman refused to be coerced by PFP's extortion attempt.  PFP only relented when Mr. Fineman swore to contact the New York Attorney General if PFP did not pay the sales tax immediately.  Hester delivered a $46,660.64 sales tax check to Mr. Fineman who promptly delivered it to the State of New York.

## ADVERTISING

110.    Pursuant to Paragraph 4.9 of the Agreement, PFP and Fineman Furniture were to cooperate and consult on the advertising campaign for the Sale.  (Ex. 4, ¶4.9).

111.    PFP failed not only to cooperate with Fineman Furniture regarding the advertising campaign, but ignored all advertising recommendations made by Mr. Fineman.

112.    PFP advertised on Time Warner cable extensively at a cost of almost $50,000 despite Mr. Fineman's protests about the venue.

113.    According to Community Board 11 (East Harlem), the average income in East Harlem is $17,205.  49% of all residents receive Public Assistance and over 37% of occupied housing units are Public Housing.  Upon this information and belief, the East Harlem location of Fineman Furniture is *not an affluent, high income or high net-worth area*.  Upon information and belief, Fineman Furniture customers and the area's demographic population are generally not viewers of the PFP selected cable stations for Fineman ads, such as House and Garden Network, HGTV, which targets gardeners and house owners.  According to Time Warner Media Sales, the networks PFP chose primarily target and capture high income, affluent viewers with assets over $1 million.

114.    East Harlem's demographic according to the US Census Bureau is 52% Hispanic, with 27% of the population speaking only Spanish.  PFP placed a total of 2% of Fineman ads on Spanish language stations and these ads were in English, placed the last two weeks of July and benefited only the auction.

115.    PFP continuously ignored Mr. Fineman's appeal for local media advertising.  This advertising served Fineman Furniture clientele and was inexpensive and often free, such as Craig's List, El Diario, local Spanish newspapers and free area newspapers.

- 24 -

116.    Advertising expenses associated with postage for flyers, mailings and promotional letters were not added into Sale advertising expenses by PFP.  Fineman paid postage and Pitney Bowes with personal funds and company checks.  Mr. Fineman submitted bills, but  PFP never reimbursed Fineman for over $5,000 in postage.

117.    PFP issued Sale Account checks to Today's Furniture, believed to be an alter ego of PFP, for advertising services which PFP's percentage of the consulting fee was supposed to cover.

118.    PFP also issued Sale Account a check to Kaufman Advertising Agency for a Media Buy, but Kaufman Advertising was already paid 15% commission on the entire botched Time Warner purchase.

119.    The advertising chosen for East Harlem's Fineman Furniture was never discussed, previewed or even proofed by Mr. Fineman.  In June, PFP knew it was a failure and inappropriate for the area, but they continued with what was purchased and used at other locations, despite PFP's hype that advertising would be designed specifically for each sale's location.

120.    Under Paragraph 4.9 of the Agreement, the advertising budget for the Sale was not to exceed for each week 9% of the prior week's written business. (Ex. 4, ¶¶2.1(b), 4.9).

121.    PFP's disastrous advertising campaign significantly exceeded the agreed upon 9% budget.

## OTHER MISCONDUCT

122.    Under Paragraph 4.11 of the Agreement, all proceeds from the sale of Fineman Furniture's inventory of electronics and appliances were to be remitted immediately to Fineman Furniture and not be deposited in the Sale Account.  (Ex. 4, ¶4.11).

- 25 -

123.    PFP did not remit all proceeds from electronics and appliance sales to Fineman Furniture, but deposited some into the Sale Account.

124.    PFP workers caused damage to Fineman Furniture assets, including but not limited to damage to: inventory, office furnishings, lighting and business equipment, two freight elevators and the phone system. In addition, PFP destroyed walls, ceilings and partitions and cracked two large showroom windows.

125.    PFP did not repair any damages it caused to Fineman Furniture assets.

126.    When PFP left Fineman Furniture, PFP did not return any keys to the over $900 worth of new locks PFP installed at the store paid for by the Sale Account.

