state with particularity who made the alleged defamatory statements or when or where such statements were published.

In order to state a claim of slander in federal court, a "plaintiff must allege facts that provide an adequate identification [*37] of the allegedly slanderous statements, the maker of the purported statements, when they were made, and to whom they were communicated." *Clark Consulting, Inc. v. Fin. Solutions Partners, LLC, 2005 U.S. Dist. LEXIS 28642, 05 Civ. 6296 (SAS), 2005 WL 3097892, *4 (S.D.N.Y. Nov. 17, 2005)* (explaining that in federal court, as compared to New York State court, "the Complaint need not contain the exact words that constitute slander. Rather, the liberal pleading standard is 'satisfied by an adequate identification of the purported [slanderous] communication'"); *Ives v. Guilford Mills, Inc., 3 F. Supp.2d 191, 199 (N.D.N.Y. 1998)* (same); *see also Tasso v. Platinum Guild Int'l, 1997 U.S. Dist. LEXIS 252, 94 Civ. 8288 (LAP), 1997 WL 16066 at *2 (S.D.N.Y. Jan. 16, 1997)* ("It is well-settled that a plaintiff pleading a defamation claim in a diversity case in federal court need only meet the more liberal standard of *Fed.R.Civ.P. 8(a).*"), *citing Kelly v. Schmidberger, 806 F.2d 44, 46 (2d Cir. 1986)*. Here, plaintiff has provided an adequate identification of the purported slanderous statement by alleging that these defendants stated "specifically [*38] that plaintiff could not complete The Wrong Coast in a timely fashion" (Compl. P154). In addition, plaintiff has alleged that the statement was communicated to "Mark Hamill and to others in the film and television industry" (Compl. P155). However, plaintiff has not fully complied with the pleading requirements for slander in that the complaint fails to allege who made these statements on behalf of defendant and when the statements were made.

Accordingly, plaintiff's motion is denied with respect to plaintiff's slander claim.

### III. *Conclusion*

Accordingly, plaintiff's motion to file an amended complaint is granted only with respect to plaintiff's claims for breach of contract, promissory estoppel, quantum meruit and quasi-contract (collectively, Count Two).

With respect to plaintiff's claims for common law fraud (Count Four), intentional interference with business relations or contract (Count Six) and slander (Count Seven), plaintiff's motion is denied. Since plaintiff may be able to remedy the defects in these claims, the motion is denied with respect to these claims without prejudice.

Finally, plaintiff's motion is denied with respect to its claims for copyright infringement [*39] (Count One), violation of the Lanham Act (Count Three) and for unfair business practices pursuant to the *California Business and Professions Code §§ 17200 et seq.* (Count Five). Since the defects in these claims cannot be remedied, the motion is denied with prejudice with respect to these claims.

Dated: New York, New York

March 31, 2006

SO ORDERED

HENRY PITMAN

United States Magistrate Judge

LEXSEE 2007 U.S. DIST. LEXIS 11346

**ECHOSTAR DBS CORPORATION, ECHOSTAR ACQUISITION L.L.C., and ECHOSTAR SATELLITE L.L.C., Plaintiffs, - against - GEMSTAR-TV GUIDE INTERNATIONAL, INC., and SUPERSTAR/NETLINK GROUP L.L.C., Defendants.**

**05 Civ. 8510 (DAB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 11346*

**February 8, 2007, Decided**
**February 8, 2007, Filed**

**COUNSEL:** [*1] For Echostar DBS Corporation, Echostar Acquisition L.L.C., Echostar Satellite L.L.C., Plaintiffs: Chad M. Hagen, David M. Noll, Ross W. Wooten, LEAD ATTORNEYS, T. Wade Welch & Associates, Houston, TX; Mary Elizabeth Brady Marzolla, LEAD ATTORNEY, MacCartney, Maccartney, Kerrigan & Maccartney, Nyack, NY.

For Gemstar-TV Guide International, Inc., Superstar/Netlink Group L.L.C., Defendants: Paul D. Sarkozi, LEAD ATTORNEY, Ana Maria Cristina Perez-Labiosa, Hogan & Hartson L.L.P., New York, NY.

**JUDGES:** Deborah A. Batts, United States District Judge.

**OPINION BY:** Deborah A. Batts

**OPINION**

*MEMORANDUM & ORDER*

DEBORAH A. BATTS, United States District Judge.

The Defendants in this action - Gemstar-TV Guide International, Inc. ("Gemstar") and Superstar/Netlink Group L.L.C. ("SNG") - have moved this Court pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* to dismiss Plaintiffs' Complaint. The Plaintiffs - Echostar DBS Corporation ("DBS"), Echostar Acquisition L.L.C. ("Acquisition"), and Echostar Satellite L.L.C. ("Satellite") - oppose Defendants' Motion. For the reasons contained herein, Defendants' Motion is GRANTED.

*I. BACKGROUND*

The [*2] following facts, which are alleged in the Complaint, are assumed to be true for purposes of this Motion.

Plaintiffs allege that Defendants breached warranties, representations, and covenants either contained in, or implied by, the parties' Asset Purchase Agreement ("APA"). (Compl. P 1.) All three Plaintiffs - DBS, Acquisition, and Satellite - are Colorado limited liability companies with their principal places of business at the same address in Englewood, Colorado. (Compl. PP 10-12.) Defendant Gemstar is a Delaware corporation with its principal place of business in California. (Compl. P 13.) Defendant SNG is a Delaware corporation with its principal place of business in Oklahoma. (Compl. P 14.) Gemstar was at all times relevant the majority shareholder of SNG, holding approximately 80% of SNG's stock. (Compl. P 22.) Gemstar later purchased the outstanding minority interest of SNG, making SNG Gemstar's wholly owned subsidiary. (Compl. P 23.)

Plaintiffs use high-powered satellites to broadcast television program packages to viewers who have purchased the requisite equipment. (Compl. P 19.) Defendant Gemstar develops, licenses, markets and distributes products and services that facilitate [*3] a television viewer's ability to canvass television stations, among other things. (Compl. P 21.) Defendant SNG markets and authorizes access to entertainment programming for C-Band home satellite dish owners.

On November 2, 1999, Satellite and SNG entered into a C-Band Conversion Agreement ("C-Band Agreement"). (Compl. P 24.) Under that agreement, SNG was appointed "as a non-exclusive authorized representative to promote and solicit orders for EchoStar programming

from individuals who were existing C-Band subscribers". (Compl. P 25.) Satellite paid $ 250 to SNG for each order that resulted in the activation of a Converted Subscriber [1], and $ 100 for each order from an Eligible C-Band Subscriber [2] that was submitted by a third party rather than by SNG. (Compl. P 27.) The C-Band Agreement required SNG to furnish Satellite with a Subscriber List of all Eligible C-Band Subscribers. (Compl. P 57.) SNG agreed either to update this list on a monthly basis, or to use "any other method pursuant to which SNG [could] reasonably demonstrate that a subscriber placing an Order is an Eligible C-Band Subscriber". (Compl. P 57; Pls.' Mem. in Opp. at 16.) According to Plaintiffs, SNG furnished [*4] Satellite with a subscriber list at the end of 1999, but did not fulfill its obligation to furnish Satellite with monthly updates. As a result, Satellite paid SNG commissions for people who were not properly qualified as Eligible C-Band Subscribers ("overpayment"). (Compl. P 57.)

> 1 See P 3.2 of the C-Band Agreement, which has been attached to the Declaration of Paul D. Sarkozi as Exhibit B, for an explanation of the term "Converted Subscriber". At the Court's permission, Defendants filed Exhibit B under seal.

> 2 See P 2.1 of the C-Band Agreement at Sarkozi Dec., Ex. B, for an explanation of the term "Eligible C-Band Subscriber".

These alleged overpayments amount to $ 5-6 million. Plaintiffs assert that Satellite neither knew, nor had reason to know, that a substantial amount of the commission paid to Defendants was never due and owing to SNG. (Compl. P 28.) SNG allegedly controlled the records used to determine who was an active C-Band subscriber. (Pls.' Mem. in Opp. at 16 n. 11.) Plaintiff [*5] paid the $ 5-6 million because, under the C-Band Agreement, Satellite promised that it would "not unreasonably and intentionally reject an Order for the purpose of avoiding payment of Commissions . . . ." (Pls. Mem. in Opp. at 16, n.11.)

On March 1, 2004, Plaintiffs DBS and Acquisition entered into an Asset Purchase Agreement ("APA") with Gemstar and SNG. (Compl. P 32.) Under the terms of that Agreement, the C-Band Agreement was terminated. (Compl. P 32.) The APA further provided for the sale of certain assets by Defendants to Acquisition and DBS. (Compl. P 34.) Among the assets acquired by Plaintiffs were assets of SNG. (Compl. P 4.)

Plaintiffs allege that Defendants buried the $ 5-6 million overpayment within their financial records so as to render it impossible for Plaintiffs to learn about it. (Compl. PP 36-41.) To this end, Defendants allegedly created different financial statements than those generated in the normal course of business. (Compl. P 39.) The Balance Sheet supplied to Plaintiffs during the APA negotiations listed the accounts payable and "accrued liabilities" as a single line item in the amount of $ 19,481,759. According to Plaintiffs, Gemstar and SNG intentionally [*6] failed to itemize this amount because they wanted to cover up the $ 5-6 million overpayment. (Compl. P 41.) Plaintiffs further allege that Defendants knew that DBS and Acquisition were not aware of the overpayment. (Compl. P 37.)

According to the Complaint, Defendants did not permit DBS and Acquisition to inquire into or examine SNG's accounts payable and accrued liabilities because those liabilities were not being purchased. (Compl. P 42.) Plaintiffs aver that Defendants "refused to tell [them] about the payable due to them during the negotiations of the APA or at any other time." (Compl. P 45.) Defendants allegedly represented to Plaintiffs that the Balance Sheet was "legitimate" and that it did not contain any material representations or omissions. (Compl. P 45.)

Plaintiffs are not bringing suit for a breach under the C-Band Agreement. Rather, they contend that Defendants' conduct constitutes breaches under several provisions of the APA. Under Section 5.09 of the APA, Defendants represented and warranted that:

> [T]o the knowledge of Sellers there is no existing condition, situation or set of circumstances that would reasonably be expected to result in such a Proceeding [*7] or Restrictive Order being brought against or in respect of any of the Acquired Assets or Seller Businesses . . . .

(Compl. P 44.) Under Section 5.10(a) of the APA, Defendants warranted that they:

> delivered to [DBS and Acquisition] complete and accurate copies of (i) the Reference Balance Sheets . . . [which were] prepared from, and are in accordance with, the books and records of the Sellers, and fairly present, in all material respects, the financial position of the applicable Seller Business as of the Reference Date . . . .

(Compl. P 47.) Plaintiffs allege that Defendants breached both of these APA sections.

Plaintiffs also cite Section 5.22 as a breached provision. In that section, Defendants represented that "[t]he copies of documents delivered, provided or made available by the members of the Seller Group to [DBS and

Acquisition] pursuant to the terms of this Agreement are complete and accurate in all material respects." (Compl. P 54.)

Section 2.06(a) of the APA obliged Defendants to "cure, or cause any of its Affiliates to cure, all material defaults or breaches (or events that would become such with a lapse of time or the giving of notice or [*8] both) to any Seller or any subsidiary of Seller under the terms of any Assigned Contract [C-Band Agreement] . . . ." (Compl. P 56.) Plaintiffs allege that Defendants violated this provision by not curing alleged breaches of the C-Band Agreement. (Compl. P 57.)

Plaintiffs not only allege breaches of the APA that pertain to the overpayment, but they also allege that Defendants breached the APA by not providing certain transition services. Section 7.10(a) of the APA provides:

> Prior to the Programming Distribution Closing, the parties shall execute and deliver a transition services agreement (the "Transition Services Agreement") . . . which identifies the services that Gemstar and its Subsidiaries shall make available to [DBS and Acquisition] after the applicable Closing to ensure the continued operation of each of the Seller Businesses and to avoid any material interruption or disruption thereof (collectively, the "Transition Services").

(Compl. P 59.) Defendants allegedly did not fulfill their obligation to provide certain Transition Services, including keeping backup tapes and software on behalf of DBS and Acquisition. [3] (Compl. PP 61-62.)

