Not Reported in F.Supp.2d
(Cite as: 1999 WL 787658, *6 (S.D.N.Y.))

year statute of limitations on an action to recover any overcharge of interest. C.P.L.R. § 215(6). This language clearly and unambiguously applies to any "monetary charge in excess of the proper, legal or agreed rate or amount." Rubin v. City Nat'l Bank and Trust Co., 131 A.D.2d 150, 152 (3d Dep't 1987) (citation omitted). Plaintiffs rely on Englishtown Sportswear, Ltd. v. Marine Midland Bank, 97 A.D.2d 498, (2d Dep't 1983)(holding that C.P.L.R. § 215(6) only applies to usury actions), which directly contradicts the holding in Rubin (holding that the plain, ordinary meaning of CPLR 215(6) statutory language is clear on its face and such language is controlling). The Court will follow the more recent and thoughtful analysis provided in Rubin. See Rubin, 131 A.D.2d at 153 (holding that the ordinary meaning of the statute controls).

*7 When a statute is clear and unambiguous in its language, New York courts should not inquire as to legislative history to aid in its interpretation. See Washington Post Co. v. New York State Insurance Dep't et al., 61 N.Y.2d 557, 565 (1984)("When the plain language of the statute is precise and unambiguous, it is determinative") (citation omitted); see also McKinney's Cons.Laws of N.Y., Book 1, Statutes at 76 (Where words of a statute are free from ambiguity and express plainly, clearly and distinctly the legislative intent, "resort need not be had to other means of interpretation."). The language of C.P.L.R. § 215(6) is entirely clear, therefore, it would be inappropriate to examine the statute's legislative history.

Plaintiffs argue that the Rubin holding is limited to the facts of that case, and as such does not extend to overcharges of interest that are contractual rather than statutory. See Plaintiff's Memorandum at 4. This argument, however, overlooks the court's statement that "[W]hile this case and Englishtown are factually distinguishable, the question remains whether CPLR 215(6) extends to actions other than usury." Rubin, 131 A.D.2d 150 (3d Dep't 1987). Despite the differing factual backgrounds between the two cases, the Rubin court was clearly re-examining the same issue addressed by the Englishtown court. The Rubin court ultimately concludes that C.P.L.R. § 215(6) applies to any overcharge of interest--not just usury. See Rubin, 131 A.D.2d at 153. The Court grants Freddie Mac's motion to dismiss on this issue, because Plaintiffs' claim is barred by the statute of limitations.

B. The Duty of Fair Dealing

Plaintiffs' claim under breach of duty of fair dealing should be dismissed. As discussed above, see supra Section IV, New York courts have consistently denied claims of breach of duty of fair dealing when they are alleged together with breach of contract. See OHM Remediation Services Corp. v. Highes Environmental Systems, Inc., 952 F.Supp. 120, 124 (N.D.N.Y.1997) (holding that New York does not recognize a simultaneous claim for breach of contract and breach of the duty of fair dealing). The Court grants Freddie Mac's motion to dismiss the Plaintiff's claim of breach of duty of fair dealing, accordingly.

C. Unjust Enrichment

Plaintiffs' claim for unjust enrichment and money had and received claim against Freddie Mac must be dismissed, as there is no set of facts in support of the Plaintiffs' claim which would entitle them to relief. Cohen, 25 F.3d at 1172 (quoting Conley, 355 U.S. at 45-46). Plaintiffs and Defendants agree that one may not maintain a claim in quasi contract where a contract governs the "particular subject matter of its claims for unjust enrichment." See Plaintiffs' Memorandum at 7 (quoting Metropolitan Elec. Mfg. Co., 183 A.D.2d at 759). Simply rephrasing an affirmative, contractual obligation into a failure to uphold this obligation, does not create a new subject matter. The quasi contract claim does not have a subject matter independent from the contract itself. Therefore, Plaintiff's claim of unjust enrichment and money had and received against Freddie Mac is dismissed.

D. Deceptive Practices Act

*8 The Siradases' claim that Freddie Mac violated New York and Virginia [FN9] statutes by deceptively using a formula for computing interest rate adjustment that was inconsistent with the formula agreed upon in their mortgage, and inconsistent with Freddie Mac's policy.

FN9. The Virginia statute specifies certain unlawful practices, and prohibits all conduct "using any other deception, fraud, false pretense, or misrepresentation in connection with a consumer transaction." Va.Code Ann. §§ 59.1-200.

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Although the Siradases' deceptive practices claim against the Chase Defendants has survived, their deceptive practices claim against Freddie Mac is dismissed.  Unlike the Chase Defendants, Freddie Mac is not subject to the New York Deceptive Practices Act. Freddie Mac is also not subject to the Virginia Code §§ 59.1-200 regulating deceptive business practices.

1. Freddie Mac is Not Subject to N.Y. Gen. Bus. Law §§ 349, 350

The Deceptive Practices Act only applies to New York residents and New York transactions. See Riordan v. Nationwide Mutual Fire Insurance Co., 977 F.2d 47, 52 (2d Cir.1992) (holding that the section applies to "every business operating in New York"), see also Weaver v. Chrysler Corp., 172 F.R.D. 96, 100 (S.D.N.Y.1997) (dismissing claim because Plaintiff has failed to allege any deceptive acts or practices by Chrysler that occurred within New York State, which is required to state a claim under the Deceptive Practices Act). However, Plaintiffs have failed to allege that Freddie Mac committed any deceptive practices or acts within New York or is a New York resident.

Plaintiffs claim that Freddie Mac should not be able to absolve itself from liability simply by hiring a servicer to do that which it was obligated to do under the contract, suggesting that Freddie Mac be liable because of its relationship with The Chase Defendants, which is subject to the New York Deceptive Practices Act. Plaintiff's Memorandum at 11. However, Freddie Mac, as a government institution, is not liable for the deceptive conduct of its servicers. See United States v. Zenith-Godly Co. Inc., 180 F.Supp. 611, 615 (S.D.N.Y.1960) ("While a private person may be bound by acts of his agents that are not within the actual bounds of the agent's authority, it does not follow that the Government may be bound by the apparent authority of its agents").  Therefore, there may be no liability under the Deceptive Practices Act on the part of Freddie Mac, and Defendants' motion to dismiss on this issue is granted.

2. Freddie Mac Is Not Subject to Va.Code Ann. §§ 59.1-200

Freddie Mac is not subject to the Virginia Consumer Protection Act ("VCPA") for two reasons. First, consumer real estate transactions are governed by 15 U.S.C.S. § 1603, and are therefore not subject to the VCPA. See Smith v. United States Credit Corp., 626 F.Supp. 102 (E.D.Va.1985) (holding that consumer real estate transactions are not subject to the VCPA, because they are exclusively under the domain of 15 U.S.C.S. § 1603, the Federal Consumer Credit Act).

Plaintiffs attempt to distinguish this case from Smith by arguing that although 15 U.S.C.S. § 1603 does regulate consumer real estate transactions in general, it does not specifically regulate interest rate adjustments on ARM loans. Plaintiffs then conclude that since this conduct is not regulated by the Federal statute, it is subject to the VCPA. See Plaintiffs' Memorandum at 12, 13. Plaintiffs are incorrect in their assertion that interest rate adjustments on ARM loans are not subject to 15 U.S.C.S. § 1603. Although the federal statute does not specify that this particular type of conduct is within its ambit, its general phrasing includes the deceptive calculation of interest rates. See 15 U.S.C.S. § 1603. The statute's statement of its own purpose supports a broader construction: "[i]t is the purpose of this title ... to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." Id.

*9 Secondly, the VCPA does not apply here because Freddie Mac is not a supplier. The VCPA only regulates suppliers. The statute defines the term "supplier" to mean "a seller or lessor who advertises, solicits, or engages in consumer transactions, or a manufacturer or distributor who advertises and sells or leases goods or services to be resold or leased by other persons in consumer transactions." Va.Code § 59.1-198. Freddie Mac is clearly not a seller or lessor--it has not sold goods or services to Plaintiffs. Rather, Freddie Mac purchased the mortgage after the loan had already been given to Plaintiffs. Finally, Freddie Mac did not engage in "consumer transactions." The VCPA defines consumer transactions as, "[t]he advertisement, sale, lease or offering for sale or lease, of goods or services to be used primarily for personal, family or household services." Va.Code § 59.1-198. "Goods" are defined to include "all real, personal or mixed property, tangible or intangible." Id. This does not apply to Freddie Mac.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
**(Cite as: 1999 WL 787658, \*9 (S.D.N.Y.))**

For both of the above reasons, Freddie Mac is not subject to the VCPA, and Plaintiff's deceptive practices claim against Freddie Mac is dismissed.

CONCLUSION

For the above reasons, the Court dismisses all of Plaintiffs' claims against Freddie Mac, and all of the individual claims brought by the Takacses against Defendants. Finally, the Court dismisses the Siradases' claims of unjust enrichment and their claim of breach of duty of fair dealing. The Court denies the Defendant's motion to dismiss the Siradases' deceptive practices claim against the Chase Defendants.

SO ORDERED:

1999 WL 787658 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
2004-1 Trade Cases P 74,361
(Cite as: 2004 WL 691680 (S.D.N.Y.))

Page 171

< KeyCite History >

United States District Court,
S.D. New York.

SIX WEST RETAIL ACQUISITION, INC.,
Plaintiff,
v.
SONY THEATRE MANAGEMENT CORP., et
al., Defendants.

No. 97 Civ.5499(LAP).

March 31, 2004.

OPINION AND ORDER

PRESKA, J.

*1 Show business is a tough business. [FN1] After managing and operating plaintiff's theatres for nearly two decades defendants found themselves parties to a suit filed by plaintiff alleging breach of contract, breach of fiduciary duties, unjust enrichment, tortious interference, and violations of the federal antitrust laws. Now, after almost seven years of litigation, after voluminous submissions, numerous motions, and depositions taken on the other side of the globe, I address defendants' motions for summary judgment.

> FN1. "Show Business is tough ... it's a dog eat dog world. No ... it's worse ... it's dog doesn't return another dog's phone call." Crimes and Misdemeanors (Image Entertainment 1989).

BACKGROUND

The plaintiff, Six West Retail Acquisition, Inc. ("Six West"), brings this action against various corporate and individual defendants alleging (1) breach of contracts related to the defendants' management of three movie theatres owned by Six West; (2) breach of fiduciary duties arising from defendants' management of those theatres; (3) tortious interference with the plaintiff's prospective business relations; (4) unjust enrichment; (5) restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (6) attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and (7) anticompetitive merger in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. (First Amended Complaint dated Dec. 4, 1997 ("Amended Compl.") ¶¶ 86-131). Following the close of discovery, plaintiff announced that it was abandoning the merger claim as it had "been compromised by subsequent events" (Letter from Jeffrey H. Howard to Judge Preska of 3/14/03, at 1 n. 2), and I now address defendants' motions for summary judgment on the remaining allegations pursuant to Fed.R.Civ.P. 56. [FN2] For the reasons set forth below, [FN3] defendants' motions are granted.

> FN2. Defendants bring two motions for summary judgment: one on behalf of the "Sony Defendants," which primarily addresses the antitrust allegations, and one on behalf of the "Loews Defendants" and "Individual Defendants," which primarily addresses the breach of contract and fiduciary duty allegations.

> FN3. "The moment of truth boys. Somebody's life is about to change." Titanic (Twentieth Century Fox 1997).

I. The Facts

A. The Parties

Plaintiff Six West is a New York corporation with its principal place of business in New York, New York. (Amended Compl. ¶¶ 6, 34). Plaintiff leases out and controls three movie theatres in Manhattan: the New York Twin (the "Twin"), the Paris Theatre (the "Paris"), and the former Festival Theatre (the "Festival"). (Amended Compl. ¶¶ 4, 6). Sheldon H. Solow ("Solow") is a real estate developer who is Six West's owner, sole shareholder, and a corporate officer. (Amended Compl. ¶¶ 4, 6).

Defendant Loews Theatre Management Corporation ("Loews Theatres"), formerly known as Sony Theatre Management Corporation, is a Delaware corporation with its principal place of business in New York. (Amended Compl. ¶ 7). Defendant Loews Fine Arts Cinema, Inc. ("Loews Fine Arts") is a subsidiary of Loews Theatres through which Loews Theatres conducted business with the Paris and Festival theatres. [FN4] (Amended Compl. ¶ 10). Defendant Talent Booking Agency, Inc. ("TBA") is a New York corporation

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 691680, *1 (S.D.N.Y.))

and Loews affiliate. (Amended Compl. ¶ 9). Loews Theatres, TBA, and Loews Fine Arts refer to themselves collectively as the "Loews Defendants" and shall be referred to herein as the "Loews Defendants" or "Loews". (Loews Def.'s 56.1 Stmt at 3).

> FN4. As Loews Theatres and Sony Theatres are the same entity, for clarity "Loews Theatres" will be used throughout.

*2 Defendant Sony Pictures Entertainment Corporation ("Sony Pictures") is a Delaware corporation and the parent company of Loews Theatres. (Amended Compl. ¶ 11). Sony Pictures produces and distributes motion pictures, which are then (along with films from other companies) exhibited by Loews Theatres and other exhibitors. (Amended Compl. ¶ 11). Defendant Sony Corporation of America ("Sony USA") is a New York corporation, and is the parent company of Sony Pictures. (Amended Compl. ¶ 12). Defendant Sony Corporation is a Japanese corporation that is the ultimate parent of all the Sony entities. (Amended Compl. ¶ 13). Sony Pictures, Sony USA, and Sony Corporation refer to themselves collectively as the "Sony Defendants" and shall be referred to herein as the "Sony Defendants". (Loews Def.'s 56.1 Stmt at 1).

Defendants James Loeks and Barrie Lawson Loeks are former Co-Chairpersons of Loews Theatres. (Amended Compl. ¶ 14-15). Defendant Travis Reid ("Reid") is President of Loews Theatres and TBA. (Amended Compl. ¶ 16). Defendant Seymour H. Smith ("Smith") is Executive Vice President of Loews Theatres and TBA. (Amended Compl. ¶ 18). Defendant Thomas Brueggeman ("Brueggeman") is Vice President of Loews Theatres. (Amended Compl. ¶ 17). Hereinafter, James and Barrie Loeks, Reid, Smith, and Brueggeman shall collectively be referred to as the "Individual Defendants".

B. The Twin

On December 13, 1978, Solow Theatre Corporation ("STC"), which leased the Twin from Solow pursuant to a lease agreement (the "Lease Agreement") of the same date (Loews Def.'s 56.1 Stmt ¶ 4), and TBA entered into an agreement (the "Twin Agreement"), whereby TBA would operate

and manage the Twin. (Twin Agreement § 3.01; Amended Compl. ¶ 33; Loews Def.'s 56.1 Stmt ¶ 2). Pursuant to the Twin Agreement, STC would receive 60% of the net theatre income, and TBA would receive 40%. (Twin Agreement § 4.04). STC and Solow, as tenant and landlord, respectively, entered into a Four Party Agreement dated December 13, 1978, with TBA and Loews, as operator and guarantor, respectively, whereby TBA and Loews agreed to assume the obligations of tenant, such as maintaining the premises, under the lease. (Pl.'s 56.1 Counterstmt to Loews ¶ 4b). [FN5] As part of a transaction involving Chartwell Theatres, Inc ., TBA and Solow entered into a letter agreement dated July 3, 1985, that amended the Twin Agreement (the "Chartwell Consent"). The Twin Agreement had a term of 15 years, from 1979 through 1993, and Loews exercised its right to extend the Twin Agreement, as amended by the Chartwell Consent, for another ten years. (Loews Def.'s 56.1 Stmt ¶¶ 19-20; Pl.'s 56.1 Counterstmt to Loews ¶ 20 (disputing when Loews exercised its right of renewal)).

