TAB 1

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 1999 WL 787658 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

CSiradas v. Chase Lincoln First Bank, N.A.
S.D.N.Y.,1999.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
George W. SIRADAS, Robin L. Siradas, Laszlo
Takacs and Judith E. Takacs, individually and on
behalf of all others similarly situated, Plaintiffs,
v.
CHASE LINCOLN FIRST BANK, N.A., Chase
Home Mortgage Corporation, Chase Manhattan
Mortgage Corporation, Chase Manhattan Bank, N.A.,
and Federal Home Loan Mortgage Corporation,
Defendants.
No. 98 CIV. 4028(RCC).

Sept. 30, 1999.

MEMORANDUM AND ORDER

CASEY, D.J.
    *1 George W. Siradas, Robin L. Siradas, Laszlo
Takacs and Judith E. Takacs (the "Plaintiffs") have
brought a class-action suit against The Chase
Manhattan Bank, successor by merger to the Chase
Manhattan Bank, N.A. ("CMB"), and successor in
interest to Chase Lincoln First Bank, N.A. ("Chase
Lincoln"), and Chase Mortgage Services, Inc.,
(formerly known as Chase Manhattan Mortgage
Corporation, formerly known as Chase Home
Mortgage Corporation) ("CMSI") (collectively
referred to as the "Chase Defendants") and Federal
Home Loan Mortgage Corporation ("Freddie Mac")
(collectively, the "Defendants") for their alleged
unlawful practices in the servicing of Adjustable Rate
Mortgages ("ARMs"). Plaintiffs have brought this
suit on behalf of all persons whose six month treasury
indexed Adjusted Rate Mortgage is or was owned or
serviced by Defendants and who were damaged
because of the method of calculation of interest.

    The Supreme Court of the State of New York,
County of New York, removed the instant case to this
Court pursuant to 28 U.S.C. § 1446 [FN1] and 12 U.S.C.
§ 1452(f)(3).[FN2] According to 12 U.S.C. § 1452(f)(3),
the Federal Home Loan Mortgage Corporation
("FHLMC"), a corporate entity created by the United
States of America, organized and existing under the
terms of the Emergency Home Finance Act of 1970,
has the statutory right to remove this action to the

District Court of the United States in the district and
division embracing where the action is pending.
Therefore, federal jurisdiction is appropriate.

    FN1.28 U.S.C. § 1446 sets forth the
    procedure for removal to federal court.

    FN2.12 U.S.C. § 1452(f)(3) provides, in
    pertinent part:
    ... any civil or other action, case or controversy
    in a court of a State, or in any court other than a
    district court of the United States, to which the
    Corporation is a party may at any time before the trial
    thereof be removed by [FHLMC], without the giving
    of any bond or security, to the district court of the
    United States for the district and division embracing
    where the same is pending ... by following any
    procedure for removal of causes in effect at the time
    of such removal.
    12 U.S.C. § 1452(f)(3).

    Before the Court is a motion for summary
judgment, pursuant to Rule 56 of the Federal Rules of
Civil Procedure, as to all of the Takacses' individual
claims, and a motion for judgment on the pleadings
pursuant to Rule 12(c) of the Federal Rules of Civil
Procedure as to the Siradases' individual claims for
violation of Section 349 and 350 of the New York
General Business Law (McKinney 1991), unjust
enrichment and money had and received, and breach
of duty of fair dealing.[FN3]Both motions have been
brought by The Chase Defendants.

    FN3. Although the parties motion papers
    refer to the duty of fair dealing, such duty is
    commonly referred to as the duty of good
    faith and fair dealing. The Court will refer to
    this duty in a manner consistent with the
    parties' motion papers.

    Also before the Court is a motion to dismiss,
pursuant to Federal Rule of Civil Procedure 12(b)(6),
the aforementioned Plaintiffs' claims, brought by
Defendant Freddie Mac. For the reasons set forth
below, Defendants' motions are granted with respect
to all of the Takacses' individual claims and the
Siradases unjust enrichment, money had and received
and breach of fair dealing claims, and denied with
respect to the Siradases' deceptive practices claim.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 787658 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

*FACTUAL BACKGROUND*

The underlying facts in this case are not in controversy. In the mid-1980's, Plaintiffs George W. Siradas and Robin L. Siradas obtained a six month treasury-indexed adjustable rate mortgage ("ARM") loan from Chase Lincoln. *See* Answer ¶ 6. In 1986, Plaintiffs Laszlo Takacs and Judith E. Takacs obtained a six month treasury indexed ARM loan from Chase Lincoln. Fourth Amended Complaint ¶ 7; Answer ¶ 7. Plaintiffs' ARM loans provided that the interest rates were to be adjusted using the Auction Average every six months until the loans were paid off. Subsequently, Freddie Mac purchased the mortgage and owned the Siradases' loan at all relevant times.

*2 The Siradases' ARM loan provided that the interest rate could be adjusted every six months, based on the weekly auction average of the six-month United States Treasury Bills. *See* Fourth Amended Complaint ¶ 17; Answer ¶ 17. Such auction average may be obtained using two methods: (1) contacting the member banks of the Federal Reserve Board, newspapers or electronic information sources (collectively referred to as the "Telerate Method"); or (2) by consulting the Federal Reserve Board's Statistical Release H.15(519), which is publicized each Monday by the Federal Reserve Board ("H15 Method").*See* Fourth Amended Complaint ¶ 18; Answer ¶ 18.

The adjustable rate rider attached to the Siradases' mortgage provides that the H15 method should be used.[FN4] In addition, Freddie Mac has published a policy which mandates use of the H15 method for six-month treasury indexed ARMs.[FN5]

FN4. The rider states: "Beginning with the first Change Date, my interest will be based on an Index. The "Index" is the weekly auction average on six-month United States Treasury bills, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index." "*See* Fourth Amended Complaint ¶ 17.

FN5. A Freddie Mac bulletin states: "[T]he Treasury index will be considered to have been made available on the release date that appears on the Federal Reserve Statistical Release H.15(519)."*See* Freddie Mac Bulletin, No. 91-18 (Sept. 5, 1991).

According to Freddie Mac, the proper method for adjusting the interest rate on six month treasury indexed ARMs is the H15 method. *See* Fourth Amended Complaint, Exhibit C, Freddie Mac Bulletin, No. 91-18. Chase Manhattan serviced the Siradases' mortgage under an agreement with the owner, Freddie Mac, by making interest rate adjustments commencing June 1, 1986 and each and every June 1 and December 1 thereafter up to the time the loan was transferred to Mellon Mortgage in or about May 1995. At times, the Defendants used the Telerate method, rather than the H15 method to compute the Plaintiffs' interest rates. *See* Carson Decl. ¶ 4. In or about April of 1998, Joseph M. Carson, the Assistant Manager of Alternative Servicing for Chase Manhattan Mortgage Corporation ("CMMC") [programed] CMMC's computer to run analysis on the Takacses' loan from inception to payoff making interest rate adjustments on their ARM loan mortgage using the H15 Method. He compared this analysis to the Takacses' actual loan history and found that had the H15 method been used, Plaintiffs would have been charged $55.72 more in interest over the life of the loan than they were actually charged. *Id.*

*DISCUSSION*

I. *The Takacses' Claims*

The Takacses claim breach of contract, violation of New York General Business Law Section 349 and 350 (the "Deceptive Practices Act"), unjust enrichment, and breach of the duty of fair dealing. The Chase Defendants move for summary judgment on all of these claims.

Summary Judgment may only be granted when, "there is no genuine issue as to any material fact [and] ... the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The moving party carries the burden of demonstrating that there exists no genuine issue as to any material fact. *See Gallo v. Prudential Residential Services, Limited Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). All ambiguities must be resolved and all inferences must be drawn in favor of the non-moving party. *Id.* The moving party

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 787658 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

may also succeed on a summary judgment motion by showing that little or no evidence may be found in support of the non-moving party's case. *Id.*

*3 Each of the Takacses' claims is based solely on the allegation that they suffered damages due to Defendants charging them excessive interest. *See* Fourth Amended Complaint ¶¶ 47, 51, 55. However, the evidence demonstrates that not only were the Takacses not overcharged, but they were actually undercharged. An analysis showed that they paid less in interest than they would have if the Defendants had used the H15 method. *See* Decl. of Joseph Carson ¶ 4. The Plaintiffs have not presented any contradictory evidence on this issue, thus, there is no genuine issue of fact on the question of damages. As damages is an essential element on the Plaintiff's claim, the Defendants are entitled to summary judgment on the Plaintiffs' claims of breach of contract, violation of the Deceptive Practice Act and unjust enrichment.

The Takacses cannot maintain a cause of action, because they have not been damaged. *See*N.Y. Gen. Bus. Law § 349(h) (McKinney 1991) (allowing a cause of action to "any person who has been injured by reason of any violation of this section"); *Lexington 360 Associates v. First Union Nat'l Bank,* 234 A.D.2d 187, 651 N.Y.S.2d 490 (1st Dep't 1996) (granting defendant's motion for summary judgment where borrower could not prove that he suffered any damages as the result of the lender's alleged breaches); *Small v. Bank of New York,* 222 A.D.2d 667, 636 N.Y.S.2d 71 (2d Dep't 1995) (granting defendant's motion for summary judgment because plaintiff suffered no damages from defendant's conduct). The Takacses themselves admit that they have suffered no injury and request a voluntary dismissal without prejudice. *See* Plaintiffs' Memorandum in Opposition to Chase's Motion at 2-3.

Defendants are entitled to summary judgement on the Takacses' individual claims, because, on the specific facts of this case, the Takacses have demonstrated no injury.

II. *Deceptive Practices Act*

The Chase Defendants move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure[FN6] regarding the Siradases' claim

of violation of New York's Deceptive Practices Act. The Deceptive Practices Act, which applies to New York residents and New York transactions, provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce ... are hereby declared unlawful."N.Y. Gen. Bus. Law § 349-50.[FN7]

> FN6. The Federal Rules state: "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."Fed.R.Civ.P. 12(c).

> FN7. The Court notes that the Plaintiffs, in the Fourth Amended Complaint, allege that The Chase Defendants violated Florida's uniform deceptive acts and practices statute, Fla. Stat. Ann. § 501.201*et seq.,* which they claim applies to The Chase Defendants because Chase Mortgage is located in Florida and carried out the unlawful practices from Florida. None of the parties addressed this claim in their moving papers on the issues addressed herein, therefore, the Court will not address the applicability of this statute to the Defendants' motions. However, as the Court has denied the Defendants' motion with respect to the New York uniform deceptive acts and practices statute, the parties suffer no prejudice by omitting discussion on this issue here.

The standard for obtaining a judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is the same as the standard used for a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6): A court may dismiss the complaint only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Cohen v. Koening,* 25 F.3d 1168, 1172 (2d Cir.1994), quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). In this case, it does not appear beyond doubt that the Plaintiffs can prove no set of facts entitling them to relief under the Deceptive Practices Act.

*4 Plaintiffs maintain that the Chase Defendants violated the Deceptive Practices Act by deceptively using a formula for computing interest rate adjustment that was inconsistent with the formula agreed upon in the mortgage. *See* Fourth Amended Complaint ¶ 49. Defendants' motion for judgment on the pleadings regarding this claim is denied, given

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 1999 WL 787658 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

that Defendants' conduct could arguably meet all of the elements of a violation of the Deceptive Practices Act.

In order to prove a claim for deceptive practices the Plaintiffs must demonstrate that the act or practice was misleading in a material respect, and that the plaintiff was injured. *Schneider v. Citicorp Mortg., Inc.,* 1997 982 F.Supp. 897, 903 (E.D.N.Y.1997) (citing *Steinmetz v. Toyota Motor Credit Corp.,* 963 F.Supp. 1294, 1306 (E.D.N.Y.1997)). There is no requirement that the Plaintiff show specific dollars injury. In order for the Plaintiffs to plead and prove their claims for relief under the Deceptive Practices Act, they must prove, at a minimum, that the conduct is consumer oriented, that Defendant's acts have a broad impact on consumers at large, and that there is injury to the public generally. *Occidental Chemical Corp. v. OHM Remediation Services Corp.,* 173 F.R.D. 74, 76-77 (W.D.N.Y.1997).

First, a miscalculation of interest rates by major servicers of mortgages in the United States clearly has a broad impact on consumers at large. *See Teller v. Bill Hayes, Ltd.,* 213 A.D.2d 141, 630 N.Y.S.2d 769 (2d Dep't 1995) (basing denial of a deceptive practices on the fact that the deceptive act did not have a sufficiently broad impact on consumers at large); *United Knitwear Co. v. North Sea Ins. Co.,* 203 A.D.2d 358, 359 (2d Dep't 1994) (requiring that claims under the Deceptive Practices Act be "harmful to the public at large"). Additionally, the Chase Defendants' practices are of a persisting nature, rather than isolated incidents. *See id. at 359* (requiring that violations of the Deceptive Practices Act involve conduct "of a recurring nature."); *Teller,* 213 A.D.2d at 148, 630 N.Y.S.2d at 774 (the Deceptive Practices Act is not applicable to "single-shot" transactions). Unlike *Teller,* which involved deceptive conduct between only two parties, the Chase Defendants' deceptive practices extended to hundreds of thousands of borrowers. *See* Fourth Amended Complaint ¶ 12. This vast impact on consumers at large is the type of ongoing behavior which the Deceptive Practices Act was intended to censure.

Defendants argue that Plaintiffs' claim under the Deceptive Practices Act must be dismissed because it is "duplicative of their breach of contract claim."Defendants' Memorandum at 7. Defendants base this contention on the *Teller* court's statement that the Deceptive Practices Act "was not intended to

turn a simple breach of contract into a tort,"*Teller,* 213 A.D.2d 141 at 148. Additionally, Defendants refer to the *United Knitwear* court's denial of a claim under the Deceptive Practices Act because it "amounts to nothing more than a private contract dispute between the parties."*United Knitwear Co.,* 203 A.D.2d at 359. Defendants have taken these statements out of context to support their claim that the Deceptive Practices Act cannot apply to those deceptive practices which are rooted in contracts. The *Teller* court clearly bases its decision to deny the deceptive practices claim on the insufficient manner and extent to which the defendant's conduct impacts consumersnot the fact that a contract was involved. Only after a lengthy analysis of these factors does the court give its conclusory statement that the Deceptive Practices Act "was not intended to turn a simple breach of contract into a tort."*Id.*

*5 Similarly, the court in *United Knitwear Co.* based its denial of the claim under the Deceptive Practices Act on the fact that the deception was neither harmful to the public nor of a recurring nature. Only after an extensive examination of these factors, did the court conclude that there was nothing more than a simple breach of contract.

Because the mortgages serviced by the Chase Defendants clearly do have a broad impact and are of a recurring nature, their conduct amounts to more than a "simple breach of contract" and as such is subject to the Deceptive Practices Act. Although Plaintiffs supplied little evidence of other mortgagors who potentially were harmed by Chase's and Freddie Mac's practices, this is a factual issue. It is possible that evidence of such could be developed to demonstrate deceptive practices which caused harm to consumers. Therefore, the Defendants' motion for summary judgment on this point is denied.

III. *Claim of Unjust Enrichment*

Plaintiffs George and Robin Siradas also bring a quasi contract claim of unjust enrichment and money had and received. (*See* Fourth Amended Complaint ¶¶ 53-55); *see generally Rocks & Jeans Inc. v. Lakeview Auto Sales & Service, Inc.,* 184 A.D.2d 502, 502 (2d Dep't 1992) (holding that a claim for money had and received "sounds in quasi contract" and arises when "in the absence of an agreement, one party possesses money that in equity and good conscience it ought not retain"). Plaintiffs base this claim on the assertion that Defendants unjustly

Not Reported in F.Supp.2d                                                                              Page 5
Not Reported in F.Supp.2d, 1999 WL 787658 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

received their money through the charging of excessive interest rates.

Plaintiffs and Defendants agree that one may not maintain a claim in quasi contract where a contract governs the "particular subject matter of its claims for unjust enrichment."*See* Plaintiffs' Memorandum at 7 (quoting *Metropolitan Elec. Mfg. Co. v. Herbert Constr. Co.,* 183 A.D.2d 758, 759 (2d Dep't 1992)).

The only dispute here is whether Plaintiffs' claim in quasi contract covers subject matter different from that covered by the contract itself. Plaintiffs argue that the two claims cover two different subjects: the contract (the mortgage) governs the proper method to calculate interest rates, whereas the subject matter of the quasi contract claim "is not the method of calculation contained in the contract, but that the defendants did not use the method of calculation contained in the contract."Plaintiff's Memorandum at 8.

This analysis is unpersuasive. Simply rephrasing an affirmative, contractual obligation into a failure to uphold this obligation, does not create a new subject matter. The quasi contract claim does not have a subject matter independent from the contract itself. The Chase Defendants' motion for judgment of the pleadings with respect to Plaintiff's claim of unjust enrichment and money had and received against the Chase Defendants is dismissed, as there is no set of facts in support of the Plaintiffs' claim which would entitle them to relief. *Cohen,* 25 F.3d at 1172 (quoting *Conley,* 355 U.S. at 45-46).

IV. *The Duty of Fair Dealing*

*6 A party may maintain a claim for breach of the duty of fair dealing only if it is based on allegations different than those underlying the accompanying breach of contract claim. *See Geler v. National Westminster Bank USA,* 770 F.Supp. 210, 215 (S.D.N.Y.1991)* (denying plaintiff's claim under breach of duty of fair dealing because the allegations of that claim presupposed a breach of the express terms of the contract).*Geler* is analogous to this case, in that the Siradas Plaintiffs have not asserted any basis for their breach of duty of fair dealing claim beyond the allegation that Defendants breached the contract.

Plaintiffs' reliance on *Davis v. Dime Bank of*

*New York, FSB,* 158 A.D.2d 50 (Appel Div.3d Dep't 1990) (holding that a plaintiff could sue for breach of contract, as well as breach of fiduciary duty, only if the latter duty arose from more than the mere existence of the contract) is misguided for two reasons. First, the plaintiffs in *Davis* claimed breach of fiduciary duty, which involves a very different relationship between the parties and requires a different standard of conduct,[FN8] rather than breach of duty of fair dealing. Second, the *Davis* court found a fiduciary relationship between the parties which was based on allegations independent of the contract itself. There was no such special duty between the Siradases and the Chase Defendants, other than the duty of fair dealing which is implicit in every contract. *See Geler,* 770 F.Supp. at 215 (holding that every contract obligates the party to engage in fair dealing). The breach of that implicit duty to engage in fair dealing is merely a breach of the underlying contract. *Id.*

> FN8."The essence of a fiduciary relationship is that the fiduciary agrees to act as his principal's alter ego ...."*United States v. Ashman,* 979 F.2d 469, 478 (7th Cir.1992).

Plaintiffs cannot claim both breach of contract and breach of the duty of fair dealing, because the latter claim is not independent of the contract itself. For this reason, the Defendants' motion for judgment of the pleadings with respect to the Plaintiffs' breach of duty of fair dealing claim is granted.

V. *Plaintiff's Claims Against Freddie Mac*

Freddie Mac has brought a motion to dismiss all of the Plaintiffs' claims against it. For the reasons set forth below, the Court grants such motion as to each claim.