127.    Paragraph 6.1 of the Agreement governs payment of PFP's commission for conducting the Sale. (Ex. 4, ¶6.1).

128.    Paragraph 6.1 provides that if the average gross margin falls below the applicable gross margin requirement, PFP's commission will be based upon a lower adjusted weekly gross sales amount and not on gross sales. (Ex. 4, ¶6.1).

129.    When gross margins fell below the applicable gross margin requirement, PFP never adjusted its commission downward for those weeks as required by the Agreement. (Ex. 4, ¶6.1).

130.    Additionally, Cappetta sold inventory to employees and others at cost or below cost; PFP then paid itself a 9% commission on these sales; and PFP also permitted payment with credit cards bearing 2%-3.5% fees. This imprudent pattern resulted in even greater losses for Fineman. On employee sales, the amount PFP credited to PFP for Additional Inventory "C" items was consistently greater than the items' true costs and in contrast, the amount PFP credited to Fineman for "A" and "B" inventory sales was consistently less than actual cost.

131.    Under Paragraph 6.2 of the Agreement, "In consideration of the devotion of his entire working time and energy to the performance of service on behalf of the Sale as may be reasonably requested by Consultant, Seymour Fineman will be paid out of the Sale proceeds on a weekly basis a commission equal to one (1%) percent of the delivered gross sales amount (excluding sales tax) of all merchandise sold at the Sale (the Owner's Commission), separately from the Consultant Fee but otherwise on the same terms and conditions as the Consultant Fee." (Ex. 4, ¶6.2).

132.    PFP never paid Seymour Fineman his weekly commissions.  (Ex. 4, ¶6.2).  PFP did pay Fineman Furniture some of the weekly commissions due Seymour Fineman but not all. It resulted in additional accounting expenses for Fineman Furniture and Mr. Fineman.

133.    Fineman Furniture was underpaid by PFP for inventory sold during the Sale.

134.    PFP underreported monies owed to Fineman Furniture for sale of Fineman Furniture inventory.

135.    PFP did not make records from the Sale available during the Sale to Fineman Furniture for sufficient periods of time to allow Fineman to adequately inspect the records in violation of Paragraph 4.3 of the Agreement.  (Ex. 4).  During and after the Sale, PFP removed records from the premises, provided only partial copies to Fineman and never provided a complete accounting of the Sale and the Auction despite numerous requests.  This resulted in significant costs and accounting difficulties to Seymour Fineman and Fineman Furniture.

136.    Cappetta took for himself and also cavalierly gave away Fineman Furniture inventory, appliances, electronics, store fixtures, displays, supplies, equipment and other items "free of charge" without authorization.  Fineman Furniture did not receive credit for these items.

137.    Once the Sale concluded, PFP removed from the premises Fineman Furniture's proprietary customer lists and mailing lists, without Fineman Furniture's authorization.

138.    After the Sale concluded, in accordance with Paragraph 7 of the Agreement, PFP conducted an auction of the remaining inventory.  Proceeds were to be deposited in the Sale Account.  (Ex. 4).

139.    PFP conducted a three day auction but had misrepresented how the auction would take place to Fineman Furniture. Mr. Fineman was told the auction would "get rid of" almost all remaining inventory and the balance would be sold-off and removed.  This was not so.  PFP left the Fineman building a total mess, costing Mr. Fineman over $20,000 to remove debris and clean up.  There was over $125,000 worth of boxed inventory scattered throughout the four floors of the building, which PFP had never opened or put up for sale.  Mr. Fineman donated the inventory to a recognized 501(c)(3) charity.

140.    There was no written agreement for the auction.  Paragraph 7 of the Agreement reduced the commission payable to PFP to 3% for any auction PFP arranged.  (Ex. 4).  However, PFP took two commissions for auction sales:  the 3% PFP commission plus an additional 12% paid to defendant Kurt Earlywine from Furniture Auction of America, the auctioneer at the Auction and PFP's Auction manager.  Upon information and belief, Furniture Auction of America is an alter ego of PFP.  Neither the 12% paid to Earlywine nor the additional Sale Account checks written to Furniture Auction of America were ever discussed with or agreed to by Fineman Furniture.