---

3   Plaintiffs concede that their claim for breach of Section 5.05 of the APA is unfounded. Therefore, the Court need not consider this provision for purposes of deciding the present Motion.

---

[*9]   Plaintiffs further allege that Defendants breached the implied covenant of good faith and fair dealing. (Compl. P 66(G).) As an alternative to that claim and their other breach of contract theories, Plaintiffs seek recovery for unjust enrichment. Lastly, Plaintiffs seek indemnification under Section 12.02(a) of the APA whereby Defendants agreed to:

> indemnify [DBS and Acquisition] . . . against, and agree[d] to hold each of them harmless from, any and all Losses, whether involving Third-Party claims or a claim solely between the parties hereto, incurred or suffered by [DBS or Acquisi-

tion] arising out or in connection with (i) any misrepresentation or breach of any covenant or agreement made by [Defendants] . . . (ii) any breach of covenant or agreement made or to be performed by [Defendants] pursuant to [the] Agreement . . . or (iv) any Excluded Liability.

(Compl. P 78.)

## II. DISCUSSION

### A. Legal Standard on a Motion to Dismiss

In a motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, the Court "must accept as true the factual allegations in the complaint, and draw all reasonable [*10] inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995)* (citations omitted). "The district court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999)*. A court's review of such a motion is limited and "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996)*. Dismissal is not warranted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*.

For purposes of a motion to dismiss, a complaint is deemed to include "any written instrument attached to it as an exhibit or any statements or documents incorporated [*11] in it by reference." *Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000)* (citations omitted). However, if the allegations of a complaint are contradicted by documents incorporated in the complaint, the documents control and the court need not accept the allegations of the complaint as true. *See Sazerac Co., Inc. v. Falk, 861 F. Supp. 253, 257 (S.D.N.Y. 1994)* (citing *Feick v. Fleener, 653 F.2d 69, 75 & n.4 (2d Cir. 1981); see also Matusovsky v. Merrill Lynch, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002)* ("allegations . . . contradicted by . . . a document [referenced in the complaint] are insufficient to defeat a motion to dismiss"); *Rapoport v. Asia Elecs. Holding Co., Inc., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)* (granting motion to dismiss where "documents [referenced but not attached to complaint] contradict Plaintiff's allegations.").

## B. Breach of Contract Claims

"Contract remedies exist to give injured parties the benefit of their bargain." *Capital Nat. Bank of New York v. McDonald's Corp., 625 F. Supp. 874, 883 (S.D.N.Y. 1986) (citing County of Suffolk v. Long Island Lighting Co., 728 F.2d 52, 63 (2d Cir. 1984);* [*12] *International Customs Associates, Inc. v. Ford Motor Co., 893 F. Supp. 1251, 1255-56 (S.D.N.Y. 1995); Clalit Health Servs. v. Isr. Humanitarian Found., No. 02 Civ. 6552, 2003 U.S. Dist. LEXIS 17254, 2003 WL 22251329, at *3 (S.D.N.Y. Sep. 30, 2003).* Only parties to a contract have standing to assert a claim for breach of contract. *See Clalit, 2003 U.S. Dist. LEXIS 17254, 2003 WL 22251329, at *3.* Without a contractual relationship, there cannot be a contractual remedy. *Capital Nat. Bank of New York, 625 F. Supp. at 883.*

Under New York law, a claim for breach of contract must allege: (1) the existence of a contract; (2) that the plaintiff has performed his or her obligations under the contract; (3) that the defendant failed to perform his or her obligations thereunder; and (4) resulting damages to the plaintiff. *See W.B. David & Co. v. DWA Communs., Inc., No. 02 Civ. 8479, 2004 U.S. Dist. LEXIS 2954, 2004 WL 369147, at *2 (S.D.N.Y. Feb. 26, 2004); Global Intellicom, Inc. v. Thomson Kernaghan & Co., No. 99 Civ. 342, 1999 U.S. Dist. LEXIS 11378, 1999 WL 544708, at *18 (S.D.N.Y. July 27, 1999).* "In pleading these elements, a plaintiff must identify what provisions of the contract [*13] were breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc., 171 F. Supp. 2d 354, 358 (citing Levy v. Bessemer Trust Co., No. 97 Civ. 1785, 1997 U.S. Dist. LEXIS 11056, 1997 WL 431079, at *5 (S.D.N.Y. July 30, 1997)).*

Satellite signed the C-Band Agreement, but did not sign the APA. Because only parties to an agreement may assert a claim for a breach thereunder, *Clalit, 2003 U.S. Dist. LEXIS 17254, 2003 WL 22251329, at *3,* and because Plaintiffs do not allege that Satellite was a third-party beneficiary of the APA, Satellite does not have standing to bring suit under the APA. EchoStar Satellite's breach of contract claim against Defendants is hereby DISMISSED for lack of standing.

DBS and Acquisition, however, have standing to bring a claim for breach of the APA because they signed it. Moreover, Plaintiffs DBS and Acquisition have satisfied the first, second, and fourth elements for breach of express warranty as to all of the APA provisions they allege were violated. The parties do not dispute the existence of the APA (first element); Plaintiffs allege that they performed their APA obligations (second element) (Compl. P 66); and they allege resulting damages of at least [*14] $ 5-6 million (fourth element) (Compl. P 68).

But Plaintiffs do not satisfy the third breach of contract element on any of the express provisions they cite.

Plaintiffs allege that Defendants did not satisfy the covenant presented in Section 5.09 of the APA. That section provides that Defendants did not have any knowledge of any condition that could reasonably be expected to result in a Proceeding in respect of any of the Acquired Assets or Seller Businesses. (Compl. P 44.) Plaintiffs' claim for breach of APA 5.09 fails because they cite no specific Proceeding that Defendants could reasonably have expected Plaintiffs to bring. Where they address Section 5.09 in their Complaint, Plaintiffs merely recapitulate their other allegations and then generally assert that "[s]uch conduct would reasonably be expected to result in a Proceeding brought against [Defendants]." (Compl. P 45.) Plaintiffs make no mention of a specific legal claim or other type of Proceeding, and cannot rely on the other claims in the Complaint to satisfy this requirement, because, as discussed *supra,* none of them are viable causes of action. Moreover, any suggestion that a claim by Plaintiffs for a default under [*15] the C-Band Agreement should have been anticipated also is in error. Bringing a claim under one contract for a breach of another contract is bootstrapping, and therefore is not proper.

Plaintiffs also fail to allege that Defendants did not perform their duties under Section 5.10. That provision requires Defendants to have delivered to Plaintiffs "complete and accurate" copies of Reference Balance Sheets that "fairly present . . . the financial position" of Defendants. (Compl. P 47.) Plaintiffs admit that the Balance Sheet Defendants provided included the total amount of Defendants' liabilities. Plaintiffs contend that Defendants' failure to itemize the total amount rendered the Balance Sheet incomplete and inaccurate. The Court finds no merit in that contention. Plaintiffs were apprised of a liability amount that included the overpayment, and they cannot now claim that the Balance Sheets were somehow incomplete because they did not expressly state that the overpayment was included.

Section 5.22 of the APA is substantially similar to Section 5.10. It requires that all the "copies of documents delivered, provided or made available pursuant to [the APA] are complete and accurate in [*16] all material respects." (Compl. P 47.) As stated above, Plaintiffs have not alleged that the liability amount on the Balance Sheet was incomplete or inaccurate, nor do they allege that the $ 5-6 million overpayment was not included in Defendants' calculations. Section 5.22 might also be read as referring to the completeness of "copies" of documents delivered. Even if this were the intended meaning of the provision, nothing in the Complaint suggests that any copies of Defendants' documents did not include all the pages and paragraphs as they appeared in the originals.

Accordingly, the Court concludes that Plaintiffs have not sufficiently alleged that Defendants failed to perform their obligations under Section 5.22 or Section 5.10.

Plaintiffs also allege a breach of Section 2.06 of the APA. That provision requires Defendants to have cured all material defaults or breaches under, *inter alia*, the C-Band Agreement. (Compl. P 56.) Plaintiffs argue that Defendants failed to furnish Satellite with updated lists of eligible C-Band subscribers as required by the C-Band Agreement.

Plaintiffs' argument is infirm for two reasons. First, Defendants' conduct did not amount to a breach of the [*17] C-Band Agreement. Even if SNG did not provide Satellite with updated lists, Satellite did not fulfill its corollary duty to notify SNG of its belief that there was inadequate Sufficient Proof of any customer's Eligible C-Band Subscriber status. (*See* C-Band Agreement 3.1.) Plaintiffs allege that only Defendants could have known whether customers were Eligible C-Band Subscribers, but SNG's not having updated the Subscriber list for four-and-a-half years put Satellite on notice that the Subscriber lists may have constituted inadequate Sufficient Proof.

Second, even if such conduct did constitute a material default in the C-Band Agreement, that Agreement was terminated at the closing of the APA. The C-Band Agreement's termination rendered immaterial any default pursuant to it. Plaintiffs do not successfully allege Defendants' failure to perform its duties under Section 2.06 of the APA.

The dismissal of Plaintiffs' claims for breach of these other contract provisions puts Plaintiffs' claim under Section 7.10 outside of the jurisdiction of this Court. Section 7.10 requires the parties to execute and deliver a transition services agreement. (Compl. P 59.) The Transition Services Agreement [*18] requires Defendants to provide Plaintiffs with certain backup tapes and software, but Plaintiffs allege that Defendants did not do so. (Compl. PP 60-62.)

Under *28 U.S.C. § 1332(a)*, diversity jurisdiction only applies in cases "where the matter in controversy exceeds the sum or value of $ 75,000." The Complaint consistently alleges that the Overpayments totaled five to six million dollars, but what damages remain from Defendants' alleged breach of Section 7.10 - the only breach of contract claim not related to the Overpayments - is not stated. Plaintiffs' Section 7.10 allegations do not satisfy the $ 75,000.01 amount in controversy requirement, and therefore shall be dismissed for lack of subject matter jurisdiction.

Accordingly, Defendants' Motion to Dismiss Plaintiffs' claims for breach of contract is hereby GRANTED.

*C. Breach of Implied Duty of Good Faith and Fair Dealing*

Plaintiffs' Complaint addresses the breach of good faith and fair dealing claim at Paragraph 65(G). They allege: "Gemstar-TV and SNG breached the implied covenant of good faith and fair dealing by wrongfully concealing and withholding the benefits it received under the C-Band [*19] Agreement, depriving EchoStar of the right to receive the benefits represented to it in the APA, and causing EchoStar to suffer injury and incur damages." (Compl. P 65(G).)

New York law implies a covenant of fair dealing and good faith in all contracts. *See Global Intellicom, Inc. v. Thomson Kernaghan & Co., No. 99 Civ. 342, 1999 U.S. Dist. LEXIS 11378, 1999 WL 544708, at *18 (S.D.N.Y. Jul. 27, 1999)* (*citing Carvel Corp. v. Diversified Management Group, Inc., 930 F.2d 228, 230 (2d Cir.1991).* In most circumstances, claims for breach of contract and the covenant of good faith and fair dealing are duplicative; however, in some cases "a party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations." *Chase Manhattan Bank v. Keystone Distributors, Inc., 873 F. Supp. 808, 815 (S.D.N.Y. 1994).* The covenant "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." *Leberman v. John Blair & Co., 880 F.2d 1555, 1560 (2d Cir.1989).* Hence, the covenant is violated "when a party to a contract acts in a manner that, although [*20] not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under the agreement." *Don King Productions, Inc. v. Douglas, 742 F. Supp. 741, 767 (S.D.N.Y.1990).* "The implied covenant does not . . . operate to create new contractual rights; it simply ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly bargained-for benefits." *Id.* (citations and internal quotations omitted).

The Court agrees with Defendants that the allegations underlying this claim merely duplicate some of Plaintiffs' other breach of contract claims. (*See* Defs.' Mem. of Law at 20, n.9.) For example, Plaintiffs' breach of good faith and fair dealing claim is predicated on the allegations they use to support their Section 5.09 claim. Underlying both of these causes of action are allegations that Defendants deliberately withheld information about the Overpayments even though they knew Plaintiffs did not have any access to that information.