> FN5. Six West submitted separate responses to "The Loews and Individual Defendants' Statement Pursuant to Local Civil Rule 56.1" ("Loews Def.'s 56.1 Stmt") and "The Sony Defendants' Statement Pursuant to Local Civil Rule 56.1" ("Sony Def.'s 56.1 Stmt"). Hereinafter, "Pl.'s 56.1 Counterstmt to Loews" and "Pl.'s 56.1 Counterstmt to Sony" shall be used to distinguish between Six West's responses to the Loews/Individual Defendants' 56.1 submissions and the Sony Defendants' 56.1 submissions, respectively.

C. The Paris and Festival

Solow began to operate the Paris theatre, which is allegedly one of the most prestigious theatres in the country and commonly used for movie premiers (Amended Compl. ¶¶ 43, 51), in 1990, and beginning on March 23, 1990, Loews and Solow Management Corporation began discussions regarding Loews' management of the Paris for Solow. (Loews Def.'s 56.1 Stmt ¶ 40). Solow and Loews continued discussions and exchanged draft operating agreements until 1993 or 1994 but never executed a written agreement that explicitly set forth the terms governing Loews' operation of the Paris. (Loews Def.'s 56.1 Stmt ¶ 41, Pl.'s 56.1 Counterstmt to Loews ¶ 41, 41a-g). Nevertheless, it

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

is undisputed Loews did operate the Paris theatre even though the parties now dispute the terms that governed Loews' operation of that theatre. Loews ceased operating the Paris on April 30, 1997. (Loews Def.'s 56.1 Stmt ¶ 75).

**\*3** At the same time as Loews began operating the Paris, Loews also began operating the Festival. (Amended Compl. ¶ 47; Loews Def.'s 56.1 Stmt ¶ 79). As with the Paris, draft operating agreements were exchanged by the parties, but the parties never entered into a signed agreement. (Loews Def.'s Stmt ¶ 80; Pl.'s Counterstmt to Loews ¶ 80a-d). The Festival ceased operations on August 21, 1994. (Loews Def.'s 56.1 Stmt ¶ 92).

## II. Procedural History

Six West filed the original complaint in this action on July 24, 1997, and the case was assigned to the Honorable David N. Edelstein. Following the public announcement of the merger between Loews and Cineplex Odeon, Six West filed the Amended Complaint on December 4, 1997, which added a Clayton Act claim alleging that the merger was anti-competitive (subsequently abandoned). All of the defendants filed a motion on January 8, 1998 to dismiss the Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6). In an Opinion & Order dated March 9, 2000, Judge Edelstein denied most of defendants' motion to dismiss, but did dismiss the contract claims as against the Individual Defendants and held that the block-booking allegations could only proceed against Sony Pictures, as Sony Pictures is the only film distributor. See Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp., 2000 WL 264295 (S.D.N.Y. March 9, 2000).

I was assigned this case from Judge Edelstein on September 26, 2000, following Judge Edelstein's passing after almost fifty years of service on this Court.

On April 16, 2003, the Loews Defendants, Sony Defendants, and Individual Defendants all moved for Summary Judgment on all remaining claims in the Amended Complaint. The defendants also submitted joint motions in limine to exclude the testimony and reports of two of plaintiff's experts. On April 16, 2003, plaintiff also filed a motion in limine to exclude the testimony and report of one of

defendants' experts. Submissions filed under seal from both parties followed.

## DISCUSSION

### I. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment shall be rendered forthwith if the pleadings, depositions, answers, interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); see Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).

The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The substantive law determines the facts which are material to the outcome of a particular litigation. See Anderson, 477 U.S. at 250; Heyman v. Commerce & Indus. Ins. Co ., 524 F.2d 1317, 1320 (2d Cir.1975). In determining whether summary judgment is appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. See Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

**\*4** If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita, 475 U .S. at 586. However, only when it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight" should summary judgment be granted. Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir.1994).

### II. Plaintiff's Antitrust Claims

#### A. Sherman Antitrust Act § 1 Tying Claims

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Page 174

(Cite as: 2004 WL 691680, *4 (S.D.N.Y.))

Six West alleges, under two related but distinct theories, that the Sony Defendants' film distribution practices and the Loews Defendants' and Sony Defendants' licensing relationships are unreasonable restraints of trade in violation of Section 1 of the Sherman Act. That provision makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. To establish such a claim plaintiff must show: " '(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either per se or under the rule of reason .'' ' Virgin Atlantic Airways Ltd. v. British Airways PLC, 257 F.3d 256, 263 (2d Cir.2001) (quoting Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95-96 (2d Cir.1998)).

1. Block-Booking

a. Standing

The Sony Defendants allege for the first time in their Reply that if there was any injury caused by the alleged block-booking by Sony Pictures the injury was only inflicted upon Loews and, thus, Six West lacks standing. [FN6] (Sony Def.'s Reply at 14). The Sony Defendants assert that as a landlord, Six West "was neither a consumer nor a competitor in the market in which trade was [allegedly] restrained" and, therefore, lacks standing to complain about foreclosure from the bidding process. (Sony Def.'s Reply at 14 (quoting Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519, 539 (1983))). In support of this lack of standing defense, the Sony Defendants cite to Calderone Enter. Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292, 1296 (2d Cir.1971), in which a non-operating landlord of a theatre, which had been leased to an exhibitor, was held to lack antitrust standing.

FN6. "Surely you can't be serious." "I am serious, and don't call me Shirley." Airplane! (Paramount Pictures 1980).

Calderone is easily distinguishable from the situation at bar. Here, Six West is much more than a mere landlord as Six West hired Loews to be its agent and perform the service of managing the three theatres and retained 60% of net profits. (Pl.'s Suppl. Opp. to Sony at 1). [FN7] This is in contrast to the situation in Calderone in which the non-operating landlord charged an annual rental (in which it did receive a percentage of the theatre's gross receipts on top of a fixed minimal rent) and did not pay the exhibitor for the provision of services in managing the theatres. Id. at 1294. The Twin, Paris and Festival are owned by Six West, and, if Six West's allegations of block-booking are true, then as a competitor in the film exhibition market, Six West has been directly injured by such anticompetitive behavior and has standing to pursue these claims.

FN7. In fact, the Twin Agreement explicitly stated "[n]othing herein contained shall be deemed to create a landlord-tenant relationship, between Tenant [STC] and Operator [TBA]." (Twin Agreement § 5.01).

b. Substantive Block-Booking Allegations

*5 As Judge Edelstein described in his Opinion and Order denying the defendants' motion to dismiss plaintiff's Section 1 claims, block-booking is "the practice of licensing, or offering for license, one feature or group of features on condition that the exhibitor will also license another feature or group of features released by the distributors during a given period" and is a type of tying arrangement. See Six West, 2000 WL 264295, at *14 (quoting United States v. Paramount Pictures, Inc., 334 U.S. 131, 156 (1948)). Such tying arrangements are per se illegal. See Paramount Pictures, 334 U.S. at 158-59 (1948). Judge Edelstein noted that "actual coercion 'is an indispensable element' of a block-booking violation," id. (quoting Unijax, Inc. v. Champion Int'l, Inc., 683 F.2d 678, 685 (2d Cir.1982)), and Unijax, 683 F.2d at 685, makes clear that "[a]ctual coercion by the seller that in fact forces the buyer to purchase the tied product" is required. Thus, "unless the buyer can prove that it was the unwilling purchaser of the allegedly tied products, actual coercion has not been established and a tying agreement cannot be found." Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 192 (2d Cir.1992) (emphasis added). At most, the facts to which Six West cites suggest that there were voluntary relationships between the Loews Defendants and film distributors, which are not per se illegal but rather ought to be evaluated under the

Not Reported in F.Supp.2d

**(Cite as: 2004 WL 691680, \*5 (S.D.N.Y.))**

rule of reason.

Though allowing both the block-booking and relationship licensing claims to go forward, Judge Edelstein warned Six West that it must delineate the Section 1 claims more cogently as the case proceeded. See Six West, 2000 WL 264295, at \*20. Yet, Six West has continued to conflate the evidence relevant to the block-booking and relationship licensing allegations. A good deal of the evidence Six West cites to support the block-booking claim against Sony Pictures does not implicate Sony Pictures but rather touches on the relationships that Loews Theatres had with distributors other than Sony Pictures. From these descriptions of Loews' relationships, which very often do not even hint at coercion by any distributor--let alone name Sony Pictures specifically--Six West attempts to maintain a block-booking claim against Sony Pictures. Six West points out that at the summary judgment stage a court:

> should not view each piece of evidence in a vacuum. Seemingly innocent or ambiguous behavior can give rise to a reasonable inference of conspiracy in light of the background against which the behavior takes place. Evidence can take on added meaning when viewed in the context with all the circumstances surrounding the dispute.

(Pl.'s Opp. to Sony at 23 (quoting Apex Oil Co. v. DiMauro, 822 F.2d 246, 254-55 (2d Cir.1987))). Viewing Six West's argument in context, Six West proffers no evidence from which a jury could find that there was any "actual coercion" by the Sony Defendants that "in fact" forced any film exhibitor to purchase any unwanted films constituting a per se Section 1 violation.

**\*6** Six West refers to a number of letters, statements and documents that purportedly demonstrate, or create a reasonable inference of possible, coercion by Sony Pictures even though this evidence merely refers to distributors generally and not Sony Pictures. For example, Six West cites a 1990 letter from Alan Friedberg, Chairman of Loews, to Solow that states, "[w]e do not have total control over the situation (film companies are increasingly arrogant and demanding) ... and there are 'relationships' with the film companies that dictate certain decisions." ((P)Misc. 9 (8/9/90 Letter from Friedberg to Solow)). This letter only refers to "film companies" in general, not Sony Pictures, and

demonstrates only that exhibitors and distributors had relationships. Likewise Sony Theatres' (a.k.a. Loews Theatres) 1994 strategic plan, which states:

> Due to the smaller number of screens per location in many of our free zone theatres, [Loews] Theatres is forced to make film selections, leading to better relationships with certain distributors. These distributors also tend to play more of their product in our competitive zones locations....

((P)PX 141). Again this evidence simply demonstrates that Loews Theatres' decisions regarding what movies to exhibit may have been influenced by relationships that Loews had with unnamed distributors. Six West's use of deposition testimony by Lawrence Ruisi, President and CEO of Loews Cineplex Entertainment, that Loews had relationships with distributors and sometimes took less desirable films to maintain access to more desirable films is similarly unavailing as evidence that Sony Pictures engaged in block-booking. (See Ruisi 115:6-16). At issue is whether there was any coercion by Sony Pictures, and evidence that Loews maintained relationships with distributors does not permit a reasonable juror to infer Sony Pictures engaged in coercion or the practice of block-booking.

Even when Six West does cite to evidence that relates to actions by Sony Pictures, the evidence fails to suggest that Sony Pictures attempted to coerce anyone. For instance, Six West cites Reid's deposition testimony that Loews had "relationships" with Sony Pictures, similar to relationships it had with other distributors, such that certain Sony Pictures releases were taken in order to preserve the ability to maintain access to other pictures. (Reid 68:18-70:8). Nowhere, however, does Reid imply that Loews' decisions were the result of any type of coercion by Sony Pictures. Despite Six West's statement to the contrary, without any hint of coercion by Sony Pictures, such conduct is not "archetypical block-booking" but rather archetypical relationship licensing. (Pl.'s Opp. to Sony at 18).

Perhaps Six West's strongest evidence, and the evidence that Judge Edelstein relied upon in allowing Six West's block-booking claim to survive defendants' motion to dismiss, is a letter dated January 16, 1996 from Reid to Solow responding to an inquiry of whether the film Sense and Sensibility, a Sony Pictures release, could be exhibited at the Twin. See Six West, 2000 WL 264295, at \*15. In

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 691680, *6 (S.D.N.Y.))

that letter, Reid responded to Solow's inquiry by stating "this business does not work in such a way that we would only play 'Sense and Sensibility', but that we would become obligated to play a full portion of the Sony Pictures release schedule." (PX 46). Based on this language, Judge Edelstein wrote, "[a]t this point in the litigation, the facts suggest that Plaintiff's difficulty in acquiring more profitable movies may be attributed to its unwillingness or its inability to accept all of Sony Pictures' films." Six West, 2000 WL 264295, at *15. I do not disagree with Judge Edelstein's finding that the language contained in Reid's letter was sufficient to survive a motion to dismiss. At that stage of litigation a court will not dismiss a complaint unless it appears beyond doubt that the plaintiff can prove no set of facts supporting a claim for relief. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Branum v. Clark, 927 F.2d 698, 705 (2d Cir.1991). Yet, at the summary judgment stage of litigation, while it is important not to deprive a deserving plaintiff of his or her day in court, when there are no genuine issues of material fact, summary judgment is both appropriate and required. Fed.R.Civ.P. 56(c); see Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).

*7 After years of discovery, Six West's block-booking claim rests almost entirely on these statements in Reid's letter, and I do not see how any reasonable juror could infer actual coercion from these few words. [FN8] Reid's use of the word "obligated" does not imply that Sony was exercising any economic muscle or coercing anyone. See American Mfrs. Mut. Ins. Co. v. American Broad-Paramount Theatres, 446 F.2d 1131, 1137 (2d Cir.1971) (coercion by a film distributor consists of the "actual exertion of economic muscle"). As Reid testified in his deposition, in a "competitive" exhibition market Loews would sometimes play films it did not "want as much" so as to preserve certain relationships with distributors. (Reid Depo. at 294:7-12; 308:5-12). This is a far cry from evidence of a distributor's actually conditioning access to one film on an exhibitor's taking a less desired film. See United States v. Twentieth Century Fox Film Corp., 882 F.2d 656, 658-59 (2d Cir.1989) (finding direct evidence that a distributor's agent had forced an exhibitor to take one film in order to play another film). Taking a film that an exhibitor does not "want as much" in order to preserve a relationship with a distributor is

not block-booking, is not per se illegal, and no reasonable juror could infer from Reid's letter to Solow that Sony Pictures was coercing Loews into taking one Sony film in order to get another Sony film. No other evidence presented by plaintiff suggests that the letter reflected anything more than the existence of a relationship between Sony Pictures and Loews.

> FN8. The only other evidence cited by Six West that even hints at any threat by Sony Pictures is an e-mail from Sony Pictures' Eastern Division Manager to employees that states Sony might deny one theatre, not affiliated with Six West, access to future films if that theatre dropped the film Wolf before the film completed its run. ((P) PX 20). One angry internal e-mail regarding how long a film would run, without any proof that such a threat was even communicated to the theatre in question, is not enough to create an inference of actual coercion or block-booking.

I do not mean to insinuate that a plaintiff must present incontrovertible oral or written proof that a defendant has engaged in block-booking. Inferences of tying agreements drawn from circumstantial evidence are often all that is available, and if the evidence is sufficient to support such inferences these inferences are quite sufficient to survive a motion for summary judgment. See Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs ., Inc., 996 F.2d 537, 545 (2d Cir.1993); Oreck Corp. v. Whirlpool Corp., 639 F.2d 75, 79 (2d Cir.1980); Caldwell v. American Basketball Assoc., Inc., 825 F.Supp. 558, 566 (S.D.N.Y.1993), aff'd, 66 F.3d 523 (2d Cir.1995). The evidence presented by Six West, however, is insufficient for any reasonable juror to infer that the Sony Defendants coerced any exhibitor to carry any films and engaged in unlawful block-booking.

For the above reasons, as Six West has failed to demonstrate any coercion by Sony Pictures, Six West's block-booking claim under Section 1 must fail.

2. Relationship Licensing

In Paramount Pictures the Supreme Court rejected the notion that it was necessary to require a competitive bidding system in which exhibitors bid on films on a film-by-film basis. See, 334 U.S. at

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

162-166. The Court questioned whether such a competitive bidding system would in fact foster competition, id. at 162, and more recently the Antitrust Division of the Department of Justice has found that relationship licensing, in which an exhibitor agrees to license a substantial number of a distributor's films, is often both permissible and pro-competitive. See Report of Department of Justice on the Legality of Customer Selection Under the Injunction in the Paramount Decrees Against Discrimination in Film, United States v. Loew's Inc., Equity No. 87-273(ELP) (S.D.N.Y. Dec. 5, 1988), at 3 [hereinafter DOJ Report].