A. *Overcharging of Interest*

Plaintiffs are subject to New York Civil Practice Law and Rules § 215(6), because they seek recovery of an overcharge of interest. This law imposes a one year statute of limitations on an action to recover any overcharge of interest. C.P.L.R. § 215(6). This language clearly and unambiguously applies to any "monetary charge in excess of the proper, legal or agreed rate or amount."*Rubin v. City Nat'l Bank and Trust Co.,* 131 A.D.2d 150, 152 (3d Dep't 1987) (citation omitted). Plaintiffs rely on *Englishtown*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 6
Not Reported in F.Supp.2d, 1999 WL 787658 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

*Sportswear, Ltd. v. Marine Midland Bank,* 97 A.D.2d 498, (2d Dep't 1983)(holding that C.P.L.R. § 215(6) only applies to usury actions), which directly contradicts the holding in *Rubin* (holding that the plain, ordinary meaning of CPLR 215(6) statutory language is clear on its face and such language is controlling). The Court will follow the more recent and thoughtful analysis provided in *Rubin. See Rubin,* 131 A.D.2d at 153 (holding that the ordinary meaning of the statute controls).

   *7 When a statute is clear and unambiguous in its language, New York courts should not inquire as to legislative history to aid in its interpretation. *See Washington Post Co. v. New York State Insurance Dep't et al.,* 61 N.Y.2d 557, 565 (1984)("When the plain language of the statute is precise and unambiguous, it is determinative") (citation omitted); *see also* McKinney's Cons.Laws of N.Y., Book 1, Statutes at 76 (Where words of a statute are free from ambiguity and express plainly, clearly and distinctly the legislative intent, "resort need not be had to other means of interpretation."). The language of C.P.L.R. § 215(6) is entirely clear, therefore, it would be inappropriate to examine the statute's legislative history.

   Plaintiffs argue that the *Rubin* holding is limited to the facts of that case, and as such does not extend to overcharges of interest that are contractual rather than statutory. *See* Plaintiff's Memorandum at 4. This argument, however, overlooks the court's statement that "[W]hile this case and *Englishtown* are factually distinguishable, the question remains whether CPLR 215(6) extends to actions other than usury."*Rubin,* 131 A.D.2d 150 (3d Dep't 1987). Despite the differing factual backgrounds between the two cases, the *Rubin* court was clearly re-examining the same issue addressed by the *Englishtown* court. The *Rubin* court ultimately concludes that C.P.L.R. § 215(6) applies to any overcharge of interest-not just usury. *See Rubin,* 131 A.D.2d at 153. The Court grants Freddie Mac's motion to dismiss on this issue, because Plaintiffs' claim is barred by the statute of limitations.

## B. *The Duty of Fair Dealing*

   Plaintiffs' claim under breach of duty of fair dealing should be dismissed. As discussed above, *see supra* Section IV, New York courts have consistently denied claims of breach of duty of fair dealing when they are alleged together with breach of contract. *See*

*OHM Remediation Services Corp. v. Highes Environmental Systems, Inc.,* 952 F.Supp. 120, 124 (N.D.N.Y.1997) (holding that New York does not recognize a simultaneous claim for breach of contract and breach of the duty of fair dealing). The Court grants Freddie Mac's motion to dismiss the Plaintiff's claim of breach of duty of fair dealing, accordingly.

## C. *Unjust Enrichment*

   Plaintiffs' claim for unjust enrichment and money had and received claim against Freddie Mac must be dismissed, as there is no set of facts in support of the Plaintiffs' claim which would entitle them to relief. *Cohen,* 25 F.3d at 1172 (quoting *Conley,* 355 U.S. at 45-46). Plaintiffs and Defendants agree that one may not maintain a claim in quasi contract where a contract governs the "particular subject matter of its claims for unjust enrichment."*See* Plaintiffs' Memorandum at 7 (quoting *Metropolitan Elec. Mfg. Co.,* 183 A.D.2d at 759). Simply rephrasing an affirmative, contractual obligation into a failure to uphold this obligation, does not create a new subject matter. The quasi contract claim does not have a subject matter independent from the contract itself. Therefore, Plaintiff's claim of unjust enrichment and money had and received against Freddie Mac is dismissed.

## D. *Deceptive Practices Act*

   *8 The Siradases' claim that Freddie Mac violated New York and Virginia [FN9] statutes by deceptively using a formula for computing interest rate adjustment that was inconsistent with the formula agreed upon in their mortgage, and inconsistent with Freddie Mac's policy.

> FN9. The Virginia statute specifies certain unlawful practices, and prohibits all conduct "using any other deception, fraud, false pretense, or misrepresentation in connection with a consumer transaction."Va.Code Ann. §§ 59.1-200.

   Although the Siradases' deceptive practices claim against the Chase Defendants has survived, their deceptive practices claim against Freddie Mac is dismissed. Unlike the Chase Defendants, Freddie Mac is not subject to the New York Deceptive Practices Act. Freddie Mac is also not subject to the Virginia Code §§ 59.1-200 regulating deceptive

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 787658 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

business practices.

1. *Freddie Mac is Not Subject to N.Y. Gen. Bus. Law §§ 349, 350*

The Deceptive Practices Act only applies to New York residents and New York transactions. *See Riordan v. Nationwide Mutual Fire Insurance Co., 977 F.2d 47, 52 (2d Cir.1992)* (holding that the section applies to "every business operating in New York"), *see also Weaver v. Chrysler Corp., 172 F.R.D. 96, 100 (S.D.N.Y.1997)* (dismissing claim because Plaintiff has failed to allege any deceptive acts or practices by Chrysler that occurred within New York State, which is required to state a claim under the Deceptive Practices Act). However, Plaintiffs have failed to allege that Freddie Mac committed any deceptive practices or acts within New York or is a New York resident.

Plaintiffs claim that Freddie Mac should not be able to absolve itself from liability simply by hiring a servicer to do that which it was obligated to do under the contract, suggesting that Freddie Mac be liable because of its relationship with The Chase Defendants, which is subject to the New York Deceptive Practices Act. Plaintiff's Memorandum at 11. However, Freddie Mac, as a government institution, is not liable for the deceptive conduct of its servicers. *See United States v. Zenith-Godly Co. Inc., 180 F.Supp. 611, 615 (S.D.N.Y.1960)* ("While a private person may be bound by acts of his agents that are not within the actual bounds of the agent's authority, it does not follow that the Government may be bound by the apparent authority of its agents"). Therefore, there may be no liability under the Deceptive Practices Act on the part of Freddie Mac, and Defendants' motion to dismiss on this issue is granted.

2. *Freddie Mac Is Not Subject to Va.Code Ann. §§ 59.1-200*

Freddie Mac is not subject to the Virginia Consumer Protection Act ("VCPA") for two reasons. First, consumer real estate transactions are governed by 15 U.S.C.S. § 1603, and are therefore not subject to the VCPA. *See Smith v. United States Credit Corp., 626 F.Supp. 102 (E.D.Va.1985)* (holding that consumer real estate transactions are not subject to the VCPA, because they are exclusively under the domain of 15 U.S.C.S. § 1603, the Federal Consumer

Credit Act).

Plaintiffs attempt to distinguish this case from *Smith* by arguing that although 15 U.S.C.S. § 1603 does regulate consumer real estate transactions in general, it does not specifically regulate interest rate adjustments on ARM loans. Plaintiffs then conclude that since this conduct is not regulated by the Federal statute, it is subject to the VCPA. *See* Plaintiffs' Memorandum at 12, 13. Plaintiffs are incorrect in their assertion that interest rate adjustments on ARM loans are not subject to 15 U.S.C.S. § 1603. Although the federal statute does not specify that this particular type of conduct is within its ambit, its general phrasing includes the deceptive calculation of interest rates. *See* 15 U.S.C.S. § 1603. The statute's statement of its own purpose supports a broader construction: "[i]t is the purpose of this title ... to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." *Id.*

*\*9* Secondly, the VCPA does not apply here because Freddie Mac is not a supplier. The VCPA only regulates suppliers. The statute defines the term "supplier" to mean "a seller or lessor who advertises, solicits or engages in consumer transactions, or a manufacturer or distributor who advertises and sells or leases goods or services to be resold or leased by other persons in consumer transactions." Va.Code § 59.1-198. Freddie Mac is clearly not a seller or lessor-it has not sold goods or services to Plaintiffs. Rather, Freddie Mac purchased the mortgage after the loan had already been given to Plaintiffs. Finally, Freddie Mac did not engage in "consumer transactions." The VCPA defines consumer transactions as, "[t]he advertisement, sale, lease or offering for sale or lease, of goods or services to be used primarily for personal, family or household services." Va.Code § 59.1-198. "Goods" are defined to include "all real, personal or mixed property, tangible or intangible." Id. This does not apply to Freddie Mac.

For both of the above reasons, Freddie Mac is not subject to the VCPA, and Plaintiffs' deceptive practices claim against Freddie Mac is dismissed.

*CONCLUSION*

For the above reasons, the Court dismisses all of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 8
Not Reported in F.Supp.2d, 1999 WL 787658 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiffs' claims against Freddie Mac, and all of the individual claims brought by the Takacses against Defendants. Finally, the Court dismisses the Siradases' claims of unjust enrichment and their claim of breach of duty of fair dealing. The Court denies the Defendant's motion to dismiss the Siradases' deceptive practices claim against the Chase Defendants.

SO ORDERED:

S.D.N.Y.,1999.
Siradas v. Chase Lincoln First Bank, N.A.
Not Reported in F.Supp.2d, 1999 WL 787658 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 2

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 438088 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

CEchostar DBS Corp. v. Gemstar-TV Guide Intern., Inc.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
ECHOSTAR DBS CORPORATION, Echostar Acquisition L.L.C., and Echostar Satellite L.L.C., Plaintiffs,
v.
GEMSTAR-TV GUIDE INTERNATIONAL, INC., and Superstar/Netlink Group L.L.C. Defendants.
No. 05 Civ. 8510(DAB).

Feb. 8, 2007.

*MEMORANDUM & ORDER*

BATTS, J.

*1 The Defendants in this action-Gemstar-TV Guide International, Inc. ("Gemstar") and Superstar/Netlink Group L.L.C. ("SNG")-have moved this Court pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiffs' Complaint. The Plaintiffs-Echostar DBS Corporation ("DBS"), Echostar Acquisition L.L.C. ("Acquisition"), and Echostar Satellite L.L.C. ("Satellite")-oppose Defendants' Motion. For the reasons contained herein, Defendants' Motion is GRANTED.

*I. BACKGROUND*

The following facts, which are alleged in the Complaint, are assumed to be true for purposes of this Motion.

Plaintiffs allege that Defendants breached warranties, representations, and covenants either contained in, or implied by, the parties' Asset Purchase Agreement ("APA"). (Compl.¶ 1.) All three Plaintiffs-DBS, Acquisition, and Satellite-are Colorado limited liability companies with their principal places of business at the same address in Englewood, Colorado. (Compl.¶¶ 10-12.) Defendant Gemstar is a Delaware corporation with its principal place of business in California. (Compl.¶ 13.) Defendant SNG is a Delaware corporation with its principal place of business in Oklahoma. (Compl.¶ 14.) Gemstar was at all times relevant the majority shareholder of SNG, holding approximately 80% of SNG's stock. (Compl.¶ 22.) Gemstar later purchased the outstanding minority interest of SNG, making SNG Gemstar's wholly owned subsidiary. (Compl.¶ 23.)

Plaintiffs use high-powered satellites to broadcast television program packages to viewers who have purchased the requisite equipment. (Compl.¶ 19.) Defendant Gemstar develops, licenses, markets and distributes products and services that facilitate a television viewer's ability to canvass television stations, among other things. (Compl.¶ 21.) Defendant SNG markets and authorizes access to entertainment programming for C-Band home satellite dish owners.

On November 2, 1999, Satellite and SNG entered into a C-Band Conversion Agreement ("C-Band Agreement"). (Compl.¶ 24.) Under that agreement, SNG was appointed "as a non-exclusive authorized representative to promote and solicit orders for EchoStar programming from individuals who were existing C-Band subscribers". (Compl.¶ 25.) Satellite paid $250 to SNG for each order that resulted in the activation of a Converted Subscriber,[FN1] and $100 for each order from an Eligible C-Band Subscriber [FN2] that was submitted by a third party rather than by SNG. (Compl.¶ 27.) The C-Band Agreement required SNG to furnish Satellite with a Subscriber List of all Eligible C-Band Subscribers. (Compl.¶ 57.) SNG agreed either to update this list on a monthly basis, or to use "any other method pursuant to which SNG [could] reasonably demonstrate that a subscriber placing an Order is an Eligible C-Band Subscriber". (Compl. ¶ 57; Pls.' Mem. in Opp. at 16.) According to Plaintiffs, SNG furnished Satellite with a subscriber list at the end of 1999, but did not fulfill its obligation to furnish Satellite with monthly updates. As a result, Satellite paid SNG commissions for people who were not properly qualified as Eligible C-Band Subscribers ("overpayment"). (Compl.¶ 57.)

FN1.See ¶ 3.2 of the C-Band Agreement, which has been attached to the Declaration of Paul D. Sarkozi as Exhibit B, for an explanation of the term "Converted Subscriber". At the Court's permission,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 438088 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Defendants filed Exhibit B under seal.

FN2.See ¶ 2.1 of the C-Band Agreement *at* Sarkozi Dec., Ex. B, for an explanation of the term "Eligible C-Band Subscriber".

*2 These alleged overpayments amount to $5-6 million. Plaintiffs assert that Satellite neither knew, nor had reason to know, that a substantial amount of the commission paid to Defendants was never due and owing to SNG. (Compl.¶ 28.) SNG allegedly controlled the records to determine who was an active C-Band subscriber. (Pls.' Mem. in Opp. at 16 n. 11.) Plaintiff paid the $5-6 million because, under the C-Band Agreement, Satellite promised that it would "not unreasonably and intentionally reject an Order for the purpose of avoiding payment of Commissions...." (Pls. Mem. in Opp. at 16, n. 11.)

On March 1, 2004, Plaintiffs DBS and Acquisition entered into an Asset Purchase Agreement ("APA") with Gemstar and SNG. (Compl.¶ 32.) Under the terms of that Agreement, the C-Band Agreement was terminated. (Compl.¶ 32.) The APA further provided for the sale of certain assets by Defendants to Acquisition and DBS. (Compl.¶ 34.) Among the assets acquired by Plaintiffs were assets of SNG. (Compl.¶ 4.)

Plaintiffs allege that Defendants buried the $5-6 million overpayment within their financial records so as to render it impossible for Plaintiffs to learn about it. (Compl.¶¶ 36-41.) To this end, Defendants allegedly created different financial statements than those generated in the normal course of business. (Compl.¶ 39.) The Balance Sheet supplied to Plaintiffs during the APA negotiations listed the accounts payable and "accrued liabilities" as a single line item in the amount of $19,481,759. According to Plaintiffs, Gemstar and SNG intentionally failed to itemize this amount because they wanted to cover up the $5-6 million overpayment. (Compl.¶ 41.) Plaintiffs further allege that Defendants knew that DBS and Acquisition were not aware of the overpayment. (Compl.¶ 37.)

According to the Complaint, Defendants did not permit DBS and Acquisition to inquire into or examine SNG's accounts payable and accrued liabilities because those liabilities were not being purchased. (Compl.¶ 42.) Plaintiffs aver that Defendants "refused to tell [them] about the payable

due to them during the negotiations of the APA or at any other time."(Compl.¶ 45.) Defendants allegedly represented to Plaintiffs that the Balance Sheet was "legitimate" and that it did not contain any material representations or omissions. (Compl.¶ 45.)

Plaintiffs are not bringing suit for a breach under the C-Band Agreement. Rather, they contend that Defendants' conduct constitutes breaches under several provisions of the APA. Under Section 5.09 of the APA, Defendants represented and warranted that:

[T]o the knowledge of Sellers there is no existing condition, situation or set of circumstances that would reasonably be expected to result in such a Proceeding or Restrictive Order being brought against or in respect of any of the Acquired Assets or Seller Businesses....

(Compl.¶ 44.) Under Section 5.10(a) of the APA, Defendants warranted that they:*3 delivered to [DBS and Acquisition] complete and accurate copies of (i) the Reference Balance Sheets ... [which were] prepared from, and are in accordance with, the books and records of the Sellers, and fairly present, in all material respects, the financial position of the applicable Seller Business as of the Reference Date....

(Compl.¶ 47.) Plaintiffs allege that Defendants breached both of these APA sections.

Plaintiffs also cite Section 5.22 as a breached provision. In that section, Defendants represented that "[t]he copies of documents delivered, provided or made available by the members of the Seller Group to [DBS and Acquisition] pursuant to the terms of this Agreement are complete and accurate in all material respects."(Compl.¶ 54.)

Section 2.06(a) of the APA obliged Defendants to "cure, or cause any of its Affiliates to cure, all material defaults or breaches (or events that would become such with a lapse of time or the giving of notice or both) to any Seller or any subsidiary of Seller under the terms of any Assigned Contract [C-Band Agreement]...." (Compl.¶ 56.) Plaintiffs allege that Defendants violated this provision by not curing alleged breaches of the C-Band Agreement. (Compl.¶ 57.)

Plaintiffs not only allege breaches of the APA that pertain to the overpayment, but they also allege that Defendants breached the APA by not providing

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 438088 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

certain transition services. Section 7.10(a) of the APA provides:

Prior to the Programming Distribution Closing, the parties shall execute and deliver a transition services agreement (the "Transition Services Agreement") ... which identifies the services that Gemstar and its Subsidiaries shall make available to [DBS and Acquisition] after the applicable Closing to ensure the continued operation of each of the Seller Businesses and to avoid any material interruption or disruption thereof (collectively, the "Transition Services").

(Compl.¶ 59.) Defendants allegedly did not fulfill their obligation to provide certain Transition Services, including keeping backup tapes and software on behalf of DBS and Acquisition.[FN3](Compl.¶¶ 61-62.)

> FN3. Plaintiffs concede that their claim for breach of Section 5.05 of the APA is unfounded. Therefore, the Court need not consider this provision for purposes of deciding the present Motion.

Plaintiffs further allege that Defendants breached the implied covenant of good faith and fair dealing. (Compl.¶ 66(G).) As an alternative to that claim and their other breach of contract theories, Plaintiffs seek recovery for unjust enrichment. Lastly, Plaintiffs seek indemnification under Section 12.02(a) of the APA whereby Defendants agreed to:

indemnify [DBS and Acquisition] ... against, and agree[d] to hold each of them harmless from, any and all Losses, whether involving Third-Party claims or a claim solely between the parties hereto, incurred or suffered by [DBS or Acquisition] arising out or in connection with (i) any misrepresentation or breach of any covenant or agreement made by [Defendants] ... (ii) any breach of covenant or agreement made or to be performed by [Defendants] pursuant to [the] Agreement ... or (iv) any Excluded Liability.

*4 (Compl.¶ 78.)

## II. DISCUSSION

### A. Legal Standard on a Motion to Dismiss

In a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff."*Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995) (citations omitted)."The district court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). A court's review of such a motion is limited and "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."*Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). Dismissal is not warranted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief."*Cooper v. Park,* 140 F.3d 433, 440 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

For purposes of a motion to dismiss, a complaint is deemed to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."*Rothman v. Gregor,* 220 F.3d 81, 88-89 (2d Cir.2000) (citations omitted). However, if the allegations of a complaint are contradicted by documents incorporated in the complaint, the documents control and the court need not accept the allegations of the complaint as true. See*Sazerac Co., Inc. v. Falk,* 861 F.Supp. 253, 257 (S.D.N.Y.1994) (citing *Feik v. Fleener,* 653 F.2d 69, 75 & n. 4 (2d Cir.1981); see also*Matusovsky v. Merrill Lynch,* 186 F.Supp. 397, 400 (S.D.N.Y.2002) ( "allegations ... contradicted by ... a document [referenced in the complaint] are insufficient to defeat a motion to dismiss"); *Rapoport v. Asia Elecs. Holding Co., Inc.,* 88 F.Supp.2d 179, 184 (S.D.N.Y.2000) (granting motion to dismiss where "documents [referenced but not attached to complaint] contradict Plaintiff's allegations.").