141.    Over $49,873 in auction costs were paid out of the Sale Account for: signs, contracted day workers, printing, supplies,  preparation, advertising, cleanup, setup, packaging, manual laborers for loading and unloading, trucking, tags, receipts, chairs, stage, equipment

rental, security, utilities, building expenses and staff. In addition, Mr. Fineman gave PFP over $1,600 for unreimbursed petty cash expenditures during auction preparations.

142.    Fineman Furniture inventory was barely given the opportunity to sell during the three auction days. PFP selected each item auctioned and exclusively controlled the items put up for bidding. Fineman Furniture's higher priced items were never even brought to the floor, but were instead kept in cartons in the warehouse to await PFP's 18 wheeler trucks taking it away after the auction for PFP's purposes.

143.    Almost every Fineman Furniture item sold at the auction was sold at a loss with no reserve. The auctioneer, PFP's Earlywine, reduced the starting bids until someone bid on an item, even if offered as low as three for $1.

144.    Approximately 25% of all items auctioned were not listed on auction paperwork given to Fineman.

145.    A number of items credited to PFP were in actually Fineman Furniture Inventory which PFP auctioned off and claimed as PFP inventory. PFP profited by this.

146.    PFP also ordered Additional Inventory from Rex Bedding for the Auction. PFP credited these bedding sales at the Auction to itself , plus took 3% commission plus 12% commission on top of the credit.

147.    After the auction, Fineman Furniture inventory, in new and boxed condition, was loaded into three tractor trailers by labor PFP paid with Sale Account checks. PFP shipped these trucks to undisclosed locations. Those goods, valued in excess of $360,000, were wrongfully removed from Fineman Furniture and Plaintiffs never received payment or an accounting for this inventory.

148.    At the end of the Sale, PFP removed two large tractor trailers and several smaller trucks with at least $185,000 of Additional Inventory paid for by Sale Account Funds and commingled Fineman Furniture inventory.  As per Paragraph 8 of the Agreement, the value of the Additional Inventory was to be included in the profits from the Sale for distribution. (Ex. 4). Fineman Furniture has not received an accounting of the Additional Inventory removed to date. However, there are obvious discrepancies in the paperwork for these transfers.  For example, the list of goods loaded on the truck at Fineman Furniture is different than the list made when that same sealed truck was unloaded by Hester at his Florida location, according to documents from PFP.

149.    PFP charged the Sale for damage to inventory after it was removed from Fineman Furniture.

150.    PFP cavalierly gave itself unauthorized discounts on purchases of Fineman Furniture Inventory and Additional Inventory sold to itself after the Sale ended.  The value of Additional Inventory was to be added to the profits of the Sale as per the Agreement at the end of the Sale and then distributed. This never happened.

151.    After the auction, PFP refused to pay six Fineman Furniture employees for work done in July and August.  However, PFP wrote Sale Account checks totaling over $53,700 for post Sale expenses, including payroll for PFP employees after they no longer worked for the Sale.

152.    After the Sale and auction, PFP was required to calculate and distribute the profits of the Sale, pursuant to the Paragraph 8 of the Agreement.  (Ex. 4, ¶8).

153.    Fineman Furniture has not received any profit distribution to date.

154. Fineman Furniture requested a full accounting of the Sale and Auction numerous times. PFP never provided a final detailed accounting of assets and liabilities of the Sale and auction, but rather provided a confusing estimated accounting without any details.

## CAUSES OF ACTION

### AS AND FOR PLAINTIFF FINEMAN FURNITURE'S
### FIRST CAUSE OF ACTION AGAINST PFP
### BREACH OF CONTRACT

155. Paragraphs 1 through 154 of this Amended Complaint are repeated and re-alleged as if fully set forth herein.

156. Fineman Furniture entered into an Agreement with PFP on March 27, 2006.

157. PFP has, in multiple respects set forth hereinabove, breached the contract.

158. Fineman Furniture performed its obligations under the contract.

159. Fineman Furniture has been damaged by this breach of contract.

160. As a result of PFP's breach, Fineman Furniture has suffered damages in an amount to be determined at trial, but believed to exceed $1,350,000.