Moreover, Defendants' alleged violation of the covenant of good faith and fair dealing - knowingly [*21] concealing crucial information during negotiations

- took place before the parties actually entered into the contract. Parties cannot breach a contract's implied promise of good faith and fair dealing before the contract is entered into. Claims under this theory arise when a party does something to prevent the other party from attaining an already agreed-upon benefit. *See, e.g., Black v. MTV Networks, 172 A.D.2d 8, 576 N.Y.S.2d 846 (N.Y. 1st Dept. 1991)* (where a party contracts with a principal and subsequently makes secret payments to agents of the principal, the party breached the implied covenant of good faith and fair dealing because they improperly created post-contract interests for the agents that are adverse to those of the principal); *see also* 22 N.Y. Jur. 2d Contracts § 230 (in claims for breach of covenant of good faith and fair dealing, "neither party [to a contract] will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.").

Accordingly, Defendants' Motion to Dismiss DBS' and Acquisition's claims for breach of the covenant of good faith and fair dealing is hereby GRANTED. [4]

> 4 Because Satellite was not a signatory to the APA, its claim for breach of the implied covenant of good faith and fair dealing, as with its claims for breaches of express contract provisions, shall be dismissed.

[*22] D. *Indeminfication*

Defendants also seek to dismiss Plaintiffs' claim for contractual indemnification. Because none of the other causes of action survive the motion to dismiss, Plaintiffs' indemnification claim is hereby DISMISSED as moot.

E. *Unjust Enrichment*

Plaintiffs also include an alternative unjust enrichment claim in their Complaint. "Generally, quasi-contractual relief, such as unjust enrichment is not permitted when an express agreement exists that governs the dispute between the parties." *Bridgeway Corp. v. Citibank N.A., 132 F. Supp. 2d 297, 305 (S.D.N.Y. 2001).* Because the C-Band Agreement controls the issues Plaintiffs present in their Complaint, a claim for unjust enrichment is not proper.

Plaintiffs argue that Satellite's claim for unjust enrichment should survive because, even though the C-Band Agreement existed between the parties, it did not address how overpaid commissions were to be dealt with

after the termination of the Agreement. (Pls.' Mem. of Law at 23.) This argument fails. Satellite has merely re-characterized SNG's duty not to breach the C-Band Agreement's Subscriber commission provisions as a duty to reimburse Satellite [*23] for commission overpayments after the termination of the C-Band Agreement. The latter, Satellite says, was not specifically addressed in the C-Band Agreement. However, these two duties are one and the same. Satellite's attempt to parse two duties from one in an effort to make hardier its unjust enrichment claim is not proper. The C-Band Agreement - not the rules of equity and unjust enrichment - govern the overpayments.

Accordingly, Defendants' Motion to Dismiss Plaintiffs' unjust enrichment claim is hereby GRANTED.

F. *Leave to Amend*

Even when a complaint has been dismissed, permission to amend it "shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a).* "While it is the usual practice upon granting a motion to dismiss to allow leave to replead," *Cohen v. Citibank, N.A., No. 95 Civ 4826, 1997 U.S. Dist. LEXIS 2112, 1997 WL 883789, at *2 (S.D.N.Y. Feb. 28, 1997),* a court may dismiss without leave to amend when amendment would be futile. *Oneida Indian Nation of New York v. City of Sherrill, 337 F.3d 139, 168 (2d Cir. 2003)* (citing *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)).*

The Overpayments are a result [*24] of alleged breaches under the C-Band Agreement, not the APA. Granting Plaintiffs leave to amend their Complaint so that they may allege causes of action under the APA would be futile.

III. CONCLUSION

For the reasons contained herein, Defendants' Motion to Dismiss is GRANTED. The Clerk of Court is directed to close the docket for this case.

SO ORDERED.

Dated: New York, New York

**February 8, 2007**

Deborah A. Batts

United States District Judge

LEXSEE 2007 N.Y. MISC. LEXIS 4962

**[*1] Jeffrey M. Gross, M.D. and Union Square Rehabilitation and Sports Medicine, Plaintiffs, against Empire Healthchoice Assurance, Inc., Guardian Life Insurance Company of America, Horizon Healthcare of New York, Inc., Healthcare Insurance Plan Of Greater New York, Inc. and Cigna Healthcare of New York, Inc., Defendants.**

**602848-2005**

**SUPREME COURT OF NEW YORK, NEW YORK COUNTY**

*2007 NY Slip Op 51390U*; *16 Misc. 3d 1112A*; *847 N.Y.S.2d 896*; *2007 N.Y. Misc. LEXIS 4962*

**July 18, 2007, Decided**

**NOTICE:** THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

**SUBSEQUENT HISTORY:** Later proceeding at *Gross v. Empire Healthchoice Assur., Inc., 2007 N.Y. App. Div. LEXIS 9096 (N.Y. App. Div. 1st Dep't, Aug. 2, 2007)*

**PRIOR HISTORY:** *Gross v. Empire Healthchoice Assur., Inc., 12 Misc. 3d 1155A, 819 N.Y.S.2d 210, 2006 N.Y. Misc. LEXIS 1188 (2006)*

**HEADNOTES**

[**1112A] Covenants--Covenant of Good Faith and Fair Dealing.

**COUNSEL:** [***1] For Plaintiffs Jeffrey M. Gross, M.D. et al.: Meiselman, Denlea, Packman, Carton & Eberz P.C., White Plains, New York, (Jill Owens, Esq., Barry Cepelewicz, Esq.).

For Defendant Empire Healthchoice Assurance Inc.: Morrison Cohen LLP, New York, New York, (Howard Wolfson, Esq.).

For Defendant Horizon Healthcare of New York, Inc.: Sills Cummins Epstein & Gross PC, New York, New York, (Jonathan Jemison, Esq.).

For Defendant Cigna Healthcare of New York, Inc.: Russo Kean & Toner, LLP, New York, New York, (Kevin Horbatiuk, Esq.)

**JUDGES:** Bernard J. Fried, J.

**OPINION BY:** Bernard J. Fried

**OPINION**

Bernard J. Fried, J.

In a Memorandum Decision and Order dated May 18, 2006, I granted the motion by defendants [*2] Empire Healthchoice Assurance, Inc. ("Empire") and Horizon Healthcare of New York, Inc. ("Horizon") to dismiss all counts of the complaint except for the cause of action for breach of an implied covenant of good faith and fair dealing (the "May 18 Order").

In July 2006, I invited Empire and Horizon to move for reargument on the question of whether my decision to sustain the cause of action for breach of an implied covenant of good faith and fair dealing was in error. They accepted my invitation. At the same time, plaintiffs [***2] requested permission, which I granted, to move for reargument of my dismissal of the other counts. Apparently attempting to piggy-back off of the partial success of Horizon and Empire's motions to dismiss, defendant Cigna Healthcare of New York, Inc. ("Cigna") then moved to amend its answer and to join the Empire and Horizon in moving to dismiss the complaint.

Now before me are four motions. (1) a motion by plaintiffs Jeffrey M. Gross, M.D. ("Dr. Gross") and Union Square Rehabilitation and Sports Medicine, seeking leave to reargue my dismissal of the causes of action for account stated, promissory estoppel, negligent misrepresentation, civil conspiracy, and declaratory judgment (Motion Seq. No. 003); (2 and 3) motions by defendants Horizon and Empire for leave to reargue my denial of their motions as to the cause of action for breach of an implied covenant of good faith and fair dealing (respec-

2007 NY Slip Op 51390U, *; 16 Misc. 3d 1112A, **;
847 N.Y.S.2d 896; 2007 N.Y. Misc. LEXIS 4962, ***

tively, Motion Seq. Nos. 004 and 005); and (4) a motion by Cigna for leave to serve an amended answer and to dismiss the complaint (Motion Seq. No. 006). I have heard oral argument on the first three motions and took the fourth under submission.

*C.P.L.R. § 2221(d)* provides that a motion to reargue [***3] may be made "based upon matters of fact or law allegedly overlooked or misapprehended by the court in determining the prior motion, but shall not include any matters of fact not offered on the prior motion." Such a motion "may be granted only upon a showing that the court overlooked or misapprehended the facts or the law or for some reason mistakenly arrived at its earlier decision." *William P. Pahl Equipment Corp. v. Kassis, 182 A.D.2d 22, 27, 588 N.Y.S.2d 8 (1st Dept. 1992)* (internal citations omitted).

For the reasons that follow, and based on the previous Order, which I incorporate by reference into this decision, I grant the motions for leave to reargue by plaintiffs and by defendants Horizon and Empire, but I adhere to the results reached in the May 18 Order for substantially the reasons stated in it. The motion by Cigna to amend its answer is granted, and its motion to dismiss is granted in part and denied in part.

For the sake of readability, I reiterate the salient allegations of the complaint. According to the complaint, in 2002, Dr. Gross became interested in using a newly FDA-approved medical device called the "Sonocur" to administer a treatment called Extracorporeal Shock Wave Therapy ("ESWT") [***4] to treat orthopedic conditions. (Compl. PP 2, 19-20.) Several major health insurers, not defendants, including United Healthcare and AIG, authorized him to bill for ESWT using the billing code typically used for gall bladder and kidney stone treatments, CPT 50590. (Compl. P 21.) Dr. Gross informed the five defendants, also health insurance companies, that these other major health insurers had recommended using that billing code for the use of ESWT.

According to the complaint, plaintiffs contacted defendants to seek pre-approval of ESWT to treat orthopedic conditions and to use the CPT 50590 billing code. Defendants "verbally informed Dr. Gross' practice that they would act similarly to United Healthcare and the other carriers," and Dr. Gross "was led to believe by [defendants] that the 50590 code was the most appropriate." (Compl. PP 23-24.) Dr. Gross repeatedly asked defendants for written confirmations of their oral approvals, but these requests were "denied." (Compl. P 4.) Nevertheless, for the next three years, Dr. Gross [*3] revised his own authorization forms to memorialize the oral approvals by documenting the names of the defendants' representatives who orally confirmed coverage [***5] for ESWT using the CPT 50590 billing code and the

dates when those approvals were given. Plaintiffs submitted these forms, along with letters of medical necessity, when they submitted bills requesting payment. (Compl. PP 24-25.) Plaintiffs' submissions consistently documented that the diagnosis code for which they used ESWT was tendonitis, an orthopedic condition. (Compl. P 69.)

The complaint asserts that defendants typically made payments about six months after plaintiffs submitted their forms. During this time, plaintiffs submitted additional documentation to defendants and spoke with defendants to resolve any pending issues. In some cases, plaintiffs submitted their claims to defendants' internal appeals process, before defendants' appeals departments agreed to pay them. (Compl. P 26.) During this time, defendants never told plaintiffs that they should not use the CPT 50590 billing code or that ESWT was unapproved for treatment of orthopedic conditions. (Compl. P 27.)

The complaint alleges that, between late October 2004 and June 2005, six insurers, including all five defendants, [1] refused further payments for ESWT, accused Dr. Gross of improper billing and of misrepresenting the [***6] medical conditions for which he used the treatment, and demanded the funds totaling over $ 600,000 that they had paid to him since 2002 for using ESWT to treat orthopedic conditions. (Compl. PP 28-29.) Empire sent a letter in late October 2004. (Compl. P 34.) Guardian Life Insurance Company of America ("Guardian") followed in January 2005. (Compl. P 40.) Letters from Horizon and Healthcare Insurance Plan of Greater New York, Inc. ("HIP") appeared in March 2005. (Compl. PP 45, 50.) A letter from Cigna followed in June 2005. (Compl. P 57.)

> 1    The sixth insurer, according to the complaint, was GHI, which subsequently withdrew its demand for repayment after plaintiffs submitted documentation that GHI had already approved the use of ESWT and the billing code plaintiffs used to bill for it. (Compl. P 28.)

According to the complaint, Dr. Gross attempted to resolve the disputed claims, providing written documentation and responses to the insurers' demands, but the defendants refused to either respond or withdraw their demands for repayment. [2] Meanwhile, Empire and Horizon began to withhold payments on undisputed claims having nothing to do with ESWT, including pre-approved claims. (Compl. PP [***7] 38, 47.) Dr. Gross was forced to stop using ESWT on patients who were unable to afford to pay for them out-of-pocket. (Compl. P 63.)

2007 NY Slip Op 51390U, *; 16 Misc. 3d 1112A, **;
847 N.Y.S.2d 896; 2007 N.Y. Misc. LEXIS 4962, ***

2 Since the complaint was filed, the Court has been informed that the action has been discontinued against two of the defendants, HIP and Guardian. So the term "defendants" in this decision applies only to the remaining defendants: Empire, Horizon, and Cigna.