**8** Plaintiff does not bring a separate relationship licensing claim in the Amended Complaint. Six West, 2000 WL 264295, at *16-17. Rather, Judge Edelstein noted that in attempting to bring a block-booking claim, Six West had unwittingly alleged an alternative claim under Section 1. Id. He observed that while statements that identified booking relationships as voluntary could not support a block-booking claim, because the requisite coercion was lacking, they could support a relationship licensing claim. Id. Judge Edelstein held that if a voluntary relationship between an exhibitor and distributor "hinder [s] other exhibitors' ability to acquire quality movies, then such relationship licensing would violate § 1." Id. at 18. Thus, unlike a block-booking violation of Section 1, in which actual coercion is the key to the claim, in a relationship licensing violation of Section 1, the key is the exclusion of other exhibitors from fair access to films. See id.; see also Paramount, 334 U.S. at 154 (relationships that eliminate the opportunity for small theatres to obtain first run films stifle competition and violate Section 1); United States v. Loews, Inc., 705 F.Supp. 878, 880 (S.D.N.Y.1988). Also unlike block-booking, because a relationship licensing claim involves a consensual agreement between exhibitors and distributors such a claim may stand against both a distributor and exhibitor if such an agreement forecloses access to films to other exhibitors. Six West, 2000 WL 264295, at *18 n. 34.

A claim for a relationship licensing violation of Section 1 is analyzed under the rule of reason, and in order to survive a motion for summary judgment a plaintiff must show that a material question of fact exists as to whether the allegedly unlawful relationship reduced competition in the relevant market. See Virgin Atlantic Airways, 257 F.3d at 264; PepsiCo., Inc. v. Coca-Cola Co., 114 F.Supp.2d 243, 258-59 (S.D.N.Y.2000), aff'd 315 F.3d 101 (2d Cir.2002). Although the relevant geographic market is disputed by each side, I find it unnecessary to resolve this issue because Six West has failed to proffer evidence that the alleged relationships have had any harmful effect on competition in any remotely relevant geographic market, including the "Upper Manhattan" market propounded by Six West.

Six West offers limited evidence concerning the Sony Defendants' relationships with any exhibitor in Upper Manhattan or any other market, and thus no reasonable juror could find that the Sony Defendants have engaged in illegal relationship licensing in violation of Section 1. Six West offers more evidence concerning the relationships that Loews had with film distributors, but that evidence does not even begin to suggest that such relationships were anticompetitive.

The DOJ Report found that relationships between exhibitors and distributors are not necessarily anticompetitive. The DOJ Report suggested that such relationships may reflect rational economic choices based on complimentary risk-taking attitudes and may reflect an on-the-merits consideration of transaction costs of licensing films separately. DOJ Report at 43-44. However, the DOJ Report recommended that exhibitor and distributor relationships might violate Section 1 if they involve: **9** circuit dealing, favoritism towards affiliates, preferential contract terms, or rejection out-of-hand of competing exhibitors' offers without any "on-the-merits" determination, [and] the mere fact that relationship licensing is also involved will not immunize that conduct. Id. at 50-51. None of Six West's evidence suggests that any rational juror could find that any of the Loews Defendants engaged in any of this prohibited behavior. While it is reasonable to believe that Loews' relationships may have reflected certain efficiencies or risk-taking attitudes, there is no evidence that Loews engaged in any activities that foreclosed Six West's theatres or other exhibitors from access to films.

As discussed above, much of the evidence Six West relies on for its block-booking claim against Sony Pictures relates to the relationships that Loews

has with distributors generally. This evidence regarding relationships, however, amounts to at most that Loews sometimes exhibits movies it is less interested in in order to maintain relationships with film distributors. That Loews had relationships with distributors is undisputed, but Six West's evidence fails to suggest that these relationships foreclosed other exhibitors from access to films and harmed competition. Six West attempts to demonstrate foreclosure through evidence that the Twin has been "unable to acquire movies from Sony [Pictures]," but Six West fails to explain how relationship licensing by the Sony Defendants or the Loews Defendants is in any way connected to that failure. (Pl.'s Opp. to Sony at 27).

In addition to Six West's failure to put forth evidence of anticompetitive licensing relationships that stifled competition, the indirect evidence available suggests that competition in the Manhattan theatre market is not dwindling but is actually quite robust. During the time in which Loews' relationships are alleged to have decreased competition, the number of movie screens in Manhattan increased almost 60%, as exhibitors-- including, but not limited to Loews--opened numerous new theatres or expanded old ones. (Loews Def.'s 56.1 Stmt ¶ 11). Along with the new screens more films are shown in Manhattan (Loews Def.'s 56.1 Stmt ¶ 23), and multi-screen theatres are becoming more prevalent (Loews Def.'s 56.1 Stmt ¶ 7; see also United States v. Syufy Enters., 903 F.2d 659, 665 (9th Cir.1990) (success of more efficient multi-screen theatres can be evidence of robust competition). While movie ticket prices have risen in Manhattan, the rise has been at a slower pace in Manhattan than in the rest of the country. See National Assoc. Theatre Owners, www.natoonline.org/statistictickets.htm (33% increase in Manhattan versus 38% average national increase from 1994-2001). Nor could Six West's assertion that Loews increased prices in order to increase profits (why else would a theatre increase ticket prices) and allegation that a Loews employee once stated "Loews theatre is of course a leader in admission prices" lead a reasonable juror to believe that Loews had the power unilaterally to raise prices or had anticompetitive market power. See K.M.B Warehouse Dist., Inc. v. Walker Mfg. Co., 61 F.3d 123, 129 (2d Cir.1995) (a prerequisite for recovery in all Section 1 claims is either actual adverse effect on competition or market power to

raise prices significantly without losing all of one's business).

*10 Six West also cites to an alleged decrease in the quality of the movie-going experience as evidence of a harm to competition and consumers. See Virgin Atlantic Airways, 257 F.3d at 264 ("reduced output, increased prices and decreased quality" can all constitute harm to consumers). Though true that a reduction in quality can constitute a harm to consumers, the mere possibility that a consumer might have to see his or her first choice movie at his or her second choice theatre or his or her second choice movie at his or her first choice theatre (Pl.'s Opp. to Sony at 34-35), is not an actionable restraint of trade. Every licensing agreement between an exhibitor and distributor will restrain trade to some extent, as licensing agreements necessarily entail that a film is shown at one theatre and not another. See Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988) (Section 1 is only intended to prohibit "unreasonable" restraints of trade). But the mere fact that a consumer who might, for example, prefer to watch a film at the Twin has to instead go to another nearby theatre to see that film does not mean that there has been an actionable harm to consumer choice or competition. See Virgin Atlantic Airways, 257 F.3d at 259 ("[t]he antitrust laws are designed to protect competitive conduct, not individual competitors."). Six West essentially asks that I compel Sony Pictures to license its films to Six West's theatres. The antitrust rules require no such compulsion. See Orson, Inc. v. Miramax, Inc., 79 F.3d 1358, 1365 (3d Cir.1996).

For the above reasons, because Six West has failed to demonstrate that the Sony Defendants or the Loews Defendants have been involved in any anticompetitive relationship licensing, Six West's Section 1 claim for relationship licensing must fail.

B. Six West's Sherman Antitrust Act § 2 Monopolization Claims

In order to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993); Tops Market, Inc. v. Quality

Markets, Inc., 142 F.3d 90, 99-100 (2d Cir.1998). In order to determine whether there is a dangerous probability of monopolization, it is necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market. Spectrum Sports, Inc., 506 U.S. at 456.

As the Sony Defendants point out in their brief, Six West only opposes the motion for summary judgment on the Section 2 monopolization claims as against the Loews Defendants. (Def.'s Reply at 19; Pl.'s Opp. to Sony at 39). As plaintiff presents no facts supporting the claim that any of the Sony Defendants have done anything to render themselves dangerously close to achieving a monopoly, summary judgment on behalf of the Sony Defendants for the Section 2 claims is granted. Though Six West attempts to mount a more significant opposition to summary judgment with regards to the Loews Defendants, it is to no avail. On the basis of the facts presented by plaintiff, there is no possibility that a rational finder of fact could determine that any of the Loews Defendants attempted to monopolize any Manhattan theatre markets.

*11 As discussed above, some question remains as to the relevant geographic market. Even conceding the possibility of Upper Manhattan as the relevant geographic market, however, the facts do not support a finding that the Loews Defendants attempted to monopolize that, or any other, market. After extensive discovery, Six West has not proffered evidence to support the elements necessary to maintain an attempted monopolization claim against Loews.

Most tellingly, there are no facts to suggest that Loews engaged in any predatory or anticompetitive behavior or had a specific intent to monopolize the Upper Manhattan theatre market. None of the Loews Defendants could have engaged in block-booking (as Loews was an exhibitor not a distributor), and the facts do not support an inference that they engaged in any illegal licensing practices. As such, the Loews Defendants' licensing practices are not anticompetitive or predatory. With respect to Six West's allegations that Travis Reid once told a Mr. Robert Smerling who then allegedly told Mr. Solow that Mr. Reid and other defendants "would make every effort to influence distributors not to deliver quality films to plaintiff's theaters,"

(Amended Compl. ¶ 84; Solow 10/25/02 Depo. at 63:12-64:2, Solow 9/28/99 Depo. at 336:8-12), Six West does not point to a single fact, aside from this inadmissible hearsay, to support that this was ever actually said or that any defendant ever attempted to prevent Six West's theatres from receiving any films from any distributor. See, e.g., Manesis v. N.Y. City Dep't of Transp., No. 02 Civ. 359(SAS), 2003 WL 289969, at *14 (S.D.N.Y. Feb. 10, 2003) ("[Inadmissible hearsay] cannot create a material issue of fact to defeat summary judgment."), aff'd 2004 WL 206316 (2d Cir.2004).

Six West's assertion that Loews' alleged mismanagement of the theatres could amount to predatory conduct is similarly unhelpful. Six West hypothesizes that Loews mismanaged the theatres in order to divert "would-be customers of plaintiff's theatres" to a "Loews theatre in Upper Manhattan," where Loews retained 100%, rather than 40%, of the net profits (Pl.'s Opp. to Sony at 39). This hypothesis does not create a triable issue of fact. Mismanaging theatres in which Loews itself had an interest is not a typical predatory or anticompetitive activity, and it is somewhat far-fetched to suggest that the alleged mismanagement of the three theatres was predatory or anticompetitive. That said, it is not inconceivable that Loews' alleged mismanagement of plaintiff's theatres could be anticompetitive if the alleged mismanagement was intended to, or did result in, an increase in Loews' net market power. I need not consider this unlikely possibility, however, because the facts do not support this hypothesis.

As Six West's own expert concedes, Loews could not ensure that diverted customers would end up at other Loews theatres. (Warren-Boulton Rep. at 13). As such, the likelihood is that any mismanagement of the Twin, Paris, or Festival would cause customers to go to theatres unaffiliated with Loews, thereby decreasing, rather than increasing, Loews' share of the exhibition market. (Warren-Boulton Rep. at Ex. 2). [FN9] Because Six West's hypothesis that Loews intentionally mismanaged the Twin, Paris, and Festival in order to divert customers from plaintiff's theatres into Loews' theatres is both unlikely on its face and has no factual support, no rational juror could infer that this alleged mismanagement was predatory conduct.

FN9. Loews would have recovered on average 10%

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 691680, *11 (S.D.N.Y.))

of the lost Twin customers if those customers remained on the East Side of Manhattan, and, at most 50% in some years if those customers traveled to other neighborhoods. (Warren-Boulton Rep. at Ex. 2).

**\*12** In addition to failing to expose facts suggesting predatory behavior or specific intent, Six West also fails to establish that Loews is close to achieving a dangerous probability of achieving market power. Assuming arguendo that Upper Manhattan is the relevant market and that plaintiff's expert is correct that Loews' share of that market has risen from 23% to 53% in nine years (Pl.'s Opp. to Sony at 4), as a matter of law this fact alone does not create a dangerous probability of monopolization. Judge Hand's oft-cited numerical test of 90% yes, 64% maybe and 33% no for monopoly power in United States v. Aluminum Co. of America, 148 F.2d 416, 424 (2d Cir.1945), suggests that a market share of 53% might justify further inquiry. [FN10] Yet, an inquiry into whether there is a dangerous probability of achieving monopoly power cannot be resolved by simply by looking at Loews' market share of the Upper Manhattan theatre market. See, e.g., PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 109 (2d Cir.2002) ("Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power."); Tops Mkts., 142 F.3d at 99 (holding that "a share between 50% and 70% can occasionally show monopoly power," but only if other factors support the inference). Aside from pointing to Loews' market share, Six West does not provide any evidence from which a reasonable juror could infer that the Loews Defendants had a dangerous probability of achieving market power.

> FN10. If the market is indeed the East Side of Manhattan only, as the defendants suggest, then clearly Loews did not have the requisite market power as Loews' percentage of that geographic market was never greater than 18% by box office revenue (excluding the Twin) or 21% by screens (including the Twin). (Sony Def.'s Br. at 38).

For the above reasons, Six West has not proffered evidence from which any of the elements required to sustain an attempted monopolization claim could be found and, therefore, the Section 2 claims must fail.

### III. Plaintiff's State Law Claims

#### A. The Twin

##### 1. Assignment of the Twin Agreement

The Twin Agreement expressly stated that any assignment from STC to another party required that the intended assignee deliver a written agreement to Loews stating that the assignee agreed unconditionally to be bound by and perform all of STC's obligations. (DX 34 § 10.01). When STC assigned all of its "right, title and interest" to Solow in 1979, an Assignment and Assumption Agreement was executed in compliance with the Twin Agreement. (DX 39). However, Loews now complains that a subsequent assignment was never made to Six West and, therefore, Six West has no standing to assert its claims relating to the Twin. (Def.'s Br. at 18). Loews' argument is unavailing.

The January 16, 1992 request of Steve Cherniak, Controller of Solow Development Corp., that Loews void uncashed checks to Solow and reissue them to Six West was not a sufficient written document evidencing assignment to comply with the assignment clause of the Twin Agreement. (See DX 42 (1/17/92 letter from Claude J. Baptiste, Asst. Treas. of Loews, to Cherniak acknowledging 1/16/92 request and enclosing reissued checks)). Additionally, deposition testimony does raise some question as to whether Six West was ever intended to be an assignee or whether Solow was to remain the designated "Tenant" under the Twin Agreement despite the payment of monies to Six West. (Cherniak Depo. at 65:17-66:24). At the very least, whether assignment to Six West was ever intended creates a triable issue for the jury.

**\*13** If the assignment to Six West was intended but did not comply with the written assignment requirement of the Twin Agreement, then there is a triable issue of fact as to whether Loews waived that requirement. Loews cites to a number of cases to support the proposition that contractual limitations on assignment are binding conditions and will be enforced. (Loews Def.'s Br. at 18-19). While in no way disputing the holdings in those cases that assignment clauses are enforceable, I note that a party can waive a contractual right if there is a "voluntary and intentional abandonment of a known right which, but for the waiver, would have been

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 691680, *13 (S.D.N.Y.))

**Page 181**

enforceable." See AXA Global Risks U.S. Ins. Co. v. Sweet Assoc., Inc., 755 N.Y.S.2d 759, 760 (3d Dep't 2003) (internal quotations and citations omitted). A waiver "may be established by affirmative conduct or by failure to act as to evince an intent not to claim a purported advantage." Id. Here, following the 1992 letter, Loews willingly made payments to, and dealt with, Six West for eleven years. See Belge v. Aetna Cas. & Sec. Co., 334 N.Y.S.2d 185, 189 (4th Dep't 1972) (holding that passive conduct constituted a waiver of the provision against the assignment of the contract). Certainly this raises a question of material fact as to whether Loews' failure to raise any objections waived the right to have a proper written notification of the assignment pursuant to Section 10.01 of the Twin Agreement.