### B. Breach of Contract Claims

"Contract remedies exist to give injured parties the benefit of their bargain."*Capital Nat. Bank of New York v. McDonald's Corp.,* 625 F.Supp. 874, 883 (S.D.N.Y.1986) (citing *County of Suffolk v. Long Island Lighting Co.,* 728 F.2d 52, 63 (2d Cir.1984); *International Customs Associates, Inc. v. Ford Motor Co.,* 893 F.Supp. 1251, 1255-56 (S.D.N.Y.1995); *Clalit Health Services v. Israel Humanitarian Foundation,* No. 02 Civ. 6552, 2003 WL 22251329, at *3 (S.D.N.Y. Sep. 30, 2003). Only parties to a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 438088 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

contract have standing to assert a claim for breach of contract. See *Clalit*, 2003 WL 22251329, at *3. Without a contractual relationship, there cannot be a contractual remedy. *Capital Nat. Bank of New York*, 625 F.Supp. at 883.

*5 Under New York law, a claim for breach of contract must allege: (1) the existence of a contract; (2) that the plaintiff has performed his or her obligations under the contract; (3) that the defendant failed to perform his or her obligations thereunder; and (4) resulting damages to the plaintiff. See *W.B. David & Co., Inc. v. DWA Communications, Inc.*, No. 02 Civ. 8479, 2004 WL 369147, at *2 (S.D.N.Y. Feb. 26, 2004); *Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 Civ. 342, 1999 WL 544708, at *18 (S.D.N.Y. July 27, 1999). "In pleading these elements, a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.*, 171 F.Supp.2d 354, 358 (citing *Levy v. Bessemer Trust Co., N.A.*, No. 97 Civ. 1785, 1997 WL 431079, at *5 (S.D.N.Y. July 30, 1997)).

Satellite signed the C-Band Agreement, but did not sign the APA. Because only parties to an agreement may assert a claim for a breach thereunder, *Clalit*, 2003 WL 22251329, at *3, and because Plaintiffs do not allege that Satellite was a third-party beneficiary of the APA, Satellite does not have standing to bring suit under the APA. EchoStar Satellite's breach of contract claim against Defendants is hereby DISMISSED for lack of standing.

DBS and Acquisition, however, have standing to bring a claim for breach of the APA because they signed it. Moreover, Plaintiffs DBS and Acquisition have satisfied the first, second, and fourth elements for breach of express warranty as to all of the APA provisions they allege were violated. The parties do not dispute the existence of the APA (first element); Plaintiffs allege that they performed their APA obligations (second element) (Compl.¶ 66); and they allege resulting damages of at least $5-6 million (fourth element) (Compl.¶ 68). But Plaintiffs do not satisfy the third breach of contract element on any of the express provisions they cite.

Plaintiffs allege that Defendants did not satisfy the covenant presented in Section 5.09 of the APA. That section provides that Defendants did not have any knowledge of any condition that could

reasonably be expected to result in a Proceeding in respect of any of the Acquired Assets or Seller Businesses. (Compl.¶ 44.) Plaintiffs' claim for breach of APA 5.09 fails because they cite no specific Proceeding that Defendants could reasonably have expected Plaintiffs to bring. Where they address Section 5.09 in their Complaint, Plaintiffs merely recapitulate their other allegations and then generally assert that "[s]uch conduct would reasonably be expected to result in a Proceeding brought against [Defendants]." (Compl.¶ 45.) Plaintiffs make no mention of a specific legal claim or other type of Proceeding, and cannot rely on the other claims in the Complaint to satisfy this requirement, because, as discussed *supra*, none of them are viable causes of action. Moreover, any suggestion that a claim by Plaintiffs for a default under the C-Band Agreement should have been anticipated also is in error. Bringing a claim under one contract for a breach of another contract is bootstrapping, and therefore is not proper.

*6 Plaintiffs also fail to allege that Defendants did not perform their duties under Section 5.10. That provision requires Defendants to have delivered to Plaintiffs "complete and accurate" copies of Reference Balance Sheets that "fairly present ... the financial position" of Defendants. (Compl.¶ 47.) Plaintiffs admit that the Balance Sheet Defendants provided included the total amount of Defendants' liabilities. Plaintiffs contend that Defendants' failure to itemize the total amount rendered the Balance Sheet incomplete and inaccurate. The Court finds no merit in that contention. Plaintiffs were apprised of a liability amount that included the overpayment, and they cannot now claim that the Balance Sheets were somehow incomplete because they did not expressly state that the overpayment was included.

Section 5.22 of the APA is substantially similar to Section 5.10. It requires that all the "copies of documents delivered, provided or made available pursuant to [the APA] are complete and accurate in all material respects."(Compl.¶ 47.) As stated above, Plaintiffs have not alleged that the liability amount on the Balance Sheet was incomplete or inaccurate, nor do they allege that the $5-6 million overpayment was not included in Defendants' calculations. Section 5.22 might also be read as referring to the completeness of "copies" of documents delivered. Even if this were the intended meaning of the provision, nothing in the Complaint suggests that any copies of Defendants' documents did not include all the pages and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 438088 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

paragraphs as they appeared in the originals. Accordingly, the Court concludes that Plaintiffs have not sufficiently alleged that Defendants failed to perform their obligations under Section 5.22 or Section 5.10.

Plaintiffs also allege a breach of Section 2.06 of the APA. That provision requires Defendants to have cured all material defaults or breaches under, *inter alia,* the C-Band Agreement. (Compl. ¶ 56 .) Plaintiffs argue that Defendants failed to furnish Satellite with updated lists of eligible C-Band subscribers as required by the C-Band Agreement.

Plaintiffs' argument is infirm for two reasons. First, Defendants' conduct did not amount to a breach of the C-Band Agreement. Even if SNG did not provide Satellite with updated lists, Satellite did not fulfill its corollary duty to notify SNG of its belief that there was inadequate Sufficient Proof of any customer's Eligible C-Band Subscriber status. (*See* C-Band Agreement 3.1.) Plaintiffs allege that only Defendants could have known whether customers were Eligible C-Band Subscribers, but SNG's not having updated the Subscriber list for four-and-a-half years put Satellite on notice that the Subscriber lists may have constituted inadequate Sufficient Proof.

Second, even if such conduct did constitute a material default in the C-Band Agreement, that Agreement was terminated at the closing of the APA. The C-Band Agreement's termination rendered immaterial any default pursuant to it. Plaintiffs do not successfully allege Defendants' failure to perform its duties under Section 2.06 of the APA.

*7 The dismissal of Plaintiffs' claims for breach of these other contract provisions puts Plaintiffs' claim under Section 7.10 outside of the jurisdiction of this Court. Section 7.10 requires the parties to execute and deliver a transition services agreement. (Compl.¶ 59.) The Transition Services Agreement requires Defendants to provide Plaintiffs with certain backup tapes and software, but Plaintiffs allege that Defendants did not do so. (Compl.¶¶ 60-62.)

Under 28 U.S.C. § 1332(a), diversity jurisdiction only applies in cases "where the matter in controversy exceeds the sum or value of $75,000."The Complaint consistently alleges that the Overpayments totaled five to six million dollars, but what damages remain from Defendants' alleged

breach of Section 7.10-the only breach of contract claim not related to the Overpayments-is not stated. Plaintiffs' Section 7.10 allegations do not satisfy the $75,000.01 amount in controversy requirement, and therefore shall be dismissed for lack of subject matter jurisdiction.

Accordingly, Defendants' Motion to Dismiss Plaintiffs' claims for breach of contract is hereby GRANTED.

*C. Breach of Implied Duty of Good Faith and Fair Dealing*

Plaintiff's Complaint addresses the breach of good faith and fair dealing claim at Paragraph 65(G). They allege: "Gemstar-TV and SNG breached the implied covenant of good faith and fair dealing by wrongfully concealing and withholding the benefits it received under the C-Band Agreement, depriving EchoStar of the right to receive the benefits represented to it in the APA, and causing EchoStar to suffer injury and incur damages."(Compl.¶ 65(G).)

New York law implies a covenant of fair dealing and good faith in all contracts. See*Global Intellicom, Inc. v. Thomson Kernaghan & Co.,* No. 99 Civ. 342, 1999 WL 544708, at *18 (S.D.N.Y. Jul. 27, 1999) (citing*Carvel Corp. v. Diversified Management Group, Inc.,* 930 F.2d 228, 230 (2d Cir.1991). In most circumstances, claims for breach of contract and the covenant of good faith and fair dealing are duplicative; however, in some cases "a party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations."*Chase Manhattan Bank v. Keystone Distributors, Inc.,* 873 F.Supp. 808, 815 (S.D.N.Y.1994). The covenant "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement."*Leberman v. John Blair & Co.,* 880 F.2d 1555, 1560 (2d Cir.1989). Hence, the covenant is violated "when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under the agreement."*Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741, 767 (S.D.N.Y.1990)."The implied covenant does not ... operate to create new contractual rights; it simply ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly bargained-for benefits."*Id.* (citations and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 438088 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

internal quotations omitted).

*8 The Court agrees with Defendants that the allegations underlying this claim merely duplicate some of Plaintiffs' other breach of contract claims. (See Defs.' Mem. of Law at 20, n. 9.) For example, Plaintiffs' breach of good faith and fair dealing claim is predicated on the allegations they use to support their Section 5.09 claim. Underlying both of these causes of action are allegations that Defendants deliberately withheld information about the Overpayments even though they knew Plaintiffs did not have any access to that information.

Moreover, Defendants' alleged violation of the covenant of good faith and fair dealing-knowingly concealing crucial information during negotiations-took place before the parties actually entered into the contract. Parties cannot breach a contract's implied promise of good faith and fair dealing before the contract is entered into. Claims under this theory arise when a party does something to prevent the other party from attaining an already agreed-upon benefit. See, e.g., Black v. MTV Networks, 172 A.D.2d 8 (N.Y. 1st Dept.1991) (where a party contracts with a principal and subsequently makes secret payments to agents of the principal, the party breached the implied covenant of good faith and fair dealing because they improperly created post-contract interests for the agents that are adverse to those of the principal); see also 22 N.Y. Jur.2d Contracts § 230 (in claims for breach of covenant of good faith and fair dealing, "neither party [to a contract] will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.").

Accordingly, Defendants' Motion to Dismiss DBS' and Acquisition's claims for breach of the covenant of good faith and fair dealing is hereby GRANTED. [FN4]

> FN4. Because Satellite was not a signatory to the APA, its claim for breach of the implied covenant of good faith and fair dealing, as with its claims for breaches of express contract provisions, shall be dismissed.

D. *Indeminfication*

Defendants also seek to dismiss Plaintiffs' claim for contractual indemnification. Because none of the other causes of action survive the motion to dismiss, Plaintiffs' indemnification claim is hereby DISMISSED as moot.

E. *Unjust Enrichment*

Plaintiffs also include an alternative unjust enrichment claim in their Complaint. "Generally, quasi-contractual relief, such as unjust enrichment is not permitted when an express agreement exists that governs the dispute between the parties."Bridgeway Corp. v. Citibank N.A., 132 F.Supp.2d 297, 305 (S.D.N.Y.2001). Because the C-Band Agreement controls the issues Plaintiffs present in their Complaint, a claim for unjust enrichment is not proper.

Plaintiffs argue that Satellite's claim for unjust enrichment should survive because, even though the C-Band Agreement existed between the parties, it did not address how overpaid commissions were to be dealt with after the termination of the Agreement. (Pls.' Mem. of Law at 23.) This argument fails. Satellite has merely re-characterized SNG's duty not to breach the C-Band Agreement's Subscriber commission provisions as a duty to reimburse Satellite for commission overpayments after the termination of the C-Band Agreement. The latter, Satellite says, was not specifically addressed in the C-Band Agreement. However, these two duties are one and the same. Satellite's attempt to parse two duties from one in an effort to make hardier its unjust enrichment claim is not proper. The C-Band Agreement-not the rules of equity and unjust enrichment-govern the overpayments.

*9 Accordingly, Defendants' Motion to Dismiss Plaintiffs' unjust enrichment claim is hereby GRANTED.

F. *Leave to Amend*

Even when a complaint has been dismissed, permission to amend it "shall be freely given when justice so requires."Fed.R.Civ.P. 15(a)."While it is the usual practice upon granting a motion to dismiss to allow leave to replead,"Cohen v. Citibank, No. 95 Civ 4826, 1997 WL 883789, at *2 (S.D.N.Y. Feb. 28, 1997), a court may dismiss without leave to amend when amendment would be futile. Oneida Indian Nation of New York v. City of Sherrill, 337 F.3d 139,

Not Reported in F.Supp.2d                                                                 Page 7
Not Reported in F.Supp.2d, 2007 WL 438088 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

168 (2d Cir.2003) (citing *Forman v. Davis,* 371 U.S. 178, 182 (1962)).

The Overpayments are a result of alleged breaches under the C-Band Agreement, not the APA. Granting Plaintiffs leave to amend their Complaint so that they may allege causes of action under the APA would be futile.

### III. CONCLUSION

For the reasons contained herein, Defendants' Motion to Dismiss is GRANTED. The Clerk of Court is directed to close the docket for this case.

SO ORDERED.

S.D.N.Y.,2007.
Echostar DBS Corp. v. Gemstar-TV Guide Intern., Inc.
Not Reported in F.Supp.2d, 2007 WL 438088 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

**H**Six West Retail Acquisition, Inc. v. Sony Theatre
Management Corp.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
SIX WEST RETAIL ACQUISITION, INC., Plaintiff,
v.
SONY THEATRE MANAGEMENT CORP., et al.,
Defendants.
No. 97 Civ.5499(LAP).

March 31, 2004.

*OPINION AND ORDER*

PRESKA, J.
    *1 Show business is a tough business.[FN1]After
managing and operating plaintiff's theatres for nearly
two decades defendants found themselves parties to a
suit filed by plaintiff alleging breach of contract,
breach of fiduciary duties, unjust enrichment, tortious
interference, and violations of the federal antitrust
laws. Now, after almost seven years of litigation,
after voluminous submissions, numerous motions,
and depositions taken on the other side of the globe, I
address defendants' motions for summary judgment.

>    FN1.“Show Business is tough ... it's a dog
>    eat dog world. No ... it's worse ... it's dog
>    doesn't return another dog's phone
>    call.”Crimes and Misdemeanors (Image
>    Entertainment 1989).

### BACKGROUND

    The plaintiff, Six West Retail Acquisition, Inc.
(“Six West”), brings this action against various
corporate and individual defendants alleging (1)
breach of contracts related to the defendants'
management of three movie theatres owned by Six
West; (2) breach of fiduciary duties arising from
defendants' management of those theatres; (3)
tortious interference with the plaintiff's prospective
business relations; (4) unjust enrichment; (5) restraint
of trade in violation of Section 1 of the Sherman Act,
15 U.S.C. § 1; (6) attempted monopolization in
violation of Section 2 of the Sherman Act, 15 U.S.C.
§ 2; and (7) anticompetitive merger in violation of

Section 7 of the Clayton Act, 15 U.S.C. § 18. (First
Amended Complaint dated Dec. 4, 1997 (“Amended
Compl.”) ¶¶ 86-131). Following the close of
discovery, plaintiff announced that it was abandoning
the merger claim as it had “been compromised by
subsequent events” (Letter from Jeffrey H. Howard
to Judge Preska of 3/14/03, at 1 n. 2), and I now
address defendants' motions for summary judgment
on the remaining allegations pursuant to Fed.R.Civ.P.
56.[FN2]For the reasons set forth below,[FN3] defendants'
motions are granted.

>    FN2. Defendants bring two motions for
>    summary judgment: one on behalf of the
>    “Sony Defendants,” which primarily
>    addresses the antitrust allegations, and one
>    on behalf of the “Loews Defendants” and
>    “Individual Defendants,” which primarily
>    addresses the breach of contract and
>    fiduciary duty allegations.

>    FN3.“The moment of truth boys.
>    Somebody's life is about to change.”Titanic
>    (Twentieth Century Fox 1997).

I. The Facts

A. The Parties

    Plaintiff Six West is a New York corporation
with its principal place of business in New York,
New York. (Amended Compl. ¶¶ 6, 34). Plaintiff
leases out and controls three movie theatres in
Manhattan: the New York Twin (the “Twin”), the
Paris Theatre (the “Paris”), and the former Festival
Theatre (the “Festival”). (Amended Compl. ¶¶ 4, 6).
Sheldon H. Solow (“Solow”) is a real estate
developer who is Six West's owner, sole shareholder,
and a corporate officer. (Amended Compl. ¶¶ 4, 6).

    Defendant Loews Theatre Management
Corporation (“Loews Theatres”), formerly known as
Sony Theatre Management Corporation, is a
Delaware corporation with its principal place of
business in New York. (Amended Compl. ¶ 7).
Defendant Loews Fine Arts Cinema, Inc. (“Loews
Fine Arts”) is a subsidiary of Loews Theatres through
which Loews Theatres conducted business with the
Paris and Festival theatres.[FN4](Amended Compl. ¶

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

10). Defendant Talent Booking Agency, Inc. ("TBA") is a New York corporation and Loews affiliate. (Amended Compl. ¶ 9). Loews Theatres, TBA, and Loews Fine Arts refer to themselves collectively as the "Loews Defendants" and shall be referred to herein as the "Loews Defendants" or "Loews". (Loews Def.'s 56.1 Stmt at 3).

> FN4. As Loews Theatres and Sony Theatres are the same entity, for clarity "Loews Theatres" will be used throughout.

*2 Defendant Sony Pictures Entertainment Corporation ("Sony Pictures") is a Delaware corporation and the parent company of Loews Theatres. (Amended Compl. ¶ 11). Sony Pictures produces and distributes motion pictures, which are then (along with films from other companies) exhibited by Loews Theatres and other exhibitors. (Amended Compl. ¶ 11). Defendant Sony Corporation of America ("Sony USA") is a New York corporation, and is the parent company of Sony Pictures. (Amended Compl. ¶ 12). Defendant Sony Corporation is a Japanese corporation that is the ultimate parent of all the Sony entities. (Amended Compl. ¶ 13). Sony Pictures, Sony USA, and Sony Corporation refer to themselves collectively as the "Sony Defendants" and shall be referred to herein as the "Sony Defendants". (Loews Def.'s 56.1 Stmt at 1).

Defendants James Loeks and Barrie Lawson Loeks are former Co-Chairpersons of Loews Theatres. (Amended Compl. ¶ 14-15). Defendant Travis Reid ("Reid") is President of Loews Theatres and TBA. (Amended Compl. ¶ 16). Defendant Seymour H. Smith ("Smith") is Executive Vice President of Loews Theatres and TBA. (Amended Compl. ¶ 18). Defendant Thomas Brueggeman ("Brueggeman") is Vice President of Loews Theatres. (Amended Compl. ¶ 17). Hereinafter, James and Barrie Loeks, Reid, Smith, and Brueggeman shall collectively be referred to as the "Individual Defendants".