### AS AND FOR PLAINTIFF FINEMAN FURNITURE'S
### SECOND CAUSE OF ACTION AGAINST PFP
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

161. Paragraphs 1 through 160 of this Amended Complaint are repeated and realleged as if fully set forth herein.

162. Fineman Furniture and PFP entered into the Agreement wherein PFP was to act as Fineman Furniture's exclusive consultant to assist Fineman Furniture with liquidating inventory and with conducting a promotional sale and a Going Out of Business sale.

163.    The Agreement was subject to the implied covenants that PFP would conduct its business with Fineman Furniture in good faith and would deal fairly with Fineman Furniture.

164.    The duty of good faith and fair dealing required, *inter alia*, that PFP act in good faith to effectuate the purposes of the Sale and to refrain from taking any action that would frustrate the purposes of the Sale.

165.    PFP breached its duty of good faith and fair dealing owed to Fineman Furniture by, among other things, (a) violating its legal duty to uphold the going-out-of-business laws of New York State and New York City; (b) manipulating the Sale to deprive Fineman Furniture of the benefits of the contract and to keep profits of the Sale for itself; (c) selling its own merchandise at the GOB Sale; and (d) unfairly engaging in a competitive business during the Sale.

166.    PFP's failure to conduct the Sale in good faith ensured that the purpose of the Sale for Fineman Furniture would be frustrated.

167.    As a direct and proximate result of PFP's breach of those implied covenants to Fineman Furniture, Fineman Furniture has been damaged in an amount to be determined at trial, but believed to exceed $1,350,000.

## AS AND FOR PLAINTIFF FINEMAN FURNITURE'S THIRD CAUSE OF ACTION AGAINST PFP BREACH OF FIDUCIARY DUTY

168.    Paragraphs 1 through 167 of this Amended Complaint are repeated and realleged as if fully set forth herein.

169.    As exclusive agent of Fineman Furniture, the parties enjoyed a relationship of trust and confidence.  PFP, as agent, was bound to exercise the utmost good faith and undivided loyalty toward Fineman Furniture throughout the relationship.

- 32 -

170.    In addition, by virtue of the parties' special relationship, PFP owed a fiduciary duty to Fineman Furniture.  Fineman Furniture relied on the superior knowledge of PFP in conducting the Fineman Furniture GOB Sale.  Fineman Furniture placed so much trust in confidence in the relationship with PFP, that it agreed to relinquish its control over the Sale to PFP such that PFP would have the right to make all final decisions regarding the operation of the GOB Sale and auction.

171.    PFP owed a fiduciary duty to Fineman Furniture, including acting in good faith and in the best interests of Fineman Furniture and not profiting at Fineman Furniture's expense or placing its private interests (including the interests of its affiliated businesses, its parent company Gene Rosenberg Associates, PFP principles, PFP Officers and PFP executives) in conflict with Fineman Furniture's interests.

172.    During the period from in or about April 2006 through in or about December 2006, PFP repeatedly breached its fiduciary duties to Fineman Furniture, including but not limited to the incidents set forth above.

173.    By reason of the foregoing, Fineman Furniture has been damaged in an amount to be determined at trial, but believed to exceed $1,350,000.

### AS AND FOR PLAINTIFF FINEMAN FURNITURE'S FOURTH CAUSE OF ACTION AGAINST PFP COMMON LAW FRAUD

174.    Paragraphs 1 through 173 of this Amended Complaint are repeated and realleged as if fully set forth herein.

175.    Unbeknownst to Fineman Furniture, PFP never intended to perform under the Agreement, but rather had a preconceived scheme, one it had implemented repeatedly in the past,

- 33 -

to loot the assets of Fineman Furniture and to use the GOB Sale to sell its own merchandise and unfairly compete with Fineman Furniture.

176.    In furtherance of its master scheme, PFP made false representations to Fineman Furniture which were collateral to the Agreement to induce Fineman Furniture to enter into the Agreement, including:  (a) promising that in conducting the GOB Sale, it would comply with the going out of business laws of New York State and New York City (PFP had a legal duty separate from its duty to perform under the Agreement to abide by those laws in conducting the GOB Sale); (b) promising to maintain Fineman Furniture's reputation and goodwill; (c) promising to purchase additional inventory for the theme sale that was appropriate for Fineman Furniture customers and that such additional inventory would not occupy so much space as to prevent the sale of existing Fineman Furniture inventory; and (d) promising to conduct the Sale in a professional manner.