Plaintiffs filed this complaint on August 5, 2005. In its answer, served on September 27, 2005, Cigna asserted as an affirmative defense that the claims against it are subject to compulsory arbitration. Horizon, in its answer, filed December 5, 2005, asserted a counterclaim in several counts for insurance fraud, breach of contract, unjust enrichment, and negligent misrepresentation, and seeking the return of $ 95,000 in asserted overpayments. Three months after my May 18 Order, Empire filed its answer, asserting counterclaims in several counts for fraud, breach of contract, specific performance, and unjust enrichment, and demanding the return of $ 250,000 in alleged [*4] overpayments. Among other things, Empire and Horizon asserted rights arising from provider agreements into which Dr. Gross had allegedly [***8] entered with each of them. Cigna filed this motion on August 15, 2006, seeking to amend its answer to withdraw its affirmative defense of compulsory arbitration, to assert counterclaims similar to those asserted by Horizon and Empire, and to dismiss the complaint.

### Horizon and Empire's motions to reargue

I address first the question raised in the motions by defendants Horizon and Empire: whether a claim for breach of an implied covenant of good faith and fair dealing is an independent cause of action, or whether dismissal of a breach of contract claim requires the dismissal of the breach of an implied covenant of good faith and fair dealing claim.

In their motions to reargue, Empire and Horizon contend that the claim for breach of an implied covenant of good faith and fair dealing must be dismissed because it cannot stand on its own, in the absence of a valid breach of contract claim.

Plaintiffs have not alleged that defendants breached a specific provision of their provider agreements, but that they breached their duty of good faith and fair dealing by (1) belatedly seeking payment refunds on claims that were previously authorized orally, of which they had notice, and which they had months [***9] or years to investigate; (2) withholding payments on false pretenses (with respect to Empire and Horizon); (3) withholding payments on unrelated claims; and (4) doing all of these things in consultation and coordination with each other. In my May 18 Order, I concluded that the complaint properly stated a cause of action for breach of an implied covenant of good faith and fair dealing, and I now affirm that opinion.

The Court of Appeals has expressly recognized that the implied covenant of good faith and fair dealing in an insurance contract encompasses the insurer's duty "to investigate in good faith and pay covered claims." *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 318, 662 N.E.2d 763, 639 N.Y.S.2d 283 (1995).

New York courts have repeatedly affirmed that a party may be in breach of an implied duty of good faith and fair dealing, even if it is not in breach of its express contractual obligations, when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denied or to deprive the other party of the fruit of its bargain. *See Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 639 N.Y.S.2d 977 (1995); *Outback/Empire I, Ltd. P'ship v. Kamitis, Inc.*, 35 AD3d 563, 563, 825 N.Y.S.2d 747 (2d Dept. 2006); [***10] *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302-03, 765 N.Y.S.2d 575 (1st Dept. 2003) (refusing to dismiss cause of action for breach of implied covenant of good faith and fair dealing based on the allegation that defendant exercised contractual veto power "for an illegitimate purpose and in bad faith" as part of scheme to deprive plaintiffs of benefits of their joint venture).

The First Department in *Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.* recently confirmed the principle that a claim for breach of the implied covenant of good faith and fair dealing can occasionally stand on its own. -- N.Y.S.2d --41 A.D.3d 269, 838 N.Y.S.2d 536, 2007 N.Y. App. Div. LEXIS 7646, 2007 NY Slip Op 5410, 2007 WL 1774986 (1st Dept. June 21, 2007). In *Maddaloni*, the defendant had moved on summary judgment to dismiss the plaintiff's third amended complaint, which alleged a cause of action for breach of an implied duty of good faith and fair dealing but did not assert a cause of action for breach of contract. (*See Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, Index No. 602457/2002, Ruffino Affirm. Ex. 2, 3d Am. Compl. (Apr. 20, 2005).) The First Department sustained the cause of action for breach of an implied duty of good faith and fair dealing. The Court found [***11] that, although the parties' contract permitted the defendant to accept plaintiff's orders and time its deliveries at its "discretion," the plaintiff's allegations had "raised a triable issue of fact as to whether [the defendant]'s discretion under the [contract] was [*5] exercised in bad faith." *Maddaloni, 2007 N.Y. App. Div. LEXIS 7646, at *3, 2007 WL 1774986, at *1. Maddaloni* makes it clear that a plaintiff may bring a cause of action for breach of the implied covenant of good faith and fair dealing alleging that a defendant has exercised its rights under its contract in bad faith in order to realize gains that the contract implicitly denied or to deprive the other party of the fruit of its bargain, even if the plaintiff has not alleged a breach of that contract.

Case 1:07-cv-09749-JSR    Document 11-3    Filed 01/31/2008    Page 11 of 26

Page 4

2007 NY Slip Op 51390U, *; 16 Misc. 3d 1112A, **;
847 N.Y.S.2d 896; 2007 N.Y. Misc. LEXIS 4962, ***

Most of the decisions that appear to reach a contrary result rely on the oft-cited rule that a claim for breach of an implied duty of good faith and fair dealing cannot stand alone if it only substitutes for a nonviable breach of contract claim. *Triton Partners LLC v. Prudential Sec. Inc.*, 301 A.D.2d 411, 411, 752 N.Y.S.2d 870 (1st Dept. 2003). Accord *Jacobs Private Equity, LLC v. 450 Park LLC*, 22 AD3d 347, 347-48, 803 N.Y.S.2d 14 (1st Dept. 2005) (good faith claim duplicated insufficient breach of [***12] contract claim); *Cerberus Int'l, Ltd. v. BancTec, Inc.*, 16 AD3d 126, 127, 791 N.Y.S.2d 28 (1st Dept. 2005); *Parker E. 67th Assocs., L.P. v. Minister, Elders & Deacons of Reformed Protestant Dutch Church*, 301 A.D.2d 453, 454, 754 N.Y.S.2d 255 (1st Dept. 2003). This rule does not bar plaintiffs' good faith claim, where plaintiffs have alleged that defendants acted in bad faith as part of scheme to deny them of the benefit of their bargain.

In *Richbell*, the First Department acknowledged the "tension between, on the one hand, the imposition of a good faith limitation on the exercise of a contract right and, on the other, the avoidance of using the implied covenant of good faith to create new duties that negate explicit rights under a contract." *Richbell, 309 A.D.2d at 302.* But notwithstanding this tension, it upheld the plaintiffs' cause of action for breach of implied covenant of good faith and fair dealing, alleging that the defendant had exercised its contractual right malevolently, for its own gain, as part of a purposeful scheme designed to deprive the plaintiffs of the benefits of their contract. Such a claim "do[es] not create new duties that negate [the party]'s explicit rights under a contract, but rather, seeks [***13] imposition of an entirely proper duty to eschew this type of bad faith targeted malevolence in the guise of business dealings." *Id.*

In such circumstances, the claim for breach of an implied duty of good faith and fair dealing does not depend on a breach of the contract; therefore, a plaintiff may bring such a claim, whether or not there is a viable breach of contract claim. *Chase Manhattan Bank, N.A. v. Keystone Distribs. Inc.*, 873 F. Supp. 808, 815 (S.D.NY 1994) (under New York law, "a party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations," where that party does something to "destroy or injure the right of another party to receive the benefits of the contract").

A few lower court decisions contain statements that, in my view, reflect a short-sighted view of the New York law on this subject. *See, e.g.*, *Cohen v. Nassau Educators Fed. Credit Union*, 12 Misc 3d 1164[A], 819 N.Y.S.2d 209, 2006 NY Slip Op 51056[U], *4, 2006 WL 1540324, *4 (Sup. Ct. May 10, 2006) (dismissing cause of action for breach of implied covenant of good faith as duplica-

tive of breach of contract action, and stating that "New York does not recognize a separate cause of action for [***14] violation of the implied covenant of good faith and fair dealing"); *Silvester v. Time Warner, Inc.*, 1 Misc 3d 250, 258, 763 N.Y.S.2d 912 (Sup. Ct. 2003), aff'd on other grounds, 14 AD3d 430, 787 N.Y.S.2d 870 (1st Dept. 2005) (dismissing claims for breach of good faith and fair dealing, where no party had "acted in a way to prevent the performance of or the rights under the contract," and stating that covenant of implied covenant of good faith and fair dealing "does not impose any obligation upon a party to the contract beyond what the explicit terms of the contract provide");*Sutton Assocs. v. LexisNexis*, 196 Misc 2d 30, 34, 761 N.Y.S.2d 800 (Sup. Ct. 2003) (dismissing cause of action for breach of implied covenant of good faith as duplicative of unavailing fraud theory, and stating that this "duty cannot be used to create independent obligations beyond those agreed upon [*6] and stated in the express language of the contract"). In my view, these statements of law are broader than necessary to the holdings of these decisions and are therefore dicta. To the extent that these statements are necessary to the holdings of these decisions, I decline to follow them, to the extent that they are inconsistent with *Dalton*,*Maddaloni*, and *Richbell*.

Consequently,    [***15]    I adhere to the result reached in the May 18 Order declining to dismiss the cause of action for breach of implied covenant of good faith and fair dealing.

### Plaintiffs' motion to reargue

Plaintiffs have also moved to reargue dismissal of five causes of action: account stated, promissory estoppel, negligent misrepresentation, civil conspiracy, and declaratory judgment.

In the account stated cause of action, the complaint seeks to bind defendants by their previous approvals of plaintiffs' claims and to estop them from demanding a refund of asserted overpayments, because they have waited an unreasonably long time to reverse their previous approvals.

An account stated cause of action generally is raised either by a plaintiff creditor seeking to recover from a debtor or as an affirmative defense by a defendant debtor, seeking to prevent the reopening of a paid account. *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 541-42 (Bankr. S.D.NY 2000). Plaintiffs' claim stretches the usual form of this cause of action to fit an unusual set of facts.

To express plaintiffs' argument in the form of a run-of-the-mill cause of action for account stated, it would go as follows: plaintiffs would like to stand in [***16] the position of creditors, which, having issued statements of

Case 1:07-cv-09749-JSR     Document 11-3     Filed 01/31/2008     Page 12 of 26

Page 5

2007 NY Slip Op 51390U, *; 16 Misc. 3d 1112A, **;
847 N.Y.S.2d 896; 2007 N.Y. Misc. LEXIS 4962, ***

the amounts due on the insurance forms submitted to defendants, having given defendants a reasonable amount of time to object to those statements, and having been paid the amounts stated as due, seek to prevent defendants from challenging the accuracy of those statements.

It is unusual to see medical insurance companies cast in the role of debtors to the physicians who bill them for services provided to their patients. I am not aware of a case in which a similar argument has been made. The question is whether this application of the account stated doctrine is appropriate. It seems to me unwise to extend the doctrine to fit these facts, especially here, where plaintiffs have another viable cause of action that more comfortably fits the facts alleged. Consequently, I adhere to my previous decision dismissing the account stated cause of action. [3]

> 3 In their motion to reargue, plaintiffs also contend that I improperly dismissed this claim based on the erroneous assertion that defendants had not made legal claims for refunds. Plaintiffs base this contention first on the complaint's allegation that defendants had made written demands [***17] for refunds, and second on the fact that Empire and Horizon filed counterclaims demanding refunds of the alleged overpayments. Because I conclude that I correctly dismissed this cause of action on another ground, I do not need to address plaintiffs' contention.

With regard to the promissory estoppel claim: I remain unconvinced that the complaint alleges that plaintiffs reasonably relied on defendants' alleged oral promises by defendants of coverage, where the complaint also alleges that the defendants repeatedly denied plaintiffs' requests to provide written confirmation of those promises. Cf. N.Y.C. Health & Hosps. Corp. v. St. Barnabas Hosp., 10 AD3d 489, 491, 782 N.Y.S.2d 12 (1st Dept. 2004) (viable cause of action for promissory estoppel requires: (1) an oral promise that is sufficiently clear and unambiguous; (2) reasonable reliance on the promise by a party; and (3) injury caused by the reliance). Therefore, I will adhere to my previous dismissal of the promissory estoppel cause of action.

For a similar reason, I also affirm my previous holding dismissing the negligent misrepresentation [*7] claim.