2. Loews' Alleged Breach of the Twin Agreement

a. Film Booking at the Twin

Section 7.01 of the Twin Agreement, as modified by the Chartwell Consent, required that Loews exhibit at the Twin:
only first run motion pictures (or reissues distributed on a first run basis) of the type, quality and character equal to or better than motion pictures exhibited at the other theatres operated under the "Loews" name and situated on the east side of Manhattan such as the Loews Tower East and the Loews 34th Street Showplace Theatre.
(DX 6; DX 34). Six West alleges that Loews breached this contractual standard by exhibiting films that were not "first run motion pictures" and did not comply with the "type, quality and character" requirement. I disagree and do not see how any reasonable juror could find Loews breached this contractual obligation.

Six West attempts to demonstrate a breach of the "type, quality and character" requirement with evidence that revenues per seat at the Twin were lower than at other Loews theatres and that Loews had a tendency to exhibit films for a longer length of time at the Twin. However, as a matter of law I find that neither this nor other similar evidence has anything to do with the "type, quality and character" of a film. New York courts interpret a contract by giving unambiguous terms their plain and ordinary meaning, and a court may determine such meaning as a matter of law. See Greenfield v. Philles

Records, Inc., 750 N.Y.S.2d 565, 569 (N.Y.2002); Levitt v. Computer Assoc. Int'l, 760 N.Y.S.2d 356, 357 (2d Dep't 2003). The plain and unambiguous meaning of "type, quality and character" unquestionably refers to the attributes and traits of the films themselves and not the manner in which those films are exhibited. [FN11] Though quality is a subjective measure that Six West correctly notes is often a question of fact to be decided by a jury (Pl.'s Opp. to Loews at 7 (citing cases)), in this instance, Six West presents no evidence from which a jury could infer that the films exhibited at the Twin did not meet the "type, quality and character" standard. Six West's argument notwithstanding, the duration of a film's run at a theatre, when the film began showing at the theatre relative to when the film opened, or ultimate box office revenue do not relate to the inherent quality of a film. (Pl.'s 56.1 Counterstmt to Loews ¶¶ 11-14).

FN11. "Type" is defined as "1. A group of persons or things that share common traits or characteristics distinguishing them as an identifiable group or class: CATEGORY." WEBSTER'S II NEW COLLEGE DICTIONARY 1193 (2001). "Quality" is defined as "1. Essential character: NATURE, 2. a. An inherent or distinguishing attribute: PROPERTY, b. A character trait." Id. at 905. "Character" is defined as "2. A distinctive feature or attribute: CHARACTERISTIC." Id. at 187.

*14 This is not to say that if Loews exhibited films for an excessively long duration or undertook other actions that failed to maximize profits at the Twin Loews could not be in breach of the Twin Agreement. If, as Six West is fond of pointing out, Loews exhibited the same film for 52 weeks at the Twin then Loews would most likely not be maximizing profits, as films usually generate lower revenues at the end of their runs. (Pl.'s Opp. to Loews at 10). This may be true and it may be a breach of the Twin Agreement, but such an action cannot be a breach of Section 7.01, as modified. Six West simply defies the plain meaning of the Chartwell Consent when it states that a film in its fifty-second week of exhibition is of a different "type, quality and character" than that very same film in its first week of exhibition. The essential character of the film, whether it be a "good" film or a "bad" film or somewhere in between, remains the same throughout the duration of the films exhibition. Exhibiting a "good" film for 52 weeks

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                         **Page 182**
**(Cite as: 2004 WL 691680, \*14 (S.D.N.Y.))**

may fail to maximize profits, which may be a breach of the Twin Agreement, but that breach would not violate Section 7.01. However, such conduct could breach Section 5.09. [FN12]

> FN12. I note that while Judge Edelstein stated that "exhibiting movies at the Twin for a protracted period" was alleged to be a violation of the Twin Agreement, he never implied that such a protracted exhibition could suffice as evidence of a breach of Section 7.01. Six West, 2000 WL 264294, at \*11.

Section 5.09 of the Twin Agreement requires that Loews "use every reasonable effort to promote and further the profitable operation of [the Twin]." (DX 34). Much of the conduct about which Six West complains; such as exhibiting films for too long, exhibiting the same film on both screens at the Twin, or failing to maximize revenue per seat; has nothing to do with the quality of the films booked at the Twin but instead relates to a possible failure by Loews to operate the Twin in a profit maximizing manner. Without passing judgment on the adequacy of Six West's proffered evidence to support such a claim of failure to maximize profits, such a failure relates only to Section 5.09, for which the sole remedy for a breach is the termination of the Twin Agreement. (DX 34). Section 5.09 explicitly precludes damages for any failure to "promote and further the profitable operation of [the Twin]," and Six West cannot get around such unambiguous language by bringing a claim for damages under Section 7.01, when the conduct about which Six West complains has nothing to do with the "type, quality or character" of the films exhibited at the Twin.

With respect to the obligation created by Section 7.01 for Loews to book only "first run" films at the Twin, I find that Six West's proposed meaning of the term, which would require that a film have never been exhibited in any theatre prior to being exhibited at the Twin, does not comport with the unambiguous meaning or customary use of the term. See Hernandez v. Schenectady Non Invasive Vascular Diagnostics, P.C., 699 N.Y.S.2d 232, 233 (3d Dep't 1999) (trial court properly accorded term its customary and ordinary meaning). Instead, as used in the Twin Agreement, "first run" refers to the initial stages of a film's release in which the film is exhibited at a theatre charging full price. (Loews Def.'s Br. at 6; Loews Def.'s Reply at 13). Both

Loews' and Six West's experts agreed with this definition of the term "first run," and Six West offers no convincing rationale for abandoning this plain meaning. (Jacobs Depo. at 38:23-41:9; Reid Depo. at 28:2-11, 111:5-112:5; Brueggemann Depo. at 52:18-54:3, 55:10-20; Bunnell Depo. at 213:18-214:5). Under this definition, Six West fails to proffer sufficient evidence from which a reasonable juror could find that Loews did not comply with its obligation to book "first run" films as required by the Twin Agreement.

b. Maintenance of the Twin

\*15 Under Section 3.02 of the Twin Agreement, Loews accepted the obligation to maintain the Twin pursuant to Section 15.04 the lease agreement. (DX 34; DX 35). [FN13] Six West has put forth evidence allegedly demonstrating Loews' failure to maintain the Twin, but even when viewed in the light most favorable to Six West, this evidence could not lead a rational juror to conclude that Loews did not fulfill its contractual obligation.

> FN13. Section 15.04 of the Lease Agreement states: Tenant shall, at all times during the term of this lease, keep in the theatres and maintain in good condition and working order and free of all liens and encumbrances and claims of third parties, all such projection equipment, sound equipment, ticket booth equipment, screens, drapery tracks, draperies, drapery motors, masking motors, carpeting, seats, aisle lights, lighting fixtures, concession equipment, lobby and lounge furniture and attraction signs and any other trade fixtures, equipment, decorations and furnishings, as shall be necessary or desirable for the efficient operation of the Theatres as first class motion picture theatres. (DX 35).

A good deal of the evidence cited by Six West as proof of Loews' breach consists of no more than a recognition by Loews that, as in any business into which the public is invited, business tools, objects and premises sometimes need to be repaired, replaced and updated. For example, Six West cites to a "Loews Theatres Visitation Report" dated August 16, 1997 that notes a "bad smell" in the theatre as evidence of Loews' breach, but Six West fails to note that the same evaluation also gives the Twin a 92% score and writes "Good job by our staff." ((P)PX 164). [FN14] This hardly suggests a

Not Reported in F.Supp.2d                                                      Page 183
(Cite as: 2004 WL 691680, *15 (S.D.N.Y.))

failure to maintain the Twin. Loews' recognition of items for improvement could not lead a rationale juror to the conclude that Loews' breached the Twin Agreement.

> FN14. That the bad smell was noted by Loews as an issue to be addressed on two other occasions over the course of one month, ((P)PX 165; (P)PX 152), is hardly enough evidence to suggest a breach of the Twin Agreement.

Also unavailing is Six West's suggestion that because the Twin did not have a new Sony Dynamic Digital Sound ("SDDS") System installed until after a number of Loews' other theatres received SDDS, that was somehow a breach of the Twin Agreement. (Pl.'s Opp. to Loews at 18). Nowhere did the Twin Agreement require Loews to provide upgrades to the Twin before other theatres, and a reasonable decision as to how to allocate resources cannot amount to a breach of a contractual maintenance obligation.

Six West also cites to a July 1997 memorandum in which Loews writes that the Twin "is in dire need of major renovations." ((P)PX 71). Taken out of context this language could be read to suggest that Loews had failed to maintain the Twin to such a degree that major renovations were needed. However, the context of the memorandum makes clear that the Loews was considering "major renovations" as necessary in order to keep pace with the competition in the neighborhood, specifically United Artist's Gemini theatre and Cineplex's Beekman theatre, which were being renovated. ((P)PX 71). No reasonable jury could find that Loews' determination that renovations were necessary to upgrade the Twin in order to keep pace with the competition meant that Loews had previously failed to fulfill its contractual obligations to maintain the Twin.

### 3. Six West's Claims for Unjust Enrichment

"The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the same subject matter." EUA Cogenex Corp. v. North Rockland Cent. Sch. Dist., 124 F.Supp.2d 861, 874 (S.D.N.Y.2000). Here, there is no dispute as to the existence of a contract governing the dispute, and neither Six West nor Loews contends that the Twin Agreement is not an enforceable contract meant to govern the operation of the Twin; the only dispute is as to Six West's standing to assert claims under that agreement. However, the preclusion of an unjust enrichment claim when there exists a valid contract governing the conduct in question holds "true whether the contract is one between parties to the lawsuit, or where one party to the lawsuit is not a party to the contract." Granite Partners, L.P. v. Bear, Stearns & Co., 17 F.Supp.2d 275, 311 (S.D.N.Y.1998); see also Metropolitan Elec. Mfg. Co. v. Herbert Constr. Co., Inc., 583 N.Y.S.2d 497, 498 (2d Dep't 1992).

*16 As it is undisputed that the conduct about which Six West now complains was governed by the Twin Agreement, Six West's claims for unjust enrichment must fail even if Six West were found not to have standing. Alternatively, for the reasons stated above, even if the existence of the Twin Agreement did not somehow preclude a claim for unjust enrichment, Six West has not set forth facts from which a reasonable juror could determine that Loews did anything improper that would entitle Six West to the quasi-contractual remedy of restitution.

### 4. Loews' Alleged Breach of Fiduciary Duties

Both Six West and Loews agree that Section 5.09 of the Twin Agreement defined a contractual fiduciary duty whereby Loews would act as Six West's fiduciary in managing the Twin. (DX 34 § 5.09). Both parties also agree that Section 5.09 limited Six West's remedy for any breach by Loews to termination. Section 5.09 in relevant part stated:

> [Six West's] sole remedy for any violation of [Loews'] obligations under this Section shall be to terminate this Agreement and [Six West] shall not assert any claim for damages for any such violation.

(DX 34). Six West attempts to get around this limitation on remedies by arguing that Loews "intentionally, willfully and maliciously" breached its fiduciary duties, rendering the liability limitation unenforceable. (Am. Compl. ¶ 97; Pl.'s Opp. to Loews at 21). See Kalisch-Jarcho, Inc. v. City of New York, 461 N.Y.S .2d 746, 749-50 (N.Y.1983).

Six West's evidence of willfulness consists of Loews' alleged mismanagement of the Twin,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Page 184

(Cite as: 2004 WL 691680, *16 (S.D.N.Y.))

Loews' and the Sony Defendants' alleged relationships with film distributors meant to keep the Twin from receiving quality films, and Loews' alleged diversion of customers from the Twin to its own theatres. With respect to the mismanagement claim, I find that the evidence is wholly lacking, and, in any event, such mismanagement would not rise to the necessary level to void the express limitation of liability contained in Section 5.09. See Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, 600 N .Y.S.2d 212, 216 (1st Dep't 1993), aff'd 618 N.Y.S.2d 152 (N.Y.1994). With respect to Loews' alleged relationships to keep films from the Twin, as discussed more fully above, I hold that there was nothing improper regarding any of the Loews Defendants' or Sony Defendants' relationships with any film distributors or that the Twin was improperly precluded from obtaining any films from distributors as a result of any defendants' actions. See supra, part II.A. Similarly, with respect to the allegation that Loews diverted customers from the Twin to its other theatres, as discussed in more detail above, I find such a theory both implausible and mere conjecture wholly unsupported by the facts. See supra, part II.B.

For the reasons stated above, Six West's claims for breach of the Twin Agreement, unjust enrichment, and breach of fiduciary duties at the Twin must fail.

B. The Paris

1. The Alleged Breach of the "Paris Agreement"

*17 It is undisputed that a final written agreement governing Loews' management of the Paris was never executed. (Loews Def.'s 56.1 Stmt ¶ 41, Pl.'s 56.1 Counterstmt to Loews ¶ 41a-g). Rather, Six West alleges that despite the absence of a final written contract, documents exchanged by the parties and the parties' course of dealing demonstrate that Six West and Loews entered into a binding agreement whereby Loews would operate the Paris according to certain agreed upon terms and conditions (the "Paris Agreement"). (Pl.'s Opp. to Loews at 25; Pl.'s 56.1 Counterstmt to Loews ¶ 41a-g). In essence, Six West is proposing that the Paris Agreement is an implied-in-fact contract, a contract evidenced by the acts of the parties rather than the oral or written words of the parties. See Radio Today, Inc. v. Westwood One, Inc., 684

F.Supp. 68, 71 (S.D.N.Y.1988); Miller v. Schloss, 218 N.Y. 400, 406 (1916). The existence and terms of implied-in-fact contracts are generally issues of fact for a jury to decide. See Rocky Point Properties, Inc. v. Sear-Brown Group, Inc., 744 N.Y.S.2d 269, 271 (2d Dep't 2002). However, the facts of the situation at bar make it clear that the implied-in-fact contract proposed by Six West did not exist and that the implied-in-fact contract that did exist was never breached by any of the defendants.

Six West proposes that the terms of the alleged Paris Agreement can be discerned by examining two letter agreements exchanged between Six West and Loews because those letters contained some overlapping terms. (Pl.'s Opp. to Loews at 28). What Six West overlooks is that the first of the proposed letter agreements sent by Six West on October 1, 1993 (DX-21) was explicitly rejected by Loews on October 19, 1993 (DX-22), and the second proposed letter agreement dated May 19, 1994 (DX-24) was never accepted by Six West and negotiations continued. Thus, these letter agreements do not provide any evidence of mutual assent to the material terms of the alleged implied-in-fact contract.

From October of 1993 through May of 1994, when the two proposed letter agreements were exchanged, Six West and Loews were no doubt involved in negotiations for an operation and management agreement for the Paris. That the parties' proposals happened to overlap on some proposed terms is not surprising and is to be expected, but such an overlap on some terms during negotiations is not evidence that the parties intended to enter into a binding contractual relationship on those overlapping terms. When an offeree responds to an offeror with an explicit rejection of the offeree's proposal and makes a counteroffer that accepts some of the terms of the original offer but rejects others and adds new terms, the offer has not been accepted, and there is no agreement between the parties. See Krumme v. Westpoint Stevens, Inc., 143 F.3d 71, 83-84 (2d Cir.1998); see also Wasserstein Perla Emerging Markets Fin., L.P. v. The Province of Formosa, 97 Civ. 793(BSJ), 2002 WL 145831 (July 2, 2002) ("In light of the history of the parties' negotiations and the court's comparison of the terms incorporated into the April 1 and April 11 letters, the court finds that the

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 691680, *17 (S.D.N.Y.))

communications never indicated mutual assent sufficient to give rise to a binding contract."). In such a case, courts do not hold that there is a partial agreement with regards to the overlapping terms; there is simply no agreement. " 'A contract cannot be implied-in-fact where the facts are inconsistent with its existence; or against the declaration of the party to be charged or against the intention or understanding of the parties." ' Tjoa v. Julia Butterfield Memorial Hospital, 612 N.Y.S.2d 676, 677 (2d Dep't 1994) (quoting Miller v. Schloss, 218 N.Y. 400, 406-07 (1916)). Likewise, without an explicit or implicit acceptance of either of the proposed letter agreements on the terms contained therein, there was no agreement, and there is no implied-in-fact contract comprised of the overlap in terms between the October 1, 1993 and May 18, 1994 letters.