B. The Twin

On December 13, 1978, Solow Theatre Corporation ("STC"), which leased the Twin from Solow pursuant to a lease agreement (the "Lease Agreement") of the same date (Loews Def.'s 56.1 Stmt ¶ 4), and TBA entered into an agreement (the

"Twin Agreement"), whereby TBA would operate and manage the Twin. (Twin Agreement § 3.01; Amended Compl. ¶ 33; Loews Def.'s 56.1 Stmt ¶ 2). Pursuant to the Twin Agreement, STC would receive 60% of the net theatre income, and TBA would receive 40%. (Twin Agreement § 4.04). STC and Solow, as tenant and landlord, respectively, entered into a Four Party Agreement dated December 13, 1978, with TBA and Loews, as operator and guarantor, respectively, whereby TBA and Loews agreed to assume the obligations of tenant, such as maintaining the premises, under the lease. (Pl.'s 56.1 Counterstmt to Loews ¶ 4b).FN5 As part of a transaction involving Chartwell Theatres, Inc ., TBA and Solow entered into a letter agreement dated July 3, 1985, that amended the Twin Agreement (the "Chartwell Consent"). The Twin Agreement had a term of 15 years, from 1979 through 1993, and Loews exercised its right to extend the Twin Agreement, as amended by the Chartwell Consent, for another ten years. (Loews Def.'s 56.1 Stmt ¶¶ 19-20; Pl.'s 56.1 Counterstmt to Loews ¶ 20 (disputing when Loews exercised its right of renewal)).

> FN5. Six West submitted separate responses to "The Loews and Individual Defendants' Statement Pursuant to Local Civil Rule 56.1" ("Loews Def.'s 56.1 Stmt") and "The Sony Defendants' Statement Pursuant to Local Civil Rule 56.1" ("Sony Def.'s 56.1 Stmt"). Hereinafter, "Pl.'s 56.1 Counterstmt to Loews" and "Pl.'s 56.1 Counterstmt to Sony" shall be used to distinguish between Six West's responses to the Loews/Individual Defendants' 56.1 submissions and the Sony Defendants' 56.1 submissions, respectively.

C. The Paris and Festival

Solow began to operate the Paris theatre, which is allegedly one of the most prestigious theatres in the country and commonly used for movie premiers (Amended Compl. ¶¶ 43, 51), in 1990, and beginning on March 23, 1990, Loews and Solow Management Corporation began discussions regarding Loews' management of the Paris for Solow. (Loews Def.'s 56.1 Stmt ¶ 40). Solow and Loews continued discussions and exchanged draft operating agreements until 1993 or 1994 but never executed a written agreement that explicitly set forth the terms governing Loews' operation of the Paris. (Loews Def.'s 56.1 Stmt ¶ 41, Pl.'s 56.1 Counterstmt to

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
**(Cite as: Not Reported in F.Supp.2d)**

Loews ¶ 41, 41a-g). Nevertheless, it is undisputed Loews did operate the Paris theatre even though the parties now dispute the terms that governed Loews' operation of that theatre. Loews ceased operating the Paris on April 30, 1997. (Loews Def.'s 56.1 Stmt ¶ 75).

*3 At the same time as Loews began operating the Paris, Loews also began operating the Festival. (Amended Compl. ¶ 47; Loews Def.'s 56.1 Stmt ¶ 79). As with the Paris, draft operating agreements were exchanged by the parties, but the parties never entered into a signed agreement. (Loews Def.'s Stmt ¶ 80; Pl.'s Counterstmt to Loews ¶ 80a-d). The Festival ceased operations on August 21, 1994. (Loews Def.'s 56.1 Stmt ¶ 92).

II. Procedural History

Six West filed the original complaint in this action on July 24, 1997, and the case was assigned to the Honorable David N. Edelstein. Following the public announcement of the merger between Loews and Cineplex Odeon, Six West filed the Amended Complaint on December 4, 1997, which added a Clayton Act claim alleging that the merger was anti-competitive (subsequently abandoned). All of the defendants filed a motion on January 8, 1998 to dismiss the Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6). In an Opinion & Order dated March 9, 2000, Judge Edelstein denied most of defendants' motion to dismiss, but did dismiss the contract claims as against the Individual Defendants and held that the block-booking allegations could only proceed against Sony Pictures, as Sony Pictures is the only film distributor. *See Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp.*, 2000 WL 264295 (S.D.N.Y., March 9, 2000).

I was assigned this case from Judge Edelstein on September 26, 2000, following Judge Edelstein's passing after almost fifty years of service on this Court.

On April 16, 2003, the Loews Defendants, Sony Defendants, and Individual Defendants all moved for Summary Judgment on all remaining claims in the Amended Complaint. The defendants also submitted joint motions *in limine* to exclude the testimony and reports of two of plaintiff's experts. On April 16, 2003, plaintiff also filed a motion *in limine* to exclude

the testimony and report of one of defendants' experts. Submissions filed under seal from both parties followed.

DISCUSSION

I. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment shall be rendered forthwith if the pleadings, depositions, answers, interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).

The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The substantive law determines the facts which are material to the outcome of a particular litigation. *See Anderson*, 477 U.S. at 250; *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975). In determining whether summary judgment is appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. *See Matsushita Elec. Industr. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

*4 If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U .S. at 586. However, only when it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight" should summary judgment be granted. *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223 (2d Cir.1994).

II. Plaintiff's Antitrust Claims

A. Sherman Antitrust Act § 1 Tying Claims

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361

(Cite as: Not Reported in F.Supp.2d)

Six West alleges, under two related but distinct theories, that the Sony Defendants' film distribution practices and the Loews Defendants' and Sony Defendants' licensing relationships are unreasonable restraints of trade in violation of Section 1 of the Sherman Act. That provision makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. To establish such a claim plaintiff must show: " '(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either *perse* or under the rule of reason .' ' *Virgin Atlantic Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 263 (2d Cir.2001) (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 95-96 (2d Cir.1998)).

1. Block-Booking

a. Standing

The Sony Defendants allege for the first time in their Reply that if there was any injury caused by the alleged block-booking by Sony Pictures the injury was only inflicted upon Loews and, thus, Six West lacks standing.[FN6] (Sony Def.'s Reply at 14). The Sony Defendants assert that as a landlord, Six West "was neither a consumer nor a competitor in the market in which trade was [allegedly] restrained" and, therefore, lacks standing to complain about foreclosure from the bidding process. (Sony Def.'s Reply at 14 (quoting *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters,* 459 U.S. 519, 539 (1983))). In support of this lack of standing defense, the Sony Defendants cite *Calderone Enter. Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292, 1296 (2d Cir.1971), in which a non-operating landlord of a theatre, which had been leased to an exhibitor, was held to lack antitrust standing.

<div style="margin-left:2em">

FN6. "Surely you can't be serious." "I am serious, and don't call me Shirley."Airplane! (Paramount Pictures 1980).

</div>

*Calderone* is easily distinguishable from the situation at bar. Here, Six West is much more than a mere landlord as Six West hired Loews to be its agent and perform the service of managing the three theatres and retained 60% of net profits. (Pl.'s Suppl. Opp. to Sony at 1).[FN] This is in contrast to the situation in *Calderone* in which the non-operating landlord charged an annual rental (in which it did receive a percentage of the theatre's gross receipts on top of a fixed minimal rent) and did not pay the exhibitor for the provision of services in managing the theatres. *Id.* at 1294.The Twin, Paris and Festival are owned by Six West, and, if Six West's allegations of block-booking are true, then as a competitor in the film exhibition market, Six West has been directly injured by such anticompetitive behavior and has standing to pursue these claims.

<div style="margin-left:2em">

FN7. In fact, the Twin Agreement explicitly stated "[n]othing herein contained shall be deemed to create a landlord-tenant relationship, between Tenant [STC] and Operator [TBA]." (Twin Agreement § 5.01).

</div>

b. Substantive Block-Booking Allegations

*5 As Judge Edelstein described in his Opinion and Order denying the defendants' motion to dismiss plaintiff's Section 1 claims, block-booking is "the practice of licensing, or offering for license, one feature or group of features on condition that the exhibitor will also license another feature or group of features released by the distributors during a given period" and is a type of tying arrangement. *SeeSix West,* 2000 WL 264295, at *14 (quoting *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 156 (1948)). Such tying arrangements are *perse* illegal. *SeeParamount Pictures,* 334 U.S. at 158-59 (1948). Judge Edelstein noted that "actual coercion 'is an indispensable element' of a block-booking violation," *id.* (quoting *Unijax, Inc. v. Champion Int'l, Inc.,* 683 F.2d 678, 685 (2d Cir.1982)), and *Unijax,* 683 F.2d at 685, makes clear that "[a]ctual coercion by the seller that in fact forces the buyer to purchase the tied product" is required. Thus, "unless the buyer can prove that it was the *unwilling* purchaser of the allegedly tied products, actual coercion has not been established and a tying agreement cannot be found." *Trans Sport, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 192 (2d Cir.1992) (emphasis added). At most, the facts to which Six West cites suggest that there were voluntary relationships between the Loews Defendants and film distributors, which are not *perse* illegal but rather ought to be evaluated under the rule of reason.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

Though allowing both the block-booking and relationship licensing claims to go forward, Judge Edelstein warned Six West that it must delineate the Section 1 claims more cogently as the case proceeded. See *Six West*, 2000 WL 264295, at \*20. Yet, Six West has continued to conflate the evidence relevant to the block-booking and relationship licensing allegations. A good deal of the evidence Six West cites to support the block-booking claim against Sony Pictures does not implicate Sony Pictures but rather touches on the relationships that Loews Theatres had with distributors other than Sony Pictures. From these descriptions of Loews' relationships, which very often do not even hint at coercion by any distributor-let alone name Sony Pictures specifically-Six West attempts to maintain a block-booking claim against Sony Pictures. Six West points out that at the summary judgment stage a court:

should not view each piece of evidence in a vacuum. Seemingly innocent or ambiguous behavior can give rise to a reasonable inference of conspiracy in light of the background against which the behavior takes place. Evidence can take on added meaning when viewed in the context with all the circumstances surrounding the dispute.

(Pl.'s Opp. to Sony at 23 (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254-55 (2d Cir.1987))). Viewing Six West's argument in context, Six West proffers no evidence from which a jury could find that there was any "actual coercion" by the Sony Defendants that "in fact" forced any film exhibitor to purchase any unwanted films constituting a *perse*Section 1 violation.

\*6 Six West refers to a number of letters, statements and documents that purportedly demonstrate, or create a reasonable inference of possible, coercion by Sony Pictures even though this evidence merely refers to distributors generally and not Sony Pictures. For example, Six West cites a 1990 letter from Alan Friedberg, Chairman of Loews, to Solow that states, "[w]e do not have total control over the situation (film companies are increasingly arrogant and demanding) ... and there are 'relationships' with the film companies that dictate certain decisions."((P)Misc. 9 (8/9/90 Letter from Friedberg to Solow)). This letter only refers to "film companies" in general, not Sony Pictures, and demonstrates only that exhibitors and distributors had relationships. Likewise Sony Theatres' (a.k.a. Loews Theatres) 1994 strategic plan, which states:

Due to the smaller number of screens per location in many of our free zone theatres, [Loews] Theatres is forced to make film selections, leading to better relationships with certain distributors. These distributors also tend to play more of their product in our competitive zones locations....

((P)PX 141). Again this evidence simply demonstrates that Loews Theatres' decisions regarding what movies to exhibit may have been influenced by relationships that Loews had with unnamed distributors. Six West's use of deposition testimony by Lawrence Ruisi, President and CEO of Loews Cineplex Entertainment, that Loews had relationships with distributors and sometimes took less desirable films to maintain access to more desirable films is similarly unavailing as evidence that Sony Pictures engaged in block-booking. (See Ruisi 115:6-16). At issue is whether there was any coercion by Sony Pictures, and evidence that Loews maintained relationships with distributors does not permit a reasonable juror to infer Sony Pictures engaged in coercion or the practice of block-booking.

Even when Six West does cite to evidence that relates to actions by Sony Pictures, the evidence fails to suggest that Sony Pictures attempted to coerce anyone. For instance, Six West cites Reid's deposition testimony that Loews had "relationships" with Sony Pictures, similar to relationships it had with other distributors, such that certain Sony Pictures releases were taken in order to preserve the ability to maintain access to other pictures. (Reid 68:18-70:8). Nowhere, however, does Reid imply that Loews' decisions were the result of any type of coercion by Sony Pictures. Despite Six West's statement to the contrary, without any hint of coercion by Sony Pictures, such conduct is not "archetypical block-booking" but rather archetypical relationship licensing. (Pl.'s Opp. to Sony at 18).

Perhaps Six West's strongest evidence, and the evidence that Judge Edelstein relied upon in allowing Six West's block-booking claim to survive defendants' motion to dismiss, is a letter dated January 16, 1996 from Reid to Solow responding to an inquiry of whether the film *Sense and Sensibility*, a Sony Pictures release, could be exhibited at the Twin. See *Six West*, 2000 WL 264295, at \*15. In that letter, Reid responded to Solow's inquiry by stating "this business does not work in such a way that we would only play 'Sense and Sensibility', but that we would become obligated to play a full portion of the

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

Sony Pictures release schedule."(PX 46). Based on this language, Judge Edelstein wrote, "[a]t this point in the litigation, the facts suggest that Plaintiff's difficulty in acquiring more profitable movies may be attributed to its unwillingness or its inability to accept all of Sony Pictures' films."*Six West*, 2000 WL 264295, at *15. I do not disagree with Judge Edelstein's finding that the language contained in Reid's letter was sufficient to survive a motion to dismiss. At that stage of litigation a court will not dismiss a complaint unless it appears beyond doubt that the plaintiff can prove no set of facts supporting a claim for relief. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir.1991). Yet, at the summary judgment stage of litigation, while it is important not to deprive a deserving plaintiff of his or her day in court, when there are no genuine issues of material fact, summary judgment is both appropriate and required. Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).

*7 After years of discovery, Six West's block-booking claim rests almost entirely on these statements in Reid's letter, and I do not see how any reasonable juror could infer actual coercion from these few words.[FN7] Reid's use of the word "obligated" does not imply that Sony was exercising any economic muscle or coercing anyone. *See American Mfrs. Mut. Ins. Co. v. American Broad-Paramount Theatres*, 446 F.2d 1131, 1137 (2d Cir.1971) (coercion by a film distributor consists of the "actual exertion of economic muscle"). As Reid testified in his deposition, in a "competitive" exhibition market Loews would sometimes play films it did not "want as much" so as to preserve certain relationships with distributors. (Reid Depo. at 294:7-12; 308:5-12). This is a far cry from evidence of a distributor's actually conditioning access to one film on an exhibitor's taking a less desired film. *See United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 658-59 (2d Cir.1989) (finding direct evidence that a distributor's agent had forced an exhibitor to take one film in order to play another film). Taking a film that an exhibitor does not "want as much" in order to preserve a relationship with a distributor is not block-booking, is not *per se* illegal, and no reasonable juror could infer from Reid's letter to Solow that Sony Pictures was coercing Loews into taking one Sony film in order to get another Sony film. No other evidence presented by plaintiff suggests that the letter reflected anything more than the existence of a relationship between Sony Pictures

and Loews.

FN8. The only other evidence cited by Six West that even hints at any threat by Sony Pictures is an e-mail from Sony Pictures' Eastern Division Manager to employees that states Sony might deny one theatre, not affiliated with Six West, access to future films if that theatre dropped the film *Wolf* before the film completed its run. ((P) PX 20). One angry internal e-mail regarding how long a film would run, without any proof that such a threat was even communicated to the theatre in question, is not enough to create an inference of actual coercion or block-booking.

I do not mean to insinuate that a plaintiff must present incontrovertible oral or written proof that a defendant has engaged in block-booking. Inferences of tying agreements drawn from circumstantial evidence are often all that is available, and if the evidence is sufficient to support such inferences these inferences are quite sufficient to survive a motion for summary judgment. *See Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir.1993); *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 79 (2d Cir.1980); *Caldwell v. American Basketball Assoc., Inc.*, 825 F.Supp. 558, 566 (S.D.N.Y.1993), aff'd, 66 F.3d 523 (2d Cir.1995). The evidence presented by Six West, however, is insufficient for any reasonable juror to infer that the Sony Defendants coerced any exhibitor to carry any films and engaged in unlawful block-booking.

For the above reasons, as Six West has failed to demonstrate any coercion by Sony Pictures, Six West's block-booking claim under Section 1 must fail.

2. Relationship Licensing

In *Paramount Pictures* the Supreme Court rejected the notion that it was necessary to require a competitive bidding system in which exhibitors bid on films on a film-by-film basis. *See*, 334 U.S. at 162-166. The Court questioned whether such a competitive bidding system would in fact foster competition, *id.* at 162, and more recently the Antitrust Division of the Department of Justice has found that relationship licensing, in which an exhibitor agrees to license a substantial number of a

Not Reported in F.Supp.2d                                                                                                   Page 7
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

distributor's films, is often both permissible and pro-competitive. *See* Report of Department of Justice on the Legality of Customer Selection Under the Injunction in the Paramount Decrees Against Discrimination in Film, *United States v. Loew's Inc.,* Equity No. 87-273(ELP) (S.D.N.Y. Dec. 5, 1988), at 3 [hereinafter DOJ Report].

*8 Plaintiff does not bring a separate relationship licensing claim in the Amended Complaint. *Six West,* 2000 WL 264295, at *16-17. Rather, Judge Edelstein noted that in attempting to bring a block-booking claim, Six West had unwittingly alleged an alternative claim under Section 1. *Id.* He observed that while statements that identified booking relationships as voluntary could not support a block-booking claim, because the requisite coercion was lacking, they could support a relationship licensing claim. *Id.* Judge Edelstein held that if a voluntary relationship between an exhibitor and distributor "hinder [s] other exhibitors' ability to acquire quality movies, then such relationship licensing would violate § 1." *Id.* at 18. Thus, unlike a block-booking violation of Section 1, in which actual coercion is the key to the claim, in a relationship licensing violation of Section 1, the key is the exclusion of other exhibitors from fair access to films. *See id.; see also Paramount,* 334 U.S. at 154 (relationships that eliminate the opportunity for small theatres to obtain first run films stifle competition and violate Section 1); *United States v. Loews, Inc.,* 705 F.Supp. 878, 880 (S.D.N.Y.1988). Also unlike block-booking, because a relationship licensing claim involves a consensual agreement between exhibitors and distributors such a claim may stand against both a distributor and exhibitor if such an agreement forecloses access to films to other exhibitors. *Six West,* 2000 WL 264295, at *18 n. 34.

A claim for a relationship licensing violation of Section 1 is analyzed under the rule of reason, and in order to survive a motion for summary judgment a plaintiff must show that a material question of fact exists as to whether the allegedly unlawful relationship reduced competition in the relevant market. *See Virgin Atlantic Airways,* 257 F.3d at 264; *PepsiCo., Inc. v. Coca-Cola Co.,* 114 F.Supp.2d 243, 258-59 (S.D.N.Y.2000), *aff'd* 315 F.3d 101 (2d Cir.2002). Although the relevant geographic market is disputed by each side, I find it unnecessary to resolve this issue because Six West has failed to proffer evidence that the alleged relationships have had any harmful effect on competition in any remotely relevant geographic market, including the "Upper Manhattan" market propounded by Six West.

Six West offers limited evidence concerning the Sony Defendants' relationships with any exhibitor in Upper Manhattan or any other market, and thus no reasonable juror could find that the Sony Defendants have engaged in illegal relationship licensing in violation of Section 1. Six West offers more evidence concerning the relationships that Loews had with film distributors, but that evidence does not even begin to suggest that such relationships were anticompetitive.

The DOJ Report found that relationships between exhibitors and distributors are not necessarily anticompetitive. The DOJ Report suggested that such relationships may reflect rational economic choices based on complimentary risk-taking attitudes and may reflect an on-the-merits consideration of transaction costs of licensing films separately. DOJ Report at 43-44. However, the DOJ Report recommended that exhibitor and distributor relationships might violate Section 1 if they involve:

*9 circuit dealing, favoritism towards affiliates, preferential contract terms, or rejection out-of-hand of competing exhibitors' offers without any "on-the-merits" determination, [and] the mere fact that relationship licensing is also involved will not immunize that conduct.