177.    Moreover, prior to the signing of the Agreement and throughout the course of the parties' relationship, PFP intentionally concealed and omitted to disclose that: (a) it planned to use and, in fact, did use the Fineman Furniture GOB Sale to offload its own merchandise on Fineman Furniture customers, as it had done in the past at other liquidation sales; (b) it planned to and, in fact, did unfairly compete against Fineman Furniture during the GOB Sale, as it had done in the past at other liquidation sales; (c) that it planned to and, in fact, did manipulate the GOB Sale for its own benefit and to the detriment of Fineman Furniture, as it had done in the past at other liquidation sales; and (d) that it planned to and, in fact, did violate the New York City and New York State GOB laws.

178.    By its actions, alleged herein, PFP violated various provisions of the going out of business laws of New York State and New York City, thereby breaching its legal duty to comply

with the laws and regulations of New York. PFP's illegal actions also exposed Plaintiffs to potential civil and criminal liability and damaged the public.

179.    PFP's aforementioned representations were intentionally false at the time they were made.

180.    Fineman Furniture relied on PFP's representations which induced Fineman Furniture to enter into the Agreement.

181.    PFP also had a duty to disclose the material facts it intentionally concealed from Fineman Furniture -- that (a) it planned to use and, in fact, did use the Fineman Furniture GOB Sale to offload its own merchandise on Fineman Furniture customers, as it had done in the past at other liquidation sales; (b) it planned to and, in fact, did unfairly compete against Fineman Furniture during the GOB Sale, as it had done in the past at other liquidation sales; (c) that it planned to and, in fact, did manipulate the GOB Sale for its own benefit and to the detriment of Fineman Furniture, as it had done in the past at other liquidation sales; and (d) that it planned to and, in fact, did violate the New York City and New York State GOB laws -- by virtue of its fiduciary and/or confidential relationship with Fineman Furniture and the fact that, as an expert in liquidation sales, it had superior knowledge that was not readily available to Fineman Furniture.

182.    Fineman Furniture was unaware that the aforementioned material facts were being withheld from it.

183.    PFP knew that Fineman Furniture was unaware of these material facts and that Fineman Furniture entered into the Agreement and continued the relationship under the mistaken belief that PFP was a reputable furniture liquidator that would act to the benefit of Fineman Furniture during the Sale.

184.    Fineman Furniture reasonably and justifiably relied on PFP's representations and omissions. Had Fineman Furniture been aware of these material facts, which PFP concealed, it would not have entered into the Agreement and continued the relationship.

185.    As a direct and proximate result of the acts and omissions of PFP, Fineman Furniture has suffered damages in an amount to be determined at trial, but believed to exceed $1,350,000.

186.    In addition, Fineman Furniture has suffered special damages, in an amount to be determined at trial, for the loss it suffered as a result of PFP's fraud, including (a) sales lost as a result of PFP's sale of its own goods during the GOB Sale; (b) losses from the damage to its reputation and goodwill; (c) losses resulting from PFP's taking of Fineman Furniture inventory for itself and its employees; (d) losses resulting from PFP giving away Fineman Furniture inventory for free or at greatly reduced prices; (e) losses for damage caused to Fineman Furniture buildings by PFP; (f) and for exposing Fineman Furniture to possible civil and criminal liability.

187.    Fineman Furniture is also entitled to recover an award of punitive damages, as a result of PFP's gross, wanton and willful conduct.

## AS AND FOR PLAINTIFF FINEMAN FURNITURE'S
## FIFTH CAUSE OF ACTION AGAINST PFP
## NEW YORK UNFAIR COMPETITION

188.    Paragraphs 1 through 187 of this Amended Complaint are repeated and realleged as if fully set forth herein.

189.    By virtue of its relationship with Fineman Furniture, PFP had a duty not to unfairly compete with Fineman Furniture.