"A claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a [***18] special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." J.A.O. Ac-

quisition Corp. v. Stavitsky, 8 NY3d 144, 148, 863 N.E.2d 585, 831 N.Y.S.2d 364 (2007).

Applying these criteria to the present case: defendants have conceded that Dr. Gross entered into provider agreements with them. Consequently, he is in privity of contract with each of them, so the first criterion is met. Defendants concede that any alleged oral approvals were incorrect, so the second criterion is met. Plaintiffs have failed to satisfy the third criterion, however, because it was unreasonable for plaintiffs to rely on defendants' alleged oral approvals of the CPT 50590 billing code to use ESWT to treat orthopedic conditions, after defendants "refused" to confirm the oral approvals in writing, despite Dr. Gross's "repeated" requests. (Compl. PP 23-24.) Therefore, I properly dismissed the cause of action for negligent misrepresentation.

With regard to the cause of action for civil conspiracy: Under New York law, where a plaintiff has failed to sufficiently allege an actionable underlying tort, there is no [***19] support for conspiracy allegations. Am. Preferred Prescription, Inc. v. Health Mgmt., Inc., 252 A.D.2d 414, 416, 678 N.Y.S.2d 1 (1st Dept. 1998). Consequently, because no cause of action for tort has survived dismissal, I correctly dismissed the cause of action for civil conspiracy.

Finally, I conclude that I properly dismissed plaintiffs' cause of action seeking a declaratory judgment. "A cause of action for a declaratory judgment is unnecessary and inappropriate when the plaintiff has an adequate, alternative remedy in another form of action, such as breach of contract." Apple Records, Inc. v. Capitol Records, Inc., 137 A.D.2d 50, 54, 529 N.Y.S.2d 279 (1st Dept. 1988); accord Artech Info. Sys., L.L.C. v. Tee, 280 A.D.2d 117, 125, 721 N.Y.S.2d 321 (1st Dept. 2001) (affirming dismissal of cause of action for declaratory judgment, where first cause of action for breach of contract afforded plaintiff an adequate remedy). Since, in this case, plaintiffs have an adequate, alternative remedy in their cause of action for breach of implied contract of good faith and fair dealing, the cause of action for declaratory judgment is unnecessary. Therefore, I affirm my original decision dismissing this cause of action.

### Cigna's Motion to Amend and Dismiss

Cigna's [***20] motion is unopposed insofar as it seeks leave to amend its answer and to dismiss counts five, seven, and nine of the complaint. These aspects of its motion are therefore granted on default. In light of my decision directing plaintiffs to file an amended complaint, Cigna shall file an answer in response to the amended complaint, rather than filing an amended answer in response to the original complaint.

2007 NY Slip Op 51390U, *; 16 Misc. 3d 1112A, **;
847 N.Y.S.2d 896; 2007 N.Y. Misc. LEXIS 4962, ***

The rest of Cigna's motion to dismiss tracks the parallel motions by Horizon and Empire, and plaintiffs oppose it for all the same reasons that they opposed Horizon and Empire's motions to dismiss and to reargue. For the reasons discussed, *supra* in connection with Horizon and Empire's motions, I deny Cigna's motion to dismiss the cause of action for breach of implied covenant of good faith and fair dealing, but grant its motion to dismiss the remaining causes of action in the complaint.

Accordingly it is

ORDERED that plaintiffs' motion for leave to reargue (Motion Seq. No. 003) is granted, but I adhere to the holdings in the May 18 Order for the reasons discussed in this memorandum decision; and it is further

ORDERED that defendants Horizon and Empire's motions for leave to reargue (Motion [***21] Seq. Nos. [*8] 004 and 005) are granted, though I adhere to my holdings in the May 18 Order for the reasons discussed in this memorandum decision; and it is further

ORDERED that Cigna's motion for leave to serve an amended answer and to dismiss the complaint (Motion Seq. No. 006) is granted in part and denied in part, in accordance with this memorandum decision; and it is further

ORDERED that plaintiffs shall file an amended complaint in accordance with this decision within 30 days of the service of a copy of this order with notice of entry, and it is further

ORDERED that discovery, which has been stayed pending my decision on these motions, shall now continue with respect to the remaining claims; and it is further

ORDERED that the parties shall appear in court for a status conference at 11:00 a.m. on September 25, 2007.

J.S.C.

LEXSEE 2003 U.S. DIST. LEXIS 5913

**EMILE B. MAALOUF, individually d/b/a CHICAGO INTERNATIONAL NET-WORK, Plaintiff, - against - SALOMON SMITH BARNEY, INC., Defendant.**

**02 Civ. 4770 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 5913*

**April 9, 2003, Decided
April 10, 2003, Filed**

**SUBSEQUENT HISTORY:** Summary judgment granted by, in part *Maalouf v. Salomon Smith Barney, 2004 U.S. Dist. LEXIS 17873 (S.D.N.Y., Sept. 7, 2004)*

**DISPOSITION:** [*1] . Defendant's motion to dismiss was granted in part and denied in part.

**COUNSEL:** Plaintiff, Pro se, Marshall, Virginia.

For Defendant: Thomas J. Moloney, Esq., Boaz S. Morag, Esq., Cleary, Gottlieb, Steen & Hamilton, New York, New York.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

**OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

Emile B. Maalouf, doing business as Chicago International Network ("CIN") and appearing pro se, is suing Salomon Smith Barney, Inc. ("Smith Barney") for, *inter alia,* breach of contract. In addition to breach of contract, Maalouf brings the following claims: negligent misrepresentation; breach of fiduciary duty; tortious interference with prospective business transactions; unjust enrichment; breach of the covenant of good faith and fair dealing; and tortious interference with a business relationship. Smith Barney is moving to dismiss all claims other than the breach of contract claim. For the following reasons, defendant's motion is granted in part and denied in part.

**I. THE COMPLAINT**

The following allegations, as pled in Maalouf's Second Amended Complaint ("Complaint") are assumed to be true for purposes of this motion.

[*2] **A. Introduction**

CIN was established to develop opportunities in emerging markets, especially those in the countries of the former Soviet Union. *See* Complaint PP 7-8. Recognizing that large amounts of capital would be needed to develop these markets, CIN approached Smith Barney with a proposition intended to improve the overseas position of Smith Barney's investment banking division. *See id.* PP 9, 11-12. In other words, CIN acted as an intermediary between Smith Barney and certain Russian companies. CIN would introduce Smith Barney to these companies and, in return, would receive fees in the form of cash and equity ownership once a deal was consummated. The rights and obligations of the parties were memorialized in the following two letter agreements.

**B. May 1995 Agreement**

On May 10, 1995, CIN and Smith Barney entered into a Non-Disclosure and Non-Circumvention Agreement (the "May 1995 Agreement") whereby CIN was to act as representative for three Russian companies, referred to as "Listed Parties" in the Addendum attached to the May 1995 Agreement. [1] *See* Addendum to May 1995 Agreement, Ex. A to Complaint. Pursuant to the May 1995 Agreement, CIN agreed to [*3] provide Smith Barney with certain "Confidential Information" relating to the Listed Parties who, according to CIN, were "seeking advice and assistance with regard to the potential sale of their securities in the United States and elsewhere." May 1995 Agreement at 1. The May 1995 Agreement provided that Smith Barney would not disclose the Con-

fidential Information provided by CIN to any outside party. *See id.* at 2. In addition, Smith Barney agreed not to make any separate contract or deal, or enter into any transaction, with the Listed Parties or their affiliates without CIN's express written permission. *See id.* The May 1995 Agreement did not include any provisions relating to CIN's compensation; the only duties it imposed on Smith Barney were to maintain the confidentiality of information provided by CIN and to obtain CIN's written consent before dealing with the Listed Parties. Compensation was addressed in a subsequent agreement.²

　　1  The three companies were Rosneft Joint-Stock Company ("Rosneft"), Almazy Yakutii Joint-Stock Company ("Yakutii") and Almazy Rossii-Sakha Joint-Stock Company ("Rossii-Sakha"). *See* Addendum to May 1995 Agreement.

[*4]

　　2  Maalouf annexed an "Agreement on the Implementation of a Capital Market Strategy," dated December 1, 1995, to his Complaint. *See* Ex. A1 to Complaint. Although this agreement contains provisions regarding the payment of compensation to CIN, it is not signed by either party and therefore not a contract.

**C. June 24, 1996 Agreement**

On June 24, 1996, the parties entered into a supplemental agreement (the "June 1996 Agreement") which sets forth specific terms and conditions governing CIN's arrangement with Smith Barney. *See* Ex. B to Complaint. The June 1996 Agreement describes the scope of services to be provided by CIN to Smith Barney as follows:

> The Company [CIN] agrees to provide consulting services to Smith Barney on an exclusive basis with regard to business opportunities, including the potential offering of securities in the United States (collectively, "Business Opportunities") for the Russian companies identified as "Listed Parties" in a letter agreement between the Company and Smith Barney, dated May 10, 1995.

June 1996 Agreement at 1.

With regard to compensation, [*5] the June 1996 Agreement provides for the payment of a $ 25,000 consulting fee, payable in two installments of $ 12,500 -- the first upon execution of the June 1996 Agreement and the second upon its expiration. This consultation fee was not

intended to be CIN's only compensation as the 1996 Agreement states:

> The parties acknowledge that the compensation described in the preceding paragraph shall not constitute compensation for closing any transaction with one or more Listed Parties, and the parties agree to negotiate a reasonable compensation to be paid by Smith Barney to [CIN] in the event such a transaction is completed on terms customary for Smith Barney for similar services (unless otherwise agreed to in writing by both parties).

June 1996 Agreement at 2. The June 1996 Agreement further provides that CIN is to function as an independent contractor with regard to the above services, not as an employee or agent of Smith Barney. *See id.* In addition, the June 1996 Agreement "does not create a partnership or joint venture between [CIN] and Smith Barney." *Id.* Nor does the June 1996 Agreement constitute CIN's "'express written permission,' as detailed in the [*6] letter agreement dated May 10, 1995, between [CIN] and Smith Barney, to make a separate contract with or enter into a transaction with any of the Listed Parties, and that Smith Barney shall continue to require [CIN's] express written permission to consummate such a transaction with any of the Listed Parties or their affiliates." *Id.*

**D. The Alleged Breaches**

Maalouf alleges that Smith Barney and its affiliates made repetitive contacts, dealings and transactions with Listed Parties without the express written permission of CIN. *See* Complaint P 25. For example, Smith Barney allegedly breached the May 1995 Agreement by concluding a $ 62 million transaction with Rossii-Sakha in mid 1996. *See id.* P 26. Maalouf also alleges that Smith Barney dealt directly with Gazprom, an affiliate of Rosneft, without CIN's express permission. *See id.* PP 31, 33 and 40. Smith Barney allegedly consummated three Eurobond transactions in 2002 with Gazprom, two for $ 500 million and one for $ 200 million, without paying CIN any fees. *See id.* PP 45-47. For this and other conduct, plaintiff seeks, *inter alia,* damages in the amount of $ 30 million.

[*7]

"Given the Federal Rules' simplified standard for pleading, 'a court may dismiss a complaint *only* if it is clear that no relief could be granted under *any* set of facts that could be proved consistent with the allegations.'" *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 152 L.*

*Ed. 2d 1, 122 S. Ct. 992 (2002)* (emphasis added) (quoting *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)).* A complaint need not state the legal theory, facts, or elements underlying the claim, except in certain instances. *Compare Fed. R. Civ. P. 8 with Fed. R. Civ. P. 9.* [3] Pursuant to the simplified pleading standard of *Rule 8(a)*, a complaint need only include "'a short and plain statement of the claim showing that the pleader is entitled to relief.'" [4] *Swierkiewicz, 534 U.S. at 512* (quoting *Rule 8(a)(2)).* A plaintiff need not, in other words, plead the elements of a claim. *See In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281, 323 (S.D.N.Y. 2003)* ("*Rule 8(a)* does not require plaintiffs to plead the legal theory, facts or elements underlying their claim.").