*18 Six West cites a number of cases for the indisputable proposition that if two parties come to an oral or preliminary agreement that agreement is an enforceable contract regardless of whether the parties ever execute a final written contract. (Pl's Opp. to Loews at 25-26). Yet, the cases cited by Six West, such as Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1537 (2d Cir.1997) and Consarc Corp. v. Marine Midland Bank, 996 F.2d 568, 574-76 (2d Cir.1993), involve situations in which the parties have moved beyond negotiations and have entered into a binding agreement. See also Paper Corp. of the United States v. Schoeller Technical Papers, Inc., 807 F.Supp. 337, 347 (S.D.N.Y.1992); Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F.Supp. 491, 497-98 (S.D.N.Y.1987). That is simply not the situation here. Six West presents no facts to suggest that Six West and Loews mutually assented to be bound by an agreement while waiting to execute a final written agreement. As there is no evidence that the letter agreements were ever assented to by the parties, the cases relied upon by Six West are inapposite. Compare Consarc, 996 F.2d 568, 573 ("[T]he combined writings contain no expression by either party of any intent not to be bound by them."), with Winston v. Mediafare Entm't Corp., 777 F.2d 78, 81 (2d Cir.1986) (the writings exchanged make clear that no binding oral agreement had been reached and the unexecuted versions of the agreement were nothing more than drafts and not final binding agreements). Finally, the mere fact that there was performance by Loews

is insufficient to support a finding that the parties had reached an agreement on the alleged overlapping letter agreement terms. See Teachers Ins. & Annuity Ass'n of Am., 670 F.Supp. at 507 (partial performance does not necessarily imply mutual assent as "[a] party may make some partial performance merely to further the likelihood of consummation of a transaction it considers advantageous."). Because Six West has set forth no facts from which a reasonable juror could infer that the parties had an implied-in-fact contract with the terms contained in the two proposed letter agreements, no trier of fact could find that Loews breached such a contract.

Although the fact that there was some overlap in the terms in proposals exchanged between Six West and Loews cannot alone imply that the parties had mutually assented to be bound by those terms, there can be no doubt that the parties did have an implied-in-fact agreement regarding the operation of the Paris. The conduct over the course of the seven years by the two parties demonstrates that Loews was to book films at the Paris and split profits with Six West, such that Six West would receive 60% of the profits. (Loews Def.'s Br. at 10). Yet, Six West points to no other conduct or facts to support the contention that any of the other alleged terms of the Paris Agreement are to be implied. Nowhere does Six West proffer any facts or course of conduct that would suggest that Loews was required to obtain Six West's consent before entering into "four-wall deals" at the Paris. (Pl.'s Opp. to Loews at 33). Similarly, nowhere is there any course of conduct or facts to support the contention that Loews would be responsible for maintaining the Paris and supply such amenities as digital sound, (Pl.'s Opp. to Loews at 35), or that Loews would be obligated to book films on an exclusive basis at the Paris (Pl.'s Opp. to Loews at 37).

*19 The Restatement (Second) of Contracts, section 205, states "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement," and New York courts hold that the "implied covenant of fair dealing and good faith" is "implicit in all contracts." Van Valkenburgh, Nooger & Neville v. Hayden Publ'g Co., 330 N.Y.S.2d 329, 333 (N.Y.1972) (citations omitted). Because the parties' conduct makes clear that there was an agreement between Six West and Loews, it follows that the agreement

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

contained an implicit covenant of good faith and fair dealing, which required that Loews would exercise reasonable efforts in booking films at the Paris. Six West cites to no evidence that suggests this implied covenant was breached. Six West's conclusory assertions that certain films were played for too long or that the Paris failed to generate profits equivalent to the Angelika Theatre or Lincoln Plaza are insufficient for any rational juror to determine that Loews booked films for or operated the Paris in bad faith. (Pl.'s Opp. to Loews at 34-37).

Lastly, Six West's contention that Loews breached the Paris Agreement when it terminated its management of the theatre is equally unavailing. First, the Paris Agreement was of an indefinite duration and terminable at any time. See Lake Erie Distrib., Inc. v. Martlett Import. Co., Inc., 634 N.Y.S.2d 599, 602 (4th Dep't 1995). Second, even if Six West's assertion that reasonable notice was required before terminating the relationship as a result of the parties' seven year relationship and the implied covenant of good faith and fair dealing, Loews' notice of its desire to terminate the relationship at the Paris five months prior to terminating the relationship requires a finding that reasonable notice was provided. (DX 107; DX 71; DX 106; DX 107; DX 110). See Copy-Data Sys., Inc. v. Toshiba Am., Inc., 755 F.2d 293, 301 (2d Cir.1985) (requiring reasonable notice); Colony Liquor Distrib., Inc. v. Jack Daniel Distillery, 254 N.Y.S.2d 547, 549-50 (3d Dep't 1964) (same).

2. Breach of Fiduciary Duty Claims

Judge Edelstein held that Loews acted as Six West's agent and was Six West's fiduciary in some capacity, Six West, 2000 WL 264295, at *6, and I agree that in operating the Paris Loews acted as Six West's agent. See Mandelblatt v. Devon Stores, Inc., 521 N.Y .S.2d 672, 676 (1st Dep't 1987) (Under New York law, " '[a] fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." ') (quoting Restatement (Second) of Torts 874 cmt. a (1979)); see also Basic Books, Inc. v. Kinko's Graphics Corp., 758 F.Supp. 1522, 1546 (S.D.N.Y.1991) (an agency relationship exists where the principal manifests an intent that the agent act on the principal's behalf, the agent accepts the undertaking, and the parties understand the principal

is still in control). Thus, Loews owed Six West the general fiduciary duties of good faith and loyalty required of all agents. See Elco Shoe Mfr., Inc. v. Sisk, 260 N.Y. 100, 103-04 (1932).

*20 Despite Six West's numerous submissions, I hold that there is no genuine issue of material fact as to whether or not Loews breached its fiduciary duties. Six West has presented no facts to suggest that Loews' use of the Paris for movie premieres was in any way a violation of fiduciary duty. Similarly, conclusory statements that "it is clear that Loews mismanaged the Paris" and did not reasonably act to maximize profits at the Paris are clearly insufficient to support a claim for breach of fiduciary duties. (Pl.'s Opp. to Loews at 36-37). See Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998) ("Conclusory allegations, conjecture, and speculation, however, are insufficient to create a genuine issue of material fact.").

With respect to the termination of the relationship between Six West and Loews at the Paris, Six West alleges that termination involved a breach of fiduciary duties. (Pl.'s Opp. to Loews at 38-39). As discussed above, the allegations made by Six West are insufficient to suggest that there was anything improper in the way Loews went about ceasing to operate the Paris. However, Six West makes the additional suggestion that the mere cessation of operation by Loews was a fiduciary breach. In an internal memorandum, Loews stated that it wished to terminate the Paris Agreement because:

> now that we have Lincoln Square, we would actually receive greater profits without the Paris Theatre, as many of the films that we now book at the Paris would instead play at Lincoln Square, as well as other [Loews] Theatres, where we keep all the profits.

(PX 143) (emphasis in original). Although fiduciaries are expected to act with nothing less than the "punctilio of an honor the most sensitive", Meinhard v. Salmon, 249 N.Y. 458, 464 (1928) (Cardozo, C.J.), even fiduciary duties cannot mandate that an individual or entity remain a fiduciary for an infinite duration or until the principal dismisses the fiduciary. A fiduciary may not maximize his or her own profits at the expense of the person or entity to whom a duty is owed, but fiduciary duties do not preclude the power of termination--even in order to maximize one's own profits--so long as termination is done in a fair and

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

(Cite as: 2004 WL 691680, *20 (S.D.N.Y.))

reasonable manner.

Six West also alleges that Loews breached its fiduciary duties by allegedly diverting the film Anna Karenina from the Paris to Loews' Sony Tower East theatre and usurping Six West's opportunity to purchase the film Belle de Jour by taking the film to Miramax in order to curry favor with the distributor. (Am.Compl.¶¶ 67, 100). With regards to Anna Karenina, I do not find that any rational juror could infer a breach of fiduciary duty from the facts alleged by Six West, and the theory that Loews took Belle de Jour to Miramax in order to curry favor is, on the record, no more than pure speculation. Six West's facts to support the notion that Loews took Belle de Jour to Miramax amount to Solow's deposition testimony that "I feel Mr. Brueggemann was a party to [taking the film to Miramax]," and "I think Mr. Brueggemann took my idea because they want to kiss Miramax's ring three times a day." (Solow Depo. 9/28/99 363:6-9). The only evidence Solow has to support these beliefs, however, is that Brueggemann once allegedly said "that's my coup," which Solow considered a "hint," while referring to Belle de Jour, (Solow Depo. 10/25/02 256:9, 257:15-16). Solow admits that he has no idea when Miramax might have begun negotiating for the film (Solow Depo. 10/25/02 257:7), and has no evidence other than the coincidental timing. At this stage in the litigation, such pure speculation is insufficient to bring the claim to a jury. See Morris v. Lindau, 196 F.3d 102, 109 (2d Cir.1999) (to avoid summary judgment the non-moving party, "may not rely simply on conclusory allegations or speculation ..., but instead must offer evidence to show that [its] version of the events is not wholly fanciful.") (citation and internal quotation marks omitted).

### 3. Tortious Interference Claims

*21 Tortious interference with business relations requires: (1) business relations with a third party; (2) the defendant's interference with those relations; (3) the defendant acting with the sole purpose of harming the plaintiff or using dishonest, unfair or improper means; and (4) injury to the business relationship. See Nadel v. Play-by-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir.2000) (applying New York law). As discussed above, Six West has failed to proffer any cognizable evidence from which a jury could find any improper actions

by Loews respecting Anna Karenina or Belle de Jour. Additionally, although Six West need not have had a contractual relationship with a third party in order to maintain a claim for tortious interference, PPX Enters. v.. Audiofidelity Enters., 818 F.2d 266, 269 (2d Cir.1987), Six West points to no evidence that it had any relationship with the third party that was selling Belle de Jour, and the suggestion that "but for" Loews' acts Six West would have entered into a contract to purchase the film is also unsupported by any evidence. See Fine v. Dudley D. Doernberg & Co., Inc., 610 N.Y.S.2d 566, 567 (2d Dep't 1994) (in an action for interference with prospective contractual relations there is a "but for" causation requirement that plaintiff would have received the contract but for the acts of the defendant).

For the above reasons, Six West's claims for breach of the Paris Agreement, breach of fiduciary duties, and tortious interference must fail.

### C. The Festival

Similar to the situation at the Paris, no final written contract was ever executed for the operation and management of the Festival. (Loews Def.'s 56.1 Stmt ¶ 80; Pl.'s 56.1 Counterstmt to Loews ¶ 80). Yet, like at the Paris, Six West's and Loews' course of conduct over four years makes clear that there was an agreement concerning the operation of the Festival between the parties (the "Festival Agreement").

Six West again proposes that despite the lack of a final written contract the parties agreed to numerous terms, and Loews agreed to be bound by certain obligations. However, Six West has proffered no evidence from which a jury could reasonably infer the existence of the obligations allegedly assumed by Loews. In his opinion, Judge Edelstein wrote that the Amended Complaint was "devoid of specific details governing the Festival Agreement," including the obligation to book certain types of films. Six West, 2000 WL 264295, at *8. Three years later, after extensive, and undoubtedly expensive, discovery Six West offers no more facts to suggest that Loews had an obligation to book particular types of films or, if such an obligation existed, breached that obligation. [FN15]

    FN15. Six West's contention that the parties' course

Not Reported in F.Supp.2d                                                      **Page 188**
**(Cite as: 2004 WL 691680, \*21 (S.D.N.Y.))**

of conduct is evidence of an obligation to book "art" or "specialty" films at the Festival is belied by the films actually booked at the Festival. (Pl.'s Opp. to Loews at 42, 46).

Similarly, Six West's assertion that Loews had the obligation to maintain the Festival is wholly unsupported by the evidence. In particular, the undisputed fact that Solow agreed to pay fully for the renovation of the Festival, which never was undertaken, directly contradicts the contention that maintenance was ever intended by the parties to be Loews' responsibility under the agreement. (Loews Def.'s Br. at 45; DX 217 (May 13, 1994 letter from Loeks to Solow ("You [Solow] will be upgrading the [Festival] theatre ... at no cost to Loews ...") (emphasis added))).

**\*22** As evidence of contractual obligations assumed by Loews, Six West cites statements that Loews had promised to maximize profits or box office revenue at the Festival, (Pl.'s Opp. to Loews at 43 n. 92; Pl.'s 56.1 Counterstmt. to Loews ¶ 80(a)), and had promised to make more money than the previous operator, (Am.Compl.¶ 48). Such statements are too indefinite to create legally enforceable obligations. See Landes v. Sullivan, 651 N.Y.S.2d 731, 734 (3d Dep't 1997). Regardless, Six West has not offered any evidence from which a jury could determine that Loews did not work to maximize profits at the Festival or breached the implied covenant of good faith and fair dealing. See Van Valkenburgh, Nooger & Neville, 330 N.Y.S.2d at 333 (covenant of good faith and fair dealing is implied in every contract).

Again, the parties' course of conduct demonstrates that Loews was Six West's agent and fiduciary at the Festival, and therefore owed the requisite duties to the principal, Six West. See Mandelblatt, 521 N.Y.S.2d at 676. However, without evidence to support the allegations of breach of the Festival Agreement or any wrongdoing by Loews, no jury could find Loews liable for breach of its fiduciary duties at the Festival.

For the reasons stated above, Six West's claims for breach of the Festival Agreement and breach of fiduciary duties must fail.

**IV. Six West's Claims Against the Individual Defendants**

Because I grant summary judgment to the corporate defendants on Six West's underlying state claims lying in tort, breach of fiduciary duty and tortious interference, and federal claims for violation of the antitrust laws, Six West's claims against the Individual Defendants must also fail.

**V. Six West's, the Sony Defendants' and the Loews Defendants' Motions In Limine to Exclude Expert Testimony**

As I find that all claims against all defendants are without merit and subject to summary judgment, the parties' motions in limine to exclude expert testimony are deemed moot.

### CONCLUSION

For the reasons stated above, defendants' motions for summary judgment (docket nos. 133 and 134) are granted, and plaintiff's complaint is dismissed. The Clerk of the Court shall mark this action closed and all pending motions denied as moot. [FN16]

FN16. "Over? Did you say over? Nothing is over until we decide it is." National Lampoon's Animal House (Universal 1978).

SO ORDERED

2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

LEXSEE 2007 U.S. DIST. LEXIS 28279

**TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA;
MINNESOTA LIFE INSURANCE COMPANY; ADVANTUS SERIES FUND, INC.
MORTGAGE AND BOND PORTFOLIOS, Plaintiffs, -against- CRIIMI MAE
SERVICES LIMITED PARTNERSHIP; CMSLP MANAGEMENT COMPANY,
INC.; and CRIIMI MAE, INC., Defendants.**

**06 Civ. 0392 (LAK)(KNF)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

***2007 U.S. Dist. LEXIS 28279***

**March 20, 2007, Decided**

**COUNSEL:** [*1] For Criimi Mae Services Limited
Partnership, CMSLP Management Company, Inc.,
Criimi Mae, Inc., Defendants: Denise A. Holzka, LEAD
ATTORNEY, Heidell, Pittoni, Murphy & Bach, LLP,
New York, NY; Gregory A. Cross, LEAD ATTORNEY,
Venable, L.L.P., Baltimore, MD; Lawrence Henry
Cooke, II, LEAD ATTORNEY, Venable LLP (NYC),
New York, NY.