*Id.* at 50-51. None of Six West's evidence suggests that any rational juror could find that any of the Loews Defendants engaged in any of this prohibited behavior. While it is reasonable to believe that Loews' relationships may have reflected certain efficiencies or risk-taking attitudes, there is no evidence that Loews engaged in any activities that foreclosed Six West's theatres or other exhibitors from access to films.

As discussed above, much of the evidence Six West relies on for its block-booking claim against Sony Pictures relates to the relationships that Loews has with distributors generally. This evidence regarding relationships, however, amounts to at most that Loews sometimes exhibits movies it is less interested in order to maintain relationships with film distributors. That Loews had relationships with distributors is undisputed, but Six West's evidence fails to suggest that these relationships foreclosed other exhibitors from access to films and harmed competition. Six West attempts to demonstrate foreclosure through evidence that the Twin has been "unable to acquire movies from Sony [Pictures]," but

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

Six West fails to explain how relationship licensing by the Sony Defendants or the Loews Defendants is in any way connected to that failure. (Pl.'s Opp. to Sony at 27).

In addition to Six West's failure to put forth evidence of anticompetitive licensing relationships that stifled competition, the indirect evidence available suggests that competition in the Manhattan theatre market is not dwindling but is actually quite robust. During the time in which Loews' relationships are alleged to have decreased competition, the number of movie screens in Manhattan increased almost 60%, as exhibitors-including, but not limited to Loews-opened numerous new theatres or expanded old ones. (Loews Def.'s 56.1 Stmt ¶ 11). Along with the new screens more films are shown in Manhattan (Loews Def.'s 56.1 Stmt ¶ 23), and multi-screen theatres are becoming more prevalent (Loews Def.'s 56.1 Stmt ¶ 7); *see also United States v. Synfy Enters.*, 903 F.2d 659, 665 (9th Cir.1990) (success of more efficient multi-screen theatres can be evidence of robust competition). While movie ticket prices have risen in Manhattan, the rise has been at a slower pace in Manhattan than in the rest of the country. *See National Assoc. Theatre Owners*, www.natoonline.org/statistictickets.htm (33% increase in Manhattan versus 38% average national increase from 1994-2001). Nor could Six West's assertion that Loews increased prices in order to increase profits (why else would a theatre increase ticket prices) and allegation that a Loews employee once stated "Loews theatre is of course a leader in admission prices" lead a reasonable juror to believe that Loews had the power unilaterally to raise prices or had anticompetitive market power. *See K.M.B Warehouse Dist., v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir.1995) (a prerequisite for recovery in all Section 1 claims is either actual adverse effect on competition or market power to raise prices significantly without losing all of one's business).

*10 Six West also cites to an alleged decrease in the quality of the movie-going experience as evidence of a harm to competition and consumers. *See Virgin Atlantic Airways*, 257 F.3d at 264 ("reduced output, increased prices and decreased quality" can all constitute harm to consumers). Though true that a reduction in quality can constitute a harm to consumers, the mere possibility that a consumer might have to see his or her first choice movie at his or her second choice theatre or his or her second choice movie at his or her first choice theatre

(Pl.'s Opp. to Sony at 34-35), is not an actionable restraint of trade. Every licensing agreement between an exhibitor and distributor will restrain trade to some extent, as licensing agreements necessarily entail that a film is shown at one theatre and not another. *See Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) (Section 1 is only intended to prohibit "unreasonable" restraints of trade). But the mere fact that a consumer who might, for example, prefer to watch a film at the Twin has to instead go to another nearby theatre to see that film does not mean that there has been an actionable harm to consumer choice or competition. *See Virgin Atlantic Airways*, 257 F.3d at 259 ("[t]he antitrust laws are designed to protect competitive conduct, not individual competitors."). Six West essentially asks that I compel Sony Pictures to license its films to Six West's theatres. The antitrust rules require no such compulsion. *See Orson, Inc. v. Miramax, Inc.*, 79 F.3d 1358, 1365 (3d Cir.1996).

For the above reasons, because Six West has failed to demonstrate that the Sony Defendants or the Loews Defendants have been involved in any anticompetitive relationship licensing, Six West's Section 1 claim for relationship licensing must fail.

**B. Six West's Sherman Antitrust Act § 2 Monopolization Claims**

In order to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Tops Market, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99-100 (2d Cir.1998). In order to determine whether there is a dangerous probability of monopolization, it is necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market. *Spectrum Sports, Inc.*, 506 U.S. at 456.

As the Sony Defendants point out in their brief, Six West only opposes the motion for summary judgment on the Section 2 monopolization claims as against the Loews Defendants. (Def.'s Reply at 19; Pl.'s Opp. to Sony at 39). As plaintiff presents no facts supporting the claim that any of the Sony Defendants have done anything to render themselves dangerously close to achieving a monopoly, summary judgment on behalf of the Sony Defendants for the

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

Section 2 claims is granted. Though Six West attempts to mount a more significant opposition to summary judgment with regards to the Loews Defendants, it is to no avail. On the basis of the facts presented by plaintiff, there is no possibility that a rational finder of fact could determine that any of the Loews Defendants attempted to monopolize any Manhattan theatre markets.

*11 As discussed above, some question remains as to the relevant geographic market. Even conceding the possibility of Upper Manhattan as the relevant geographic market, however, the facts do not support a finding that the Loews Defendants attempted to monopolize that, or any other, market. After extensive discovery, Six West has not proffered evidence to support the elements necessary to maintain an attempted monopolization claim against Loews.

Most tellingly, there are no facts to suggest that Loews engaged in any predatory or anticompetitive behavior or had a specific intent to monopolize the Upper Manhattan theatre market. None of the Loews Defendants could have engaged in block-booking (as Loews was an exhibitor not a distributor), and the facts do not support an inference that they engaged in any illegal licensing practices. As such, the Loews Defendants' licensing practices are not anticompetitive or predatory. With respect to Six West's allegations that Travis Reid once told a Mr. Robert Smerling who then allegedly told Mr. Solow that Mr. Reid and other defendants "would make every effort to influence distributors not to deliver quality films to plaintiff's theaters," (Amended Compl. ¶ 84; Solow 10/25/02 Depo. at 63:12-64:2, Solow 9/28/99 Depo. at 336:8-12), Six West does not point to a single fact, aside from this inadmissible hearsay, to support that this was ever actually said or that any defendant ever attempted to prevent Six West's theatres from receiving any films from any distributor. See, e.g.,Manesis v. N.Y. City Dep't of Transp., No. 02 Civ. 359(SAS), 2003 WL 289969, at *14 (S.D.N.Y. Feb. 10, 2003) ("[Inadmissible hearsay] cannot create a material issue of fact to defeat summary judgment."), aff'd 2004 WL 206316 (2d Cir.2004).

Six West's assertion that Loews' alleged mismanagement of the theatres could amount to predatory conduct is similarly unhelpful. Six West hypothesizes that Loews mismanaged the theatres in order to divert "would-be customers of plaintiff's

theatres" to a "Loews theatre in Upper Manhattan," where Loews retained 100%, rather than 40%, of the net profits (Pl.'s Opp. to Sony at 39). This hypothesis does not create a triable issue of fact. Mismanaging theatres in which Loews itself had an interest is not a typical predatory or anticompetitive activity, and it is somewhat far-fetched to suggest that the alleged mismanagement of the three theatres was predatory or anticompetitive. That said, it is not inconceivable that Loews' alleged mismanagement of plaintiff's theatres could be anticompetitive if the alleged mismanagement was intended to, or did result in, an increase in Loews' net market power. I need not consider this unlikely possibility, however, because the facts do not support this hypothesis.

As Six West's own expert concedes, Loews could not ensure that diverted customers would end up at other Loews theatres. (Warren-Boulton Rep. at 13). As such, the likelihood is that any mismanagement of the Twin, Paris, or Festival would cause customers to go to theatres unaffiliated with Loews, thereby decreasing, rather than increasing, Loews' share of the exhibition market. (Warren-Boulton Rep. at Ex. 2).[FN9] Because Six West's hypothesis that Loews intentionally mismanaged the Twin, Paris, and Festival in order to divert customers from plaintiff's theatres into Loews' theatres is both unlikely on its face and has no factual support, no rational juror could infer that this alleged mismanagement was predatory conduct.

> FN9. Loews would have recovered on average 10% of the lost Twin customers if those customers remained on the East Side of Manhattan, and, at most 50% in some years if those customers traveled to other neighborhoods. (Warren-Boulton Rep. at Ex. 2).

*12 In addition to failing to expose facts suggesting predatory behavior or specific intent, Six West also fails to establish that Loews is close to achieving a dangerous probability of achieving market power. Assuming arguendo that Upper Manhattan is the relevant market and that plaintiff's expert is correct that Loews' share of that market has risen from 23% to 53% in nine years (Pl.'s Opp. to Sony at 4), as a matter of law this fact alone does not create a dangerous probability of monopolization. Judge Hand's oft-cited numerical test of 90% yes, 64% maybe and 33% no for monopoly power in United States v. Aluminum Co. of America, 148 F.2d

Not Reported in F.Supp.2d                                                                  Page 10
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

416, 424 (2d Cir.1945), suggests that a market share of 53% might justify further inquiry.[FN10] Yet, an inquiry into whether there is a dangerous probability of achieving monopoly power cannot be resolved by simply by looking at Loews' market share of the Upper Manhattan theatre market. *See, e.g.,PepsiCo, Inc. v. Coca-Cola Co.,* 315 F.3d 101, 109 (2d Cir.2002) ("Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power."); *Tops Mkts.,* 142 F.3d at 99 (holding that "a share between 50% and 70% can occasionally show monopoly power," but only if other factors support the inference). Aside from pointing to Loews' market share, Six West does not provide any evidence from which a reasonable juror could infer that the Loews Defendants had a dangerous probability of achieving market power.

> FN10. If the market is indeed the East Side of Manhattan only, as the defendants suggest, then clearly Loews did not have the requisite market power as Loews' percentage of that geographic market was never greater than 18% by box office revenue (excluding the Twin) or 21% by screens (including the Twin). (Sony Def.'s Br. at 38).

For the above reasons, Six West has not proffered evidence from which any of the elements required to sustain an attempted monopolization claim could be found and, therefore, the Section 2 claims must fail.

III. Plaintiff's State Law Claims

A. The Twin

1. Assignment of the Twin Agreement

The Twin Agreement expressly stated that any assignment from STC to another party required that the intended assignee deliver a written agreement to Loews stating that the assignee agreed unconditionally to be bound by and perform all of STC's obligations. (DX 34 § 10.01). When STC assigned all of its "right, title and interest" to Solow in 1979, an Assignment and Assumption Agreement was executed in compliance with the Twin Agreement. (DX 39). However, Loews now complains that a subsequent assignment was never made to Six West, and, therefore, Six West has no

standing to assert its claims relating to the Twin. (Def.'s Br. at 18). Loews' argument is unavailing.

The January 16, 1992 request of Steve Cherniak, Controller of Solow Development Corp., that Loews void uncashed checks to Solow and reissue them to Six West was not a sufficient written document evidencing assignment to comply with the assignment clause of the Twin Agreement. (*See* DX 42 (1/17/92 letter from Claude J. Baptiste, Asst. Treas. of Loews, to Cherniak acknowledging 1/16/92 request and enclosing reissued checks)). Additionally, deposition testimony does raise some question as to whether Six West was ever intended to be an assignee or whether Solow was to remain the designated "Tenant" under the Twin Agreement despite the payment of monies to Six West. (Cherniak Depo. at 65:17-66:24). At the very least, whether assignment to Six West was ever intended creates a triable issue for the jury.

*13 If the assignment to Six West was intended but did not comply with the written assignment requirement of the Twin Agreement, then there is a triable issue of fact as to whether Loews waived that requirement. Loews cites to a number of cases to support the proposition that contractual limitations on assignment are binding conditions and will be enforced. (Loews Def.'s Br. at 18-19). While in no way disputing the holdings in those cases that assignment clauses are enforceable, I note that a party can waive a contractual right if there is a "voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable."*SeeAXA Global Risks U.S. Ins. Co. v. Sweet Assoc., Inc.,* 755 N.Y.S.2d 759, 760 (3d Dep't 2003) (internal quotations and citations omitted). A waiver "may be established by affirmative conduct or by failure to act as to evince an intent not to claim a purported advantage."*Id.* Here, following the 1992 letter, Loews willingly made payments to, and dealt with, Six West for eleven years. *SeeBelge v. Aetna Cas. & Sec. Co.,* 334 N.Y.S.2d 185, 189 (4th Dep't 1972) (holding that passive conduct constituted a waiver of the provision against the assignment of the contract). Certainly this raises a question of material fact as to whether Loews' failure to raise any objections waived the right to have a proper written notification of the assignment pursuant to Section 10.01 of the Twin Agreement.

2. Loews' Alleged Breach of the Twin Agreement

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

a. Film Booking at the Twin

Section 7.01 of the Twin Agreement, as modified by the Chartwell Consent, required that Loews exhibit at the Twin:

only first run motion pictures (or reissues distributed on a first run basis) of the type, quality and character equal to or better than motion pictures exhibited at the other theatres operated under the "Loews" name and situated on the east side of Manhattan such as the Loews Tower East and the Loews 34th Street Showplace Theatre.

(DX 6; DX 34). Six West alleges that Loews breached this contractual standard by exhibiting films that were not "first run motion pictures" and did not comply with the "type, quality and character" requirement. I disagree and do not see how any reasonable juror could find Loews breached this contractual obligation.

Six West attempts to demonstrate a breach of the "type, quality and character" requirement with evidence that revenues per seat at the Twin were lower than at other Loews theatres and that Loews had a tendency to exhibit films for a longer length of time at the Twin. However, as a matter of law I find that neither this nor other similar evidence has anything to do with the "type, quality and character" of a film. New York courts interpret a contract by giving unambiguous terms their plain and ordinary meaning, and a court may determine such meaning as a matter of law. See *Greenfield v. Philles Records, Inc.*, 750 N.Y.S.2d 565, 569 (N.Y.2002); *Levitt v. Computer Assoc. Int'l*, 760 N.Y.S.2d 356, 357 (2d Dep't 2003). The plain and unambiguous meaning of "type, quality and character" unquestionably refers to the attributes and traits of the films themselves and not the manner in which those films are exhibited.[FN11] Though quality is a subjective measure that Six West correctly notes is often a question of fact to be decided by a jury (Pl.'s Opp. to Loews at 7 (citing cases)), in this instance, Six West presents no evidence from which a jury could infer that the films exhibited at the Twin did not meet the "type, quality and character" standard. Six West's argument notwithstanding, the duration of a film's run at a theatre, when the film began showing at the theatre relative to when the film opened, or ultimate box office revenue do not relate to the inherent quality of a film. (Pl.'s 56.1 Counterstmt to Loews ¶¶ 11-14).

FN11. "Type" is defined as "1. A group of

persons or things that share common traits or characteristics distinguishing them as an identifiable group or class: CATEGORY."WEBSTER'S II NEW COLLEGE DICTIONARY 1193 (2001). "Quality" is defined as "1. Essential character: NATURE, 2. a. An inherent or distinguishing attribute: PROPERTY, b. A character trait."*Id.* at 905. "Character" is defined as "2. A distinctive feature or attribute: CHARACTERISTIC."*Id.* at 187.

*14 This is not to say that if Loews exhibited films for an excessively long duration or undertook other actions that failed to maximize profits at the Twin Loews could not be in breach of the Twin Agreement. If, as Six West is fond of pointing out, Loews exhibited the same film for 52 weeks at the Twin then Loews would most likely not be maximizing profits, as films usually generate lower revenues at the end of their runs. (Pl.'s Opp. to Loews at 10). This may be true and it may be a breach of the Twin Agreement, but such an action cannot be a breach of Section 7.01, as modified. Six West simply defies the plain meaning of the Chartwell Consent when it states that a film in its fifty-second week of exhibition is of a different "type, quality and character" than that very same film in its first week of exhibition. The essential character of the film, whether it be a "good" film or a "bad" film or somewhere in between, remains the same throughout the duration of the films exhibition. Exhibiting a "good" film for 52 weeks may fail to maximize profits, which may be a breach of the Twin Agreement, but that breach would not violate Section 7.01. However, such conduct could breach Section 5.09.[FN12]

FN12. I note that while Judge Edelstein stated that "exhibiting movies at the Twin for a protracted period" was alleged to be a violation of the Twin Agreement, he never implied that such a protracted exhibition could suffice as evidence of a breach of Section 7.01. *Six West*, 2000 WL 264294, at *11.

Section 5.09 of the Twin Agreement requires that Loews "use every reasonable effort to promote and further the profitable operation of [the Twin]." (DX 34). Much of the conduct about which Six West complains; such as exhibiting films for too long, exhibiting the same film on both screens at the Twin,

Not Reported in F.Supp.2d                                                                                    Page 12
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

or failing to maximize revenue per seat; has nothing to do with the quality of the films booked at the Twin but instead relates to a possible failure by Loews to operate the Twin in a profit maximizing manner. Without passing judgment on the adequacy of Six West's proffered evidence to support such a claim of failure to maximize profits, such a failure relates only to Section 5.09, for which the sole remedy for a breach is the termination of the Twin Agreement. (DX 34). Section 5.09 explicitly precludes damages for any failure to "promote and further the profitable operation of [the Twin]," and Six West cannot get around such unambiguous language by bringing a claim for damages under Section 7.01, when the conduct about which Six West complains has nothing to do with the "type, quality or character" of the films exhibited at the Twin.

With respect to the obligation created by Section 7.01 for Loews to book only "first run" films at the Twin, I find that Six West's proposed meaning of the term, which would require that a film have never been exhibited in any theatre prior to being exhibited at the Twin, does not comport with the unambiguous meaning or customary use of the term. See *Hernandez v. Schenectady Non Invasive Vascular Diagnostics, P.C.,* 699 N.Y.S.2d 232, 233 (3d Dep't 1999) (trial court properly accorded term its customary and ordinary meaning). Instead, as used in the Twin Agreement, "first run" refers to the initial stages of a film's release in which the film is exhibited at a theatre charging full price. (Loews Def.'s Br. at 6; Loews Def.'s Reply at 13). Both Loews' and Six West's experts agreed with this definition of the term "first run," and Six West offers no convincing rationale for abandoning this plain meaning. (Jacobs Depo. at 38:23-41:9; Reid Depo. at 28:2-11, 111:5-112:5; Brueggemann Depo. at 52:18-54:3, 55:10-20; Bunnell Depo. at 213:18-214:5). Under this definition, Six West fails to proffer sufficient evidence from which a reasonable juror could find that Loews did not comply with its obligation to book "first run" films as required by the Twin Agreement.

b. Maintenance of the Twin

*15 Under Section 3.02 of the Twin Agreement, Loews accepted the obligation to maintain the Twin pursuant to Section 15.04 the lease agreement. (DX 34; DX 35).[FN13] Six West has put forth evidence allegedly demonstrating Loews' failure to maintain the Twin, but even when viewed in the light most favorable to Six West, this evidence could not lead a rational juror to conclude that Loews did not fulfill its contractual obligation.

FN13. Section 15.04 of the Lease Agreement states:
Tenant shall, at all times during the term of this lease, keep in the theatres and maintain in good condition and working order and free of all liens and encumbrances and claims of third parties, all such projection equipment, sound equipment, ticket booth equipment, screens, drapery tracks, draperies, drapery motors, masking motors, carpeting, seats, aisle lights, lighting fixtures, concession equipment, lobby and lounge furniture and attraction signs and any other trade fixtures, equipment, decorations and furnishings, as shall be necessary or desirable for the efficient operation of the Theatres as first class motion picture theatres.
(DX 35).