190.    As alleged hereinabove, PFP unfairly engaged in a competitive business during the Sale and deprived Fineman Furniture of business opportunities during the Sale.

191.    As alleged hereinabove, PFP unfairly engaged in a competitive business during the Auction and deprived Fineman Furniture of business opportunities during the Auction.

192.    PFP is liable to Fineman Furniture for unfair competition under New York Law for engaging in a competitive business during the Sale and during the Auction.

193.    The acts of PFP constituting unfair competition have caused damage to Fineman Furniture in an amount to be determined at trial, but believed to exceed $1,350,000.

### AS AND FOR PLAINTIFF FINEMAN FURNITURE'S SIXTH CAUSE OF ACTION AGAINST PFP CONVERSION

194.    Paragraphs 1 through 193 of this Amended Complaint are repeated and realleged as if fully set forth herein.

195.    Fineman Furniture is the owner of Fineman Furniture inventory, Other Inventory, electronics and appliances, its warehouse equipment, its business equipment and its proprietary customer lists and mailing lists ("Fineman Furniture Assets").

196.    Without Fineman Furniture's knowledge and consent, PFP exercised unlawful dominion and control over Fineman Furniture Assets when it (i) took proprietary customer lists and mailing lists after the Sale; (ii) when it wrongfully removed truckloads of Fineman Furniture inventory, Other Inventory, and other goods from the Fineman warehouse after the Sale and Auction; (iii) when it wrongfully gave away Fineman Furniture Company Inventory, Other Inventory, business and warehouse equipment, electronics and appliances "free of charge" to third parties; (iv) when it wrongfully gave away Additional Inventory "free of charge" to third parties when Fineman Furniture was charged by PFP for and Fineman Furniture paid for the Additional Inventory; (v) when it took furniture from Fineman Furniture to furnish apartments of PFP personnel without payment to Fineman.

197.   PFP has converted Fineman Furniture Assets for its own use and benefit or for the use and benefit of another.

198.   The foregoing unlawful acts by PFP interfered with and were and are in defiance of Fineman Furniture's superior possessory rights with respect to its Fineman Furniture Assets.

199.   As a direct and foreseeable result of the foregoing acts of conversion and as a proximate result thereof, Fineman Furniture has been injured and suffered damages in an amount to be determined at trial, but in all events not less than $600,000.

200.   PFP's conduct was gross, willful and wanton and in conscious disregard of Fineman Furniture's rights.  Fineman Furniture is therefore entitled to recover an award of punitive damages.

### AS AND FOR PLAINTIFF FINEMAN FURNITURE'S SEVENTH CAUSE OF ACTION AGAINST PFP ACCOUNTING

201.   Paragraphs 1 through 200 of this Amended Complaint are repeated and realleged as if fully set forth herein.

202.   Due to the special relationship between the parties and the fiduciary duty owed by PFP to Fineman Furniture, Fineman Furniture is entitled to a full and complete accounting of all transactions, costs, expenditures and collections involved in the matters contemplated by the Agreement.

203.   Fineman Furniture has made demands for an accounting which have been completely ignored by PFP and such information is necessary to review and understand the transactions between the parties.  PFP has ignored Fineman Furniture's demands for a full and complete accounting.

## AS AND FOR PLAINTIFF FINEMAN FURNITURE'S
## EIGHTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
## <u>UNJUST ENRICHMENT</u>

204.    Paragraphs 1 through 203 of this Amended Complaint are repeated and realleged as if fully set forth herein.

205.    For the reasons alleged herein, Defendants are liable to Plaintiff Fineman Furniture for unjust enrichment under New York law.

206.    As alleged herein, the acts of Defendants have caused Plaintiff Fineman Furniture damage and have unjustly enriched Defendants at Fineman Furniture's expense.

207.    By reason of the foregoing, Plaintiff Fineman Furniture has been damaged in an amount not yet fully ascertained but believed to exceed $1,000,000.

## AS AND FOR PLAINTIFF FINEMAN FURNITURE'S
## NINTH CAUSE OF ACTION AGAINST ALL DEFENDANTS (EXCEPT PFP)
## <u>CONSPIRACY TO DEFRAUD</u>

208.    Paragraphs 1 through 207 of this Amended Complaint are repeated and realleged as if fully set forth herein.

209.    Upon information and belief, Defendants were aware of PFP's fraudulent scheme from the outset.

210.    As alleged herein, Defendants consciously schemed and conspired with each other to defraud and injure Plaintiffs.