   3   The heightened pleading standard of *Rule 9(b)* requires that in claims of fraud or mistake "the circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R. Civ. P. 9(b).*

[*8]

   4   Although New York substantive law governs the claims in issue here, federal procedural law is applied. *See generally Hanna v. Plumer, 380 U.S. 460, 14 L. Ed. 2d 8, 85 S. Ct. 1136 (1965)* (explaining that procedural requirements in federal court are governed by federal, not state, procedural law). A federal court may not impose a heightened pleading standard -- under any circumstance -- unless that heightened standard is embodied in the Rules or enacted by Congress. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168-69, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993).*

   When deciding a motion to dismiss pursuant to *Rule 12(b)(6)*, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. *See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).* Courts may not consider matters outside the pleadings but may consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings. [*9] *See id. at 152-53.*

   At the motion to dismiss stage, the issue "'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.'" *Phelps v. Kapnolas, 308 F.3d 180, 184-85 (2d Cir. 2002)* (per curiam) (quoting *Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998)).* Therefore, the task of the court in ruling on a *Rule 12(b)(6)* motion is "'merely to assess the legal feasibility of the

complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Pierce v. Marano, No. 01 Civ. 3410, 2002 U.S. Dist. LEXIS 14870, 2002 WL 1858772, at *3 (S.D.N.Y. Aug. 13, 2002)* (quoting *Saunders v. Coughlin, No. 92 Civ. 4289, 1994 U.S. Dist. LEXIS 3015, 1994 WL 98108, at *2 (S.D.N.Y. Mar. 15, 1994)).*

## III. DISCUSSION

### A. Negligent Misrepresentation

   In his second cause of action, Maalouf claims that Smith Barney made negligent misrepresentations upon which CIN relied. Examples of such misrepresentations include statements by Smith Barney that it would [*10] engage in multi-billion dollar transactions with Listed Parties through CIN, *see* Complaint P 50, and that Smith Barney was able and ready to raise capital for Rosneft through debt financing on the international market, *see id.* P 51.

   Smith Barney seeks to dismiss plaintiff's negligent misrepresentation claim as "'so broad and conclusory as to be meaningless.'" Memorandum of Law in Support of Defendant's Motion to Dismiss the Second Through Seventh Causes of Action in the Second Amended Complaint at 8 ("Def. Mem.") (quoting *In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001)).* Smith Barney also seeks dismissal of this claim on the ground that Maalouf failed to plead the required elements of a negligent misrepresentation claim. [5]

   5   These elements are as follows: (1) defendant had a duty, by virtue of a special relationship with plaintiff, to give plaintiff correct information; (2) defendant made a false representation that it should have known was incorrect; (3) defendant knew that plaintiff desired the information supplied in the representation for a serious purpose; (4) plaintiff intended to rely and act upon such information; and (5) plaintiff reasonably relied on such information to its detriment. *See Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000).*

   [*11]   Negligent misrepresentation is a type of fraud and, as such, is subject to *Rule 9(b)*'s heightened pleading standard. *See Simon v. Castello, 172 F.R.D. 103, 105 (S.D.N.Y. 1997)* ("The particularity requirements of *Rule 9(b)* have also been found to apply to claims for negligent misrepresentation."). Nonetheless, it does not necessarily follow that a plaintiff must plead all elements of a negligent misrepresentation claim with particularity. *Rule 9(b)* merely states that "the circumstances constituting fraud or mistake shall be stated with

particularity." *Fed. R. Civ. P. 9(b)*. Accordingly, *Rule 9(b)*'s particularity requirement demands that the complaint contain specific factual allegations demonstrating that a statement was false or misleading when made. *See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69-70 (2d Cir.)* ("The complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made."), *cert. denied sub nom., Scholastic Corp. v. Truncellito, 534 U.S. 1071, 151 L. Ed. 2d 590, 122 S. Ct. 678 (2001).*

Here, plaintiff's [*12] generalized averments of negligent misrepresentations allegedly made by Smith Barney do not meet the particularity requirements of *Rule 9*. To do so, Maalouf would have to identify, at a minimum, the allegedly false representations made by Smith Barney, who at Smith Barney made them, where and when were they made, and why they are considered fraudulent. [6] For example, Maalouf claims that Smith Barney made representations "that it was able and ready to raise capital on the International market for the oil company Rosneft through debt financing guaranteed by [Rosneft's] oil reserves and assets ...." Complaint P 51. Such a vague and generic allegation does not satisfy *Rule 9(b)* because it does not put the defendant on sufficient notice of the claim, *i.e.,* the who, what, why, where and when. *See In re Scholastic Corp., 252 F.3d at 69-70.* Having failed to provide this level of detail, plaintiff's negligent misrepresentation claim is dismissed without prejudice.

> 6    In the context of securities fraud case, the Second Circuit has interpreted *Rule 9(b)* as follows:
>
> > To pass muster under *rule 9(b)*, the complaint must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation. Although scienter need not be alleged with great specificity, there must be some factual basis for conclusory allegations of intent.
>
> *Ouaknine v. MacFarlane, 897 F.2d 75, 79-80 (2d Cir. 1990)* (citations omitted).

## [*13] B. Breach of Fiduciary Duty

Maalouf's third claim against Smith Barney is for breach of fiduciary duty. Maalouf alleges that Smith Barney owed a duty to CIN not to conceal critical and detrimental facts regarding Smith Barney's direct dealings with Rossii-Sakha. *See* Complaint PP 66-67, 70. Specifically, plaintiff claims that "CIN was justified in believing that Smith Barney, Inc., would not act in a manner adverse to CIN's interest. Smith Barney, Inc., was in a dominant position as it possessed knowledge and expertise and Smith Barney's involvement could lead to a contract binding CIN." *Id.* P 65.

In order to pursue a breach of fiduciary duty claim, there must be a fiduciary relationship between the parties. *See Whitney v. Citibank, N.A., 782 F.2d 1106, 1115 (2d Cir. 1986)* (describing the elements of a breach of fiduciary duty claim as: (1) a breach by a fiduciary in its obligations to another; (2) defendant's knowing participation in the breach, and (3) damages as a result of the breach). Requiring Maalouf to plead all of these elements would clearly contradict *Swierkiewicz*. However, dismissal is nonetheless appropriate where a plaintiff has not, [*14] and cannot as a matter of law, plead a fiduciary relationship.

Entering into a conventional business relationship generally does not create a fiduciary relationship. *See Reuben H. Donnelley Corp. v. Mark I Mktg. Corp., 893 F. Supp. 285, 289 (S.D.N.Y. 1995). See also In Re Kressner, 206 B.R. 303, 312 (Bankr. S.D.N.Y. 1997)* ("A substantial factor to be considered in determining the existence of a fiduciary relationship is the intent to create a trust relationship, rather than a contractual relationship."). As stated by the Sixth Circuit,

> To make out a claim that a fiduciary relationship existed, the party claiming the fiduciary relationship must first show the relationship existed before the transaction that is the subject of the action. Second, the party claiming a fiduciary relationship must show that reliance was not merely subjective. Third, the party claiming a fiduciary relationship must show that the nature of the relationship imposed a duty upon the fiduciary to act in the principal's interest, even if such action were to the detriment of the fiduciary.

*In re Sallee, 286 F.3d 878, 892 (6th Cir.)* (citations omitted), [*15] *cert. denied, 537 U.S. 949, 154 L. Ed. 2d 294, 123 S. Ct. 415 (2002).*

In attempting to plead a fiduciary relationship, Maalouf has alleged that Smith Barney "was in a dominant position as it possessed knowledge and expertise" and that a "relationship of trust and confidence between CIN and Smith Barney Inc" existed. Complaint PP 65-66. However, "the fact that one businessman trusts another, and relies upon his promise to perform a contract, does

not rise to a confidential relationship." *In re Sallee*, 286 F.3d at 891. Moreover, "an arm's length business transaction, even those where one party has superior bargaining power[,] is not enough to give rise to a fiduciary relationship." *Sony Music Entm't Inc. v. Robison, No. 01 Civ. 6415, 2002 U.S. Dist. LEXIS 3100, 2002 WL 272406, at *3 (S.D.N.Y. Feb. 25, 2002)* (quotation marks and citation omitted). Given that Maalouf alleges that CIN and Smith Barney were parties to a garden variety business transaction, there can be no fiduciary relationship between the two parties. Nonetheless, if plaintiff can allege that Smith Barney was a fiduciary with respect to CIN, then his claim might be able to proceed. *See Sony Music, 2002 U.S. Dist. LEXIS 3100, 2002 WL 272406, at *3* [*16] . Accordingly, plaintiff's breach of fiduciary duty claim is dismissed without prejudice.

## C. Tortious Interference with Prospective Business Transactions

Maalouf's fourth claim against Smith Barney is for tortious interference with prospective business transactions. According to Maalouf, Smith Barney was aware that CIN had "substantial opportunities and prospective advantage" with the Listed Parties. Complaint P 73. Maalouf claims that Smith Barney intentionally interfered with CIN's prospective business opportunities and, as a result, CIN's business was severely damaged as to past, present and future engagements and prospects. *See id.* PP 74, 76. Although it is not entirely clear from the Complaint as to how Smith Barney interfered, Maalouf alleges that CIN "incurred reasonably foreseeable losses as a result of the *omissions and statements* of Smith Barney Inc." *Id.* P 76 (emphasis added).

Smith Barney seeks to dismiss this claim because Maalouf "does not identify the nature of CIN's business opportunities with the Listed Parties, nor does he explain how Smith Barney interfered with those opportunities." Def. Mem. at 12. In addition, defendant argues that plaintiff [*17] has failed to allege that any purported interference was done either with malicious motive or through wrongful means. [7] Defendant's argument may have succeeded before *Swierkiewicz*. However, the Supreme Court has emphatically reiterated that the purpose of pleadings is merely to put the adverse party on notice of the claims against it. *See Swierkiewicz, 534 U.S. at 512* (the "short and plain statement" required by *Rule 8(a)(2)* must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests'") (quoting *Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*). A plaintiff need not plead his claim in exhaustive detail, nor must he plead the elements of a particular claim. *See id.* ("*Rule 8(a)*'s simplified pleading standard applies to all civil actions, with limited exceptions."). Here, the Complaint suffi-

ciently puts Smith Barney on notice of plaintiff's claim for tortious interference with prospective business transactions. The specifics of that claim, as well as defendant's motives and methods, will be explored through discovery. Defendant's motion to dismiss this claim is therefore [*18] denied.

> 7 Under New York law, the elements of a claim for tortious interference with prospective business relations are: (1) a business relationship between plaintiff and a third party; (2) defendant's knowledge of such relationship; (3) intent to interfere; (4) defendant acted with the sole purpose of harming plaintiff or used dishonest, unfair or improper means; and (5) the relationship is injured. *See Nadel v. Play-by-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir. 2000)*. According to Smith Barney, plaintiff's claim fails because he has completely failed to allege malicious motive or wrongful means as required by the fourth element.

## D. Unjust Enrichment

In his fifth claim against Smith Barney, Maalouf alleges that services rendered by CIN, as well as its disclosure of Confidential Information to Smith Barney, unjustly enriched Smith Barney to CIN's detriment. *See* Complaint P 78. Maalouf goes on to state that Smith Barney has not compensated CIN for its services or "for [*19] damages resulting from its breaches of the specific written Agreements." *Id.* P 79. Smith Barney seeks to dismiss this claim on the ground that a breach of contract claim and a claim for unjust enrichment are mutually exclusive. *See* Def. Mem. at 16.

Unjust enrichment is "an amorphous cause of action, but one which falls under the umbrella of quasi-contract, or contract implied-in-law." *Michele Pommier Models, Inc. v. Men Women NY Model Mgmt., Inc., 14 F. Supp. 2d 331, 338 (S.D.N.Y. 1998), aff'd, 173 F.3d 845 (2d Cir. 1999)*. Unjust enrichment is premised on the notion that where principles of contract law are inadequate to compensate an unjustly deprived party, a court should resort to principles of equity. *See Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)* (noting that under New York law, the "essence" of an unjust enrichment claim "is that one party has received money or a benefit at the expense of another") (quotation marks and citations omitted). Accordingly, under New York law, the existence of a valid contract generally preempts a quasi-contract claim for unjust enrichment. *See Ohio Players, Inc. v. Polygram Records, Inc., No. 99 Civ. 33, 2000 U.S. Dist. LEXIS 15710, 2000 WL 1616999, [*20] at *4 (S.D.N.Y. Oct. 25, 2000)* ("Under New York law, unjust enrichment is a quasicontractual claim that ordinarily can be

maintained only in the absence of a valid, enforceable contract.").