**JUDGES:** KEVIN NATHANIEL FOX, UNITED
STATES MAGISTRATE JUDGE. THE HONORABLE
LEWIS A. KAPLAN, UNITED STATES MAGIS-
TRATE JUDGE.

**OPINION BY:** KEVIN NATHANIEL FOX

**OPINION**

**REPORT AND RECOMMENDATION**

    KEVIN NATHANIEL FOX

    UNITED STATES MAGISTRATE JUDGE

    TO THE HONORABLE LEWIS A. KAPLAN,
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

    Plaintiffs Teachers Insurance Annuity Association
of America, Minnesota Life Insurance Company and
Advantus Series Fund, Inc., Mortgage and Bond Portfo-
lios bring this action against CRIIMI MAE Services
Limited Partnership ("CMSLP"), CMSLP Management
Company, Inc. ("CMSLPM") and CRIIMI MAE, Inc.
("CRIIMI") alleging: (1) breach of contract; (2) breach of
fiduciary duty; (3) gross negligence; and (4) unjust en-

richment. The plaintiffs seek: (a) compensatory damages;
(b) disgorgement of CMSLP's fees; (c) punitive dam-
ages; (d) costs and attorneys' [*2] fees; and (e) such
other relief as the court deems proper. Before the Court
is the defendants' motion to dismiss the complaint, pur-
suant to *Fed. R. Civ. P. 12 (b)(6)*, with prejudice, for
failure to state a claim upon which relief can be granted.
The defendants contend: (i) this action is barred by a
contractual "no-action" clause; (ii) the defendants do not
owe a fiduciary duty to the plaintiffs independent of the
relevant contract; (iii) New York law, which governs this
action, does not allow the plaintiffs, in the circumstance
of this case, to assert a separate tort claim(s) for conduct
that gives rise to their breach of contract claim; and (iv)
New York law does not allow the plaintiffs to assert an
unjust enrichment claim in a case such as this, where a
contract defines the relationship between the parties. The
defendants also contend the plaintiffs' request for dis-
gorgement should be dismissed, when the liability claims
are dismissed and, furthermore, the plaintiffs have failed
to plead facts that would warrant a recovery of punitive
damages. The motion is addressed below.

**II. BACKGROUND AND FACTS**

    The plaintiffs allege they own over [*3] 25 percent
of the outstanding class A-CS2 certificates representing a
beneficial interest in a trust fund, treated, for tax pur-
poses, as two real estate mortgage investment conduits
("REMIC" or the "trust"). The REMIC at issue consists
primarily of nine fixed-rate mortgage loans, made to
separate borrowers, secured by first mortgage liens on
various properties. These loans were pooled and securi-
tized into certificates with different risk and benefit rat-
ings. A Pooling and Servicing Agreement ("PSA") gov-
erns the rights and responsibilities of the parties associ-

Case 1:07-cv-09749-JSR    Document 11-5    Filed 01/31/2008    Page 23 of 33

Page 2
2007 U.S. Dist. LEXIS 28279, *

ated with the REMIC loans. The holders of the certificates are parties to the PSA. The plaintiffs' certificates are interest-only certificates. They entitle their holders to receive distributions derived solely from the interest payments made by the borrowers of the REMIC loans. To protect the interest-only certificate holders from the risk that borrowers might prepay their loans in whole or in part and, thus, deprive the trust and the certificate holders of the opportunity to receive revenue based on interest payments, the borrowers' ability to prepay their loans voluntarily was restricted during designated periods. Interest-only [*4] certificate holders, like the plaintiffs, would benefit greatly if the REMIC loans were not voluntarily prepaid but, instead, were repaid over a long period of time. Long term loan repayments would maximize the revenue interest-only certificate holders would realize through the loans' interest payments. The plaintiffs allege they relied upon the prepayment restrictions placed on the borrowers when they purchased their certificates.

CRIIMI owns class B principal-only certificates, which entitles it to receive distributions derived solely from payments of principal made on the REMIC loans. The principal-only certificate holders have an interest in having the REMIC loans repaid as quickly as possible. This would accelerate and ensure their receipt of distributions from the loans. CRIIMI's certificates are "first-loss" certificates. This means that, if a borrower fails to pay the principal in full, under a REMIC loan, a class B certificate holder is the first to bear the loss. Class B certificate holders have the lowest payment priority and receive a distribution only when all classes with a superior priority have been paid in full.

CMSLP is a special servicer. It services and administers [*5] the mortgage loans on behalf of the trust, for the benefit of the certificate holders and the trustee, as an independent contractor. The plaintiffs allege CMSLP is a subsidiary of CRIIMI and that CMSLPM is CMSLP's general partner. The PSA permitted CMSLP and its affiliates, including CRIIMI, to own certificates. It required that CMSLP perform its loan service functions "in the best interest of and for the benefit of all of the Certificateholders" and without regard to "the ownership of any Certificate by the Servicer, the Special Servicer or any Affiliate." The plaintiffs assert they believed the PSA would protect them from the risk that CMSLP would favor its parent, CRIIMI, a holder of principal-only certificates, at the expense of the plaintiffs and other holders of interest-only certificates.

Hardage Hotels I, L.L.C. ("Hardage") was one of the REMIC loan recipients. Under the original terms of the Hardage loan, voluntary prepayment was prohibited throughout the loan term. However, upon acceleration of the repayment schedule by the lender, or under certain circumstances relating to casualty loss or condemnation, the loan was subject to an involuntary mandatory prepayment. Any mandatory [*6] prepayment was required to be accompanied by a premium equal to the amount that would be needed to enable the REMIC to continue to pay the loan as scheduled. This loan provision protected the interest-only certificate holders.

In 2002, Hardage experienced financial problems. During 2003, the Hardage loan was referred to CMSLP for special servicing. The plaintiffs allege that, on or about March 11, 2003, without conducting an appropriate investigation into Hardage's financial condition, CMSLP modified the Hardage loan agreement by waiving the prepayment period and prepayment penalties. According to the plaintiffs, CMSLP failed to explore alternatives to modifying Hardage's loan agreement and failed to provide timely and accurate notice to the trust and the certificate holders of Hardage's modified loan agreement. The plaintiffs contend they learned about Hardage's modified loan agreement in May 2003, when an entity known as Commercial Mortgage Alert reported that Hardage's loan prepayment restrictions had been waived by CMSLP and that Hardage was seeking refinancing to pay off its loan.

In July 2003, CMSLP sold the modified loan. The proceeds of the sale were treated as repayments [*7] of the loan's principal and were distributed accordingly. The plaintiffs assert that, by treating proceeds of the sale in this manner, CMSLP deprived them of their contractual protection from prepayment and caused the trust to forfeit their rights to recover interest payments. The plaintiffs allege that, in numerous public filings and press releases, the defendants admitted that CRIIMI had used CMSLP to increase the value of its own certificate holdings and to serve its own goals.

Section 10.02 of the PSA, which is labeled "Limitation on Rights of Certificateholders," contains a "no-action" clause that limits the rights of certificate holders to initiate litigation upon, under or with respect to the PSA. The no-action clause provides, in pertinent part, the following:

No Certificateholder shall have any right to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holders of Certificates representing Percentage Interests of at least 25% of each affected [*8] Class of Certificates shall have made written request upon the Trus-

tee to institute such action, suit or pro-
ceeding in its own name as Trustee here-
under and shall have offered to the Trus-
tee such reasonable indemnity as it may
require against the costs, expenses and li-
abilities to be incurred therein or thereby,
and the Trustee, for 30 days after its re-
ceipt of such notice, request and offer of
indemnity, shall have neglected or refused
to institute any such action, suit or pro-
ceeding.

On March 11, 2005, the plaintiffs sent a notice of default
to CRIIMI, CMSLP, the trustee, the depositor of the
REMIC loans, Asset Securitization Corporation, and the
current loan servicer, GMAC Commercial Mortgage
Corporation, as required by the PSA. On that same date,
the plaintiffs sent a letter to the trustee demanding that
the trustee take action against CRIIMI and CMSLP for
breaching the PSA, breaching their fiduciary duty and,
engaging in conduct to enrich themselves unjustly. The
plaintiffs allege that counsel to the trustee initiated an
investigation concerning the allegations in the plaintiffs'
demand letter. The plaintiffs maintain they waited thirty
days after making their demand, [*9] as required by the
PSA, before they filed the instant action. As noted above,
the instant motion followed.

## III. DISCUSSION

### Standard of Review for Motion to Dismiss

A court may dismiss an action pursuant to *Fed. R.
Civ. P. 12(b)(6)* for failure to state a claim upon which
relief may be granted only if "it appears beyond doubt,
even when the complaint is liberally construed, that the
plaintiff can prove no set of facts which would entitle
him to relief." *Jaghory v. New York State Dep't of Educ.,
131 F.3d 326, 329 (2d Cir. 1997)* (quoting *Hoover v.
Ronwin, 466 U.S. 558, 587, 104 S. Ct. 1989, 2005, 80 L.
Ed. 2d 590 [1984]).* In determining whether to dismiss
the complaint, a court is "required to view all allegations
raised in the complaint in the light most favorable to the
non-moving party" and "must accept as true all factual
allegations in the complaint." *Newman & Schwartz v.
Asplundh Tree Expert Co., Inc., 102 F.3d 660, 662 (2d
Cir. 1996)* (quoting *Leatherman v. Tarrant County Nar-
cotics Unit, 507 U.S. 163, 164, 113 S. Ct. 1160, 1161,
122 L. Ed. 2d 517 [1993])* [*10] (internal citations
omitted). "At the pleading stage, then, '[t]he issue is not
whether a plaintiff will ultimately prevail but whether the
claimant is entitled to offer evidence to support the
claims.'" *Eternity Global Master Fund Ltd. v. Morgan
Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir.*

*2004)* (quoting *York v. Ass'n of the Bar, 286 F.3d 122,
125 [2d Cir. 2002]).*

### Breach of Contract: No-Action Clause

Under New York law, [1] a party asserting a breach of
contract claim must allege: (1) the existence of a con-
tract; (2) plaintiff's performance of the contract; (3) de-
fendant's breach of the contract; and (4) damages caused
by the breach. See *Rexnord Holdings, Inc. v. Bidermann,
21 F.3d 522, 525 (2d Cir. 1994).* Where the agreement
contains a "no-action" clause with specific obligations
that must be met before an action may be commenced, a
plaintiff's failure to comply with conditions precedent to
suit, set forth in that clause, will bar the plaintiff from
prosecuting a claim for breach of contract. See *Metro.
West Asset Mgmt., LLC v. Magnus Funding, Ltd., No. 03
Civ. 5539, 2004 U.S. Dist. LEXIS 11761, 2004 WL
1444868, at *5-6 (S.* [*11] *D.N.Y. June 25, 2004);
Rossdeutscher v. Viacom, Inc., 768 A.2d 8, 22 (Del. Sup.
2001).* A no-action clause should be strictly construed by
a court. See *Cruden v. Bank of New York, 957 F.2d 961,
968 (2d Cir. 1992).*

> 1  The PSA provides that it will be construed in
> accordance with New York law.

The defendants contend the plaintiffs' complaint al-
leges their compliance with only two of the PSA's "no-
action" clause conditions: (1) providing written notice of
default to the trustee; and (2) waiting 30 days after giv-
ing notice to the trustee to act, before filing this action.
However, the defendants also contend the plaintiffs'
complaint fails to indicate, as required by the PSA's "no-
action" clause, that the plaintiffs "are Holders 'of at least
25% of each affected Class of Certificates' [or] that a
demand has been made [of the trustee] on behalf of hold-
ers of each affected class [of certificates]." For their part,
the plaintiffs maintain they have satisfied the "no-action"
clause's [*12] requirements in that their complaint al-
leges they hold collectively over 25 percent of the A-CS2
certificates and, further, they comprise an affected class
of certificate holders whose rights may be impacted by
the instant litigation.

*Fed. R. Civ. P. 9(c)* provides: "In pleading the per-
formance or occurrence of conditions precedent, it is
sufficient to aver generally that all conditions precedent
have been performed or have occurred. A denial of per-
formance or occurrence shall be made specifically and
with particularity." Courts have recognized that a general
averment of performance of a condition(s) precedent to
suit is sufficient to withstand a motion to dismiss. See
*Ackerley Media Group v. Sharp Electronics Corp., 170
F. Supp. 2d 445, 453 (S.D.N.Y. 2001).* However, "[o]nce
the defendant has challenged the condition precedent
specifically and with particularity, the burden is on the

plaintiff to prove that the condition precedent was satisfied." *Hill v. Citibank Corp.*, 312 F. Supp. 2d 464, 473-74 (S.D.N.Y. 2004).

Here, the plaintiffs satisfied the requirement of *Fed. R. Civ. P. 9(c)* [*13] by averring generally, in their complaint, that they had performed all the conditions precedent to suit. *Fed. R. Civ. P. 9(c)* does not require the plaintiffs to itemize the conditions precedent to suit and allege compliance with each, as the defendants seem to suggest. The burden of identifying all the conditions precedent to suit falls to the defendants, if they wish to challenge the plaintiffs' alleged performance of all those conditions and, in such a circumstance, the defendants must make their challenge with specificity and with particularity.

The PSA's "no action" clause, which is reproduced at page five of this writing, sets forth the conditions precedent to suit that must be met by a certificate holder before the certificate holder may properly commence a "suit, action or proceeding in equity or at law upon or under or with respect to" that agreement. This provision of the PSA states, among other things, that, no action may be commenced by a certificate holder who has given the trustee a written notice of default "unless also the Holders of Certificates representing Percentage Interests of at Least 25% of each affected Class of Certificates" [*14] also has made a written request of the trustee that he or she initiate such litigation in the trustee's own name. The defendants assert the plaintiffs alleged in their complaint that they own A-CS2 class certificates. According to the defendants, "three [] classes [of certificates]-- A-CS1, A-CS2 and A-CS3 -- are informally referred to as 'interest-only [certificates].'" The defendants assert that the plaintiffs failed to allege in the complaint that they own any class A-CSI and A-CS3 certificates. The defendants contend that, "even if the 'interest-only' [certificate] holders were the only 'affected' classes" of certificate holders, the plaintiffs failed, as required by the express language of the "no action" clause, to allege in their complaint that class A-CSI and A-CS3 certificate holders had made a written demand on the trustee that an action of like kind be initiated in the trustee's name. In addition, the defendants maintain the plaintiffs conceded "that the pre-payment of the [Hardage] loan affected each of the 12 classes [of certificates], including [classes of certificates] owned by CRIIMI, because the reduced interest payments caused by the waiver of the prepayment [*15] restrictions would affect all the certificate-holders as it waterfalled from one class to another." However, the defendants contend no mention is made in the complaint that holders of the requisite percentage of classes of certificates so affected petitioned the trustee, in writing, to commence an action or other judicial proceeding. As a consequence of the alleged omissions from the

complaint, the defendants maintain the plaintiffs have failed to satisfy all the conditions precedent to suit contained in the PSA's "no action" clause.

The plaintiffs contend the defendants are wrong. According to the plaintiffs, they have satisfied the conditions precedent to suit because, "[u]nder the most logical meaning of 'affected class,' [] the Plaintiffs have satisfied [the PSA's no-action clause since they own at least 25 percent of one class of affected certificates and ownership of that quantity of affected certificates is all that is required under the relevant contract provision], since any other reading of the words "affected class" would mean that "any suit would require the consent of all classes of Certificateholders, regardless of whether those Certificateholders have a cause [*16] of action."

It is clear from the parties' respective submissions that they have very different views of the meaning of the phrase "each affected class of certificate" found in PSA § 10.02. The phrase is not defined in the PSA, and PSA § 10.02 neither explains by what each class of certificates must be affected nor indicates the nature of the affection that is contemplated.