A good deal of the evidence cited by Six West as proof of Loews' breach consists of no more than a recognition by Loews that, as in any business into which the public is invited, business tools, objects and premises sometimes need to be repaired, replaced and updated. For example, Six West cites to a "Loews Theatres Visitation Report" dated August 16, 1997 that notes a "bad smell" in the theatre as evidence of Loews' breach, but Six West fails to note that the same evaluation also gives the Twin a 92% score and writes "Good job by our staff." ((P)PX 164).[FN14] This hardly suggests a failure to maintain the Twin. Loews' recognition of items for improvement could not lead a rationale juror to conclude that Loews' breached the Twin Agreement.

FN14. That the bad smell was noted by Loews as an issue to be addressed on two other occasions over the course of one month, ((P)PX 165; (P)PX 152), is hardly enough evidence to suggest a breach of the Twin Agreement.

Also unavailing is Six West's suggestion that because the Twin did not have a new Sony Dynamic Digital Sound ("SDDS") System installed until after a number of Loews' other theatres received SDDS, that was somehow a breach of the Twin Agreement. (Pl.'s Opp. to Loews at 18). Nowhere did the Twin Agreement require Loews to provide upgrades to the Twin before other theatres, and a reasonable decision as to how to allocate resources cannot amount to a breach of a contractual maintenance obligation.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 13
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

Six West also cites to a July 1997 memorandum in which Loews writes that the Twin "is in dire need of major renovations."((P)PX 71). Taken out of context this language could be read to suggest that Loews had failed to maintain the Twin to such a degree that major renovations were needed. However, the context of the memorandum makes clear that the Loews was considering "major renovations" as necessary in order to keep pace with the competition in the neighborhood, specifically United Artist's Gemini theatre and Cineplex's Beekman theatre, which were being renovated. ((P)PX 71). No reasonable jury could find that Loews' determination that renovations were necessary to upgrade the Twin in order to keep pace with the competition meant that Loews had previously failed to fulfill its contractual obligations to maintain the Twin.

### 3. Six West's Claims for Unjust Enrichment

"The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the same subject matter."*EUA Cogenex Corp. v. North Rockland Cent. Sch. Dist.*, 124 F.Supp.2d 861, 874 (S.D.N.Y.2000). Here, there is no dispute as to the existence of a contract governing the dispute, and neither Six West nor Loews contends that the Twin Agreement is not an enforceable contract meant to govern the operation of the Twin; the only dispute is as to Six West's standing to assert claims under that agreement. However, the preclusion of an unjust enrichment claim when there exists a valid contract governing the conduct in question holds "true whether the contract is one between parties to the lawsuit, or where one party to the lawsuit is not a party to the contract."*Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F.Supp.2d 275, 311 (S.D.N.Y.1998); see also*Metropolitan Elec. Mfg. Co. v. Herbert Constr. Co., Inc.*, 583 N.Y.S.2d 497, 498 (2d Dep't 1992).

**\*16** As it is undisputed that the conduct about which Six West now complains was governed by the Twin Agreement, Six West's claims for unjust enrichment must fail even if Six West were found not to have standing. Alternatively, for the reasons stated above, even if the existence of the Twin Agreement did not somehow preclude a claim for unjust enrichment, Six West has not set forth facts from which a reasonable juror could determine that Loews

did anything improper that would entitle Six West to the quasi-contractual remedy of restitution.

### 4. Loews' Alleged Breach of Fiduciary Duties

Both Six West and Loews agree that Section 5.09 of the Twin Agreement defined a contractual fiduciary duty whereby Loews would act as Six West's fiduciary in managing the Twin. (DX 34 § 5.09). Both parties also agree that Section 5.09 limited Six West's remedy for any breach by Loews to termination. Section 5.09 in relevant part stated:

[Six West's] sole remedy for any violation of [Loews'] obligations under this Section shall be to terminate this Agreement and [Six West] shall not assert any claim for damages for any such violation.

(DX 34). Six West attempts to get around this limitation on remedies by arguing that Loews "intentionally, willfully and maliciously" breached its fiduciary duties, rendering the liability limitation unenforceable. (Am. Compl. ¶ 97; Pl.'s Opp. to Loews at 21).See*Kalisch-Jarcho, Inc. v. City of New York*, 461 N.Y.S.2d 746, 749-50 (N.Y.1983).

Six West's evidence of willfulness consists of Loews' alleged mismanagement of the Twin, Loews' and the Sony Defendants' alleged relationships with film distributors meant to keep the Twin from receiving quality films, and Loews' alleged diversion of customers from the Twin to its own theatres. With respect to the mismanagement claim, I find that the evidence is wholly lacking, and, in any event, such mismanagement would not rise to the necessary level to void the express limitation of liability contained in Section 5.09. See*Metropolitan Life Ins. Co. v. Noble Lowndes Int'l*, 600 N.Y.S.2d 212, 216 (1st Dep't 1993), *aff'd*618 N.Y.S.2d 152 (N.Y.1994). With respect to Loews' alleged relationships to keep films from the Twin, as discussed more fully above, I hold that there was nothing improper regarding any of the Loews Defendants' or Sony Defendants' relationships with any film distributors or that the Twin was improperly precluded from obtaining any films from distributors as a result of any defendants' actions. See*supra*, part II.A. Similarly, with respect to the allegation that Loews diverted customers from the Twin to its other theatres, as discussed in more detail above, I find such a theory both implausible and mere conjecture wholly unsupported by the facts. See*supra*, part II.B.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

For the reasons stated above, Six West's claims for breach of the Twin Agreement, unjust enrichment, and breach of fiduciary duties at the Twin must fail.

B. The Paris

1. The Alleged Breach of the "Paris Agreement"

*17 It is undisputed that a final written agreement governing Loews' management of the Paris was never executed. (Loews Def.'s 56.1 Stmt ¶ 41, Pl.'s 56.1 Counterstmt to Loews ¶ 41a-g). Rather, Six West alleges that despite the absence of a final written contract, documents exchanged by the parties and the parties' course of dealing demonstrate that Six West and Loews entered into a binding agreement whereby Loews would operate the Paris according to certain agreed upon terms and conditions (the "Paris Agreement"). (Pl.'s Opp. to Loews at 25; Pl.'s 56.1 Counterstmt to Loews ¶ 41a-g). In essence, Six West is proposing that the Paris Agreement is an implied-in-fact contract, a contract evidenced by the acts of the parties rather than the oral or written words of the parties. See *Radio Today, Inc. v. Westwood One, Inc., 684 F.Supp. 68, 71 (S.D.N.Y.1988); Miller v. Schloss, 218 N.Y. 400, 406 (1916)*. The existence and terms of implied-in-fact contracts are generally issues of fact for a jury to decide. See *Rocky Point Properties, Inc. v. Sear-Brown Group, Inc., 744 N.Y.S.2d 269, 271 (2d Dep't 2002)*. However, the facts of the situation at bar make it clear that the implied-in-fact contract proposed by Six West did not exist and that the implied-in-fact contract that did exist was never breached by any of the defendants.

Six West proposes that the terms of the alleged Paris Agreement can be discerned by examining two letter agreements exchanged between Six West and Loews because those letters contained some overlapping terms. (Pl.'s Opp. to Loews at 28). What Six West overlooks is that the first of the proposed letter agreements sent by Six West on October 1, 1993 (DX-21) was explicitly rejected by Loews on October 19, 1993 (DX-22), and the second proposed letter agreement dated May 19, 1994 (DX-24) was never accepted by Six West and negotiations continued. Thus, these letter agreements do not provide any evidence of mutual assent to the material terms of the alleged implied-in-fact contract.

From October of 1993 through May of 1994, when the two proposed letter agreements were exchanged, Six West and Loews were no doubt involved in negotiations for an operation and management agreement for the Paris. That the parties' proposals happened to overlap on some proposed terms is not surprising and is to be expected, but such an overlap on some terms during negotiations is not evidence that the parties intended to enter into a binding contractual relationship on those overlapping terms. When an offeree responds to an offeror with an explicit rejection of the offeree's proposal and makes a counteroffer that accepts some of the terms of the original offer but rejects others and adds new terms, the offer has not been accepted, and there is no agreement between the parties. See *Krumme v. Westpoint Stevens, Inc., 143 F.3d 71, 83-84 (2d Cir.1998); see also Wasserstein Perla Emerging Markets Fin., L.P. v. The Province of Formosa, 97 Civ. 793 (BSJ), 2002 WL 145831 (July 2, 2002)* ("In light of the history of the parties' negotiations and the court's comparison of the terms incorporated into the April 1 and April 11 letters, the court finds that the communications never indicated mutual assent sufficient to give rise to a binding contract."). In such a case, courts do not hold that there is a partial agreement with regards to the overlapping terms; there is simply no agreement. " 'A contract cannot be implied-in-fact where the facts are inconsistent with its existence; or against the declaration of the party to be charged or against the intention or understanding of the parties." ' *Tjoa v. Julia Butterfield Memorial Hospital, 612 N.Y.S.2d 676, 677 (2d Dep't 1994)* (quoting *Miller v. Schloss, 218 N.Y. 400, 406-07 (1916)*). Likewise, without an explicit or implicit acceptance of either of the proposed letter agreements on the terms contained therein, there was no agreement, and there is no implied-in-fact contract comprised of the overlap in terms between the October 1, 1993 and May 18, 1994 letters.

*18 Six West cites a number of cases for the indisputable proposition that if two parties come to an oral or preliminary agreement that agreement is an enforceable contract regardless of whether the parties ever execute a final written contract. (Pl's Opp. to Loews at 25-26). Yet, the cases cited by Six West, such as *Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1537 (2d Cir.1997)* and *Consarc Corp. v. Marine Midland Bank, 996 F.2d 568, 574-76 (2d Cir.1993)*, involve situations in which the parties have moved beyond negotiations and have entered into a binding agreement. See also *Paper Corp. of the*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 15
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

*United States v. Schoeller Technical Papers, Inc.,* 807 F.Supp. 337, 347 (S.D.N.Y.1992); *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.,* 670 F.Supp. 491, 497-98 (S.D.N.Y.1987).* That is simply not the situation here. Six West presents no facts to suggest that Six West and Loews mutually assented to be bound by an agreement while waiting to execute a final written agreement. As there is no evidence that the letter agreements were ever assented to by the parties, the cases relied upon by Six West are inapposite. *Compare* *Consarc,* 996 F.2d 568, 573 ("[T]he combined writings contain no expression by either party of any intent not to be bound by them."), *with* *Winston v. Mediafare Entm't Corp.,* 777 F.2d 78, 81 (2d Cir.1986) (the writings exchanged make clear that no binding oral agreement had been reached and the unexecuted versions of the agreement were nothing more than drafts and not final binding agreements). Finally, the mere fact that there was performance by Loews is insufficient to support a finding that the parties had reached an agreement on the alleged overlapping letter agreement terms. *See* *Teachers Ins. & Annuity Ass'n of Am.,* 670 F.Supp. at 507 (partial performance does not necessarily imply mutual assent as "[a] party may make some partial performance merely to further the likelihood of consummation of a transaction it considers advantageous."). Because Six West has set forth no facts from which a reasonable juror could infer that the parties had an implied-in-fact contract with the terms contained in the two proposed letter agreements, no trier of fact could find that Loews breached such a contract.

Although the fact that there was some overlap in the terms in proposals exchanged between Six West and Loews cannot alone imply that the parties had mutually assented to be bound by those terms, there can be no doubt that the parties did have an implied-in-fact agreement regarding the operation of the Paris. The conduct over the course of the seven years by the two parties demonstrates that Loews was to book films at the Paris and split profits with Six West, such that Six West would receive 60% of the profits. (Loews Def.'s Br. at 10.) Yet, Six West points to no other conduct or facts to support the contention that any of the other alleged terms of the Paris Agreement are to be implied. Nowhere does Six West proffer any facts or course of conduct that would suggest that Loews was required to obtain Six West's consent before entering into "four-wall deals" at the Paris. (Pl.'s Opp. to Loews at 33.) Similarly, nowhere is there any course of conduct or facts to support the

contention that Loews would be responsible for maintaining the Paris and supply such amenities as digital sound, (Pl.'s Opp. to Loews at 35), or that Loews would be obligated to book films on an exclusive basis at the Paris (Pl.'s Opp. to Loews at 37).

*\*19* The RESTATEMENT (SECOND) OF CONTRACTS, section 205, states "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement," and New York courts hold that the "implied covenant of fair dealing and good faith" is "implicit in all contracts." *Van Valkenburgh, Nooger & Neville v. Hayden Publ'g Co.,* 330 N.Y.S.2d 329, 333 (N.Y.1972) (citations omitted). Because the parties' conduct makes clear that there was an agreement between Six West and Loews, it follows that the agreement contained an implicit covenant of good faith and fair dealing, which required that Loews would exercise reasonable efforts in booking films at the Paris. Six West cites to no evidence that suggests this implied covenant was breached. Six West's conclusory assertions that certain films were played for too long or that the Paris failed to generate profits equivalent to the Angelika Theatre or Lincoln Plaza are insufficient for any rational juror to determine that Loews booked films for or operated the Paris in bad faith. (Pl.'s Opp. to Loews at 34-37.)

Lastly, Six West's contention that Loews breached the Paris Agreement when it terminated its management of the theatre is equally unavailing. First, the Paris Agreement was of an indefinite duration and terminable at any time. *See* *Lake Erie Distrib., Inc. v. Marlett Import. Co., Inc.,* 634 N.Y.S.2d 599, 602 (4th Dep't 1995). Second, even if Six West's assertion that reasonable notice was required before terminating the relationship as a result of the parties' seven year relationship and the implied covenant of good faith and fair dealing, Loews' notice of its desire to terminate the relationship at the Paris five months prior to terminating the relationship requires a finding that reasonable notice was provided. (DX 107; DX 71; DX 106; DX 107; DX 110).*See* *Copy-Data Sys., Inc. v. Toshiba Am., Inc.,* 755 F.2d 293, 301 (2d Cir.1985) (requiring reasonable notice); *Colony Liquor Distrib., Inc. v. Jack Daniel Distillery,* 254 N.Y.S.2d 547, 549-50 (3d Dep't 1964) (same).

2. Breach of Fiduciary Duty Claims

Not Reported in F.Supp.2d                                                                                    Page 16
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

Judge Edelstein held that Loews acted as Six West's agent and was Six West's fiduciary in some capacity, _Six West,_ 2000 WL 264295, at *6, and I agree that in operating the Paris Loews acted as Six West's agent. _SeeMandelblatt v. Devon Stores, Inc.,_ 521 N.Y.S.2d 672, 676 (1st Dep't 1987) (Under New York law, " '[a] fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.' ") (quoting RESTATEMENT (SECOND) OF TORTS 874 cmt. a (1979)); _see alsoBasic Books, Inc. v. Kinko's Graphics Corp.,_ 758 F.Supp. 1522, 1546 (S.D.N.Y.1991) (an agency relationship exists where the principal manifests an intent that the agent act on the principal's behalf, the agent accepts the undertaking, and the parties understand the principal is still in control). Thus, Loews owed Six West the general fiduciary duties of good faith and loyalty required of all agents. _SeeElco Shoe Mfr., Inc. v. Sisk,_ 260 N.Y. 100, 103-04 (1932).

*20 Despite Six West's numerous submissions, I hold that there is no genuine issue of material fact as to whether or not Loews breached its fiduciary duties. Six West has presented no facts to suggest that Loews' use of the Paris for movie premieres was in any way a violation of fiduciary duty. Similarly, conclusory statements that "it is clear that Loews mismanaged the Paris" and did not reasonably act to maximize profits at the Paris are clearly insufficient to support a claim for breach of fiduciary duties. (Pl.'s Opp. to Loews at 36-37).SeeKerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998) ("Conclusory allegations, conjecture, and speculation, however, are insufficient to create a genuine issue of material fact.").

With respect to the termination of the relationship between Six West and Loews at the Paris, Six West alleges that termination involved a breach of fiduciary duties. (Pl.'s Opp. to Loews at 38-39). As discussed above, the allegations made by Six West are insufficient to suggest that there was anything improper in the way Loews went about ceasing to operate the Paris. However, Six West makes the additional suggestion that the mere cessation of operation by Loews was a fiduciary breach. In an internal memorandum, Loews stated that it wished to terminate the Paris Agreement because:
    now that we have Lincoln Square, we would actually receive greater profits _without_ the Paris

Theatre, as many of the films that we now book at the Paris would instead play at Lincoln Square, as well as other [Loews] Theatres, where we keep all the profits.

(PX 143) (emphasis in original). Although fiduciaries are expected to act with nothing less than the "punctilio of an honor the most sensitive", _Meinhard v. Salmon,_ 249 N.Y. 458, 464 (1928) (Cardozo, C.J.), even fiduciary duties cannot mandate that an individual or entity remain a fiduciary for an infinite duration or until the principal dismisses the fiduciary. A fiduciary may not maximize his or her own profits at the expense of the person or entity to whom a duty is owed, but fiduciary duties do not preclude the power of termination-even in order to maximize one's own profits-so long as termination is done in a fair and reasonable manner.

Six West also alleges that Loews breached its fiduciary duties by allegedly diverting the film _Anna Karenina_ from the Paris to Loews' Sony Tower East theatre and usurping Six West's opportunity to purchase the film _Belle de Jour_ by taking the film to Miramax in order to curry favor with the distributor. (Am.Compl.¶¶ 67, 100). With regards to _Anna Karenina,_ I do not find that any rational juror could infer a breach of fiduciary duty from the facts alleged by Six West, and the theory that Loews took _Belle de Jour_ to Miramax in order to curry favor is, on the record, no more than pure speculation. Six West's facts to support the notion that Loews took _Belle de Jour_ to Miramax amount to Solow's deposition testimony that "I _feel_ Mr. Brueggemann was a party to [taking the film to Miramax]," and "I _think_ Mr. Brueggemann took my idea because they want to kiss Miramax's ring three times a day."(Solow Depo. 9/28/99 363:6-9). The only evidence Solow has to support these beliefs, however, is that Brueggemann once allegedly said "that's my coup," which Solow considered a "hint," while referring to _Belle de Jour,_ (Solow Depo. 10/25/02 256:9, 257:15-16). Solow admits that he has no idea when Miramax might have begun negotiating for the film (Solow Depo. 10/25/02 257:7), and has no evidence other than the coincidental timing. At this stage in the litigation, such pure speculation is insufficient to bring the claim to a jury. _SeeMorris v. Lindau,_ 196 F.3d 102, 109 (2d Cir.1999) (to avoid summary judgment the non-moving party, "may not rely simply on conclusory allegations or speculation ..., but instead must offer evidence to show that [its] version of the events is not wholly fanciful.") (citation and internal

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

3. Tortious Interference Claims

**\*21** Tortious interference with business relations requires: (1) business relations with a third party; (2) the defendant's interference with those relations; (3) the defendant acting with the sole purpose of harming the plaintiff or using dishonest, unfair or improper means; and (4) injury to the business relationship. See*Nadel v. Play-by-Play Toys & Novelties, Inc.,* 208 F.3d 368, 382 (2d Cir.2000) (applying New York law). As discussed above, Six West has failed to proffer any cognizable evidence from which a jury could find any improper actions by Loews respecting *Anna Karenina* or *Belle de Jour.*Additionally, although Six West need not have had a contractual relationship with a third party in order to maintain a claim for tortious interference, *PPX Enters. v. Audiofidelity Enters.,* 818 F.2d 266, 269 (2d Cir.1987), Six West points to no evidence that it had any relationship with the third party that was selling *Belle de Jour,* and the suggestion that "but for" Loews' acts Six West would have entered into a contract to purchase the film is also unsupported by any evidence. See*Fine v. Dudley D. Doernberg & Co., Inc.,* 610 N.Y.S.2d 566, 567 (2d Dep't 1994) (in an action for interference with prospective contractual relations there is a "but for" causation requirement that plaintiff would have received the contract but for the acts of the defendant).