211.    Each of the Defendants reaped a financial benefit by conspiring with each other in the wrongful conduct and breaches of the contractual duties alleged in this Complaint.

212.    Each of the Defendants specifically reaped a financial benefit, to the detriment of Plaintiffs, by accepting payments from the Fineman Furniture Sale Account to which they were

not entitled and with the knowledge that the payments were being made as part of the scheme to defraud Plaintiffs.

213.    As a result of the acts of Defendants, Plaintiff Fineman Furniture has been damaged in an amount to be determined at trial.

214.    Accordingly, Defendants are jointly and severally liable for the fraudulent and tortious conduct and breaches of contractual duties alleged in this Complaint.

215.    By reason of the foregoing, Plaintiff Fineman Furniture has been damaged in an amount to be determined at trial.

## AS AND FOR PLAINTIFF FINEMAN FURNITURE'S TENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS (EXCEPT PFP) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

216.    Paragraphs 1 through 215 of this Amended Complaint are repeated and realleged as if fully set forth herein.

217.    As alleged herein, PFP breached the fiduciary obligations it owed to Plaintiff Fineman Furniture.

218.    Defendants knowingly induced and participated in PFP's breach of its fiduciary obligations to Plaintiff Fineman Furniture by participating in the scheme to defraud Plaintiff, as alleged herein.

219.    Defendants' conduct consisted of gross, wanton and willful fraud and involved a high degree of moral culpability.

220.    By reason of the foregoing, Plaintiff Fineman Furniture has been damaged in an amount to be determined at trial.

- 40 -

### AS AND FOR PLAINTIFF SEYMOUR FINEMAN'S
### ELEVENTH CAUSE OF ACTION AGAINST PFP
### BREACH OF CONTRACT

221.    Paragraphs 1 through 220 of this Amended Complaint are repeated and realleged as if fully set forth herein.

222.    Plaintiff Seymour Fineman is a third party beneficiary of the Agreement between Fineman Furniture and PFP dated on or about March 27, 2006.

223.    PFP has breached Paragraph 6.2 of the Agreement by failing to pay Seymour Fineman his weekly commission.  (Ex. 4, ¶ 6.2).

224.    Seymour Fineman has performed his obligations under the contract.

225.    Seymour Fineman has been damaged by this breach of contract.

226.    As a result of PFP's breach, Seymour Fineman has suffered damages in an amount to be determined at trial.


WHEREFORE, Plaintiffs Fineman Furniture and Seymour Fineman respectfully ask that this Court grant the following relief:

A.    Compensatory damages in an amount to be proved at trial but believed to be in excess of $1,350,000, plus interest;

B.    Monetary damages for the fair market value of the converted Fineman Furniture assets in an amount to be proved at trial, but believed to be in excess of $600,000, plus interest;

C.    An accounting of PFP's expenses, expenditures, profits and earnings.

D.    Special damages, apart from and in addition to those damages arising from the breach of contract;

E.    Punitive damages;

- 41 -

F.    An award to Fineman Furniture and Seymour Fineman of their costs, disbursements, accountants' fees and attorneys' fees as provided by law;

G.    Such other and further just relief, including without limitation an award of attorney's fees and all other legal expenses incurred by Plaintiffs in connection with this matter.

**PLAINTIFFS DEMAND A TRIAL BY JURY.**

Dated: New York, New York
          November 20, 2007

                                        KIRKPATRICK & LOCKHART PRESTON
                                        GATES ELLIS LLP

                                        By: _____
                                             Douglas F. Broder (DB 8406)
                                             Catherine R. Keenan (CK 5925)
                                             599 Lexington Avenue
                                             New York, New York 10022
                                             Telephone:  (212) 536-4808
                                             Facsimile: (212) 536-3901

                                        Attorneys for Plaintiffs Fineman Furniture Co. Inc.
                                        and Seymour Fineman