"Here, Maalouf does not allege that the CIN Agreements are either unenforceable or that the dispute between CIN and Smith Barney falls outside the scope of those agreements." Def. Mem. at 17. In defense of the action, however, Smith Barney intends to argue that the transactions in dispute: (1) did not involve Smith Barney; (2) occurred after the CIN-Smith Barney Agreements terminated; and/or (3) were with Russian companies not covered under the Agreements. See id. 2000 U.S. Dist. LEXIS 15710, [WL] at *2. It is the second defense that could conceivably re-characterize plaintiff's breach of contract claim into a claim for unjust enrichment. If the services rendered by CIN to Smith Barney are found to be outside the scope of the Agreements, Maalouf's breach of contract claim would necessarily fail. But Maalouf may still have a claim for unjust enrichment in the absence of a governing contract. The fact that Maalouf may only *recover* on one claim, either contract or quasi-contract, certainly does not preclude him from *pleading* [*21] unjust enrichment in the alternative. [8] See Fed. R. Civ. P. 8(e)(2); see also MDCM Holdings, Inc. v. Credit Suisse First Boston Corp., 216 F. Supp. 2d 251, 261 (S.D.N.Y. 2002). Accordingly, Smith Barney's motion to dismiss Maalouf's claim for unjust enrichment is denied.

> 8   To plead a claim of unjust enrichment, a plaintiff must merely allege: "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." Golden Pac. Bancorp v. FDIC, 273 F.3d 509, 519 (2d Cir. 2001). Maalouf has met this minimal burden. See Complaint PP 77-83.

### E. Breach of Covenant of Good Faith and Fair Dealing

Maalouf's sixth claim against Smith Barney is for breach of the covenant of good faith and fair dealing. In short, Maalouf argues that Smith Barney's alleged unauthorized communications and direct transactions with [*22] the Listed Parties constituted breaches of the duty of good faith and fair dealing implicit in the Agreements. See Complaint PP 84-90. Smith Barney seeks to dismiss this claim as duplicative of plaintiff's breach of contract claim. See Def. Mem. at 18.

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance .... This embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Dalton v. Educational Testing Serv., 87 N.Y.2d

384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995) (quotation marks and citations omitted). See also Renner v. Chase Manhattan Bank, No. 98 Civ. 926, 2000 U.S. Dist. LEXIS 8552, 2000 WL 781081, at *19 (S.D.N.Y. June 14, 2000) ("The covenant of good faith arises out of and is inherent in a contract."). Because Maalouf could conceivably recover under a quasi-contract theory, as discussed with respect to his claim of unjust enrichment, his claim for breach of the covenant of good faith and fair dealing cannot be dismissed at this time.

### F. Tortious Interference with a Business Relationship

[*23]   Maalouf's final claim alleges that Smith Barney unlawfully interfered with "existing written agreements for joint ventures, representation and business development" with the Listed Parties and that Smith Barney's "tortious interference with CIN's business relationships caused a detriment to CIN and its contractual relations with Listed Parties." Complaint PP 92, 94. According to Maalouf, "had Smith Barney Inc. honored the terms of the Agreements with CIN[,] CIN would have been compensated for its years of work, and would have realized its planned joint ventures and stock ownership with Listed Parties." Id. P 96.

Smith Barney first argues that Maalouf's allegations based on CIN's purported *future* relations with the Listed Parties are virtually identical to those underlying his tortious interference with prospective business transactions claim. Defendant argues that the instant claim should be dismissed for the same reasons. See Def. Mem. at 14. These arguments have already been addressed. Secondly, Smith Barney argues that Maalouf has failed to state a claim for tortious interference with *existing* business relations as he has failed to assert that Smith Barney induced [*24] any of the Listed Parties to breach any contractual duties owed CIN. [9] See id. at 15. Defendant also argues that Maalouf has failed to sufficiently plead Smith Barney's intent to interfere with contracts between CIN and the Listed Parties. See id. at 16.

> 9   The elements of a claim for tortious interference with existing business relationships under New York law are as follows: (1) the existence of a valid contract; (2) defendant's knowledge of the contract; (3) defendant's intentional procurement of the breach of that contract; and (4) damages. See Yucyco, Ltd. v. Republic of Slovenia, 984 F. Supp. 209, 224 (S.D.N.Y. 1997).

A plaintiff does not need to describe a defendant's motivation at the pleading stage. The question of intent is highly fact-based and often involves sifting through circumstantial evidence. Such evidence generally becomes available through the course of discovery. See

*Swierkiewicz, 534 U.S. at 512* ("Before discovery has unearthed relevant facts and [*25] evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case."). However, a plaintiff claiming tortious interference with a business relationship must at least identify the existing third party contract he claims was breached as a result of defendant's conduct. *See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., No. 96 Civ. 1103, 1996 U.S. Dist. LEXIS 18653, 1996 WL 724734, at *3 (S.D.N.Y. Dec. 17, 1996)* (stating that courts have dismissed claims for tortious interference with contractual relations for failing to identify specific contracts that were breached by a defendant's actions). The instant claim is therefore dismissed without prejudice.

## IV. LEAVE TO AMEND

When a cause of action is dismissed because of pleading deficiencies, the usual remedy is to permit a plaintiff to amend his complaint. *See Fed. R. Civ. P. 15(a)* ("Leave [to amend] shall be freely given when justice so requires."); *see also Foman v. Davis, 371 U.S. 178, 183, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)* (stating that refusal to grant leave to amend without reason is an abuse of discretion and inconsistent with the spirit of the Federal Rules). [*26] Leave to amend is especially appropriate here given plaintiff's pro se status.

Accordingly, plaintiff is hereby given one final opportunity to amend his complaint to properly plead his claims of negligent misrepresentation, [10] breach of fiduciary duty, and tortious interference with a business relationship. Any such amended complaint must be served within thirty (30) days of receipt of this Opinion.

> 10 The policy of granting free leave to amend is especially appropriate in the context of claims dismissed under *Rule 9(b)* because the law favors resolving disputes on their merits. *See Acito v. IMCERA Group, Inc., 47 F.3d 47, 54-55 (2d Cir. 1995); Luce v. Edelstein, 802 F.2d 49, 56-57 (2d Cir. 1986).*

## V. CONCLUSION

For the reasons stated above, defendant's motion is granted in part and denied in part. In sum, Maalouf's claims for negligent misrepresentation, breach of fiduciary duty, and tortious interference with a business relationship are dismissed without prejudice [*27] with possible leave to re-plead. Plaintiff's claims of tortious interference with prospective business transactions, unjust enrichment, and breach of the covenant of good faith and fair dealing remain. A status conference is scheduled for Monday April 14, 2003, at 1:00 p.m. The Clerk of the Court is directed to close this motion.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: April 9, 2003

LEXSEE 2007 NY APP DIV. LEXIS 7646

[*1]  **Maddaloni Jewelers, Inc., Plaintiff-Respondent, v Rolex Watch U.S.A., Inc., et al., Defendants-Appellants. Index 602457/02**

**9986**

**SUPREME COURT OF NEW YORK, APPELLATE DIVISION, FIRST DEPARTMENT**

*2007 NY Slip Op 5410; 41 A.D.3d 269; 838 N.Y.S.2d 536; 2007 N.Y. App. Div. LEXIS 7646*

**June 21, 2007, Decided**
**June 21, 2007, Entered**

**NOTICE:**

THE LEXIS PAGINATION OF THIS DOCUMENT IS SUBJECT TO CHANGE PENDING THE RELEASE OF THE FINAL PUBLISHED VERSION. THIS OPINION IS UNCORRECTED AND SUBJECT TO REVISION BEFORE PUBLICATION IN THE OFFICIAL REPORTS.

**COUNSEL:** Gibney, Anthony & Flaherty, LLP, New York (Stephen F. Ruffino of counsel), for appellants.

Tarter Krinsky & Drogin LLP, New York (Debra Bodian Bernstein of counsel), for respondents.

**JUDGES:** Tom, J.P., Friedman, Nardelli, Catterson, Malone, JJ.

**OPINION**

[**269]  [***537]  Order, Supreme Court, New York County (Karla Moskowitz, J.), entered February 28, 2006, which denied defendants' motion for summary judgment dismissing the third amended complaint, unanimously modified, on the law, to grant the motion to the extent of dismissing the fourth cause of action alleging tortious interference with prospective business relations, and otherwise affirmed, without costs.

Plaintiff, a retail jeweler, and the corporate defendant (Rolex) entered into an Official Rolex Jeweler [**270]  Agreement, dated April 3, 2000 (the ORJ Agreement), setting certain terms and conditions for Rolex's filling of plaintiff's future orders for Rolex merchandise and for plaintiff's retail sale of such merchandise. Plaintiff's principal alleges that the individual defendants, who were employed by Rolex as sales managers, demanded that plaintiff make extra-contractual cash payments to them to ensure that plaintiff would have access to the full range of Rolex merchandise and that its orders would be filled in a timely fashion. After Rolex terminated the ORJ Agreement, plaintiff commenced this action, in which it alleges that the individual defendants caused Rolex to punish plaintiff for its resistence to their illegal demands by not processing certain orders by plaintiff's customers and unreasonably delaying the filling of other orders, thereby causing plaintiff to lose sales commissions and customers.

[***538]  Even assuming the truth of plaintiff's allegations, defendants were entitled to summary judgment dismissing the claim for tortious interference with prospective business relations because there is no evidence that the alleged tortious conduct was directed at third parties, i.e., plaintiff's customers (see *Carvel Corp. v Noonan, 3 NY3d 182, 192, 818 N.E.2d 1100, 785 N.Y.S.2d 359 [2004]*). However, the motion court correctly declined to render summary judgment dismissing the cause of action against Rolex for breach of the implied covenant of good faith and fair dealing. Although the ORJ Agreement made the acceptance of plaintiff's orders and the timing of deliveries subject to Rolex's discretion, the implied covenant obligated Rolex to exercise such discretion in good faith, not arbitrarily or irrationally (see *Dalton v Educational Testing Serv., 87 N.Y.2d 384, 389, 663 N.E.2d 289, 639 N.Y.S.2d 977 [1995]*; *Outback/Empire I, Ltd. Partnership v Kamitis, Inc., 35 AD3d 563, 825 N.Y.S.2d 747 [2006]*). Plaintiff's allegations therefore raise a triable issue of fact as to whether Rolex's discretion under the ORJ Agreement was exercised in bad faith, and, if so, whether plaintiff was damaged thereby.

2007 NY Slip Op 5410, *; 41 A.D.3d 269, **;
838 N.Y.S.2d 536, ***; 2007 N.Y. App. Div. LEXIS 7646

THIS CONSTITUTES THE DECISION AND OR-
DER  [*2]  OF THE SUPREME COURT, APPELLATE

DIVISION, FIRST DEPARTMENT.

ENTERED: JUNE 21, 2007

LEXSEE 2007 U.S DIST LEXIS 49641

**MANHATTAN MOTORCARS, INC., Plaintiff, - against - AUTOMOBILI LAMBORHINI, S.p.A., CHAMPION MOTOR GROUP, INC., and CHAMPION MOTORS, INC., d/b/a LAMBORGHINI LONG ISLAND, Defendants.**

**07 Civ. 978 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*244 F.R.D. 204; 2007 U.S. Dist. LEXIS 49641*

**July 9, 2007, Decided
July 9, 2007, Filed**

**COUNSEL:** [**1] For Plaintiff: David M. Kolko, Esq., Michael Cohen, Esq., Phillips Nizer LLP, New York, New York.

For Defendants: Daniel V. Gsovski, Esq., Keith A. Frederick, Esq., Herzfeld & Rubin, P.C., New York, New York; James R. Vogler, Esq., Randall L. Oyler, Esq., David M. Wiese, Esq., Barack Ferrazzano Kirschbaum Perlman & Nagelberg LLP, Chicago, Illinois.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

[*209] **OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I. INTRODUCTION**

Manhattan Motorcars, Inc. ("Manhattan") brings this diversity action [1] against Automobili Lamborghini, S.p.A. ("Lamborghini" or "Defendant") claiming common-law fraud, breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, negligent misrepresentation, violation of the New York Franchised Motor Vehicle Dealer Act, and account stated. [2] The claims arise from the circumstances surrounding Manhattan's operation of a Lamborghini dealership and its attempts to expand dealership operations into Westhampton, New York. Manhattan seeks over fifty million dollars in damages, as well as five million dollars in punitive damages. Lamborghini now moves to dismiss all claims brought [**2] against it for failure to satisfy *Rules 9(b)* and *12(b)(6) of the Federal Rules of Civil Procedure*. Manhattan opposes this motion. For the following reasons, defendant's motion to dismiss is granted in part and denied in part.