When the language of a contract is clear, a court may not alter or go beyond its express terms. Rather, the court must construe it according to general principles of contract law. See *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999). Whether a contract's language is clear and unambiguous, is a threshold question of law for a court to decide. See *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 149 (2d Cir 1993).

A contract's language is ambiguous when a "word or phrase [in the contract] is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood [*17] in the particular trade or business." *Walk-In Med. Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987) (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F. Supp. 987, 994 [S.D.N.Y. 1968]). However, "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations." *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992).

After reading PSA § 10.02 closely, the Court finds that the phrase, "each affected class of certificate," as used in that provision of the contract, is ambiguous because it is reasonably susceptible to more than one meaning. For example, the phrase "each affected class of certificate" can mean: (a) each class of certificate that was negatively affected by an event of default, in a way the plaintiffs were affected; (b) each class of certificate that

was affected by an event of default, in any way, regardless of the resulting detriment or benefit; (c) each class of certificate that was affected by an event of default, in a way the plaintiffs were affected, and that will also be affected by this litigation; (d) each class [*18] of certificate that was affected by an event of default, in any way, regardless of the resulting detriment or benefit, and that will also be affected by this litigation; or (e) each class of certificate that will be affected by the litigation, regardless of whether it was affected by the event of default.

In the Second Circuit, if a contract's language is found to be ambiguous, granting a motion to dismiss a breach of contract claim, for failure to state a claim upon which relief can be granted, is improper. See *Peregrine Fixed Income Ltd. v. JP Morgan Chase Bank, No. 05 Civ. 4351, 2006 U.S. Dist. LEXIS 8766, 2006 WL 196967, at *2 (S.D.N.Y. Jan. 26, 2006); OnBank & Trust Co. v. Federal Deposit Ins. Corp., 967 F. Supp. 81, 90 (W.D.N.Y. 1997);* see also *Heyman v. Commerce & Industry Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975)* ("Where contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment would be improper."). Therefore, since the phrase "each affected class of certificate" creates an ambiguity that is not susceptible to resolution at this stage of litigation, the Court [*19] finds that granting a motion to dismiss the plaintiffs' breach of contract claim is not warranted.

*Tort and Quasi-Contractual Claims*

The defendants contend the plaintiffs' tort and quasi-contractual claims should be dismissed because, under New York law, such claims cannot be made where an undisputed contract exists between the parties that governs the conduct at issue. The plaintiffs maintain that, under *Fed. R. Civ. P. 8(a)* and *8(e)(2)*, they are entitled to plead breach of contract and tort claims simultaneously or as separate and distinct theories under which they may recover damages.

*Fed. R. Civ. P. 8(e)(2)* provides, in pertinent part:

A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. . . . A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.

Under New York law, "a simple breach of contract is not to be considered a tort unless a legal [*20] duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Clark-Fitzpatrick v. Long Island Rail Road, 70*

*N.Y.2d 382, 389, 516 N.E.2d 190, 521 N.Y.S.2d 653, 656-57 (1987)* (internal citations omitted); see *New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 315-16, 662 N.E.2d 763, 639 N.Y.S.2d 283, 287-88 (1995); Mandelblatt v. Devon Stores, Inc., 132 A.D.2d 162, 167-68, 521 N.Y.S.2d 672, 676 (App. Div. 1st Dep't 1987).* However, both New York substantive law and federal procedural law, *Fed. R. Civ. P. 8(e)(2)*, permit a party to plead contradictory claims alleging both breach of contract, or in the alternative, a tort because, for example, "[n]egligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract." *Ajax Hardware Mfg. Corp. v. Industrial Plants Corp., 569 F.2d 181, 185 (2d Cir. 1977).* Similarly, "[w]hile the existence of an enforceable contract *between the parties* will [*21] prevent recovery in quasi-contract, as between those parties, the mere existence of a written contract governing the same subject matter does not preclude such recovery from non parties so long as the other requirements for quasi contracts are met." *Seiden Associates, Inc. v. ANC Holdings, Inc., 754 F. Supp. 37, 40 (S.D.N.Y. 1991)* (internal citations omitted).

Here, the plaintiffs asserted a claim for breach of the fiduciary duty of loyalty, care and candor against all the defendants. The plaintiffs' complaint alleges the defendants mishandled trust assets, in which the plaintiffs had a beneficial interest, by engaging in self-dealing and, thereby, benefitted themselves and entities affiliated with them, at the expense of the plaintiffs. The existence of the PSA does not prevent the plaintiffs from asserting, in this action, that a fiduciary duty was owed to them by the defendants. In addition, the plaintiffs have made a claim sounding in tort against CMSLP and CMSLPM. Specifically, the plaintiffs contend that, in performing the contract, CMSLP and CMSLPM were grossly negligent. As discussed above, such a claim may be made in an action such as this. Moreover, the [*22] plaintiffs' unjust enrichment claim, which is a quasi-contractual claim, may also be made because it is asserted against CRIIMI only--a party with whom the plaintiffs did not have an enforceable contract. In summary, the Court finds that the existence of the PSA does not preclude the plaintiffs from asserting tort and quasi-contractual claims in this action.

*Breach of Fiduciary Duty*

The defendants contend the plaintiffs have failed to assert any independent breach of fiduciary duty claim against CMSLPM other than that CMSLP was aided and abetted in its breach of its fiduciary duty by its general partner, CMSLPM. They also contend the various theories under which the plaintiffs allege breach of fiduciary duty should be rejected because: (i) CMSLP does not owe a fiduciary duty to the plaintiffs independent of the

PSA; (ii) the plaintiffs' fiduciary duty claim(s) arises out of the same facts as their breach of contract claim; and (iii) CRIIMI does not owe a fiduciary duty to the plaintiffs because it is a co-investor in the REMIC. The plaintiffs assert they alleged sufficiently in their complaint that a fiduciary relationship exists between them and the defendants.

In order [*23] to establish a claim for breach of fiduciary duty, a plaintiff must establish that: (1) a fiduciary duty exists between the parties; (2) the defendant breached that duty; and (3) the breach of that duty was the proximate cause of the damages suffered by the plaintiff. See *Metro. West Asset Mgmt. v. Magnus Funding, Ltd., No. 03 Civ. 5539, 2004 U.S. Dist. LEXIS 11761, 2004 WL 1444868, at *8 (S.D.N.Y. June 25, 2004)*. In order to prevail on a claim that a party aided and abetted a breach of fiduciary duty, a plaintiff must show: (a) a breach by the fiduciary of obligations owed to another; (b) the defendant knowingly induced or participated in the breach; and (c) the plaintiff suffered damages as a result of the breach. See *S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 847-48 (2d Cir. 1987)*.

In the case at bar, the plaintiffs allege that CMSLP managed the Hardage loan in a manner that was advantageous to its parent entity, CRIIMI, whose interests were in conflict with the plaintiffs' interests because the plaintiffs were "interest-only" certificate holders. As a consequence, the plaintiffs contend CMSLP breached the fiduciary duty of loyalty it owed to them. The plaintiffs also allege [*24] that CMSLPM, which, as CMSLP's general partner, controlled its actions, and CRIIMI, which reported in public filings and press releases that it used CMSLP to enhance the value of its commercial mortgage-backed securities, aided and abetted CMSLP's breach of its fiduciary duty. According to the plaintiffs, the fiduciary duty was breached exists independent of the PSA and springs from circumstances extrinsic to the PSA and not contemplated by that contract, to wit, the self-dealing by CMSLP and CMSLPM that benefitted CRIIMI to the detriment of the plaintiffs.

Inasmuch as the conduct that may give rise to a breach of contract claim may also constitute "the breach of a duty arising out of the relationship created by contract but which is independent of the contract itself[,]" the Court finds that the plaintiffs have pleaded sufficiently a claim for breach of, and aiding and abetting the breach of, a fiduciary duty against the defendants. *Mandelblatt, 132 A.D.2d at 168, 521 N.Y.S.2d at 676*.

*Gross Negligence*

"Gross negligence is defined as 'conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing.' To constitute [*25] gross neg-

ligence, 'the act or omission must be of an aggravated character, as distinguished from the failure to exercise ordinary care.'" *Travelers Indemnity Co. of Conn. v. Losco Group, Inc., 204 F. Supp. 2d 639, 644 (S.D.N.Y. 2002)* (citations omitted).

The defendants contend the plaintiffs' claim for gross negligence, made against CMSLP and CMSLPM, should be dismissed because the claim "does little more than re-allege the same breach of contract allegations." The Court disagrees. The plaintiffs allege CMSLP and CMSLPM not only breached the contract, but also failed to exercise any care in their management of the Hardage loan. According to the plaintiffs, CMSLP and CMSLPM "acted with gross negligence in connection with their conflict of interest with respect to the Hardage Loan." The plaintiffs assert that the willful and knowing misconduct by these defendants "raises the presumption of conscious indifference to the consequences." The plaintiffs' complaint contains factual allegations concerning conduct by CMSLP and CMSLPM that went beyond a mere breach of contract. The allegations touch upon conduct that arguably evinces a reckless disregard for the plaintiffs' [*26] rights and, to the extent that self-dealing is alleged, smacks of intentional wrongdoing. Therefore, the Court finds a claim for gross negligence has been pleaded adequately.

*Unjust Enrichment*

Under New York law, in order to state a claim for unjust enrichment, a plaintiff must allege that: "(1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution." *CBS Broadcasting Inc. v. Jones, 460 F. Supp. 2d 500, 505-06 (S.D.N.Y. 2006)* (citations omitted). Generally, "[t]he existence of a valid and enforceable written contract governing a particular subject matter precludes recovery in quasi-contract or unjust enrichment for occurrences or transactions arising out of the same matter." Id. (citations omitted); see also *Clark-Fitzpatrick, 70 N.Y.2d at 388, 521 N.Y.S.2d at 656*. However, a party is not precluded from proceeding on both theories "where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue." *CBS Broadcasting, 460 F. Supp. 2d at 506 [*27]* (citations omitted).

The defendants contend that, because there is a valid and enforceable contract between the two parties, and there is no independent duty distinct from the parties' contractual relationship, the plaintiffs are barred from making an unjust enrichment claim together with a breach of contract claim in this action.

The plaintiffs' unjust enrichment claim has been asserted against CRIIMI. Although both the plaintiffs and CRIIMI are bound by the PSA as certificate holders, the plaintiffs have not alleged the PSA is a contract between them and CRIIMI. The plaintiffs contend that CRIIMI was unjustly enriched, at their expense, through the misconduct of CRIIMI's subsidiary, CMSLP. The plaintiffs maintain that, because CRIIMI received financial benefits improperly, as a result of CMSLP's misconduct, it would be inequitable to permit it to retain those benefits without making restitution.

It is uncontested that a valid and enforceable contract exists, the PSA. However, the PSA is not a contract between the plaintiffs and CRIIMI. The subject matter of that contract is the administration and servicing of certain mortgage loans by CMSLP. The plaintiffs' allegation, that CRIIMI [*28] was unjustly enriched to the plaintiffs' detriment by CMSLP's misconduct in administering and servicing the Hardage loan, in contravention of its obligation to refrain from acts that would be advantageous to an entity affiliated with it, is all that needed to be alleged to state a claim for unjust enrichment under New York law. See *id.*, *at* 505-06. Therefore, in the circumstance of the instant case, the Court finds that the plaintiffs' unjust enrichment claim against CRIIMI can co-exist with the breach of contract claim they have made against all the defendants.

*Disgorgement By CMSLP*

Disgorgement is an equitable remedy which, [u]nlike damages, [] is a method of forcing a defendant to give up the amount by which he was unjustly enriched." *S.E.C. v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006). The plaintiffs allege that, because CMSLP acted in its own interest and the interest of its affiliates in connection with the Hardage loan, rather than in the best interest of all certificate holders, it should be required to disgorge all the fees it received based on that transaction. Although styled by the plaintiffs as a claim, "COUNT FIVE" in the [*29] complaint, the defendants note, correctly, that disgorgement is a remedy. They maintain the court should reject the plaintiffs' request for this remedy once it grants the defendants' motion and dismisses all the liability claims.

Since the Court is not persuaded that all the plaintiffs' claims ought to be dismissed, it would be inappropriate, at this stage of the litigation, to constrict the court's ability to exercise its discretion in fashioning an appropriate remedy should the plaintiffs prevail in this action. Accordingly, no reason exists to bar the plaintiffs from asking the court to consider the equitable remedy of disgorgement should it be determined that CMSLP's conduct permitted it to obtain fees it should not be allowed to retain.

*Punitive Damages*

The plaintiffs seek to recover punitive damages from all the defendants. The defendants contend punitive damages are recoverable in a breach of contract action only if they are necessary to vindicate a public right. They contend further that the plaintiffs have failed to allege the defendants engaged in conduct that would justify a request for punitive damages. The plaintiffs disagree.

"Punitive damages are not recoverable [*30] for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights." *Rocanova v. Equitable Life Assurance Soc'y of U.S.*, 83 N.Y.2d 603, 613, 634 N.E.2d 940, 612 N.Y.S.2d 339, 342 (1994). However, punitive damages, are available in the limited circumstance "where it is necessary to deter [a] defendant and others like it from engaging in conduct that may be characterized as 'gross' and 'morally reprehensible,' and of 'such wanton dishonesty as to imply a criminal indifference to civil obligations.'" *New York University v. Continental Ins. Co.*, 87 N.Y.2d 308, 315-16, 662 N.E.2d 763, 639 N.Y.S.2d 283, 287 (1995). In the context of a claim arising from an alleged breach of contract, a request for punitive damages, as an additional and exemplary remedy, may be made by a plaintiff who alleges: (1) a defendant's conduct is actionable as an independent tort; (2) the tortious conduct is of an egregious nature, akin to conduct evincing a high degree of moral turpitude, see *Walker v. Sheldon*, 10 N.Y.2d 401, 404-405, 179 N.E.2d 497, 223 N.Y.S.2d 488, 490-491 (1961); (3) the conduct was directed at the plaintiff; and (4) the conduct is part of [*31] a pattern directed at the public generally. See *New York University, supra at* 316, 287.

The plaintiffs have satisfied the first pleading requirement for punitive damages. They have alleged a breach of fiduciary duty and gross negligence as independent claims in their complaint. However, while the plaintiffs have asserted the defendants' misconduct was directed at them and was "intentional, malicious, outrageous, and otherwise aggravated beyond mere negligence," they have failed to satisfy the last pleading requirement; they have not alleged the defendants' conduct was part of a pattern directed at the public generally. Therefore, the Court finds that, should the plaintiffs prevail in this action, their request for punitive damages need not be considered in determining the appropriate measure of damages.

## IV. RECOMMENDATION

For the reasons set forth above, the defendants' motion to dismiss should be granted, in part, and denied, in part.

2007 U.S. Dist. LEXIS 28279, *

## V. FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to *28 U.S.C. § 636(b)(1)* and *Rule 72(b) of the Federal Rules of Civil Procedure*, the [*32] parties shall have ten (10) days from service of this Report to file written objections. See also, *Fed. R. Civ. P. 6.* Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, 500 Pearl Street, Room 1310, New York, New York, 10007, and to the chambers of the undersigned, 40 Foley Square, Room 540, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Kaplan. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. See *Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)*; *IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993)*; *Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992)*; *Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988)*; *McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983)*.

Dated: New York, New York

March 20, 2007

Respectfully submitted,

KEVIN NATHANIEL FOX

UNITED STATES MAGISTRATE [*33] JUDGE

LEXSEE 2007 U.S. DIST. LEXIS 93349

**MICHAEL P. TIERNEY, Plaintiff, -v- OMNICOM GROUP, INC., Defendant.**

**No. 06 Civ. 14302 (LTS)(THK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2007 U.S. Dist. LEXIS 93349*

**December 19, 2007, Decided
December 20, 2007, Filed**

**PRIOR HISTORY:** *Tierney v. Omnicom Group, Inc.,
2007 U.S. Dist. LEXIS 69985 (S.D.N.Y., Sept. 20, 2007)*

**COUNSEL:** [*1] For Michael P. Tierney, Plaintiff:
William Coudert Rand, LEAD ATTORNEY, Law Office
of William Coudert Rand, New York, NY.