For the above reasons, Six West's claims for breach of the Paris Agreement, breach of fiduciary duties, and tortious interference must fail.

C. The Festival

Similar to the situation at the Paris, no final written contract was ever executed for the operation and management of the Festival. (Loews Def.'s 56.1 Stmt ¶ 80; Pl.'s 56.1 Counterstmt to Loews ¶ 80). Yet, like at the Paris, Six West's and Loews' course of conduct over four years makes clear that there was an agreement concerning the operation of the Festival between the parties (the "Festival Agreement").

Six West again proposes that despite the lack of a final written contract the parties agreed to numerous terms, and Loews agreed to be bound by certain obligations. However, Six West has proffered no evidence from which a jury could reasonably infer

the existence of the obligations allegedly assumed by Loews. In his opinion, Judge Edelstein wrote that the Amended Complaint was "devoid of specific details governing the Festival Agreement," including the obligation to book certain types of films. *Six West,* 2000 WL 264295, at \*8. Three years later, after extensive, and undoubtedly expensive, discovery Six West offers no more facts to suggest that Loews had an obligation to book particular types of films or, if such an obligation existed, breached that obligation.[FN15]

> FN15. Six West's contention that the parties' course of conduct is evidence of an obligation to book "art" or "specialty" films at the Festival is belied by the films actually booked at the Festival. (Pl.'s Opp. to Loews at 42, 46).

Similarly, Six West's assertion that Loews had the obligation to maintain the Festival is wholly unsupported by the evidence. In particular, the undisputed fact that Solow agreed to pay fully for the renovation of the Festival, which never was undertaken, directly contradicts the contention that maintenance was ever intended by the parties to be Loews' responsibility under the agreement. (Loews Def.'s Br. at 45; DX 217 (May 13, 1994 letter from Loeks to Solow ("*You* [Solow] will be upgrading the [Festival] theatre ...*at no cost to Loews...*") (emphasis added))).

**\*22** As evidence of contractual obligations assumed by Loews, Six West cites statements that Loews had promised to maximize profits or box office revenue at the Festival, (Pl.'s Opp. to Loews at 43 n. 92; Pl.'s 56.1 Counterstmt. to Loews ¶ 80(a)), and had promised to make more money than the previous operator, (Am.Compl.¶ 48). Such statements are too indefinite to create legally enforceable obligations. See*Landes v. Sullivan,* 651 N.Y.S.2d 731, 734 (3d Dep't 1997). Regardless, Six West has not offered any evidence from which a jury could determine that Loews did not work to maximize profits at the Festival or breached the implied covenant of good faith and fair dealing. See*Van Valkenburgh, Nooger & Neville,* 330 N.Y.S.2d at 333 (covenant of good faith and fair dealing is implied in every contract).

Again, the parties' course of conduct demonstrates that Loews was Six West's agent and fiduciary at the Festival, and therefore owed the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361
(Cite as: Not Reported in F.Supp.2d)

requisite duties to the principal, Six West. See *Mandelblatt, 521 N.Y.S.2d at 676.* However, without evidence to support the allegations of breach of the Festival Agreement or any wrongdoing by Loews, no jury could find Loews liable for breach of its fiduciary duties at the Festival.

For the reasons stated above, Six West's claims for breach of the Festival Agreement and breach of fiduciary duties must fail.

IV. Six West's Claims Against the Individual Defendants

Because 1 grant summary judgment to the corporate defendants on Six West's underlying state claims lying in tort, breach of fiduciary duty and tortious interference, and federal claims for violation of the antitrust laws, Six West's claims against the Individual Defendants must also fail.

V. Six West's, the Sony Defendants' and the Loews Defendants' Motions *InLimine* to Exclude Expert Testimony

As I find that all claims against all defendants are without merit and subject to summary judgment, the parties' motions *inlimine* to exclude expert testimony are deemed moot.

CONCLUSION

For the reasons stated above, defendants' motions for summary judgment (docket nos. 133 and 134) are granted, and plaintiff's complaint is dismissed. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.[FN16]

> FN16."Over? Did you say over? Nothing is over until we decide it is." National Lampoon's Animal House (Universal 1978).

SO ORDERED

S.D.N.Y.,2004.
Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp.
Not Reported in F.Supp.2d, 2004 WL 691680 (S.D.N.Y.), 2004-1 Trade Cases P 74,361

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4

LEXSEE 2004 U.S. DIST. LEXIS 16157

STEPHEN M. ROSS, Plaintiff, - against - FSG PRIVATAIR INC. d/b/a PRIVATAIR, Defendant.

03 Civ. 7292 (NRB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2004 U.S. Dist. LEXIS 16157*

August 16, 2004, Decided
August 17, 2004, Filed

**DISPOSITION:**    [*1] Defendant's motion to dismiss granted in part and denied in part, and its motion for Rule 11 sanctions denied.

**COUNSEL:** For Plaintiff: Mark Walfish, Esq., Robert C. Weisz, Esq., Esanu Katsky Korins & Siger, LLP, New York, NY.

For Defendant: Joseph C. Maya, Esq., Russell J. Sweeting, Esq., Bryan T. Carmody, Esq., Maya & Associates, P.C., Fairfield, CT.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** NAOMI REICE BUCHWALD

**OPINION**

 MEMORANDUM and ORDER

 NAOMI REICE BUCHWALD

 UNITED STATES DISTRICT JUDGE

 Plaintiff Stephen M. Ross ("plaintiff" or "Ross") initiated this action against defendant FSG PrivatAir Inc., d/b/a PrivatAir ("defendant" or "PrivatAir") claiming, through an Amended Complaint, breach of contract, breach of fiduciary duty and negligence, all related to Ross's prospective but ultimately unconsummated purchase of an aircraft from a third-party, Grafair. Defendant essentially acted as plaintiff's agent [1] in the failed transaction, and has now moved to dismiss plaintiff's Amended Complaint pursuant to *Fed. R. Civ. P. 12 (b) (6)* on various grounds, including plaintiff's supposed failure to state a claim for any of [*2] his three causes of action. Additionally, defendant claims that in this suit

plaintiff is advocating certain positions of law and fact that are inconsistent with those plaintiff advanced in prior related litigation, and as such plaintiff should be sanctioned pursuant to *Fed. R. Civ. P. 11*. For the reasons that follow, defendant's motion to dismiss is granted in part and denied in part, and its motion for *Rule 11* sanctions is denied.

 1   *See infra* note 2.

**BACKGROUND**

 For purposes of this motion, the following facts, drawn from plaintiff's Amended Complaint unless otherwise noted, are taken as true, and all inferences are drawn in plaintiff's favor. *See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999).*

A. *The Failed Aircraft Purchase.*

 In or about 2001, plaintiff Ross, a New York resident, and defendant PrivatAir, a Delaware corporation with its principal place of business in the Connecticut, entered into an agreement whereby PrivatAir [*3] would act as Ross's agent [2] in connection with Ross's prospective purchase of an aircraft in exchange for a commission if the purchase was consummated. At all times relevant to this agreement, PrivatAir held itself out as an expert in aircraft purchases and sales and the contract negotiations accompanying such transactions. According to Ross, he relied on this expertise in entering into his agreement with PrivatAir.

 2   Ross alleges that PrivatAir was his agent. On a motion to dismiss, the Court need not credit legal conclusions included in a complaint's factual allegations. For purposes of this factual background, we refer to PrivatAir as Ross's "agent"

2004 U.S. Dist. LEXIS 16157, *

only in a generic and not a legal sense. *See Papasan v. Allain, 478 U.S. 265, 286, 92 L. Ed. 2d 209, 106 S. Ct. 2932 (1986)* ("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.")

On behalf of Ross, PrivatAir [*4] located and negotiated the purchase of a used 1981 Challenger 600 aircraft (the "Aircraft") owned by Grafair, a Florida corporation. An Aircraft Purchase Agreement (the "Grafair Agreement") drafted by PrivatAir codifying the transaction was entered into by Ross and Grafair on October 29, 2001. *See* Am. Compl., Ex. A. At some unspecified point, PrivatAir represented to Ross that the Grafair Agreement was PrivatAir's "standard purchase agreement." *See* Am. Compl., P 13.

Ross placed into escrow a $ 100,000 deposit on the Aircraft. Upon satisfaction of all applicable terms and conditions in the Grafair Agreement, Ross was to purchase the Aircraft for $ 6,650,000. The Grafair Agreement reserved to Ross prior to closing the right to inspect the Aircraft at his own expense. It is Ross's contention that PrivatAir represented to him that pursuant to the terms of the Grafair Agreement Ross could terminate the Grafair Agreement after inspection for any or no reason. Ross further contends that if he chose to terminate, he would be refunded $ 85,000 of his deposit, and the $ 15,000 balance would be remitted to Grafair to cover the expense of relocating the Aircraft for inspection.

The inspection [*5] uncovered problems with the Aircraft itself and its regulatory paperwork. After the inspection, PrivatAir, allegedly without Ross's authorization or knowledge, urged Grafair to undertake certain repairs of the Aircraft. Ross, however, in light of the inspection results, elected to terminate the Grafair Agreement. Grafair, in response, claimed that the Ross had no right to repudiate because the Grafair Agreement did not provide Ross such a right and because of PrivatAir's post-inspection statements encouraging Grafair to repair the Aircraft. Grafair took the position that Ross would be in breach of contract if he did not complete the purchase.

B. *The Florida Lawsuit.*

The contract dispute between Ross and Grafair prompted an interpleader action by the deposit's escrowee against the two transacting parties in Oklahoma state court. That action was removed to the United States District Court for the Western District of Oklahoma, and then transferred to the Southern District of Florida. *See Insured Aircraft Title Service, Inc. v. Stephen M. Ross and Grafair, Inc.,* 02-14081-Civ (S.D. Fla.) (the "Florida Lawsuit").

Ross and Grafair cross-claimed against each other in the Florida [*6] Lawsuit, the former alleging it had a right to terminate the Grafair Agreement, the latter alleging it was entitled to receive the entire $ 100,000 deposit, as well as consequential damages flowing from Ross's breach of the Grafair Agreement. Ross's motion for judgment on the pleadings on his cross-claim against Grafair was denied. *See* Florida Lawsuit, Order of Nov. 21, 2002. [3]

> 3   Ross's motion for judgment on the pleadings was not denied on the merits, but instead because Grafair had not yet filed an answer to Ross's cross-claims. *See id.,* P 5. In the Order, discovery was ordered completed by December 30, 2002, and a cutoff date of January 15, 2003 was set for dispositive motions. *Id.,* at P 8.

Following the denial of Ross's motion, Ross and Grafair entered into a settlement which, *inter alia,* provided for the escrowee's release to Grafair of the entire $ 100,000 deposit, and the discontinuance with prejudice of both Ross's and Grafair's cross-claims. *See* Affidavit in Support of Defendant's [*7] Motion to Dismiss of Russell J. Sweeting, Document 33 (Stipulation for Settlement). According to Ross's Amended Complaint, he entered into the settlement because the cost of discovery and trial would exceed his deposit, and to eliminate exposure to a potentially substantial verdict against him on Grafair's breach of contract cross-claims.

C. *Ross's Claims.*

On December 31, 2003, Ross filed an Amended Complaint in this action alleging that PrivatAir committed a breach of contract, breach of fiduciary duty, and negligence in the course of negotiating and executing the Grafair Agreement. Specifically, Ross claims that PrivatAir (1) drafted an Agreement with an ambiguity preventing Ross from recovering $ 85,000 of the deposit; [4] (2) misrepresented to Ross that the Grafair Agreement permitted Ross's recovery of $ 85,000 of the deposit; and (3) urged Grafair, without Ross's knowledge or authorization, to make certain repairs to the Aircraft. All three of these acts and omissions of PrivatAir's are alleged to constitute a breach of contract, a breach of fiduciary duty, and negligence. Ross claims that PrivatAir is liable to him for $ 169,612.65 plus interest, which is the sum of [*8] the $ 84,612.65 he paid in legal fees and disbursements in defending against the Florida Lawsuit, as well as the $ 85,000 partial deposit refund he believed he was entitled to upon terminating the Grafair Agreement. [5] On February 6, 2004, PrivatAir moved to dismiss the Amended Complaint. Oral argument on the motion was held on June 24, 2004.

4    Oddly, Ross's Amended Complaint never identifies the alleged ambiguity in the Grafair Agreement which in part gives rise to this lawsuit.

However, the arguments of the parties in their briefing papers and clarification provided at oral argument indicates that the reference is to § 1.2(a) of the Grafair Agreement, which provides, in relevant part:

> Upon Buyer's acceptance of the Aircraft, as defined by Exhibit "B" attached, Buyer shall cause the [$ 100,000] deposit to be paid to Seller. The balance of the [$ 6,550,000.00] purchase price ... will be due and payable in immediately available U.S. funds upon delivery of the Aircraft pursuant to this Agreement.

Exhibit "B" is a document headed "CONFIRMATION OF AIRCRAFT ACCEPTANCE". The document reads in relevant part:

> Pursuant to the Aircraft Purchase Agreement dated October 29, 2001 between Steven Ross ("Buyer") and Grafair ("Seller"), this is to confirm that Buyer has inspected the above referenced Aircraft on this date. Buyer hereby accepts the Aircraft and the deposit is nonrefundable in accordance with the terms of the Agreement subject to Seller correcting or requiring the following items[.]

No items are identified, and the signature lines for Grafair and Ross are blank.

Section 1.2(b) of the Agreement reads in full:

> If buyer does not accept the aircraft, Buyer will pay Seller, from the deposit, $ 15,000 to cover costs of moving aircraft to and from the pre-purchase facility.

Also relevant to these provisions is the right of inspection given to Ross under the Agreement in § 2.2, which reads in relevant part:

The sale is subject to Buyer's inspection and a one-hour test flight ... to determine [if] the Aircraft conforms with the conditions specified in Section 2.1 [related to the Aircraft's airworthiness] ... Buyer shall provide Seller with a written list of discrepancies within two (2) business days after completion of said inspection. All costs and expenses for repairs in order to make the Aircraft conform with conditions set forth in Section 2.1 shall be borne by Seller.

[*9]

5    Although PrivatAir has not yet counterclaimed against Ross, Ross seeks also seeks a declaration that neither he nor anyone on his behalf owes PrivatAir $ 43,395.42 for services allegedly rendered.

## DISCUSSION

### I. Standard of Review for Motion to Dismiss

In assessing a motion to dismiss under *Fed. R. Civ. P. 12(b) (6)*, the Court is obligated to accept as true all well-pleaded factual allegations in the Amended Complaint, and view them in the light most favorable to plaintiff. *See Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683; Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1993)*. Defendant's motion is to be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996) (citing Conley v. Gibson, 355 U.S. 41, 48, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957))*.

### II. Breach of Contract Claim

According to plaintiff, he and PrivatAir [*10] entered into a contract under which plaintiff was to act as plaintiff's agent for plaintiff's purchase of an airplane, and plaintiff in turn would pay PrivatAir a commission upon purchase. *See* Am. Compl., P7-8. This contract was not reduced to writing.

Plaintiff alleges that defendant committed a breach of the contract by "(a) drafting the [Grafair] Agreement with an ambiguity that prevented Ross from recovering $ 85,000 of his deposit; (b) wrongly representing to Ross that the [Grafair] Agreement, as drafted, would permit

Page 4

2004 U.S. Dist. LEXIS 16157, *

him to recover $ 85,000 of his deposit; and (c) without Ross' knowledge or authorization, urging Grafair to proceed with certain repairs to the Aircraft." Am. Compl., P 32. *See also* Am. Compl., PP 12, 15, 19.

A breach of contract claim under New York law [6] must establish (1) the existence of a contract; (2) plaintiff's performance on the contract; (3) defendant's breach of contract; and (4) resulting damages. *See Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994).* Additionally, where a breach of contract claim fails to denote the "essential terms of the parties' purported contract, including the specific provisions [*11] of the contract upon which liability is predicated," it will be dismissed. *See Highlands Ins. Co. v. PRG Brokerage, Inc., 2004 U.S. Dist. LEXIS 83, No. 01 Civ. 2272 (GBD), 2004 WL 35439, at *8 (S.D.N.Y. Jan. 6, 2004) (quoting Sud v. Sud, 211 A.D.2d 423, 621 N.Y.S.2d 37, 38 (1st Dep't 1995); see also Window Headquarters, Inc. v. MAI Basic Four, Inc., 1993 U.S. Dist. LEXIS 11245, Nos. 91 Civ. 1816 (MBM), 92 Civ. 5283 (MBM), 1993 WL 312899 at *3 (S.D.N.Y. 1993)* (stating that while a "plaintiff is not required to attach a copy of the contract or to plead its terms verbatim", a complaint in a breach of contract action must nevertheless "set forth the terms of the agreement upon which liability is predicated"). Defendant challenges the viability of plaintiff's breach of contract claim, contending that plaintiff has not alleged a breach of any term of the contract. While it is clear from the face of the Amended Complaint that plaintiff enumerates certain acts and omissions of PrivatAir's alleged to comprise breaches of the contract, PrivatAir maintains that this alleged conduct did not violate any contractual obligations actually existing between the parties. Based on Ross's recitation in the [*12] Amended Complaint of the contract's formation and terms, we agree with PrivatAir. [7]

6    There is agreement that New York law governs the consideration of this motion.

7    PrivatAir also charges that Ross's damages claim is impermissibly speculative as the Florida Lawsuit's settlement forever placed in doubt whether Ross was entitled to recoup the deposit. Because we find that plaintiff's Amended Complaint fails to allege a breach of a contract provision, we need not address the damages issue.

A. $ 85,000 of the Deposit.

According to Ross, he contract with PrivatAir to "act as Ross' agent in connection with the prospective purchase of an aircraft by Ross." Am. Compl., PP 7 and 8. PrivatAir, in turn, was to receive a commission from Ross if he ultimately purchased an aircraft. *See id.*, P 7. Ross asserts that because his Agreement with Grafair did

not ultimately result in his recovery of $ 85,000 of his deposit, PrivatAir breached the contract it had with Ross.

8    The Grafair Agreement specified that "[a] refundable deposit of [$ 100,000] has been placed in escrow" and that "upon Buyer's acceptance of the Aircraft ... Buyer shall cause the deposit to be paid to Seller. The balance of the purchase price [$ 6,550,000.00] will be due and payable ... upon delivery of the Aircraft pursuant to this Agreement." Agreement, §§ 1.2, 1.2(a). The Grafair Agreement further provided that if Ross did not accept the Aircraft, "Buyer will pay Seller, from the deposit, $ 15,000 to cover costs of moving aircraft to and from the pre-purchase facility." *Id.*, at § 1.2(b).

[*13]    Ross argues that PrivatAir, both before and throughout their engagement with Ross, held itself out as an "expert in aircraft sales and acquisitions, including without limitation, in negotiating contracts for the purchase and sale of aircraft." Am. Compl., P 6. Moreover, Ross claims he relied on this self-professed expertise in choosing to contract for PrivatAir's services. *Id.* at P 9.

These representations, however, are not alleged to have ever matured into specific, incorporated and binding terms of its contract with Ross. Thus, at most, the results of defendant's performance were inconsistent with general representations about its expertise and competence made incident to contract formation. Even if PrivatAir is to be held to an "as advertised" standard of performance, Ross's complaints are outside the scope of PrivatAir's representations. PrivatAir's self-praise related to contract *negotiation* (i.e. locating an airworthy aircraft and securing Ross a competitive price), not contract *drafting.* [9] Ross faults PrivatAir for misfeasance classifiable in the latter category.