1   This Court has jurisdiction over this matter pursuant to *section 1332(a) of title 28 of the United States Code.*

2   Manhattan alternately characterizes its claim in account stated as a claim for "Monies Owed." *See* Amended Complaint ("Am. Compl.") at 17. The Court has found no authority for the existence of such a claim.

**II. BACKGROUND** [3]

3   The following facts, drawn from the Amended Complaint, are assumed to be true for the purposes of this motion.

**A. The Parties**

Manhattan, a New York corporation, [4] "is a dealer and seller of expensive, unique and top of the line automobiles including Rolls [*210] Royce, Bentley, Porsche, and Lamborghini, with its primary showroom located at 270 Eleventh Avenue, New York . . . ." [5] Lamborghini is an Italian-based company which manufactures and sells the Lamborghini automobile through dealerships located throughout the world, including New York. [6]

4   *See* Am. Compl. P 1.

5   *Id.* P 2.

Case 1:07-cv-09749-JSR     Document 11-3     Filed 01/31/2008     Page 24 of 26

Page 2

244 F.R.D. 204, *; 2007 U.S. Dist. LEXIS 49641, **

6  *See id.* PP 3-4.

## B. The 1996 Agreement

In 1996, Lamborghini sought to induce [**3] Manhattan to enter into a dealer agreement with it for the marketing and sale of Lamborghini automobiles from plaintiff's Manhattan showroom. [7] In order to induce Manhattan to become a dealer, Lamborghini, through its representatives, advised Manhattan's president and owner, Brian Miller, that if Manhattan became a dealer, it would have "an exclusive territory in and throughout New York State for the marketing and sale of Lamborghini vehicles for as long as [Manhattan] acted as a dealer." [8] According to Manhattan, this representation was a necessary inducement due to the unique nature of the Lamborghini automobile, which bears a price tag "well in excess of $ 150,000" [9] as well as high insurance and maintenance costs. [10] These factors result in a limited market for the Lamborghini automobile. [11] In fact, competition is so "stiff" among dealers that a reduction in sales volume of even a few vehicles has the potential to "significantly impair the revenues and profitability" of a Lamborghini dealership. [12] Moreover, Lamborghini allegedly requires its dealers to satisfy "exacting design, construction and showroom standards in order to maintain the prestige and special image of the Lamborghini." [**4] [13] The costs of compliance with these standards, which are borne by the dealers, are "substantial." [14] As a result of these considerations, Lamborghini allegedly must offer potential dealers an exclusive territory in order to persuade them to enter into dealer agreements, which would likely be unprofitable otherwise. [15]

7  *See id.* P 11.

8  *Id.* P 16.

9  *Id.* P 12.

10  *See id.* P 13.

11  *See id.* Manhattan alleges that approximately five hundred Lamborghini automobiles are sold each year through approximately forty-seven Lamborghini dealers located throughout the United States. *See id.*

12  *Id.*

13  *Id.* P 15.

14  *Id.*

15  *See id.* P 17.

Manhattan alleges that without the assurance of exclusivity in New York, it would not have entered into a dealer agreement with Lamborghini. [16] In 1996, in reliance upon Lamborghini's alleged representations regarding exclusive territory in New York, Manhattan entered into a written dealer agreement with Lamborghini ("1996 Agreement"). [17] The 1996 Agreement, however, makes no mention of exclusivity or territory. [18] Between 1996 and 2005, Manhattan served as the sole Lamborghini dealer in New York State. [19]

16  *See id.* P 22.

17  *See id.* P 18.

18  *See id.* Manhattan alleges that this conspicuous silence [**5] was an attempt by Lamborghini to conceal the fact that it had no intention of granting an exclusive license to Manhattan for the New York area. *See id.* P 21.

19  *See id.* P 23.

Since the 1996 Agreement was originally entered into by the parties, it has been renewed from time to time. [20] The most recent incarnation of the Agreement was entered into on September 1, 2005 ("2005 Agreement"). [21] The 2005 Agreement contains an integration clause, which states: "[t]his Agreement is the entire and sole agreement and understanding between the parties [and] terminates and supersedes any and all other [*211] prior agreements between the parties, whether oral or in writing." [22]

20  *See id.* P 18.

21  *See* 2005 Agreement, Ex. A. to Am. Compl., at 40.

22  *Id.* at 36.

## C. The Westhampton Facility

On January 16, 2004, Manhattan and Lamborghini entered into a written Letter of Intent, in which Lamborghini "consented" to Manhattan's construction of a new facility in Westhampton, New York for the sale and service of Lamborghini automobiles. [23] The Letter of Intent designated the new facility as a satellite of plaintiff's Manhattan dealership, [24] and stated that "an addendum to the main contract would be drafted and signed to reflect [**6] Lamborghini's acceptance of the proposed additional location in Long Island." [25] Lamborghini represented to Miller, both before and after the signing of the Letter of Intent, that plaintiff's Westhampton facility would "be the sole dealership selling Lamborghinis in

Case 1:07-cv-09749-JSR     Document 11-3     Filed 01/31/2008     Page 25 of 26

Page 3

244 F.R.D. 204, *; 2007 U.S. Dist. LEXIS 49641, **

Long Island . . . ." [26] Manhattan relied on these representations in that it would not have signed the Letter of Intent had it known that it would not have exclusive dealer rights on Long Island. [27]

23  *Id.* P 24.

24  *See id.*

25  *Id.*

26  *Id.* P 26.

27  *See id.* P 39. Manhattan alleges that these representations were made to induce Manhattan to expand its dealership to Long Island and that the representations were knowingly false when made. *See id.* P 41.

After signing the Letter of Intent, Manhattan "expended several million dollars to renovate a temporary facility for the Westhampton dealership and then to build a new, permanent facility in Westhampton . . . ." [28] Lamborghini was aware of these expenditures since 2004. [29] In September 2005, Lamborghini "changed course" and "insisted" that the Westhampton facility be operated as a separate dealership by Manhattan, rather than as a satellite facility of the Manhattan dealership. [30] "[H]aving [**7] already expended several millions of dollars on the Westhampton facility," plaintiff had "little choice but to accede to [Lamborghini's] demand . . . ." [31]

28  *Id.* P 27.

29  *See id.* P 31.

30  *Id.* P 28.

31  *Id.* P 29.

As the Westhampton facility would be operated as a separate dealership, Manhattan was required to submit a new dealer application and obtain approval of the application from Lamborghini. [32] On October 15, 2005, Manhattan filed the requisite dealer application ("Westhampton Dealer Application"). [33] Miller was later informed by a Lamborghini official that the Westhampton facility was "in full compliance with all standards and requirements, that his application for the Westhampton dealership would soon be approved, and he should expect a dealer agreement to sign." [34] To date, Manhattan's Westhampton Dealer Application remains pending, and Lamborghini has "refused to formally approve said application or send a dealer agreement to [Manhattan] for execution." [35] Despite a lack of formal approval, Manhattan "is holding itself out and acting as a Lamborghini dealer in its West-

hampton facility[,]" an activity that Lamborghini encourages. [36]

32  *See id.* P 28.

33  *See id.* P 29.

34  *Id.* P 33.

35  *Id.* P 35.

36  *Id.*

### D.  [**8] The Appointment of Champion

In the summer of 2006, Manhattan learned that Lamborghini had signed a Letter of Interest with another car dealership, Champion Motor Group, Inc. ("Champion"). [37] Under the Letter of Interest, Lamborghini authorized Champion to market and sell Lamborghinis in New York. [38] Champion's showroom is located in Jericho, New York, [*212] about fifty miles from Manhattan's Westhampton facility. [39] Lamborghini entered into the Letter of Interest fully aware of the substantial expenditures Manhattan made in connection with the construction of its Westhampton dealership. [40] Manhattan alleges that, in fact, Lamborghini intentionally concealed its relationship with Champion with the intention of inducing Manhattan to incur these expenses so as "to induce, if not coerce [Manhattan] to accede to the rights granted to Champion." [41] As a result of "unfair competition" from Champion, Manhattan "has and will lose sales from its Manhattan and Westhampton dealerships and will suffer substantial loss of profits." [42] At the same time, the additional Lamborghini dealership on Long Island has benefitted Lamborghini by increasing its revenues and promoting its good will. [43]

37  *See id.* P 36.

38  *See* [**9] *id.*

39  *See id.*

40  *See id.* P 38.

41  *Id.* P 80.

42  *Id.* P 42.

43  *See id.* P 66.

## III. LEGAL STANDARDS

### A. Motion to Dismiss

Case 1:07-cv-09749-JSR    Document 11-3    Filed 01/31/2008    Page 26 of 26

Page 4

244 F.R.D. 204, *; 2007 U.S. Dist. LEXIS 49641, **

"*Federal Rule of Civil Procedure 8(a)(2)* requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary . . . ." [44] When a complaint is attacked by a *Rule 12(b)(6)* motion to dismiss, the plaintiff need not provide "detailed factual allegations." [45] To survive a motion to dismiss, it is enough that the complaint "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." [46]

44   *Erickson v. Pardus, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007).*

45   *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007).*

46   *Id.*

The task of the court is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." [47] When determining the sufficiency of plaintiff's claim for *Rule 12(b)(6)* purposes, consideration is limited to the factual allegations in plaintiff's amended complaint, which are accepted as true, as well as "documents relied on or incorporated by reference in the complaint." [48] While there are legitimate reasons to dismiss [**10] a case under *Rule 12(b)(6)*, "[t]he case cannot, however, be dismissed on the ground that petitioner's allegations of harm were too conclusory to put these matters in issue." [49] Thus, while a court must take the plaintiff's allegations as true, "the claim may still fail as a matter of law if it appears . . . that the plaintiff can prove no set of facts in support of its claim which would entitle [him] to relief, or if the claim is not legally feasible." [50]

47   *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 176 (2d Cir. 2004)* (quotation marks and citation omitted).

48   *International Design Concepts, LLC v. Saks, Inc., 486 F. Supp. 2d 229, 235-36 (S.D.N.Y. 2007).*

49   *Erickson, 127 S. Ct. at 2200 (2007).*

50   *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 457 F. Supp. 2d 455, 459 (S.D.N.Y. 2006)* (citing *Allaire Corp. v. Okumus, 433 F.3d 248, 250 (2d Cir. 2006)).*

## B. Common-Law Fraud

To recover damages for fraud under New York law, a plaintiff must prove: (1) a misrepresentation of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) [**11] which caused injury to the plaintiff. [51] "The claim also requires a showing of proximate causation, such that the injury 'is the natural and probable consequence of the defrauder's misrepresentation or . . . the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud.'" [52] [*213] A claim for fraud can also be based on concealment of information if the plaintiff, in addition to showing an intentional failure to disclose a material fact reasonably resulting in injury, can demonstrate that the defendant had a duty to disclose material information. [53] Such a duty can arise in the course of negotiations pursuant to a business transaction in three situations -- (1) "where [one] party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party, it cannot give only half of the truth"; (2) "when the parties stand in a fiduciary or confidential relationship with each other"; and (3) "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." [54]

51   *See Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001).*

52   *Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 104-05 (2d Cir. 2001)* [**12] (quoting *Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1044 (2d Cir. 1986)).*

53   *See Swersky v. Dreyer & Traub, 219 A.D.2d 321, 643 N.Y.S.2d 33, 36 (1st Dep't 1996).*

54   *Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).*

A claim for fraud under New York law must also satisfy the heightened pleading standards of *Federal Rule of Civil Procedure 9(b)*, which requires "all averments of fraud" to be "stated with particularity." [55] This requirement must be met even in suits in which subject matter jurisdiction is based, as here, on diversity of citizenship and in which state law controls the elements of the fraud claim. [56] For claims of fraudulent misrepresentation, the Second Circuit has held that *Rule 9(b)* requires allegations that "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." [57] In the case of fraudulent concealment or omission, where the plaintiff is unable to specify the time and place because no act occurred, "the complaint must still allege: (1) what the omissions were; (2) the person responsible for the