For Omnicom Group Inc., Defendant: Christopher R.
Harris, LEAD ATTORNEY, Latham & Watkins, LLP,
New York, NY, Jeff G Hammel, LEAD ATTORNEY,
Latham and Watkins (NY), New York, NY, Adrienne
Kimberley Eason Wheatley, Latham & Watkins, LLP,
New York, NY, Roger Steven Goldman, Latham & Wat-
kins, LLP, Washington, DC.

**JUDGES:** LAURA TAYLOR SWAIN, United States
District Judge.

**OPINION BY:** LAURA TAYLOR SWAIN

**OPINION**

*MEMORANDUM ORDER*

In this action brought against Defendant Omnicom
Group Inc. ("Defendant" or "Omnicom"), Plaintiff Mi-
chael P. Tierney ("Plaintiff" or "Tierney"), in his Second
Amended Complaint, raises several causes of action un-
der New York common law concerning stock options
that Omnicom allegedly promised to him. The Court has
diversity jurisdiction of this action pursuant to *28 U.S.C.
§ 1332.*

On July 11, 2007, the Court granted in part and de-
nied in part Defendant's motion to dismiss Plaintiff's
Amended Complaint. The Court also granted Plaintiff
leave to replead two causes of action: his breach of con-
tract claim in connection with an executed employment
term sheet as orally modified by both [*2] parties, and

his breach of contract claim(s) in connection with three
separate stock option agreements. *Tierney v. Omnicom
Group, Inc., No. 06 Civ. 14302(LTS)(THK), 2007 U.S.
Dist. LEXIS 50435, 2007 WL 2012412 (S.D.N.Y. July 11,
2007)* ("*Tierney I*").

Plaintiff filed his Second Amended Complaint (the
"SAC") on July 20, 2007. Defendant moves pursuant to
*Rule 12(b)(6) of the Federal Rules of Civil Procedure* to
dismiss Plaintiff's SAC in its entirety. In addition, De-
fendant moves to strike portions of Plaintiff's SAC pur-
suant to *Rule 12(f) of the Federal Rules of Civil Proce-
dure.* The Court has thoroughly considered all of the
parties' submissions and arguments. For the following
reasons, Defendant's motion to dismiss is denied, and
Defendant's motion to strike is granted in part and denied
in part.

*BACKGROUND*

The Court presumes familiarity with the facts al-
leged in Plaintiff's Amended Complaint, which were
summarized by the Court in *Tierney I.* This section high-
lights only the allegations of the SAC that are materially
different from those of the Amended Complaint. The
following alleged facts are taken as true for the purposes
of the instant motion practice. *Bernheim v. Litt, 79 F.3d
318, 321 (2d Cir. 1996).*

In early 2001, [*3] Omnicom orally assured Tier-
ney that stock options previously granted to him by
Omnicom would remain exercisable by Tierney upon his
transfer to Seneca or that Omnicom would "pay to Plain-
tiff at any time on or after the date of his transfer to Se-
neca ("Seneca Transfer Date") cash equal to the value of
the Options calculated as of the Seneca Transfer Date."
(SAC P 30.) In exchange, Tierney agreed to be trans-
ferred to Seneca and continue his responsibilities there.
(*Id.* PP 32-38.) The Seneca Transfer Date was May 1,

2001. (*Id.* P 39.) (The Court will refer to this alleged set of terms and conditions as the "Modified Agreement.")

In late March 2004, Omnicom unilaterally informed Tierney that it would terminate the employment relationship between Omnicom and Tierney on March 31, 2004. Accordingly, Omnicom "involuntarily terminated [Tierney] as a reported employee of Omnicom and Seneca" on March 31, 2004. (SAC PP 82-84.) Omnicom did not terminate Tierney for cause or for reasons of disability or retirement, and Omnicom reported to the IRS and other third parties that Tierney's employment had been involuntarily terminated. (*Id.* PP 85-86.)

The SAC asserts five causes of action: breach of the [*4] Modified Agreement, breach of the Stock Option Agreements, quantum meruit, unjust enrichment and promissory estoppel. Tierney also alleges breaches of the implied covenant of good faith and fair dealing. (SAC PP 265, 274.)

*DISCUSSION*

In evaluating a motion to dismiss a pleading pursuant to *Rule 12(b)(6)*, the Court must take as true the facts alleged in the claimant's pleading and draw all reasonable inferences in his favor. *W. Mohegan Tribe & Nation v. Orange County, 395 F.3d 18, 20 (2d Cir. 2004); Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994).*

In the following sections of this Memorandum Order, the Court considers, in turn, Defendant's arguments for the dismissal of each cause of action asserted in the SAC, with the exception of the good faith and fair dealing claims. Those claims will be addressed in the section concerning Defendant's motion to strike.

*First Cause of Action: Breach of the Modified Agreement*

Defendant argues that the Modified Agreement, which was not memorialized in writing, is unenforceable because it runs afoul of the New York Statute of Frauds. However, under the Statute of Frauds, *see N.Y. Gen. Oblig. Law § 5-701(a)* (McKinney 2001 & Supp. 2007), if there [*5] is any possibility that an oral agreement, according to the parties' terms, can be performed within one year, the oral agreement need not be memorialized in writing to be enforceable. *D & N Boening, Inc. v. Kirsch Beverages, Inc., 63 N.Y.2d 449, 455, 472 N.E.2d 992, 483 N.Y.S.2d 164 (N.Y. 1984).* As pled in the SAC, the Modified Agreement could have been performed within one year. In exchange for Plaintiff's services, Omnicom promised that it would ensure the viability of his stock options *or* that it would pay to Plaintiff the cash value equivalent of the stock options calculated as of May 1, 2001, at any time after May 1, 2001. (SAC P 30.) Since the Modified Agreement was allegedly formed in early 2001, Omnicom could have performed it within one year

by choosing to give Plaintiff the cash value equivalent at any time in 2001. Therefore, the alleged Modified Agreement did not have to be in writing and Defendant's Statute of Frauds argument fails. [1]

1

In *Tierney I*, the Court found that *Plaintiff* could not perform his obligations under the oral agreement as plead in the Amended Complaint within one year because the oral agreement was "part and parcel of a [written] agreement that was, by its terms, to be performed over [*6] a three-year period." *Tierney I, 2007 WL 2012412, at *6.* In the SAC, it is not so clear that the alleged Modified Agreement as plead was meant to also incorporate the three-year employment term of the written term sheet. Therefore, in drawing all reasonable inferences in favor of Plaintiff at the motion to dismiss stage, the Court does not construe the Modified Agreement as incorporating the three-year employment term of the term sheet. Therefore, Plaintiff, as well as Omnicom, could have performed under the Modified Agreement within one year.

Defendant further argues that the Modified Agreement is unenforceable for lack of definiteness -- specifically, Defendant argues that the Modified Agreement lacks a price term with regard to the stock options. However, the SAC does plead a specific price term in connection with the Modified Agreement. Plaintiff alleges that Omnicom promised that it would ensure the continued viability of the stock options in Paragraph 30; the specific strike prices of the stock options as referenced are listed in Paragraph 16. Therefore, the SAC is sufficiently specific as to the alleged price term. [2]

2

This argument was also raised in connection with the first [*7] motion to dismiss and rejected for the same reason described here. *See Tierney I, 2007 WL 2012412, at *6.*

Defendant also argues that, "to the extent the Oral Modification is a modification to the [stock] options contracts" (Mot. to Dismiss at 13), the Modified Agreement is unenforceable because the Stock Option Agreements explicitly provide: "This Agreement may be amended only by an instrument in writing executed and delivered by the Employee and Omnicom." (Stock Option Agreements, annexed to August 27, 2007, Declaration of Christopher R. Harris as Ex. 31-33 at § 9.) However, the SAC does not allege that the Modified Agreement is a modification of the Stock Option Agreements. While the pleadings in connection with the Modified Agreement are certainly not a model of clarity, it is sufficiently clear that the Modified Agreement is plead as a modification to the October 2000 employment term sheet and/or a separate oral agreement altogether. (See generally SAC PP 20-39.) Specific, written stock option contracts are referenced separately from the section of the pleadings discussing the alleged Modified Agreement. (See id. at P 271 ("Defendant has willfully breached its promises and contractual [*8] undertakings, as reflected in the Options (the "Option Contracts").").) Therefore, Defendant's argument in connection with the Stock Option Agreements fails at this pleading stage.

*Second Cause of Action: Breach of the Stock Option Agreements*

Defendant raises several arguments to support its motion to dismiss as to Plaintiff's second cause of action. Citing *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (U.S. 2007), Defendant argues that Plaintiff cannot plausibly maintain that he was terminated from Seneca and/or Omnicom on March 31, 2004, because Plaintiff has allegedly made statements in other litigation and other contexts contradicting or undermining that allegation. However, *Twombly* does not require courts to examine evidentiary proffers outside the pleadings in order to determine plausibility on a motion to dismiss. Defendant may proffer such evidence in future stages of litigation but, on a motion to dismiss, the Court construes all of Plaintiff's allegations as true and evaluates whether, on the facts plead, the Plaintiff has plausibly framed his allegations of actionable conduct. Therefore, the Court construes as true the allegation that Plaintiff was both terminated from Omnicom [*9] and terminated from Seneca as a reported employee of Omnicom on March 31, 2004, and his second cause of action stands to the extent that it relies on that alleged fact. [3] (See SAC PP 77-87.)

Defendant additionally argues that Plaintiff cannot plead that he was terminated from Omnicom because it would contradict pleadings that allege that Plaintiff was hired in October 2000 as President of Communicade rather than Omnicom. However, Plaintiff explicitly alleges that Communicade was a subsidiary of Omnicom. (SAC P 10.) Therefore, this portion of Defendant's argument is rejected, just as a similar argument was rejected in *Tierney I, 2007 WL 2012412, at \*7*.

Defendant further argues that, as a matter of law, discontinued compensation alone does not constitute termination. However, Plaintiff does not premise his allegation of involuntary termination solely on the allegation that his compensation was discontinued. Rather, he alleges explicitly that his employment was terminated unilaterally and involuntarily. (SAC P 84.)

Defendant has failed to put forth any viable grounds for dismissing Plaintiff's second cause of action. In *Tierney I*, this cause of action was dismissed without prejudice because [*10] Plaintiff had failed to plead that he was involuntarily terminated by Omnicom and/or an Omnicom Subsidiary on March 31, 2004. *Tierney I, 2007 WL 2012412, at \*8*. Plaintiff now explicitly alleges that his employment with Omnicom and Seneca was terminated involuntarily. (SAC PP 82-84.) Therefore, Defendant's motion to dismiss is denied as to this cause of action.

*Remaining Causes of Action: Quantum Meruit, Unjust Enrichment, and Promissory Estoppel*

Quasi-contract claims must be dismissed where there undisputedly exists a valid written agreement, the scope of which clearly covers the quasi-contractual dispute between the parties. *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) (citing *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389, 516 N.E.2d 190, 521 N.Y.S.2d 653 (N.Y. 1987)); *Brown v. Brown*, 12 A.D.3d 176, 176, 785 N.Y.S.2d 417 (N.Y. App. Div. 1st Dep't 2004) (applying *Clark-Fitzpatrick* rule to promissory estoppel claim). In *Tierney I*, the Court rejected Defendant's argument that Schedule 3.7 precluded Plaintiff's quasi-contract claims. *Tierney I, 2007 WL 2012412, at \*8-\*9*. In this round of motion practice, Defendant argues that the Stock Option Agreements preclude [*11] Plaintiff's quasi-contract claims.

3

Plaintiff's request for quasi-contractual relief is premised on the services that Plaintiff rendered from the start of his employment with Omnicom in October 2000 up until March 31, 2004. Although there is no dispute that the Stock Option Agreements are valid, enforceable agreements, the scope of the Agreements cannot be said, at this stage of the proceedings, to clearly cover the services Tierney rendered during the whole of that time frame. Under the Stock Option Agreements, Plaintiff was entitled to benefits for services rendered so long as he was employed by Omnicom or an "Omnicom Subsidiary" (within the meaning of the Incentive Compensation Plan), among other necessary conditions, but no time frame whatsoever was specified. While there appears to be no material dispute that Tierney performed services through March 2004, there are disputes as to, inter alia, whether all of those services were performed in a capacity covered by the Stock Option Agreements. The Stock Option Agreements thus do not, at this stage of the proceedings, preclude Plaintiff's quasi-contractual claims for the alleged value of his services rendered during the specified employment [*12] period. Defendant's motion to dismiss Plaintiff's quasi-contractual claims is denied. *See Joseph Sternberg, Inc. v. Walber 36th Street Assocs., 187 A.D.2d 225, 228, 594 N.Y.S.2d 144 (1st Dep't App. Div. 1993)* (quasi-contract claim permitted "where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue") (emphasis added); *DeCiutiis v. Nynex Corp., No. 95 Civ. 9745(PKL), 1996 U.S. Dist. LEXIS 13122, 1996 WL 512150, at \*4 (S.D.N.Y. 1996)* (quasi-contract claim that plaintiff was entitled to recovery for his ideas volunteered to employer dismissed because plaintiff plead existence of express contract clearly governing compensation for employee ideas).

*Defendant's Motion to Strike*

Defendant also moves to strike certain portions of Plaintiff's SAC pursuant to *Rule 12(f) of the FRCP. Rule 12(f)* provides:

> (f) Motion To Strike.
>
> Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, [*13] immaterial, impertinent, or scandalous matter.

Defendant moves to strike Paragraph 84 of the SAC, which alleges: "Effective March 31, 2004, Omnicom involuntarily terminated Plaintiff as a reported employee of Omnicom and Seneca, and terminated the benefits, salaries and other elements of compensation Omnicom had provided to him since October 1, 2000 when he first joined Omnicom." Defendant makes numerous evidentiary submissions in an attempt to show that Plaintiff's allegations are false. However, Defendant fails to make any showing whatsoever as to how the facts alleged in Paragraph 84 are "redundant, immaterial, impertinent, or scandalous." Therefore, Defendant's motion to strike Paragraph 84 is denied.

Defendant also moves to strike the portions of the SAC which raise implied covenant of good faith and fair dealing claims. (*See* SAC PP 265-66, 272-74.) In *Tierney I*, the Court dismissed Plaintiff's good faith and fair dealing claims, without granting leave to replead those claims. *Tierney I, 2007 WL 2012412, at \*7-\*8.* Plaintiff argues that he pleads these claims out of an abundance of caution so as to preserve these claims on appeal. This concern is unwarranted. *P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 96 (2d Cir. 2004).* [*14] Therefore, the good faith and fair dealing claims are immaterial, and Defendant's motion to strike Plaintiff's good faith and fair dealing claims as set forth in Paragraphs 265-266 and Paragraphs 272-274 is granted. *See In re Alstom SA Secs. Litig., 454 F. Supp. 2d 187, 216-17 (S.D.N.Y. 2006)*(granting motion to strike causes of action in amended complaint that were immaterial as they were previously dismissed); *Turk v. Chase Manhattan Bank USA, NA, No. 00-Civ-1573, 2001 U.S. Dist. LEXIS 8862, 2001 WL 736814, at \*4 (S.D.N.Y. June 11, 2001)*(granting motion to strike previously dismissed causes of action).

*CONCLUSION*

For the foregoing reasons, Defendant's motion to dismiss the Second Amended Complaint is denied in its entirety. Defendant's motion to strike Paragraphs 265-266 and Paragraphs 272-274 from the SAC is granted, and Defendant's motion to strike Paragraph 84 is denied.

Accordingly, the stay of discovery ordered on October 23, 2007, is hereby lifted, and the Clerk of Court is respectfully requested to terminate Docket Entries 31 and 33.

SO ORDERED.

Dated: New York, New York

December *19*, 2007

LAURA TAYLOR SWAIN

United States District Judge