9    Ross evidently understands this distinction, as in his Memorandum of Law in Opposition to Summary Judgment ("Opp. Mem.") he states "as Ross' broker, PrivatAir not only found Ross an airplane, but *negotiated* the transaction with the seller on Ross' behalf and *drafted* for him a contract embodying the deal it had *negotiated.*" Opp. Mem. at 11 (emphasis added). While the two pursuits are not mutually exclusive, neither are they coterminous, or synonymous. An expert in contract negotiating is by no means necessarily an expert in contract drafting, and a skilled contract drafter might not have any aptitude for contract negotiation and bargaining.

[*14]    More importantly, Ross does not allege that, as part of PrivatAir's contractual obligations, PrivatAir

was to furnish Ross a aircraft purchase agreement that permitted Ross to abort the agreement after an inspection at-will and then reclaim eighty-five percent of the deposit. PrivatAir's assurances regarding Ross's right under the Grafair Agreement to recover his deposit did not concern terms of its contract with Ross susceptible to breach. Significantly, it was not until *after* Ross and PrivatAir consummated their agreement that PrivatAir is alleged to reference particular rights possessed by Ross under its prospective contract with Grafair. Specifically, Ross avers that PrivatAir located the Aircraft and negotiated a purchase and sale transaction on Ross's behalf with Grafair. *See* Am. Compl., PP 10-11. Thereafter, PrivatAir drafted the Aircraft Purchase Agreement, which was to be executed by Ross and Grafair. *See id.*, P 12. PrivatAir informed Ross that the drafted Agreement was PrivatAir's "standard purchase agreement," one which allowed for Ross to terminate the Grafair Agreement after inspection of the Aircraft, for any or no reason, and then recover $ 85,000 of his [*15] $ 100,000 deposit. *See id.*, PP 14-15.

Any facts giving rise to an obligation on the part of PrivatAir to arrange the Aircraft purchase in a way that offered Ross an opportunity to terminate the purchase and recover the bulk of his deposit postdate the formation of the Ross/PrivatAir contract. Nor does Ross allege that his contract with PrivatAir was subsequently modified to include this obligation. [10] Thus, PrivatAir was under no such obligation, and PrivatAir's alleged failure to draft an agreement in this regard cannot be a breach of the contract.

    10  In his opposition memorandum, Ross argues that "PrivatAir advised Ross that the contract was the standard agreement used for [aircraft] purchases, and that under it he could recover $ 85,000 his deposit if he chose to terminate the deal. Ross reasonably relied upon such representations in signing the [Grafair] Agreement." Opp. Mem. at 11. Ross's Amended Complaint does not seek recovery on a theory of promissory estoppel, although this appears to be the legal basis for this particular argument. Under New York law, a cause of action for promissory estoppel requires demonstration of the following: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance. *See Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000).* Ross would face the difficult task of establishing that the prospective purchaser of a $ 6 million aircraft reasonably relied on what amounts to legal advise from a non-lawyer.

[*16]  B. *Repairs to the Aircraft.*

Ross also alleges that PrivatAir unauthorizedly petitioned Grafair to repair the Aircraft after Ross's inspection gave Ross reason to seek to terminate the Grafair Agreement. *See* Am. Compl., PP 18-20. Because Grafair was urged to proceed with repairs, Grafair maintained that Ross could not then back out of the sale. *Id.*, P 21. Ross argues that PrivatAir's unauthorized statements to Grafair, which had the purported effect of binding Ross to purchase the Aircraft, were a breach of contract.

Ross's allegations in this regard fail to articulate an actionable breach of contract. As with Ross's claim of a breach with respect to the deposit, this allegation does not identify what term of his contract with PrivatAir was breached by these statements or their consequences. Instead, it simply assumes the described conduct was proscribed by or inconsistent with the contract. If Ross limited PrivatAir's authority to act on his behalf, the Amended Complaint should at the very least demarcate the bounds on that authority. Otherwise, there is no way for the Court to discern whether this particular act, if true, violated a provision of the contract agreed [*17] upon by the two parties. [11] *See Highlands Ins., 2004 U.S. Dist. LEXIS 83, 2004 WL 35439, at *8; Sud, 211 A.D. at 424, 621 N.Y.S. 2d at 38; see also Window Headquarters, 1993 U.S. Dist. LEXIS 11245, 1993 WL 312899, at *3.*

    11  Ross cites to *William Wrigley Jr. Co. v. Waters, 890 F.2d 594 (2d Cir. 1989)* for the proposition that "it is well settled under New York law that negligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract, which may be submitted to the trier of the case alternatively", and that by acting without authority with regard to the aircraft repairs, PrivatAir did not act with reasonable skill and care. For this reason, Ross claims he need not allege the specific supposedly broken terms of his agreement with PrivatAir because PrivatAir's failure to deliver its services with appropriate competence was itself a breach. We disagree with Ross's interpretation of *Wrigley*. The case merely stands for the proposition that negligent performance of contract can sometimes constitute a tort as well as a breach of contract. We do not think this means that every negligent performance of a contract is *itself* a breach of the contract. Instead, a negligent performance of a contract might *cause* a breach of the contract. Under that circumstance, a plaintiff is not relieved of its obligation to identify what term of a contract was actually breached. Moreover, plaintiff's assertion that he need not specify the terms of the agreement on which he maintains defendant's liability is directly refuted by well-settled New York law. *See*

2004 U.S. Dist. LEXIS 16157, *

*Highlands Ins., 2004 U.S. Dist. LEXIS 83, 2004 WL 35439, at *8; Sud, 211 A.D. at 424, 621 N.Y.S. 2d at 38; see also Window Headquarters, 1993 U.S. Dist. LEXIS 11245, 1993 WL 312899, at *3.* To the extent Ross means to advance a breach of the term of good faith and fair dealing implied in every contract, it is subsumed by the discussion of plaintiff's breach of a fiduciary duty claim.

[*18] **III. Breach of Fiduciary Duty Claim**

Ross asserts that "as Ross's agent, PrivatAir had a fiduciary duty to Ross." Am. Compl., P 35. Ross's Amended Complaint does not define what that duty was or entailed. [12] As discussed above, Ross elsewhere alleges that PrivatAir "held itself out to be expert in aircraft sales and acquisitions, including without limitation, in negotiating contracts for the purchase and sale of aircraft," *id.,* P 6, and that Ross relied on these representations in entering into its contract. *id.,* P 9. According to Ross, the same exact acts and omissions of PrivatAir's that violated the contract also constituted a breach of fiduciary duty, namely, again, "(a) drafting the [Grafair] Agreement with an ambiguity that prevented Ross from recovering $ 85,000 of his deposit; (b) wrongly representing to Ross that the [Grafair] Agreement, as drafted, would permit him to recover $ 85,000 of his deposit; and (c) without Ross' knowledge or authorization, urging Grafair to proceed with certain repairs to the Aircraft." *Id.,* P 37.

12  In his opposition memorandum, Ross asserts that "a broker owes fiduciary duties to his principal." Opp. Mem. at 10 (citations omitted). Nowhere in his Amended Complaint does Ross allege that PrivatAir was his broker. If being an agent is not synonymous with being a broker, then Ross's arguments about the responsibilities of a broker are an impermissible attempt to amend his complaint through a briefing memorandum. *See Jacobson v. Peat, Marwick, Mitchell & Co., 445 F. Supp. 518, 526 (S.D.N.Y. 1977)* (stating that party may not amend pleading through statements in briefs).

[*19] Under New York law, an actionable breach of fiduciary duty claim is comprised of the existence of a fiduciary relationship and damages caused by a breach of the fiduciary duty. *See, e.g., Cramer v. Devon Group, 774 F. Supp. 176, 184 (S.D.N.Y. 1991).*

*A. Was There A Fiduciary Relationship?*

A fiduciary duty exists "when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another", and "whether one party is a fiduciary of another depends on the relationship between the parties." *Reuben H. Donnelley Corp. v. Mark I Marketing Corp., 893 F. Supp. 285, 289 (S.D.N.Y. 1995).* Attorney/client or doctor/patient relationships "are sufficiently rooted in trust and confidence to trigger super-contractual fiduciary duties." *Id.* However, "a conventional business relationship does not create a fiduciary relationship in the absence of additional factors." *Id., quoting Feigen v. Advance Capital Management Corp., 150 A.D.2d 281, 283, 541 N.Y.S.2d 797, 799 (1st Dep't 1989).* Indeed, "under New York law, [*20] parties to a commercial contract do not ordinarily bear a fiduciary relationship to one another unless they specifically so agree," or if "one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party." *Calvin Klein Trademark Trust v. Wachner, 123 F. Supp.2d 731, 733-34 (S.D.N.Y. 2000).*

It is insufficient to merely allege the existence of a fiduciary relationship. Instead, "to plead a cause of action alleging that defendants became fiduciaries, plaintiffs must allege at least some factors from which a court could conclude that such a relationship has been established." *Boley v. Pineloch Associates, Inc., 700 F. Supp. 673, 681 (S.D.N.Y. 1988).* Moreover, it is well-settled that "a simple breach of contract is not to be considered a tort unless a duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389, 516 N.E.2d 190, 521 N.Y.S.2d 653, 656-57 (1987)* [*21] (citations omitted). A tort claim is barred as redundant where it is "merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract." *Id. at 657.*

Fiduciary obligations are not imposed on one party merely because it possesses relative expertise as compared to the other. *See Mechigian v. Art Capital Corp., 612 F. Supp. 1421, 1430 (S.D.N.Y. 1985)* (finding that "plaintiff has provided no support for the proposition that mere expertise in a matter create fiduciary responsibilities, which is essentially the sum and substance of his argument"); *see also Boley, 700 F. Supp. 673, 681* (holding that "allegations of reliance on another party with superior expertise, standing by themselves, will not suffice").

Furthermore, where the parties' contract forms both the foundation and boundary of their relationship, fiduciary responsibilities have not attached. *See Reuben H. Donnelley Corp., 893 F. Supp. at 290* (refusing to find a

Page 7

2004 U.S. Dist. LEXIS 16157, *

fiduciary obligation where "absent ... contractual obliga-
tions" the complained of "conduct would not be action-
able"); [*22] *see also Clark-Fitzpatrick, Inc., 521
N.Y.S.2d at 656-57, 70 N.Y.2d at 389* (barring a tort
claim that was redundant of a contract claim).

With the foregoing authority in mind, for purposes
of this motion we conclude that plaintiff has adequately
pled that PrivatAir had a fiduciary relationship with Ross
based on his allegation and description of an agency rela-
tionship with PrivatAir coupled with his claim that he
both relied on PrivatAir's espoused expertise and over
the course of their relationship had PrivatAir negotiate
with Grafair on his behalf. *See Fyrdman & Co. v. Credit
Suisse First Boston Corp., 272 A.D.2d 236, 237, 708
N.Y.S.2d 77, 79 (1st Dep't 2000)* (holding that a fiduciary
duty existed where bank provided plaintiff "with invest-
ment banking advice and other services, including con-
ducting negotiations with ... on [plaintiff's] behalf ... in
connection with the attempted acquisition" of a busi-
ness); *see also Wiener v. Lazard Freres & Co., 241
A.D.2d 114, 672 N.Y.S2d 8, 15 (1st Dep't 1998)* (holding
that a fiduciary obligation has been adequately pled
where *inter alia* the defendant assumed negotiations on
behalf of plaintiff, [*23] where plaintiff relied on de-
fendant's expertise).

B. *Was The Fiduciary Duty Breached?*

To find a fiduciary relationship through agency only
begins the inquiry, which also requires identifying,
amongst other things, the particular obligations owed.
*See SEC v. Chenery Corp., 318 U.S. 80, 85-86, 87 L. Ed.
626, 63 S. Ct. 454 (1943)*. Under New York law an agent
owes its principal fiduciary duties of good faith and loy-
alty. *See Six West Retail Acquisition, Inc. v. Sony Theatre
Management Corp., 2004 U.S. Dist. LEXIS 5411, No. 97
Civ. 5499 (LAP), 2004 WL 691680 at *19, (S.D.N.Y. Mar
31, 2004)* (stating that all agents owe their principals
"general fiduciary duties of good faith and loyalty"); *cf.
Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d
184, 200 (2d Cir. 2003)* ("Under New York law, an agent
is obligated to be loyal to his employer and is prohibited
from acting in any manner inconsistent with his agency
or trust and is at all times bound to exercise the utmost
good faith and loyalty in the performance of his duties")
(citations and quotations omitted). Additionally, there is
authority for the general proposition that a fiduciary is
"responsible to undertake reasonable [*24] diligence"
upon matters within the fiduciary obligation. *BNY Capi-
tal Markets, Inc. v. Moltech Corp., 2001 U.S. Dist.
LEXIS 2705, 99 Civ. 11754 (GEL), 2001 WL 262675 at
*8 (S.D.N.Y. Mar. 14, 2001)*. A fiduciary obligation,
however, is "limited to matters relevant to affairs en-
trusted." *Rush v. Oppenheimer & Co., Inc., 681 F. Supp.
1045, 1055 (S.D.N.Y. 1988)*; *BNY Capital Markets, 2001*

*U.S. Dist. LEXIS 2705, 2001 WL 262675 at *8* (stressing
that a "fiduciary is only responsible to undertake reason-
able diligence or give advice for the benefit of another
upon matters *within the scope of the relation*")" (emphasis
in original, citations and quotations omitted).

PrivatAir's alleged breaches with respect to the con-
tract language are on their face outside the confines of its
fiduciary obligations. PrivatAir is affirmatively alleged
to only possess expertise in "aircraft sales and acquisi-
tions" and in "negotiating contracts for the purchase and
sale of aircraft." Am. Compl. P 6. PrivatAir is not a law
firm. Plaintiff cites no authority which supports holding a
non-lawyer to a special standard of care for conduct that
is the province of attorneys, such as contract drafting and
interpretation. Regardless [*25] of how plaintiff may
have interpreted PrivatAir's abilities or representations,
PrivatAir cannot be held liable for what is essentially a
legal malpractice claim when it never held itself out to be
an attorney. *See BNY Capital Markets, 2001U.S. Dist.
LEXIS 2705, 2001 WL 262675, at *8*.

Ross also claims that PrivatAir breached its fiduci-
ary duty by urging Grafair to make repairs to the Air-
craft. Unlike contract drafting and interpretation, Pri-
vatAir's charge to communicate with prospective air-
plane sellers was attended by fiduciary duties. Thus, it
would be inappropriate to dismiss this particular claim of
Ross's at this time. [13]

---

    13 It is, however, appropriate to note that the au-
    thority which enables a portion of Ross's breach
    of fiduciary duty claim to survive contain af-
    firmative allegations of active disloyalty and self-
    dealing. *See Frydman, 708 N.Y.S.2d at 79; Wie-
    ner, 672 N.Y.S2d at 15*. The absence of such
    claims here could make those cases distinguish-
    able from the present one. Moreover, based on
    what has been presented to the Court thus far (in
    Ross's amended complaint, his opposition memo-
    randum, and during oral argument), we are highly
    skeptical that Ross will be able to establish a
    breach of fiduciary duty sufficient to withstand
    summary judgment. For example, Ross will have
    to demonstrate that PrivatAir's statements to
    Grafair were actually unauthorized, a position
    which has yet been set out in any detail. But there
    is serious tension between Ross's claim that Pri-
    vatAir was his fiduciary, which depends in large
    part on PrivatAir possessing authority to negoti-
    ate on Ross's behalf, and the claim that PrivatAir
    had to seek permission from Ross before acting.
    It seems the more control Ross had over Pri-
    vatAir, the less PrivatAir can be considered a
    trusted and empowered fiduciary acting on Ross's
    behalf by virtue of its expertise as opposed to

Case 1:07-cv-09749-JSR    Document 14-2    Filed 02/07/2008    Page 45 of 45
Case 1:07-cv-09749-JSR    Document 11-4    Filed 01/31/2008    Page 21 of 26

Page 8

2004 U.S. Dist. LEXIS 16157, *

Ross's direction. Ross will also have to establish that PrivatAir's supposedly unauthorized actions actually caused the damage he claims. Again, based on the Court's current understanding of the allegations, this will be a challenge. This Court is not bound to Grafair's interpretation of PrivatAir's communications or the Grafair Agreement, which included specific provisions defining the mechanics of acceptance, as well as an integration clause.

[*26] IV. *Negligence Claim*

PrivatAir is alleged to have committed negligence for the same exact reasons PrivatAir is alleged to have breached its contract with and fiduciary duties owed to Ross. *See* Am. Compl., P 42. The elements of a negligence claim under New York law are "(1) a duty owed by the defendant to the plaintiff; (2) a breach thereof; and (3) injury proximately resulting therefrom." *Solomon v. City of New York*, 66 N.Y.2d 1026, 489 N.E.2d 1294, 1294-95, 499 N.Y.S.2d 392 (1985); *see also Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 79 (2d Cir. 1997). In particular, Ross is accused of violating a duty to act with reasonable care and skill. *See* Am. Compl., P 43; *see also* Opp. Mem., at 18. This allegation, framed as one for negligence, is subsumed by Ross's contract and fiduciary duty claims. Again, "a simple breach of contract is not to be considered a tort unless a duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389, 516 N.E.2d 190, 521 N.Y.S.2d 653, 656-57 (1987) [*27] (citations omitted). The only possible sources of a duty of PrivatAir's to exercise reasonable care and skill in performing its contract with Ross are the contract itself, or from PrivatAir's fiduciary status. As such, plaintiff's negligence claim fails. *See, e.g., Seybert-Nicholas Printing Corp. v. MLP U.S.A., Inc.*, 1992 U.S. Dist. LEXIS 16220, No. 92 Civ. 6143 (RPP), 1992 WL 315643, at *1 (S.D.N.Y. Oct. 22, 1992).

V. *Rule 11 Sanctions*

Defendant's motion for *Rule 11* sanctions is plainly deficient as a matter of procedure, and is therefore denied.

*Rule 11* sanctions are appropriate only after the allegedly offending party has been afforded a remedial "safe harbor" period. Under *Rule 11 (c) (1) (A)*:

A motion for sanctions ... shall be made separately from other motions or requests ... [and] shall be served as provided in *Rule 5*, but shall not be filed with or presented to the court unless, within 21 days after service of the motion ... the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected.

Here, Ross was not served with PrivatAir's *Rule 11* motion twenty-one days prior to its filing. Instead, the *Rule 11* motion, [*28] which was made as part of PrivatAir's motion to dismiss, was contemporaneously served on Ross and filed with this Court. Nor is the Court informed of any other pre-filing notice provided by PrivatAir to Ross substantially fulfilling the safe harbor requirement. In brief, Ross has been deprived of any opportunity to "withdraw[] or appropriately correct[]" the challenged matter, and therefore we will not consider the merits of PrivatAir's *Rule 11* application. The motion is denied.

*CONCLUSION*

For the foregoing reasons, defendant's motion to dismiss is granted with respect to the breach of contract and negligence counts. With respect to the breach of fiduciary duty count, defendant's motion is granted except that it is denied with respect to Ross's allegation that PrivatAir urged Grafair to repair the Aircraft without Ross's knowledge or authorization. Defendant's motion for *Rule 11* sanctions is denied.

By September 8, 2004, the parties are to confer about and submit for the Court's review a discovery and motion schedule that is prompt and targeted at the issues raised in footnote 13 of this Memorandum. Upon completion of this limited discovery the Court will entertain [*29] a motion for summary judgment from defendant.

IT IS SO ORDERED.

DATED: New York, New York

August 16, 2004

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE