TAB 9

Not Reported in F.Supp.                                           Page 1
Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

**H**Redtail Leasing, Inc. v. Bellezza
S.D.N.Y.,1997.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
REDTAIL LEASING, INC., Hull Trading Company,
Robert J. Rosener, and Steven Paskvallich,
individually and on behalf of all others similarly
situated, Plaintiffs,
v.
Leonard BELLEZZA, Michael Borlinghaus, Jeffrey
F. Green, Joseph P. Greenwald, Heinz Grein, Steven
Krysty, Joanne Latona-Administratrix of The Estate
of Angelo Latona, Joseph Latona, Val Maiale,
Christopher M. Garvey, Darrin Gleeman, Seymour
Gleeman, Edwin Karger, and David Simon,
Defendants.
No. 95 Civ. 5191(JFK).

Sept. 30, 1997.

Sachnoff & Weaver, Ltd., Chicago, IL, of Counsel
John W. Moynihan, Pollack & Greene New York
City, of Counsel Alan Pollack, for plaintiff.
Weil, Gotshal & Manges Llp New York City, of
Counsel Greg A. Danilow, Jason M. Halper, Michael
J. Aiello, for defendants Darrin Gleeman, Seymour
Gleeman and Edwin Karger.KEENAN, J.

OPINION and ORDER

*1 Before the Court is the joint motion of
Defendants Darrin Gleeman, Seymour Gleeman and
Edwin Karger to dismiss the first amended class
action complaint, pursuant to Fed.R.Civ.P. 12(b)(1)
and 12(b)(6), and Plaintiffs' motion for class
certification, pursuant to Fed.R.Civ.P. 23(a) and
(b)(3). For the reasons stated below, the Court grants
the Moving Defendants' motion to dismiss, and the
Court grants Plaintiffs' motion for class certification.

*Background*

Plaintiffs allege that beginning in 1989, a group
of people, including the Moving Defendants, created
an organization to obtain material, nonpublic inside
information regarding public entities for the purpose
of disseminating that information among the group so
that the members of the group could engage in illegal
insider trading in those securities. Among the

securities that Plaintiffs claim that this insider trading
ring traded by using the material, nonpublic inside
information were Ambase Corp., ACCO/Swingline,
AT & T, Birmingham Steel Corp., Chubb, Columbia
Pictures, Kay Jeweler Inc ., Motel 6, L.P., R.H. Macy
& Co., Northwest Airlines, Time Warner, Inc.,
United Airlines, and Wang Laboratories.

According to the Amended Complaint,
Defendant Christopher Garvey, who worked as a
paralegal at the law firm Skadden, Arps, Slate,
Meagher & Flom, would obtain material, nonpublic
inside information and provide this inside
information to Defendant Darrin Gleeman, who was
Garvey's roommate and friend. *See* Am.Compl. (¶ (¶
12-13, 43. While the Amended Complaint states that
the insider trading ring had several sources of
material, nonpublic information, Plaintiffs allege that
Garvey was the "primary source" of the material
inside information central to the insider trading ring's
conspiracy. *See* Am.Compl. (¶ (¶ 41, 48. Darrin
Gleeman would allegedly provide Garvey's inside
information to his father, Defendant Seymour
Gleeman, who was employed by IBM in New York
City. *See* Am.Compl. (¶ 43. On several occasions,
Seymour Gleeman allegedly purchased through
foreign accounts, common stock and call options for
the Garvey-recommended securities. To conceal his
identity, Seymour Gleeman allegedly used false
identification to open various trading accounts in
1989 and 1990 in Luxembourg and Austria. Id.
Seymour Gleeman would also provide Garvey's
inside information to Defendant Edwin Karger, who
was an IBM coworker of Seymour Gleeman. *See* Am
.Compl. (¶ 44. Karger would then provide the Garvey
inside information to his friend Defendant Leonard
Bellezza. Both Karger and Bellezza would then
allegedly trade on the inside information, and
Bellezza would allegedly provide the information to
others in the insider trading ring. Defendants
Seymour and Darrin Gleeman allegedly shared in the
kickbacks paid to Garvey for obtaining and sharing
the inside information with the ring. *See* Am.Compl.
(¶ (¶ 42-43.

The focus of this lawsuit concerns the insider
trading ring's alleged utilization of material,
nonpublic information regarding the proposed
acquisition of Motel 6, L.P., a Dallas-based national
chain of owner-operated economy motels, by Accor,

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

S.A., a French-based company. The insider trading ring was allegedly part of a conspiracy to trade on highly sensitive inside information about tender offer negotiations occurring in New York between Motel 6's largest shareholder, Kohlberg Kravis Roberts & Company, and Accor. This alleged insider trading on the Motel 6 shares and call options occurred between May 18, 1990 and July 12, 1990, when Accor made a public announcement that it would made a tender offer for Motel 6. Plaintiffs sold Motel 6 shares and call options contemporaneously with Defendants' purchase of the same during the alleged insider trading period of May 18, 1990 to July 12, 1990. Plaintiffs claim that through the insider trading in Motel 6 securities, Defendants generated illegal profits in excess of $4 million, and that Plaintiffs and the proposed class suffered millions of dollars in damages due to Defendants' misconduct in the sharing of and trading on the material, nonpublic inside information concerning the Accor tender offer.

*2 While the Amended Complaint alleges that the inside information came primarily from Garvey, who informed Darrin Gleeman, who then informed his father Seymour Gleeman, who in turn informed Defendant Karger, who informed Bellezza and Bellezza tipped off the others involved, this usual chain of events did not happen with regard to material, nonpublic inside information concerning the Motel 6 tender offer negotiations. Rather, the inside information came from another source and was disseminated in a different manner. Hugh Thrasher, executive vice-president of Motel 6 in charge of communication at the time of the tender offer negotiations, allegedly tipped his friend Carl Harris about the tender offer negotiations. *See* Am.Compl. (¶ (¶ 102-03. Harris then allegedly told Gregg Shawzin, who then told John Anderson. *See* Am.Compl. (¶ 107, 111. Anderson purportedly tipped off Defendant Joseph Greenwald, who allegedly tipped Defendants Jeffrey Green and Joseph Latona. *See* Am. Compl. (¶ (¶ 113, 118. Defendants Green and Latona allegedly tipped Defendant David Simon. *See* Am.Compl. (¶ 124. Defendant Latona also allegedly tipped Defendant Michael Borlinghaus, who then allegedly tipped Defendants Heinz Grein, Steven Krysty, and Leonard Bellezza. *See* Am.Compl. (¶ (¶ 130, 131, 139, 141. Defendant Bellezza allegedly tipped Defendant Karger, who allegedly tipped Defendant Seymour Gleeman. *See* Am.Compl. (¶ (¶ 143, 145. All of these individuals are alleged to have purchased Motel 6 stock or call options based upon this material, nonpublic inside information.

Based upon the insider trading ring's alleged activities, Plaintiffs filed this instant action stating claims for federal RICO violations, violations of § 10(b), Rule 10b-5, § 14(e), and Rule 14e-5 of the Exchange Act, as well as state law claims for common law fraud, unjust enrichment and violations of New York's Consumer Protection Act.

Defendants Darrin Gleeman, Seymour Gleeman and Edwin Karger now move jointly to dismiss all claims against them in this action, on the grounds that Plaintiffs have failed to state a claim upon which relief may be granted. Plaintiffs have named the Moving Defendants in the first, third, fourth, fifth, sixth, and seventh claims for relief. Plaintiffs do not seek relief against the Moving Defendants in the second claim for relief, pursuant to §§ 10(b) and 14(e) of the Exchange Act and Rules 10b-5 and 14e-3 promulgated thereunder.

### *Discussion*

### A. The Motion to Dismiss

A motion to dismiss for failure to state a claim should be granted only if it appears beyond doubt that a plaintiff can prove no set of facts in support of a claim that would entitle the plaintiff to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The factual allegations set forth in the complaint must be accepted as true, *see Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), and the court must view those allegations in the light most favorable to the pleader. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Nevertheless, the complaint must contain allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory. *See Connolly v. Havens,* 763 F.Supp. 6, 9 (S.D.N.Y.1991).

### 1. Section 1962(b)-RICO Acquisition Claim

*3 The third claim for relief alleges a violation of 18 U.S.C. § 1962(b). Section 1962(b) provides:
   It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

interstate or foreign commerce.

18 U.S.C. § 1962(b). To state a claim under § 1962(b), a plaintiff must plead that they were injured by a defendants' acquisition of an interest in an enterprise, as distinct from an injury resulting from the pattern of racketeering activity, or commission of predicate acts. See *Discon, Inc. v. Nynex Corp.*, 93 F.3d 1055, 1062-63 (2d Cir.1996) (finding that the plaintiff did not state a claim under § 1962(b) because the plaintiff "has not alleged any injury stemming from the 'acquisition or maintenance' of [the enterprise] by [the defendant], only injuries resulting from the commission of predicate acts"); *Lightning Lube, Inc. v. Citco Corp.*, 4 F.2d 1153, 1190 (3d Cir.1993) ("in order to recover under [ § 1962(b) ], a plaintiff must show injury from the defendant's acquisition or control of an interest in a RICO enterprise, in addition to injury from the predicate acts."). As explained by Judge Sand in *Dornberger v. Metropolitan Life Ins. Co.*, 961 F.Supp. 506, 525 (S.D.N.Y.1997),to state a claim under § 1962(b), a plaintiff must allege an injury by reason of the defendant's acquisition or maintenance of an interest in or control of an enterprise ... As with § 1962(a), it is not sufficient merely to allege an injury caused by the predicate acts themselves ... The rationale for this "acquisition injury requirement analogous to that of the investment injury requirement of § 1962(a)-the essence of a § 1962(b) violation is not the commission of predicate acts, but rather the acquisition or maintenance of an interest in or control of an enterprise ... Thus, a plaintiff cannot recover under § 1962(b) unless he alleges a distinct injury caused not by predicate acts but by the defendant's acquisition or maintenance of an interest in or control of an enterprise.

*Id.* at 525; *see also Lightning Lube*, 4 F.3d at 1190 ("Such an injury [[[under § 1962(b) ] may be shown, for example, where the owner of an enterprise infiltrated by the defendant as a result of racketeering activities is injured by the defendant's acquisition or control of his enterprise."(citations omitted)). A plaintiff who is injured solely as a result of predicate acts may sue only under § 1962(c), "whose essence is the commission of predicate acts in connection with conducting the affairs of an enterprise." *Dornberger*, 961 F.Supp. at 525. The Moving Defendants contend that Plaintiffs have not alleged any "acquisition injury" distinct from the injury resulting from the underlying racketeering activity, and therefore this claim must be dismissed. The Court agrees.

*4 Plaintiffs have only alleged facts showing injuries that resulted from the underlying pattern of racketeering activity. According to the facts alleged in the Amended Complaint, and as conceded in Plaintiffs' papers in opposition to this motion, Plaintiffs suffered millions of dollars in damages as a result of Defendants' illegal insider trading purchases of Motel 6 securities. *See* Am.Compl. (¶ (¶ 4; Pls.' Mem. in Opp. at 10 ("The Complaint alleges that the plaintiffs and the putative class suffered damages totalling millions of dollars as a result of the defendants' ... illegal insider trading purchases of SIX securities."). Plaintiffs offer no factual allegations to show how Defendants' acquisition of or maintenance of an interest in or control of the enterprise injured Plaintiffs in a manner distinct from the racketeering activity itself. Thus, Plaintiffs' § 1962(c) claim encompasses all of their alleged injuries. Without any factual allegations to support a claim of a distinct acquisition injury, Plaintiffs cannot state a cause of action under § 1962(b), and the Court grants the Moving Defendants' motion to dismiss this claim. *See Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 657 (S.D.N.Y.1996) ("[T]o state a claim under § 1962(b), a plaintiff must allege that the injury was caused by the acquisition or maintenance of control and not by the predicate acts.... By failing to allege how she was injured by an acquisition or maintenance of control, [plaintiff] has failed to plead a violation of § 1962(b)." (citations omitted)), *aff'd,*113 F.3d 1229 (2d Cir.1997). The third claim, as against the Moving Defendants, is dismissed.

## 2. Section 1962(c)-RICO Conduct Claim

The fourth claim for relief alleges a violation of 18 U.S.C. § 1962(c). Section 1962(c) provides:
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). In *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) the Supreme Court found that liability under § 1962(c) requires that a defendant be a participant "in the operation or management of the enterprise itself." *Id.* at 185. The Supreme Court stated:Once we understand the word conduct" to require some degree

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. *In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs.* Of course, the word "participate" makes clear the RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.

*5*Id*. at 1170 (emphasis added). Therefore, to state a claim for liability under § 1962(c), Plaintiffs must allege that the Gleemans and Karger participated "in the operation or management of the enterprise itself," which requires that these Defendants must have had some part in directing the enterprise's affairs.

The Moving Defendants contend that the Amended Complaint contains no factual allegations suggesting that the Gleemans or Karger directed, managed or operated the affairs of the enterprise alleged in the § 1962(c) claim. Because liability under § 1962(c) "may not be imposed on one who merely 'carries on' or 'participates' in an enterprise's affairs," *Biofeedtrac Inc. v. Koliner Optical Enters. & Consultants, S.R.L.,* 832 F.Supp. 585, 590-91 (E.D.N.Y.1993), the Moving Defendants assert that this § 1962(c) claim must be dismissed. The Court agrees.

The Amended Complaint is devoid of allegations suggesting that the Gleemans or Karger had some part in directing the enterprise's affairs. Certainly, the alleged facts tend to show that the Moving Defendants participated in the enterprise's affairs. But other than passing on inside information to others, trading on inside information and receiving some kickbacks for illegal trades, none of the allegations in the Amended Complaint raise the inference that these three men had a role in managing or directing the enterprise's affairs. *See Stone v. Kirk,* 8 F.3d 1079, 1091 (6th Cir.1993) (defendant who "was associated with the" enterprise and "engaged in a pattern of racketeering activity when he repeatedly violated the anti-fraud provisions of the [federal] securities" laws was not liable under § 1962(c) because he "had no part in directing" the enterprise's affairs). A defendant does not "direct" an enterprise's affairs under § 1962(c) merely by engaging in wrongful

conduct that assists the enterprise.

In opposition to this motion, Plaintiffs offered new allegations to support their claim that the Moving Defendants had some part in directing the enterprise's affairs, however, these allegations do not appear in the Amended Complaint. *See* Pls.' Mem. in Opp. at 12-13 (alleging, among other things, that Darrin Gleeman conceived of the inside trading idea and encouraged Garvey to obtain employment with a law firm to obtain inside information, that the Moving Defendants determined the kickbacks to be paid to Garvey in order to protect that source of information, that the Moving Defendants had the "primary responsibility" to disseminate the Garvey inside information to the others and to place trades on the inside information). Papers in response to a Rule 12(b)(6) motion to dismiss cannot cure a defect in the pleadings. *See O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 229 (S.D.N.Y.1989). Insofar as the Amended Complaint contains no factual allegations to indicate that the Moving Defendants participated in the operation or management of the enterprise itself, the Court grants the motion to dismiss the § 1962(c) claim against them. However, in light of the new allegations put forth by Plaintiffs in the memorandum of law and affidavit in opposition to this motion, and the fact that those allegations raise the inference that some of the Moving Defendants may have had a part in directing the enterprise, the Court grants Plaintiffs leave to replead the Amended Complaint with regard to this specific claim and these Moving Defendants.

**3. Section 1962(d)-Conspiracy to Violate §§ 1962(b)-(c)**

*6 Plaintiff's first claim for relief alleges that Defendants engaged in a conspiracy to violate 18 U.S.C. §§ 1962(b)-(c), in violation of § 1962(d). Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). The Moving Defendants argue that this claim must be dismissed because Plaintiffs' substantive RICO § 1962(b) and § 1962(c) claims against them are deficient and must be dismissed. The Court concludes that the § 1962(d) claim should be dismissed for another reason.

Upon a careful review of the Amended Complaint, the Court finds that like the §§ 1962(b) and 1962(c) claims, Plaintiffs have made no more

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                         Page 5
Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

than conclusory allegations with regard to the § 1962(d) claim against the Moving Defendants. The factual allegations just do not support a claim that the Moving Defendants conspired to violate § 1962(b) or § 1962(c). However, because the Court granted Plaintiffs leave to replead the Amended Complaint in light of the new factual allegations relevant to the § 1962(c) claim, the Court also grants Plaintiffs leave to replead this claim against the Moving Defendants consistent with the new allegations.

### 4. New York General Business Law Section 349(a) Claim

The fifth claim for relief alleges a violation of § 349(a) of the New York General Business Law.Section 349(a) prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [the] state." N.Y. Gen.Bus. Law § 349(a). This Court has addressed the applicability of § 349(a) to securities transactions and found that " § 349 should not be applied to investment transactions in securities" because the purpose of § 349"is to protect consumers ... [and] [c]ourts have therefore been reluctant to apply the section to transactions that are 'different in kind and degree from those that confront the average consumer who requires the protection of a state against fraudulent practices.' " *In re Motel 6 Sec. Litig.*, Nos. 93-2183(JFK), 93-2866(JFK), 1995 WL 431326, at *6-7 (S.D.N.Y. July 20, 1995) (citations omitted). This holding also applies to this case for the reasons discussed by the Court in that decision. Therefore, the Court grants the Moving Defendants' motion to dismiss this claim for relief.

### 5. Common Law Fraud Claim

The sixth claim for relief alleges that Defendants committed common law fraud. To state a claim for common law fraud claim, a plaintiff must allege that a defendant (1) made a material false representation or omission, (2) knowing of its falsity, (3) intending to defraud, (4) upon which the plaintiff reasonably relied, and (5) the plaintiff suffered injury as a result. *See Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995).

The Moving Defendants contend that the common law fraud claim must be dismissed because Plaintiffs have not adequately alleged that the

Moving Defendants had a duty to disclose the material inside information or that Plaintiffs adequately pleaded the other elements of a common law fraud claim. Upon examination of the Complaint, the Court concludes that Plaintiffs have failed to alleged facts to support the common law fraud element of direct reliance on Defendants' material omissions.

*7 Common law fraud claims must be supported by factual allegations demonstrating the plaintiff's actual, direct reliance on the misrepresentation or omission. *See Golden Budha Corp. v. Canadian Land Co.*, 931 F.2d 196, 202 (2d Cir.1991); *Turtur v. Rothschild Registry Int'l, Inc.*, No. 92-8710(RAP), 1993 WL 338205, at *6 (S.D.N.Y. Aug.27, 1993). Consequently, common law fraud claims
are distinct from actions brought under the federal securities laws, which "permit a rebuttable presumption of reliance where a plaintiff purchases his shares on the open market."
Common law fraud cases such as the present one are therefore to be distinguished from cases that involved a fraud on the market theory or other theories in which reliance on a material omission is presumed to have existed and which are applicable primarily in the context of federal securities fraud claims arising under section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

*Turtur*, 1993 WL 338205, at *7 (citations omitted); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 241-47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (observing that actions under § 10(b) and Rule 10b-5 are distinct from common law deceit and misrepresentation claims and are designed to add to the protections provided investors by common law). Unlike § 10(b) and Rule 10b-5 claims based on a fraud-on-the-market theory, common law fraud claims do not enjoy a presumption of reliance once a material omission and duty to speak have been sufficiently pleaded. Because the factual allegations focus solely on an insider trading conspiracy that perpetrated a fraud on the market, and Plaintiffs have alleged no connection to Defendants, let alone the Moving Defendants, other than a "contemporaneous trading" relationship,[FN1] Plaintiffs have not alleged facts to support a claim of actual, direct reliance on the Moving Defendants' omissions. *See Schultz v. Commercial Programming Unlimited Inc.*, No. 91-7924(LJF), 1992 WL 396434, at *4 (S.D.N.Y.1992) (stating that "this Court will not permit Schultz to

Not Reported in F.Supp.                                                           Page 6
Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

circumvent the [reliance] requirement by infusing the fraud on the market theory into his common law fraud action" and dismissing the common law fraud claim); *In re 3COM Securities Litigation,* 761 F.Supp. 1411, 1419 (N.D.Cal.1990) (finding that Plaintiff adequately pleaded reliance for a 10b-5 claim, but dismissing common law fraud claim because Plaintiff had not adequately pleaded actual reliance for that claim). In that Plaintiffs have failed to plead facts to support the direct reliance element of the common law fraud claim, the Court grants the Moving Defendants' motion to dismiss this sixth claim for common law fraud.

> FN1. The Court notes that, of the three Moving Defendants, the Amended Complaint alleges only that Defendants Seymour Gleeman and Edwin Karger purchased the Motel 6 securities during the period in question. Plaintiffs make no allegation that Defendant Darrin Gleeman illegally traded the Motel 6 securities.

**6. Unjust Enrichment Claim**

The seventh claim for relief alleges that Defendants have been unjustly enriched at the expense of Plaintiffs. To state a claim for unjust enrichment, a plaintiff must allege that (1) defendant was enriched, (2) enrichment was at plaintiff's expense and (3) the circumstances were such that equity and good conscience require defendant to make restitution.

*8*Violette v. Armonk Assocs., L.P.,* 872 F.Supp. 1279, 1282 (S.D.N.Y.1995); *see also Dolmetta v. Unitak Nat'l Corp.,* 712 F.2d 15, 20 (2d Cir.1983).

The Moving Defendants contend that under New York law, unjust enrichment requires direct dealing, or privity, between the parties. Because Plaintiffs allege no such privity, the Moving Defendants argue that the unjust enrichment claim must be dismissed. Plaintiffs counterargue that privity is not a required element of an unjust enrichment claim.

This Court agrees with the Moving Defendants that an unjust enrichment claim, which is a quasi-contract claim, requires some type of direct dealing or actual, substantive relationship with a defendant. As this Court recently held,

While the elements of the unjust enrichment

claim ... do not explicitly spell out such a requirement, those elements imply a more substantive relationship, or closer nexus, between a defendant and a plaintiff than Plaintiffs have alleged in this case. The requirements that the defendant be enriched at the plaintiff's expense and that good conscience necessitate that the defendant make restitution to the plaintiff, clearly contemplate that the defendant and the plaintiff must have had some type of direct dealing, an actual relationship or some greater substantive connection than is alleged in this case.

*See In re Motel 6 Sec. Litig.,* Nos. 93-2183(JFK), 93-2866(JFK), 1997 WL 154011, at *7 (S.D.N.Y. Apr.2, 1997).

In the instant case, Plaintiffs do not allege any direct dealings or actual, substantive relationship with any of the Defendants, let alone the Moving Defendants. At most, Plaintiffs claim to have had a contemporaneous trading relationship with Defendants. Plaintiffs contend that the Defendants were unjustly enriched at Plaintiffs' expense in purchasing shares of Motel Six based upon inside information during the same time period in which Plaintiffs sold their shares. These factual allegations do not sound in the quasi-contract common law claim of unjust enrichment. In the absence of any factual allegations that Plaintiffs had a more substantive connection to the Moving Defendants beyond a contemporaneous trading relationship, Plaintiffs have not alleged facts to support a claim that the Moving Defendants were unjustly enriched at the Plaintiffs' expense and that the Moving Defendants should make restitution to Plaintiffs. *Cf. Martes v. USLIFE Corp.,* 927 F.Supp. 146, 149 (S.D.N.Y.1996) (holding that an unjust enrichment claim lies only where the defendant possesses money or received a benefit which defendant should not retain because it belongs to the plaintiff, and dismissing the unjust enrichment claim because defendant received nothing that belonged to plaintiff and had no contractual or other relationship with plaintiff). Therefore, the Court grants the Moving Defendants' motion to dismiss the seventh claim for unjust enrichment.

**B. Plaintiffs' Motion for Class Certification**

*9* Plaintiffs seek an order pursuant to Fed.R.Civ.P. 23(a) and (b)(3) certifying a plaintiff class consisting of:

[A]ll persons other than the Defendants who sold shares of [Motel 6 L.P.] ("SIX") or sold call options

Not Reported in F.Supp.                                                                Page 7
Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

on SIX shares between May 18, 1990 and July 12, 1990, inclusive (the "Class Period.") and who traded contemporaneously with Defendants' purchases of SIX shares or call options.

Compl. ¶ 33. Rule 23 contains a two-tier test for class certification. First, Plaintiffs must meet Rule 23(a)'s four requirements for defining a class: a class so numerous that joinder is impracticable; questions of law or fact common to the class; named parties with interests typical of the class; and class representatives who will provide fair and adequate representation of absent members of the class. See Fed.R.Civ.P. 23(a). Second, Plaintiffs must demonstrate that the case falls within one of Rule 23(b)'s three categories where class action is appropriate. In this action, Plaintiffs seek certification under Rule 23(b)(3), which permits the maintenance of a class action where the court finds that the questions of law or fact common to the members of the class predominate and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. See Fed.R.Civ.P. 23(b)(3).

Upon an examination of the Amended Complaint in this securities fraud insider trading case, as well as Plaintiffs' papers in support of this motion, the Court concludes that Plaintiffs' proposed class satisfies all of the requirements of Rule 23(a) as well as Rule 23(b)(3). See In re Motel 6 Securities Litig., No. 93-2183(JFK), 1996 WL 53189 (S.D.N.Y. Sept. 18, 1996) (granting the plaintiffs' motion to certify class in related securities fraud action based upon the Motel 6 insider trading). Furthermore, to the extent that Defendants have not submitted papers in opposition to this motion, Defendants have implicitly agreed to the relief sought in Plaintiffs' motion for class certification.

### Conclusion

For the reasons stated above, the Court grants Defendants Darrin Gleeman, Seymour Gleeman and Edwin Karger's joint motion to dismiss the first, third, fourth, fifth, sixth and seventh claims for relief. Plaintiffs may replead the first and fourth claims for relief consistent with this opinion, and the Amended Complaint is to be filed by October 28, 1997. The Court grants Plaintiffs' motion for class certification.

**SO ORDERED.**

S.D.N.Y.,1997.
Redtail Leasing, Inc. v. Bellezza
Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 10

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 613085 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

C Pope v. Rice
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Michael POPE, Plaintiff,
v.
Joseph F. RICE, Ronald L. Motley, Motley Rice
LLC, Ness Motley PA, The Jaques Admiralty Law
Firm, and Alan Kellman, Defendants.
No. 04 Civ. 4171(DLC).

March 14, 2005.

Joseph D. Pope, Cohen Pope PLLC, New York, New
York, for the Plaintiff.
Samuel Issacharoff, New York, New York, Susan E.
Brune, Theresa Trzaskoma, Brune & Richard LLP,
New York, New York, for Defendants Joseph F.
Rice, Motley Rice LLC, and Ronald L. Motley.
Steven G. Storch, Storch Amini & Munves PC, New
York, New York, for Defendant Ness Motley PA.
Jordan M. Sklar, Babchik & Young, LLP, White
Plains, New York, for Defendants Alan Kellman and
The Jaques Admiralty Law Firm, P.C.

*OPINION & ORDER*

COTE, J.

*1 The plaintiff was a claimant in a series of
"pre-packaged" bankruptcy workouts involving
various companies with substantial asbestos-related
liabilities. The plaintiff has filed suit against his own
lawyer and law firm, who reside in Michigan, as well
as the South Carolina lawyers who played the lead
role in negotiating the terms of the bankruptcy plans
and asbestos settlements, for breaches of their
fiduciary duties to him. To state claims against the
South Carolina defendants who were not his retained
counsel, he has asserted that they had a fiduciary duty
to him because they acted as co-counsel or conspired
with his own attorneys. Among other things, this
Opinion addresses the pleading requirements to state
a claim for breach of fiduciary duty by an attorney
who represents others but is working cooperatively
with plaintiff's counsel. The motions to dismiss filed
by both groups of defendants are granted and the case
is dismissed.

BACKGROUND

The following facts are taken from the
allegations contained in the Second Amended
Complaint ("Complaint"), unless otherwise noted. In
1996, the plaintiff Michael Pope ("Pope") retained
the defendants Alan Kellman ("Kellman") and his
law firm, the Jaques Admiralty Law Firm ("Jaques
Firm") (collectively, the "Jaques Group"), from
Detroit, Michigan, to pursue asbestos-related
personal injury claims against various companies
(collectively, "Asbestos Companies") including
Combustion Engineering, Inc. ("CE"), ACandS, Inc.,
Shook and Fletcher, Inc. ("Shook"), North American
Refractories Co. ("NARCO"), and a number of
companies that the Complaint collectively calls
"Halliburton." Pope was not diagnosed with any
asbestos-related illnesses until 1997.

The Complaint states that "[u]nbeknownst to
Pope," defendants Motley Rice LLC ("Motley
Rice"), Ness Motley PA ("Ness Motley"), and
Motley Rice partners Joseph F. Rice ("Rice") and
Ronald L. Motley ("Motley") (collectively, the "Rice
Group"),FN1 established a "co-counsel" relationship
with the Jaques Firm in or before 1999, such that it
"assists the Jaques Group in the prosecution and
settlement of Pope's asbestos personal injury claims"
and has "one or more fee-sharing agreements with
the Jaques Group."The Complaint alleges that since
"no later than 2001 and continuing to date, the Rice
Group has, pursuant to its co-counsel relationship
with the Jaques Group and without Pope's
knowledge, been acting as one of the attorneys for
Pope in the prosecution and settlement of his asbestos
... claims."Motley Rice also "has, sometimes jointly
with the Jaques Group, negotiated, approved or
signed agreements with the Asbestos Companies on
behalf of Pope and others which settled Pope's
asbestos personal injury claims" from mid-2001 to
mid-2003.

> FN1. The Complaint states that the
> predecessor in interest of Motley Rice was
> the law firm Ness Motley, and that Motley
> Rice's partners include Rice and Motley.

The five specific examples of Motley Rice's
alleged representation of Pope that the Complaint
references involve Shook, ACandS, NARCO, CE,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 613085 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

and Halliburton. In each of these circumstances, Rice negotiated "most, if not all, the material terms of 'pre-packaged' bankruptcy plans."The Complaint alleges that the Jaques Firm "knew or approved of the Rice's [sic] negotiation" of those plans.

*Shook*

*2 Rice allegedly negotiated a master settlement agreement with Shook ("Shook Agreement") starting in mid-2001, culminating in Rice signing the agreement on November 28, 2001.[FN2]The Shook Agreement apparently identified Rice as "Claimants' Counsel." The Complaint states that "Claimant's Counsel" is "a term that includes Pope and other persons who had asbestos personal injury claims pending against Shook as of November 28, 2001."[FN3]Rice allegedly received a $3 million payment from Shook for advising Shook on creating a pre-packaged bankruptcy plan and settlement that would resolve Shook's ongoing asbestos liability issues. Pope claims that the Jaques Firm was aware of the fee, that neither the Jaques Firm nor Motley Rice informed him of the fee, and that he did not consent to it. This fee allegedly reduced the amount of money that would have been available to asbestos claimants such as Pope.

> FN2. The Shook Agreement was later amended on February 25, 2002.

> FN3. It is presumed that the plaintiff considers himself a "claimant," not "Claimant's Counsel."

Pope also claims that the settlement trust, which was to pay the claims of asbestos claimants, divided claimants into different categories that would be paid different amounts based on how far each claim had progressed in the litigation and settlement process. The Complaint does not describe the categories, nor does it describe what category Pope was in, other than to allude to "higher paying levels ... that discriminated against Pope."After Rice signed the Shook Agreement, Kellman executed a document adopting the Shook Agreement on behalf of Pope and others. Motley Rice and the Jaques Firm allegedly shared fees in some way in connection with this pre-packaged bankruptcy plan settlement agreement.

*ACandS*

After negotiations beginning in the fall of 2001, in April 2002, Rice signed or approved the ACandS pre-packaged bankruptcy plan on behalf of Pope and others. In May 2002, Kellman executed a document adopting the ACandS Master Agreement ("ACandS Agreement") on behalf of Pope and others. Motley Rice and the Jaques Firm allegedly shared fees in some way in connection with this pre-packaged bankruptcy plan settlement agreement.

*NARCO*

Rice allegedly negotiated a settlement agreement with NARCO ("NARCO Agreement") from 2002 until February 2003, when Rice and Kellman jointly signed the NARCO Agreement on behalf of Pope and others. The Complaint identifies the Jaques Firm as "Affiliated Counsel." Motley Rice and the Jaques Firm allegedly shared fees in some way in connection with this pre-packaged bankruptcy plan settlement agreement. Pope also alleges that the NARCO Agreement would "pay different amount [sic] to claimants with the same asbestos-related disease as Pope, to the detriment of Pope," although the Complaint does not specify how.

*Combustion Engineering*

From October 2002 until November 2002, Rice negotiated a master settlement agreement with CE ("CE Agreement"). Pope alleges that Rice signed the CE Agreement as "Claimants [sic] Representative" on November 22, 2002. The Complaint alleges that "[d]uring all or part of the process of negotiating the [CE Agreement], Rice held himself out to Combustion Engineering as the legal representative of all individuals, including Pope, who had asbestos personal injury claims against Combustion Engineering."The Complaint also alleges that Rice accepted a $20 million fee from CE for advising CE on creating a pre-packaged bankruptcy plan and settlement that would resolve CE's ongoing asbestos liability issues. Pope claims that the Jaques Firm was aware of the fee, that neither the Jaques Firm nor Motley Rice informed him of the fee, and that he did not consent to it. This fee allegedly reduced the amount of money that would have been available to asbestos claimants such as Pope.

*3 The CE pre-packaged bankruptcy plan also allegedly incorporated a $30 million pre-bankruptcy

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 613085 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

fund that would be reserved exclusively for the clients of "approximately three law firms" that generally had the same asbestos-related illness that Pope had. Pope alleges that he was not informed of, and did not consent to that fund, and that the existence of the fund reduced the amount of money that would have been available to asbestos claimants such as Pope. The CE Settlement Trust, which Rice negotiated, and which was to pay the claims of asbestos claimants, allegedly divided claimants into three categories whereby Category 1 claimants would receive 95% of the value of their claim, Category 2 claimants would receive 85% of the value of their claim, and Category 3 claimants would receive between 37.5% and 75% of their claim. The Complaint alleges that the categories were established pursuant to how far each claim had progressed in the litigation and settlement process. Pope states that he was not informed of, and did not consent to, this category system that placed him in Category 3.

On January 31, 2003, Kellman executed a signature page of the CE Agreement on behalf of Pope and others, and sent a list of claimants to CE that included Pope. Motley Rice and the Jaques Firm allegedly shared fees in some form in connection with this pre-packaged bankruptcy plan settlement agreement.

The Complaint notes that the bankruptcy judge evaluating the pre-packaged CE bankruptcy plan found, among other things, that "Mr. Rice has an actual conflict of interest in this case" because he was paid $20 million by the parent of an entity he is suing.[FN4] *See also In re Combustion Engineering, 295 B.R. 459, 478 (Bankr.D.Del.2003).* Aside from the description of the bankruptcy court's opinion in the Complaint, the opinion also stated that although the bankruptcy court did not have the power to interfere with Rice's fee from CE's parent, *Combustion Engineering,* 295 B.R. at 479, the court had the "equitable power to fashion a remedy," stating that "Mr. Rice and [his] firm are prohibited from collecting any fees from tort clients as the result of distributions they have received or will receive through the CE Settlement Trust." *Id.* at 478.

> FN4. The Complaint states that the bankruptcy judge recommended withholding confirmation of the CE bankruptcy plan. It neglects to state that the withholding of confirmation was only for ten days in order

to receive supplemental affidavits on issues unrelated to this case, and that confirmation was subsequently granted. *See In re Combustion Engineering,* 295 B.R. at 491; *In re Combustion Engineering, Inc.,* 391 F.3d 190, 200 n. 2 (3d Cir.2004).

Following an appeal to the district court where the bankruptcy court's recommendation of confirmation of the CE bankruptcy plan was approved, the Third Circuit Court of Appeals vacated the district court's opinion for reasons unrelated to this case, and remanded the case back to the district court for further proceedings. *In re Combustion Engineering, Inc.,* 391 F.3d 190, 248-49 (3d Cir.2004).

*Halliburton*

From the summer of 2002 until April 2003, Motley Rice negotiated settlement agreements with Halliburton ("Halliburton Agreements"), acting as "co-counsel" with "several dozens of lawyers and law firms," signing over 200 such settlement agreements for the clients "jointly represented by the Rice group and the lawyers and law firms with which they were co-counsel." The Complaint alleges that Rice and Kellman jointly signed a settlement agreement with Halliburton that identified them both as "Plaintiffs' Counsel" on behalf of Pope and others in April 2003. Motley Rice and the Jaques Firm allegedly shared fees in some form in connection with this pre-packaged bankruptcy plan settlement agreement. Pope also alleges that the Halliburton Agreements, like the NARCO Agreement, would "pay different amount [sic] to claimants with the same asbestos-related disease as Pope, to the detriment of Pope," although the Complaint does not specify how.

*4 With respect to all of these settlement agreements, the plaintiff alleges that he "was not informed of and did not consent to any" of them, and was informed neither that Motley Rice participated in negotiations, nor that the Jaques Firm signed or adopted the agreements on his behalf. He also alleges that he was not informed of, and did not consent to, any fee sharing arrangements between the Jaques Firm and Motley Rice. With respect to all of the agreements except for the ACandS Agreement, Pope alleges that at the same time Motley Rice was "representing" Pope in connection with his asbestos claims, it was representing thousands of other

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 613085 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

asbestos claimants with claims that competed with Pope's, without the knowledge or consent of Pope.

Based on the foregoing allegations, the Complaint pleads twelve causes of action. First, Pope claims a breach of fiduciary duty owed by the Rice Group to Pope, because "as one of the attorneys for Pope," Rice owed a duty of undivided loyalty to Pope that was breached when Rice gave advice to CE for a fee. Second, Pope claims a breach by the Rice Group of the fiduciary duty of undivided loyalty by causing CE to create a $30 million pre-bankruptcy fund that excluded Pope. Third, Pope claims a breach by the Rice Group of the fiduciary duty of undivided loyalty by negotiating and agreeing to the CE Agreement that created different categories of claimants, and that placed Pope in a lower category than other claimants.[FN5] Fourth, Pope claims a breach by the Rice Group of the fiduciary duty of undivided loyalty by giving advice to Shook for a fee. Fifth, Pope claims a breach by the Rice Group of the fiduciary duty of undivided loyalty by negotiating and agreeing to the Shook Agreement that created "higher paying levels" that "discriminated against Pope." [FN6] Sixth, Pope claims that all defendants breached their fiduciary duty of undivided loyalty to Pope by representing other asbestos claimants with claims that competed with Pope's without Pope's knowledge or consent and subordinating Pope's claims to those of other claimants.[FN7] Seventh, Pope claims that all defendants breached their fiduciary duty to disclose "all facts and proceedings material to the prosecution or settlement of [Pope's] asbestos personal injury claims" where they failed to disclose all of the above breaches, in addition to "any fee-splitting, co-counsel, affiliation or assistance agreements," thereby depriving him of the opportunities to give his "informed consent" to adopt the agreements and to resist the settlements that "unfairly discriminate" against him. Eighth, Pope claims that the Jaques Group breached its fiduciary duty of undivided loyalty to Pope during motion practice in the ACandS litigation. Ninth, Pope seeks an injunction to compel the Jaques Group to disclose its fee-sharing arrangements with the Rice Group to Pope. Pope's tenth and twelfth claims advance theories that the Rice Group knowingly aided and abetted the Jaques Group's breaches of its fiduciary duties to Pope, and that the Rice Group and Jaques Group conspired to breach their fiduciary duties to Pope, while the eleventh claim asserts that the Jaques Group knowingly aided and abetted the Rice Group's breaches of its fiduciary duties to Pope.

FN5. This cause of action also contains a claim of breach of fiduciary duty by the Jaques Group for adopting the CE Agreement on behalf of Pope, and for knowing about the Rice Group's breach in this cause of action and failing to disclose it to Pope.

FN6. This cause of action also contains a claim of breach of fiduciary duty by the Jaques Group for knowing about the Rice Group's breach in this cause of action and failing to disclose it to Pope.

FN7. The ultimate claim in this cause of action omits essential words: "As a result of their undisclosed multiple representation, the Rice Group and the Jaques Group agreed with Halliburton, Shook, NARCO and Combustion Engineering that persons with the same asbestos-related disease as Pope's would payment before."It is assumed that Pope intends to claim that the agreements contemplated that other claimants would *receive* payment before *Pope.*

*Procedural History*

*5 Pope filed this action on June 3, 2004. After a motion to dismiss by defendants Rice, Motley Rice, and Ness Motley was fully submitted, the plaintiff filed a First Amended Complaint on September 20. An Order of September 24 required that any further amendment to the pleadings must take place by October 1, and that no further amendments would be permitted in the event a renewed motion to dismiss were granted. The plaintiff filed the Second Amended Complaint on October 1. The Complaint greatly expands the factual allegations and adds new defendants and nine more claims for relief than were in the initial pleading. Among other things, it focuses on five bankruptcy proceedings instead of one.[FN8]

FN8. The defendants assert that plaintiff's counsel has a professional relationship with asbestos defendants and is using his father's claim, valued at $15,000, to "reform the world of asbestos litigation."

Defendants Motley Rice, Rice, and Ness Motley renewed their motion to dismiss, incorporating by

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 613085 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

reference arguments from the first motion and adding new arguments. They move to dismiss the Complaint on the grounds that this Court does not have jurisdiction to review workouts approved by bankruptcy courts in other jurisdictions or to hear a claim for damages that was administratively dismissed by the MDL court with exclusive jurisdiction over all federal court asbestos cases, that there is no personal jurisdiction over the defendants or venue for this action in this district, that there is no diversity jurisdiction because the dispute does not meet the amount in controversy threshold, and that the Complaint fails to state a claim. As explained below, it is only necessary to reach this last issue. Defendant Motley filed a Notice of Joinder in the motion to dismiss by Motley Rice, Rice, and Ness Motley.[FN9]

> FN9. Motley's Notice of Joinder states that he "did not join in the Motions to Dismiss at the time of original filing because he had not been served." Motley filed his joinder after he had been served.

The Jaques Group has separately filed its own motion to dismiss. It asserts that it has not been properly served, and that there is no personal jurisdiction over it.

### DISCUSSION

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2), Fed.R.Civ.P. Pleadings are to give "fair notice" of a claim and "the grounds upon which they rest" in order to enable the opposing party to answer and prepare for trial, and to identify the nature of the case. *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 512 (2002)."The federal rules allow simple pleadings and rely on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Phillip v. Univ. of Rochester,* 316 F.3d 291, 293 (2d Cir.2003) (citation omitted). Because Rule 8 is fashioned in the interest of fair and reasonable notice, not technicality, "extensive pleading of facts is not required." *Wynder v. McMahon,* 360 F.3d 73, 77 (2d Cir.2004) (citation omitted). If it is clear, however, that "no relief could be granted under any set of facts that could be proved consistent with the allegations," the complaint should be dismissed. *Swierkiewicz,* 534 U.S. at 514.[FN10] In construing the complaint, the court must "accept all

factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997).

> FN10. Pope's allegations pose complex issues concerning subject matter jurisdiction. He seeks to challenge collaterally the fairness of bankruptcy workouts in other jurisdictions through accusations that the defendants represented thousands of clients with competing claims and caused the unfair categorization of at least one of these clients. Ordinarily, federal courts address issues pertaining to their subject matter jurisdiction over a case before considering the merits or other issues in the case. *Cantor Fitzgerald, L.P. v. Peaslee,* 88 F.3d 152, 155 (2d Cir.1996)."On some occasions, however, considerations of judicial economy and restraint may persuade the court to avoid a difficult question of subject-matter jurisdiction when the case may be disposed of on a simpler ground." *Id.* Such a decision is appropriate where the court is "convinced that the challenge to the court's subject-matter jurisdiction is not easily resolved and that the alternative ground is considerably less difficult to decide." *Id.*

Here, deciding the Rice Group's motion to dismiss on subject matter jurisdiction grounds would require an extensive analysis of the Bankruptcy Code, what matters constitute "core" bankruptcy issues, whether the claims here are "related to" bankruptcy proceedings in other jurisdictions, and whether the claims are barred by the approval given by other courts to bankruptcy workouts and settlements of claims. By contrast, because Pope fails to plead an attorney-client relationship with the Rice Group as demonstrated below, and this alleged relationship serves as the linchpin to Pope's fiduciary duty claims, the claims are disposed of more easily and succinctly on this ground.

### *Attorney-Client Relationship*

*6 Fiduciary duties such as the duty of undivided loyalty are generated with the formation of an attorney-client relationship. *In re Hayes,* 183 F.3d 162, 168 (2d Cir.1999) (applying New York law).[FN11] The formation of an attorney-client relationship is governed by contract principles. See *C.K. Indus.*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 613085 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

*Corp. v. C.M. Indus. Corp.,* 623 N.Y.S.2d 410, 411 (3d Dep't 1995). *See also Priest v. Hennessy,* 409 N.E.2d 983, 986 (N.Y.1980). Although a formal written contract is not necessary, the existence of such a relationship depends upon whether there is contractual privity and a legally binding contract. *C.K. Indus. Corp.,* 623 N.Y.S.2d at 411. *See also Mason Tenders Dist. Council Pension Fund v. Messera,* 4 F.Supp.2d 293, 298 (S.D.N.Y.1998). The existence of an attorney-client relationship depends on a variety of factors, including:

> FN11. The plaintiff has relied on New York law to defend his claims, and the Rice defendants have agreed to the application of New York law to their motion. The parties having consented, New York law shall be relied upon. *See American Fuel Corp. v. Utah Energy Dev. Co., Inc.,* 122 F.3d 130, 134 (2d Cir.1997).

1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in an aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of a litigation in order to protect another (or a) client's interest; 6) whether the purported client believed that the attorney was representing him and whether this belief was reasonable.

*M.J. Woods, Inc. v. Conopco, Inc.,* 271 F.Supp.2d 576, 585 (S . D.N.Y.2003) (citation omitted) (applying New York law).

The Complaint identifies the Jaques Group as plaintiff's counsel. It asserts that he retained the Jaques Group in 1996 to pursue his asbestos claims. The Complaint denies that the plaintiff ever had knowledge that the Jaques Group was acting as co-counsel with the Rice Group, that they shared fees, or that the Rice Group was acting as the plaintiff's counsel. These factual allegations are fatal to any legal claim by the plaintiff that the Rice Group had an attorney-client relationship with Pope, or had a fiduciary duty to him through the existence of such a relationship. The Complaint underscores this conclusion with its assertions that the institution had the authority to transmit Pope's votes in favor of bankruptcy plans and to bind Pope to the settlement

agreements was the Jaques Firm, not the Rice Group. Kellman executed documents adopting the Shook Agreement, ACandS Agreement, and CE Agreement on behalf of Pope. Pope was only bound to the NARCO and Halliburton Agreements when Kellman signed the agreements jointly with Rice.

The Rice Group's negotiation of pre-packaged bankruptcies is insufficient as a matter of law to create a fiduciary relationship with claimants represented by separate counsel. The Bankruptcy Code's laws governing pre-packaged bankruptcies provide that once a pre-packaged bankruptcy plan is negotiated and finalized, it still must be approved by a majority, and in some cases, a supermajority, of creditors. 11 U.S.C. §§ 1126(c), 524(g)(2)(B)(ii)(IV)(bb). *See In re Combustion Engineering, Inc.,* 391 F.3d 190, 201 n. 4 (3d Cir.2004). Since the Rice Group's negotiations did not have any binding effect on Pope's claims until the plans were approved by creditors and the Jaques Firm signed the settlement agreements on his behalf, the negotiation did not as a matter of law create an attorney-client relationship between the Rice Group and claimants such as Pope who were separately represented by counsel.

*7 Pope has not only pleaded facts which directly undermine a claim that he had a fiduciary relationship with the Rice Group, he has also failed to plead any fact that would give "fair notice" of the existence of such a relationship. *Swierkiewicz,* 534 U.S. at 512. For example, he alleges no communications or contact with Rice, no reliance on Rice, no knowledge about Rice's involvement in asbestos bankruptcy workouts, and no other experience that could have led a reasonable person to believe he was represented by Rice or the Rice Group. The bald assertion of a legal conclusion that an attorney-client relationship existed is insufficient in the face of these profound deficiencies. In sum, the Complaint fails to allege an attorney-client relationship between the Rice Group and Pope, and, therefore, fails to allege a fiduciary duty owed by the Rice Group to Pope.

*Alternate Fiduciary Duty Theories*

In an attempt to salvage his fiduciary duty claims, Pope resists the motion to dismiss by advancing three alternate theories to support the existence of a fiduciary duty owed by Rice to Pope, to wit, that there was a "co-counsel" relationship

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 613085 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

between the Rice Group and the Jaques Group, that there was a "subagency" relationship between the two firms, and that he was a third-party beneficiary of Rice's activities. These efforts are also unsuccessful to state a claim.

*Co-Counsel Relationship*

The Complaint alleges that the Rice Group had a co-counsel relationship with the Jaques Group, and without Pope's knowledge was acting as counsel for Pope. Generally, a client must consent to a co-counsel arrangement in order to create a fiduciary relationship between the client and additional counsel. *SeeLacher v. Gordon*, 111 N.Y.S. 283, 284 (2d Dep't 1908); *Grennan v. Well Built Sales of Richmond County, Inc.*, 231 N.Y.S.2d 625, 628 (N.Y.Sup.Ct.1962). Since Pope explicitly denies any knowledge, approval, or reliance on the co-counsel arrangement, he has failed to allege the existence of a fiduciary relationship with the Rice Group through the co-counsel arrangement.

The plaintiff argues that the Complaint successfully alleges a co-counsel relationship between the Rice Group and the Jaques Group because the firms had an express fee-sharing arrangement, the settlement agreements with the Asbestos Companies were jointly signed by both the Rice Group and the Jaques Group on Pope's behalf, and in some of the settlement agreements, where Pope is listed as a settling plaintiff, the Rice and Jaques Groups refer to themselves jointly as "Plaintiffs Counsel" or "affiliated counsel." These assertions, however, do not allege a bona fide, consensual co-counsel relationship, because such a relationship depends on, among other things, the plaintiff having consented to the Rice Group's representation of the plaintiff as co-counsel to the Jaques Group, a fact the Complaint explicitly denies.[FN12]

> FN12. Even Pope's assertion in his motion papers that the settlement agreements with the Asbestos Companies were jointly signed by both the Rice Group and the Jaques Group on Pope's behalf is belied by the Complaint, which alleges that while the Rice Group signed all of the agreements, only the Jaques Group, not the Rice Group, executed the Shook Agreement, ACandS Agreement, and CE Agreement *on behalf of Pope.*

None of the cases on which Pope relies applies to the situation at hand. None of them applies New York law. None of them involves counsel who have established relationships with their own clients and who work cooperatively in a litigation or proceeding with plaintiff's counsel. Each of the cases cited by Pope involves retained counsel hiring another lawyer to assist him in representing his client. *SeeHuston v. Imperial Credit Commercial Mortgage Inv. Corp.*, 179 F.Supp.2d 1157, 1166, 1168 (C.D.Cal.2001) (attorney who was managing director of defendant and outside counsel acted as co-counsel for defendant); *Streit v. Covington & Crowe*, 82 Cal.App. 4th 441, 443 (Cal.Ct.App.2000) (additional counsel hired to make special appearance at summary judgment hearing); *In re Woodall*, 499 S.E.2d 150, 152 (Ga.Ct.App.1998) (additional counsel retained to assist at trial).

*8 Because the Complaint describes a relationship in which the Rice Group and the Jaques Group each had their own clients, and explicitly denies that Pope had knowledge of or consented to the Rice Group acting as his counsel, it fails as a matter of law to allege a relationship in which the Rice Group had a fiduciary relationship to Pope. The fact that the Rice Group took a leading role in negotiating pre-packaged bankruptcies and settlement plans, and did so in concert with other asbestos litigation law firms, does not, as a matter of law, create a fiduciary relationship to separately represented claimants under a theory that the Rice Group became co-counsel for other firms' clients.

*Subagency Relationship*

Plaintiff next argues that, because the Complaint has alleged a co-counsel relationship, it has alleged a subagency relationship in which the Rice Group was a subagent of plaintiff's counsel and owed the same fiduciary duties to the plaintiff. The plaintiff admits that the agency was created without his authorization, but asserts that where the agent delegates authority to the subagent, and the subagent accepts fees for the services rendered, that the subagent is liable to the principal for a breach of fiduciary duty.

The attorney-client relationship is traditionally viewed as that of agent and principal. *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir.1994). A subagent is a person "appointed by an agent *empowered to do so,*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 613085 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible."*Manley v. AmBase Corp.*, 121 F.Supp.2d 758, 772 (S.D.N.Y.2000) (citation omitted) (citing Restatement (Second) of Agency § 5(1)) (emphasis supplied). Ordinarily, a subagent owes to the principal the same fiduciary duties as the agent owes to the principal. *See* Restatement (Second) of Agency § 428. Where an agent does not have actual or apparent authority to appoint a subagent, however, the subagent "is the agent *solely of the appointing agent and is not the principal's subagent* unless the principal ratifies the appointment ."Restatement (Third) of Agency (Tentative Draft No. 3) § 3.15 cmt. c (emphasis supplied). In such cases, the subagent "is *the agent of the principal only,* and *the latter is responsible* both *to the principal* for any improper delegation or/and to third persons *for his agent's conduct."* Restatement (Second) of Agency § 5 cmt. b (emphasis supplied). In the context of legal representation, "a firm may be liable to the client for the acts and omissions of [an] outside lawyer if the firm assumes responsibility to a client for a matter, for example pursuant to obligations in fee-sharing arrangements or by assigning work to a temporary lawyer who has no direct relationship with the client. Such arrangements make the outside lawyer *the firm's* subagent." Restatement (Third) of the Law Governing Lawyers § 58 cmt. e (citations omitted) (emphasis supplied). In such circumstances, "the outside lawyer may be liable *to the firm* for contribution or indemnity."*Id.* (emphasis supplied).

*9 An agent gains the authority to appoint a subagent when the principal through word or conduct causes the agent reasonably to believe it has such authority. Restatement (Second) of Agency § 26. *See also* Carte Blanche (Singapore) PTE, Ltd. v. Diners Club Int'l, Inc., 758 F.Supp. 908, 919 (S.D.N.Y.1991). An agent gains apparent authority "by the same method as that which creates authority, except that the manifestation of the principal is to [a] third person rather than to the agent."Restatement (Second) of Agency § 27 cmt. a. *See also* Standard Funding Corp. v. Lewitt, 678 N.E.2d 874, 877 (N.Y.1997); Restatement (Second) of Agency § 77. An agent's designated authority to conduct a transaction does not include the authority to delegate to another the power to perform related acts involving special skills. Restatement (Second) of Agency § 78. Indeed, the "relation of principal and agent is a fiduciary one in which the principal

ordinarily relies upon the personal qualities of the agent; unless the transaction includes no element of discretion, the one appointed to conduct it cannot properly appoint another to perform it, in the absence of other facts."*Id.* cmt. a. An agent's designated authority to conduct a transaction only creates an inference of authority to appoint a subagent in certain limited circumstances not at issue here. Manley, 121 F.Supp.2d at 772. *See also* Restatement (Second) of Agency § 80.

An attorney is generally authorized to delegate a client's business only to the attorney's *employees,* and even then, such a delegation is inappropriate when the attorney would have reason to know that his client was unaware of how the attorney's business was organized. *See* Restatement (Second) of Agency § 80 cmt. a. Because the relationship between an attorney and client is personal, without "specific" authorization from the client, an attorney cannot delegate the trust and create an agency relationship between the client and other counsel. Mackler v. Richard Hyde Estate, 105 N.Y.S.2d 276, 278 (1st Dep't 1951). *See also* Quintel Corp. v. Citibank, N.A., 589 F.Supp. 1235, 1239 (S.D.N.Y.1984).

Accepting the allegations in the Complaint as true, Pope has not pleaded that the Rice Group acted as an authorized subagent of the Jaques Group on behalf of Pope. Because the acts of litigation and negotiation are acts requiring the exercise of discretion, the Jaques Group could not hire a subagent without authority from its client. The Complaint expressly disavows that Pope authorized the Rice Group to act on his behalf. Accordingly, the Jaques Group did not have either actual or apparent authority to appoint the Rice Group as subagent, and the Rice Group did not owe a separate and independent fiduciary duty to Pope as a subagent of the Jaques Group.

Again, none of the cases on which Pope relies to assert the existence of a fiduciary relationship through a subagency address the circumstance he describes in his complaint: two separate law firms with their own sets of clients working cooperatively together in litigation. Moreover, he fails to distinguish between circumstances where an attorney is a subagent of the principal, or merely of the agent. At best, it is only this latter situation which is pleaded here. *See* United States v. Schwab, 88 F.Supp.2d 1275, 1286-87 (D.Wyo.2000) (insurance agent); Credit Gen. Ins. Co. v. Midwest Indem. Corp., 916

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 613085 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

F.Supp. 766, 775-76 (N.D.Ill.1996) (insurance company and manager of surety bonds); _N.Y. State Energy Res. & Dev. Auth. v. Nuclear Fuel Servs._, 714 F.Supp. 71, 73 (W.D.N.Y.1989) (client's failure to act not excused where local counsel received notice); _American Equity Ins. Co. v. Beck_, 108 Cal.Rptr.2d 728, 733-34 (Cal.Ct.App.), _superseded by_ 31 P.3d 1270 (Cal.2001) (co-counsel hired by same client).

_Third-Party Beneficiary Theory_

*10 Pope's resort to a third-party beneficiary theory of liability is equally unavailing. Pope has not pleaded a third-party beneficiary claim. This alone is fatal since further amendments will not be permitted. Nevertheless, in his brief Pope advances the theory that the Jaques Group engaged the Rice Group for the purpose of assisting it in settling the claims of Pope and others, thereby making Pope a third-party beneficiary of the alleged co-counsel agreement between the Jaques and Rice Groups. This, Pope contends, generated a fiduciary duty owed to him by the Rice Group.

In New York, a third party to a contract may receive a recovery based on the contract only if that party is an "intended beneficiary" of the contract. Restatement (Second) of Contracts §§ 304, 315. _See also_ _Fourth Ocean Putnam Corp. v. Interstate Wrecking Co._, 485 N.E.2d 208, 212 (N.Y.1985) (adopting Restatement (Second) of Contracts for New York third-party beneficiary law); _BAII Banking Corp. v. UPG, Inc._, 985 F.2d 685, 697 (2d Cir.1993) (noting essence of New York third-party beneficiary law captured in Restatement); _Houbigant, Inc. v. Dev. Specialists, Inc._, 229 F.Supp.2d 208, 217 (S.D.N.Y.2002) (noting adoption).

[A] beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Restatement (Second) of Contracts § 302. "Among the circumstances to be considered is whether manifestation of the intention of the promisor and promisee is sufficient, in a contractual setting, to make reliance by the beneficiary both reasonable and probable." _Fourth Ocean_, 485 N.E.2d at 212. A contract is intended for the benefit of a third-party if "'(1) no one other than the third party can recover if the promisor breaches the contract or (2) the language of the contract otherwise evidences an intent to permit enforcement by third parties.'" _Chen v. Street Beat Sportswear, Inc._, 226 F.Supp.2d 355, 362 (E.D.N.Y.2002) (citation omitted).

In the context of negligence claims brought by third parties against attorneys, New York law treats such claims as "a theory close to that of third-party beneficiary," and has held attorneys liable to parties who are not their clients only in limited circumstances. _Crossland Sav. FSB v. Rockland Ins. Co._, 700 F.Supp. 1274, 1281 (S.D.N.Y.1988) (Leval, J.). An attorney is not liable to a third party for simple negligence. _See_ _United Bank of Kuwait PLC v. Enventure Energy Enhanced Oil Recovery Assocs._, 755 F.Supp. 1195, 1200 (S.D.N.Y.1989). As a general rule in New York, a lawyer has "no duty of due care to third parties." _Friedman v. Hartmann_, No. 91 Civ. 1523(PKL), 1994 WL 97104, at *7 (S.D.N.Y. Mar. 23, 1994). _See also_ _Crossland_, 700 F.Supp. at 1280; _Redhead v. Winston & Winston, P.C._, No. 01 Civ. 11475(DLC), 2002 WL 31106934, at *5 (S.D.N.Y. Sept. 20, 2002). The requirement of privity has its roots in ethical considerations since "the interests of the attorney's client may not be harmonious with other persons." _Massera_, 4 F.Supp.2d at 298 (citation omitted). In addition, imposing a duty of care to a third party is "likely to interfere with the client's right to confidentiality." _United Bank of Kuwait_, 755 F.Supp. at 1203. The rationale for the requirement of privity is that it "is necessary in order to provide fair and manageable bounds to what otherwise could prove to be limitless liability." _Prudential Ins. Co. of America v. Dewey, Ballantine, Bushby, Palmer & Wood_, 605 N.E.2d 318, 320 (N.Y.1992). Thus, "[u]nder New York law, attorneys are not liable to the third party for negligent representations, even where they prepare documents knowing that third parties will rely upon them." _Crossland_, 700 F.Supp. at 1281.

*11 A duty of care to third parties may arise in certain limited circumstances, however, such as in cases of fraud or other malicious acts, _see_ _Chinello v. Nixon, Hargrave, Devans & Doyle, LLP_, 788 N.Y.S.2d 750, 751 (4th Dep't 2005), where an attorney for a trustee places his own self-interest

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 10
Not Reported in F.Supp.2d, 2005 WL 613085 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

above the interest of the trustee, *seeid.,* negligence claims by intended beneficiaries in wrongful death actions, *seeBaer v. Broder,* 447 N.Y.S.2d 538, 539 (2d Dep't 1982), or where there is "a relationship so close as to approach that of privity,"*Prudential,* 605 N.E.2d at 320, as when "a lawyer *at the direction of her client* prepares an opinion letter which is *addressed to the third party* or which *expressly invites the third party's reliance,"Crossland,* 700 F.Supp. at 1282 (emphasis supplied).*See alsoPrudential,* 605 N.E.2d at 321-22.

As already noted, the Complaint does not state a claim based on a third party beneficiary theory. It does not even allege the existence of a contract between the Rice and Jaques Groups intended to benefit Pope, nor a breach of that contract. Moreover, its causes of action are not among the limited circumstances which New York law has acknowledged may permit recovery for tortious conduct. The first six causes of action allege breaches of the fiduciary duty of undivided loyalty, while the seventh cause of action alleges a breach of the fiduciary duty to disclose all facts and proceedings material to an attorney's prosecution of a client's claim. Pope cannot pursue these causes of action against the Rice Group under a third-party beneficiary theory because these duties are owed by an attorney to his client, not to a third party. In sum, the Complaint does not allege one of the special circumstances required to permit a departure from the long-standing rule that a lawyer has no duty of care to third parties with whom he is not in privity of contract.

The plaintiff cites *Crossland,* 700 F.Supp. at 1281, to support the contention that, having held themselves out and signed agreements as Pope's counsel, the Rice Group is estopped from denying an attorney-client relationship. *Crossland* is inapposite. The attorney in *Crossland* issued an opinion letter at his client's direction that expressly invited reliance by a third party. *Id.* at 1282-83.

Other authorities cited by Pope, none of which applies New York law, do not alter this conclusion. *Pizel v. Zuspann,* 795 P.2d 42 (Kan.1990), declined to follow New York law, but nonetheless simply re-states the notion that in the special circumstance where the negligence of an attorney for a trust harms the beneficiaries of that trust, it may be possible to hold that attorney liable even though he is not in contractual privity with the beneficiaries. *Id .* at

51.*Red River Valley Bank v. Home Ins. Co.,* 607 So.2d 892 (La.Ct.App.1992), involves negligent investigation of real estate title. *Id.* at 896.*Rutkoski v. Hollis,* 600 N.E.2d 1284 (Ill.App.Ct.1992), addressed a third-party beneficiary claim brought by the beneficiary of an estate for whom the attorney had performed work, and rejected the claim. *Id.* at 1289-90.*Leyba v. Whitley,* 907 P.2d 172 (N.M.1995), contains an exceedingly narrow holding permitting third-party beneficiaries to recover from attorneys in the context of a New Mexico wrongful death statute. *Id.* at 177, 180.

*12 In sum, the plaintiff's attempt to salvage his first seven causes of action by resort to a third-party beneficiary theory fails. To the extent they purport to assert claims against the Rice Group, the first seven causes of action are dismissed for failure to state a claim.

### Aiding and Abetting

Pope's tenth cause of action proceeds on the theory that the Rice Group aided and abetted breaches of fiduciary duty by the Jaques Group. To state a claim for aiding and abetting a breach of fiduciary duty under New York law, a plaintiff must plead: "1) a breach of fiduciary obligations to another; 2) that the defendant knowingly induced or participated in the breach; and 3) that the plaintiff suffered damages as a result of the breach."*In re Sharp Int'l Corp.,* 302 B.R. 760, 770 (E.D.N.Y.2003) (Trager, J.).*See alsoWight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000) (applying New York law); *Kaufman v. Cohen,* 760 N.Y.S.2d 157, 169 (1st Dep't 2003). The complaint must plead actual, not constructive, knowledge of the breach of fiduciary duty.*Kaufman,* 760 N.Y.S.2d at 169. The "knowing participation" prong of the second element means that the defendant must have provided "substantial assistance to the primary violator."*Id.* at 170."Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur."*Id.See also Kolbeck v. LIT America, Inc.,* 939 F.Supp. 240, 246 (S.D.N.Y.1996) (Mukasey, J.)."[T]he mere inaction of an alleged aider and abettor," however, "constitutes substantial assistance *only* if the [aider and abettor] owes a fiduciary duty *directly to the plaintiff."Kaufman,* 760 N.Y.S.2d at 170 (emphasis supplied).*See alsoIn re Sharp,* 302 B.R. at 774. The "knowing inducement" prong of the second element means "advice or encouragement to

act, in instances where the act encouraged is known to be tortious."*In re Sharp,* 302 B.R. at 775 (citation omitted).

Pope has failed to plead any fact that would give "fair notice" of how the Rice Group knowingly induced or participated in any alleged breach by the Jaques Group.[FN13] *Swierkiewicz,* 534 U.S. at 512. In his opposition papers, Pope identifies the underlying wrongdoing which the Rice Group "induced" as the signing of "settlement agreements that the Jaques Group knew were unfavorable to and had not been approved by Pope and by failing to disclose to Pope the co-counsel and fee-sharing agreements between the Rice and Jaques Groups."These assertions do not allege that the Rice Group *knew* that the Jaques Group was breaching its fiduciary duties to Pope. The Complaint does not allege that the Rice Group knew that the Jaques Group had not consulted sufficiently with Pope before signing the settlement agreements on his behalf. As such, the Complaint fails to allege the knowledge component of an aiding and abetting claim. Consequently, the tenth cause of action is dismissed.

> FN13. The Complaint asserts only: "The Rice Group knowingly induced or participated in the Jaques Group's breaches of fiduciary duty to Pope *by engaging in the conduct alleged in this complaint.*"(Emphasis supplied.)

*Conspiracy*

*13 Pope's twelfth cause of action proceeds on the theory that the Rice Group conspired with the Jaques Group to breach fiduciary duties to Pope. New York law does not recognize a substantive tort of civil conspiracy. *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank,* 755 F.2d 239, 251 (2d Cir.1985). Rather, a claim for civil conspiracy is only tenable where there is "evidence of an underlying actionable tort."*Missigman v. USI Northeast, Inc.,* 131 F.Supp.2d 495, 517 (S.D.N.Y.2001). Where there is an underlying tort, the elements of civil conspiracy are: "(1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage."*Kashi v. Gratsos,* 790 F.2d 1050, 1055 (2d Cir.1986) (applying New York law). In order to sustain an allegation of civil conspiracy that involves a conspiracy to breach a fiduciary duty, all members of

the alleged conspiracy must independently owe a fiduciary duty to the plaintiff. *SeeOfficial Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.,* No. 00 Civ. 8688(WHP), 2002 WL 362794, at *13-14 (S.D.N.Y. Mar. 6, 2002) (collecting cases).

The Complaint does not allege facts supporting the existence of an independent fiduciary duty owed by the Rice Group to Pope. Therefore, the Complaint fails to allege an essential component of civil conspiracy, and consequently, the twelfth cause of action is dismissed with respect to the Rice Group.

*Service of Process on the Jaques Group*

On October 5, 2004, the plaintiff had two copies of the Summons and Complaint delivered to Danielle Kinney ("Kinney"), a receptionist for the Jaques Firm. As Kellman's declaration notes, Kinney is not an officer, director, or agent of Kellman or of the Jaques Firm. A Cohen Pope attorney's declaration pertaining to service issues attaches a declaration by the process server that simply asserts "Corporate Service by serving the Authorized Agent 'Danielle Kinney," but it does not state how, if at all, the process server determined that Kinney held the status of "Authorized Agent." Kellman also notes that the Summons and Complaint were never mailed to him or the Jaques Firm, nor were they ever affixed to the door or inserted in the mailbox of his residence or place of business. The Cohen Pope attorney's declaration on this point attaches an affidavit of service from a process server stating that she mailed, among other things, a summons and a copy of the First Amended Complaint to Kellman at the Jaques Firm.[FN14]An examination of the docket sheet in this case reveals that the plaintiff has not, to this date, filed any proof of service with the Clerk of Court with respect to Kellman or the Jaques Group.

> FN14. The affidavit states that the documents were placed in an envelope "bearing the legend 'Personal and Confidential' " and that did not indicate in any way that the communication was from an attorney or concerned an action against the person being served.

"[I]nsufficiency of service of process" is an appropriate ground for dismissal of a complaint. Rule 12(b)(5), Fed.R.Civ.P. *See alsoMartin v. N.Y. State*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 613085 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

*Dep't of Mental Hygiene,* 588 F .2d 371, 373 (2d Cir.1978). The burden of proof to show the adequacy of service rests with the plaintiff. *Blue Ocean Lines v. Universal Processing Equip., Inc.,* No. 93 Civ. 1722(SS), 1993 WL 403961, at \*4 (S.D.N.Y. Oct. 7, 1993)."[T]he return of a private process server [under penalty of perjury] is not conclusive as to the facts of service" where "the defendant has produced affidavits controverting the allegations of the return."*Id.*

*\*14* Service of process may be effected upon an individual in any judicial district of the United States either "pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons" upon a defendant in that state's courts, or "by delivering a copy of the summons and of the complaint to the individual personally or ... by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process."Rule 4(e), Fed.R.Civ.P. New York law provides for service of process on a natural person by, among other ways, delivering the summons and complaint "to a person of suitable age and discretion at the actual place of business ... of the person to be served *and* by ... mailing the summons by first class mail to the person to be served at his or her actual place of business" with such delivery and mailing "to be effected within twenty days of each other."N.Y. C.P.L.R. § 308(2).[FN15] If this method is used, "proof of such service shall be filed with the clerk of the court designated in the summons within twenty days of either such delivery or mailing, whichever is effected later."*Id.* Service will only be deemed properly completed "ten days after such filing," and must "identify [the] person of suitable age and discretion" who was served and must "state the date, time and place of service."*Id.* As a result, " 'leave and mail' service under Section 308(2) is ineffective where a plaintiff does not file proof of service with the clerk within twenty days of the date on which the process server mailed the summons and complaint."*Howard v. Klynveld Peat Marwick Goerdeler,* 977 F.Supp. 654, 660 (S.D.N.Y.1997).

FN15. Michigan law does not provide for such service.

[T]he specific language of CPLR 308(2) confers jurisdictional import upon the filing which is accomplished in connection with that section. Jurisdiction over a natural person is obtained when

service is complete. Personal service is complete when a natural person is himself served. Substituted service is complete when: a) a person of suitable age and discretion is served; and b) a copy of the summons and complaint is mailed to the defendant; and c) upon the expiration of ten days after proof of such service has been filed.

*Roth v. Syracuse Housing Auth.,* No.2001-5404, 2002 WL 31962630, at \*12 (N.Y.Sup.Ct. July 17, 2002).[FN16]

FN16. It is worth noting that the New York Court of Appeals has endorsed such analysis in the context of Section 307, N.Y. B.C.L., which provides for an analogous method of service of process on unauthorized foreign corporations: "Where service of a copy of process was effected by mailing in accordance with this section, proof of service shall be by affidavit of compliance with this section filed, together with the process, within thirty days after receipt of the return receipt signed by the foreign corporation, or other official proof of delivery or of the original envelope mailed.... Service of process shall be complete ten days after such papers are filed with the clerk of the court."N.Y. B.C.L. § 307(c). The Court of Appeals has held that the "fail[ure] to file an affidavit of compliance as required by Business Corporation Law § 307(c)(2)... is [a] jurisdictional [defect] and does not constitute a 'mere irregularity' subject to cure."*Flannery v. General Motors Corp.,* 655 N.E.2d 176, 176 (N.Y.1995) (citation omitted). The statute thus prescribes a "mandatory sequence and progression of service completion options necessary to acquire jurisdiction,"*id.*(citation omitted), and therefore where plaintiff failed to comply with the affidavit filing requirement, the defendant's motion to dismiss was "properly granted." *Id.*

Service of process may be effected upon a corporate entity in any judicial district of the United States "in the manner prescribed for individuals by subdivision (e)(1),"*i.e.,* pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons, or "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 613085 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

or to any other agent authorized by appointment or by law to receive service of process."Rule 4(h)(1), Fed.R.Civ.P. Under New York law, service on a corporation may be made by delivering the summons "to an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or by law to receive service."N.Y. C.P.L.R. § 311(a)(1). Where service is on a receptionist of a professional corporation, the requirements of Section 311(a)(1) are not met and service is invalid. Albilia v. Hillcrest Gen. Hosp., 508 N.Y.S.2d 10, 10-11 (1st Dep't 1986). Under Michigan law, service on a corporation FN17 may be made, among other ways, by: "(1) leaving a summons and a copy of the complaint with any officer or the resident agent, or (2) leaving a summons and a copy of the complaint with any director, trustee, or person in charge of any office or business establishment and sending a summons and a copy of the complaint by registered mail, addressed to the principal office of the corporation."Mich. Comp. Laws § 600.1920.

> FN17. It is assumed, for the purposes of this Opinion, that under Michigan law, the rules governing the service of process on a corporation apply to the Jaques Firm due to its designation as "P.C .," or "professional corporation." It bears noting, however, that the rules governing the service of process on a partnership are similar, such that service may be made by "(1) leaving a summons and a copy of the complaint with any general partner personally, or (2) leaving a summons and a copy of the complaint with a person in charge of a partnership office or business establishment at such office or place of business and sending a summons and a copy of the complaint by registered mail, addressed to any general partner at his usual place of abode or last known address."Mich. Comp. Laws § 600.1917.

*15 With respect to the Jaques Firm, the plaintiffs, in serving a copy of the summons and complaint on a receptionist who was unauthorized to accept service, did not deliver those documents to an officer, director, a managing or general agent, cashier, assistant cashier, trustee, person in charge of the office, or to any other agent authorized by appointment or by law to receive service of process. The process server's declaration's bald characterization of the receptionist as "the

Authorized Agent" with no further support is not sufficient to find effective service, particularly where it is the plaintiff's burden to demonstrate compliance with the law, and where there is an affidavit from the defendants indicating that the receptionist has never been, and in practice is not, authorized to accept service.FN18 Therefore, all claims against the Jaques Firm are dismissed due to insufficient service of process.

> FN18. A hearing has not been requested, and in any event is unnecessary since the plaintiff has not identified any disputed facts that need to be resolved through a hearing.

Since service of process was not delivered to Kellman personally, the only possible avenue for service is pursuant to Section 308(2), N.Y. C.P.L.R. Although process was left with a person of "suitable age and discretion" at Kellman's "actual place of business," there is a dispute as to whether the summons was mailed to Kellman at his actual place of business. The process server contends in an affidavit that she mailed the summons and the First Amended Complaint, along with other documents, to Kellman at his workplace on October 11, 2004, while Kellman states in an affidavit that no such mailing took place. This dispute need not be resolved, however, because the plaintiff failed to comply with Section 308's requirement that proof of service shall be filed with the Clerk of Court designated in the summons within twenty days of either such delivery or mailing, whichever is effected later. Compliance with this filing requirement is particularly important where there is a dispute as to whether a proper mailing took place, as it represents evidence of mailing created and properly filed in advance of the dispute. Because failure to file proof of service is a jurisdictional defect,FN19 all claims against Kellman are dismissed due to insufficient service of process.

> FN19. There is no need for a hearing on this point because it is clear from the public record that no proof of service has been filed. Moreover, because plaintiff has been officially on notice for almost three months that Kellman was contesting sufficiency of service of process, and has made no effort to correct the filing deficiency, it is appropriate to grant the motion to dismiss.

CONCLUSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 613085 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

For the foregoing reasons, the defendants' motions to dismiss are granted. The action against Rice, Motley, Motley Rice LLC, and Ness Motley PA is dismissed with prejudice. The action against the Jaques Admiralty Law Firm and Kellman is dismissed without prejudice. The Clerk of Court shall close the case.

SO ORDERED:

S.D.N.Y.,2005.
Pope v. Rice
Not Reported in F.Supp.2d, 2005 WL 613085 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 11



Not Reported in F.Supp.                                                      Page 1
Not Reported in F.Supp., 1996 WL 331090 (E.D.N.Y.), 1996-2 Trade Cases P 71,493, RICO Bus.Disp.Guide 9064
(Cite as: Not Reported in F.Supp.)

**H**Fiore v. McDonald's Corp.
E.D.N.Y.,1996.

United States District Court, E.D. New York.
Frederick FIORE, Joan Fiore, Mac Flower
Corporation, Mac Jacqueline Corporation, Mac
Ditmars Corporation, Mac Highway Corporation, and
Steinway Distributors Corporation, Plaintiffs,
v.
McDONALD'S CORPORATION, Defendant.
Nos. CV-95-2708, 96-CV-0376.

June 12, 1996.

Diana E. Marshall, J. Tynan Kelly, Schechter &
Marshall, L.L.P., Houston, TX.
Stanley Bernstein, Bernstein, Libhard & Lifshitz,
New York City.
Richard G. Schultz, Carmen D. Caruso, Foran &
Schultz, Chicago, IL.
Mark P. Zimmett, New York City.

*MEMORANDUM AND ORDER*

GLASSER, District Judge:

*SUMMARY*

*1 Plaintiffs Joan and Frederick Fiore ("the
Fiores"), the original owners of five McDonalds
restaurants located in the New York Metropolitan
area, subsequently assigned their rights and title in
these franchises to the corporations also named as
plaintiffs in this case. Plaintiffs' suit against the
McDonald's Corporation alleged both federal and
state causes of action, including antitrust violations;
RICO violations; breach of contract; fraud and
duress; and contractual and tortious breach of
fiduciary duty of good faith and fair dealing. The
allegations which formed the basis for these claims
are more fully set forth in the Memorandum and
Order issued by this Court on February 23, 1996,
which dismissed plaintiffs' complaint other than a
claim for breach of contract and a claim for breach of
contractual duty of good faith and fair dealing.

This matter is again before the Court on
plaintiffs' motion to vacate, asking the Court to

reconsider its February 23, 1996 decision.
Alternatively, plaintiffs request permission to replead
to correct the deficiencies in their complaint noted by
the Court. Also before the Court at this time are
McDonald's motions for summary judgment on
plaintiffs' claim for breach of a contractual duty of
good faith and fair dealing; for dismissal of a related
case brought by plaintiffs, Dkt. No. 96-CV-0376;
and, pursuant to Rule 12(f), to strike certain
paragraphs of plaintiffs' First Amended Complaint.

*DISCUSSION*

I. *MOTION TO VACATE AND REARGUE OR TO
REPLEAD*

A. *Standard for Motion to Reconsider*

As a general principle, a court will not reconsider
a decision already issued unless there has been an
intervening change in the controlling law; new
evidence has been made available; or there is a need
to correct a clear error or prevent injustice. See *Doe v.
New York City Dep't of Social Svcs.*, 709 F.2d 782,
789 (2d Cir.), cert. denied, 464 U.S. 864 (1983); see
also Local Rule 3(j). To persuade the court to
reconsider its decision, it is not enough for a party to
make a more convincing argument than was made the
first time. "The law of the case will be disregarded
only when the court has 'a clear conviction of error'
with respect to a point of law on which its previous
decision was predicated." *Fogel v. Chestnutt*, 668
F.2d 100, 109 (2d Cir.1981), cert. denied, 459 U.S.
828 (1982) (citations omitted); see also *North River
Insur. Co. v. Philadelphia Reinsurance Corp.*, 63
F.3d 160, 165 (2d Cir.1995), cert. denied, 116 S.Ct.
1289. --- U.S. ---- (1996) ("A court should be 'loath'
to revisit an earlier decision 'in the absence of
extraordinary circumstances such as where the initial
decision was 'clearly erroneous and would work a
manifest injustice' ") (quoting *Christianson v. Colt
Ind. Operating Corp.*, 486 U.S. 800, 817 (1988)).

Plaintiffs' have not pointed to a change in
controlling law, new evidence, or a clear error or
injustice caused by this Court in its February 23,
1996 Memorandum and Order, and their motion to
reargue therefore is denied.[FN1] Nevertheless, the
Court will discuss the merits of the points raised in

Not Reported in F.Supp.                                                                              Page 2
Not Reported in F.Supp., 1996 WL 331090 (E.D.N.Y.), 1996-2 Trade Cases P 71,493, RICO Bus.Disp.Guide 9064
(Cite as: Not Reported in F.Supp.)

plaintiffs' motion, in order to clarify for plaintiffs the grounds on which its decisions were based.

> FN1. Moreover, plaintiffs' motion does not comply with the requirements set forth in the Local Rules of the Eastern District of New York, which provide in relevant part that "[a] notice of motion for reargument shall be served within ten (10) days after the docketing of the court's determination of the original motion." Local Rule 3(j). Plaintiffs' motion for reconsideration was filed with this Court on March 29, 1996, more than ten days after the docketing of the Court's February 23, 1996 Memorandum and Order.

B. *Standing*

**\*2** Plaintiffs ask that the Court reconsider its decision that Frederick and Joan Fiore's assignment of all their rights in their McDonald's franchises to certain corporations of which they were 100% shareholders deprives them of standing to bring this action. Plaintiffs recognize the general rule that "[f]or a wrong against a corporation a shareholder has no individual cause of action, though he loses the value of his investment or incurs personal liability in an effort to maintain the solvency of the corporation." *Abrams v. Donati*, 66 N.Y.2d 951, 953 (1985). *See also Schwartz v. Nordstrom, Inc.*, 160 A.D.2d 240, 553 N.Y.S.2d 684, 685 (1st Dep't 1990), *app. dismissed*, 76 N.Y.2d 845, *and app. denied*, 76 N.Y.2d 711 (1990) (dismissing claims of sole shareholder because "a shareholder may not secure a personal recovery for alleged injury to a corporation").

Nevertheless, plaintiffs claim to fit under an exception to this rule that applies where "the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged." *Abrams v. Donati* at 953 (citing cases). Plaintiffs argue that the Court's conclusion that "Joan and Frederick Fiore have not alleged that McDonald's owed them a duty as individuals, or that if McDonald's owed them such a duty, the duty was breached," (Memo. and Order p. 10) was incorrect; according to plaintiffs, their allegation of "a direct agreement between Fred Fiore and McDonald's to sell some of his business and invest new capital in the remaining stores" suffices to establish a legal duty running from McDonald's to Fred Fiore as an individual. Plaintiffs also argue that McDonald's conduct in preventing Fred Fiore from

meeting the conditions set forth in the above agreement "damage[d] Fiore personally because the new capital that he agreed to inject into the enterprise in reliance on the agreement was wasted and because he lost the income stream that would have been earned." Reply Memo. pp. 2-3.

The facts asserted by plaintiffs do not fit within the aforementioned exception, which is generally restricted to instances where the shareholder plaintiff and corporate defendant stand in a fiduciary relationship. *See, e.g., Bingham v. Zolt*, 66 F.3d 553 (2d Cir.1995), *cert. denied*, 116 S.Ct. 1418. --- U.S. --- (1996) (holding that defendant, accountant and lawyer to an estate, owed fiduciary duties directly to estate and that estate therefore had standing to sue as shareholder); *Confidence Trans. Inc. v. Buck*, 630 N.Y.S.2d 804, 808 (App.Div.1995) (holding that shareholder had standing to sue "since he properly alleged a breach of an independent fiduciary duty owed to him which is independent of any duty owing to the corporation wronged").[FN2] The plaintiffs in this case have not alleged any facts which establish the existence of a fiduciary relationship between McDonald's and the Fiores. Any agreement between one of the corporations owned by the Fiores and McDonald's Corp. necessarily had to have been between the officers or other representatives of these corporations, as a corporation can act only through the persons who fill its offices. The fact that Fred Fiore entered into agreements with McDonald's which dealt simultaneously with several of the franchises owned by the Fiores does not create a separate legal relationship or duty between the Fiores and McDonald's Corp. outside of the Fiores' roles as owners and officers of their corporations, because in making these agreements, Mr. Fiore was acting as an officer on behalf of his corporation and not in an individual capacity.

> FN2. *See also Herbert H. Post & Co. v. Sidney Bitterman, Inc.*, 639 N.Y.S.2d 329, 337 (App.Div.1996) (holding that defendant accounting firm owed individual shareholders "a fiduciary duty independent of the duty owed to the companies" because it "was their accountant personally as well as in a business capacity."); *Hammer v. Werner*, 239 A.D. 38, 265 N.Y.S. 172 (App.Div.1933) (issuance of treasury stock to directors at an inadequate price and without affording plaintiff right to purchase his proportionate part gave plaintiff direct

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1996 WL 331090 (E.D.N.Y.), 1996-2 Trade Cases P 71,493, RICO Bus.Disp.Guide 9064
(Cite as: Not Reported in F.Supp.)

cause of action against corporation); *Kono v. Roeth,* 237 A.D. 252, 260 N.Y.S. 662 (App.Div.1932) (pledgor/pledgee relationship creates duty of good faith providing plaintiff shareholder with direct cause of action).

*3 At oral argument, plaintiffs suggested that the unique relationship between McDonald's Corporation and its franchise operators created a "recognized exception" to the general rule that shareholders cannot sue on behalf of the corporation.[FN2] However, neither at oral argument nor in their briefs did plaintiffs cite any authority in support of this argument. In fact, the case law supports the opposite proposition-courts have consistently refused to carve out a widespread exception, applicable in the franchise context, to the general rule that an individual shareholder cannot sue for injuries suffered by the corporation. *See Vincel v. White Motor Corp.,* 521 F.2d 1113 (2d Cir.1975); *Nordberg v. Lord, Day & Lord,* 107 F.R.D. 692, 698 (S.D.N.Y.1985). *See also Persaud v. Exxon Corp.,* 867 F.Supp. 128 (E.D.N.Y.1994) (holding that sole shareholder and president of franchise corporation lacked standing to bring claims against franchisor); *Hengel, Inc. v. Hot 'N Now, Inc.,* 825 F.Supp. 1311 (N.D.Ill.1993) (denying standing to sole shareholders who were also officers and directors of the franchise to sue franchisor because the litigation arose from an alleged breach of the franchise agreements which were executed by the corporation).[FN4] Those cases that have granted standing to individual shareholders of franchises to sue a franchisor have arisen under acts which afford special protection to unique industry groups such as automobile dealerships,[FN5] or out of narrow fact situations not applicable here.[FN6] Furthermore, even these cases have been widely criticized and their holdings further restricted. *See, e.g., Rea v. Ford Motor Co.,* 497 F.2d 577, 584 (3d Cir.1974), *cert. denied,*419 U.S. 868 (1974); *Ford Motor Credit Co. v. Garner,* 688 F.Supp. 435, 444 (N.D.Ind.1988) (holding that such cases "represent departures from the general rule" and that "[u]nless a plaintiff can make out a legitimate reason for finding an exception to the general rule, the general rule must be applied"); *Continental Ill. Nat'l Bank & Trust Co. v. Stanley,* 585 F.Supp. 1385, 1387 (N.D.Ill.1984) (distinguishing cases which grant individual shareholders standing to sue for injuries to a corporation under the Automobile Dealers' Day in Court Act because that Act "contains a unique broad definition of 'automobile dealer' for the purposes of

standing"); *Moorehead v. General Motors Corp.,* 442 F.Supp. 873, 880 (E.D.Pa.1977); *Rodrigue v. Chrysler Corp.,* 421 F.Supp. 903 (E.D.La.1976).

FN3. Contrary to plaintiffs' assertion, it has generally been held that the franchisor/franchisee relationship does not establish a fiduciary duty that runs from the franchisor to the franchisee. *See, e.g., McGuirk Oil Co., Inc. v. Amoco Oil Co.,* 889 F.2d 734 (6th Cir.1989) ( "absent facts creating a confidential relationship, a 'franchise agreement will not give rise to fiduciary or confidential relationships between the parties' ") (citation omitted); *Sparano v. The Southland Corp.,* Dkt. No. 94 C 2098, 1995 WL 470267 (N.D.Ill. Aug. 4, 1995) (referring to the "mountain of case law holding that franchisors are not fiduciaries to their franchisees); *AAMCO Transmissions, Inc. v. Marino,* Dkt. Nos. 88-5522, 88-6197, 1991 WL 281760 (E.D.Pa. Dec. 31, 1991) (citing cases).

FN4. *See also Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 439 (9th Cir.1979) (denying standing to president and sole stockholder of franchise corporation despite franchisor's recognition of the importance of individual's service to the corporation and individual's personal guarantee of corporation's obligations); *Lui Ciro, Inc. v. Ciro, Inc.,* 895 F.Supp. 1365, 1381 (D.Haw.1995) (holding that although individual shareholders had risked their personal wealth by guaranteeing the franchise's debt, they suffered "no direct harm"); *Picture Lake Campground v. Holiday Inns, Inc.,* 497 F.Supp. 858, 863 (E.D.Va.1980); *Brady v. General Motors Corp.,* 1789-2 Trade Cas. P 62,209, 1978 WL 1387 (July 14, 1978, D.Minn.) (holding that agreement to form an automobile dealership which provided that it was a "personal service contract" did not justify granting owner standing to sue in his individual capacity).

FN5. *See York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.,* 447 F.2d 786, 791 (5th Cir.1971); *Kavanaugh v. Ford Motor Co.,* 353 F.2d 710 (7th Cir.1965); and *Imperial Motors, Inc. v. Chrysler Corp.,* 559

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 4
Not Reported in F.Supp., 1996 WL 331090 (E.D.N.Y.), 1996-2 Trade Cases P 71,493, RICO Bus.Disp.Guide 9064
(Cite as: Not Reported in F.Supp.)

F.Supp. 1312, 1314-15 (D.Mass1983), which all grant individual shareholders standing to sue under the Automobile Dealers' Day in Court Act. Similarly, _Swerdloff v. Miami Nat'l Bank_, 584 F.2d 54 (5th Cir.1978) and _Continental Illinois Nat'l Bank & Trust Co. v. Stanley_, 585 F.Supp. 1385 (N.D.Ill.1984), grant standing to stockholders and guarantors of loans to a corporation under the Bank Holding Co. Act, 12U.S.C. §§ 1971 et seq., because of that Act's purpose of ensuring "adequate safeguards against the possibility of misuse of the economic power of a bank." _Swerdloff_ at 58 (citation omitted).

FN6.See _John Peterson Motors, Inc. v. General Motors Corp._, 613 F.Supp. 887, 903 (D.C.Minn.1985) (allowing claims of franchise owner to proceed in part because it was unlikely that any corporate entity would remain after the ongoing bankruptcy proceedings to pursue the claims). The fact that the relevant corporate entities had signed releases waiving their right to bring claims against the defendant has specifically been held insufficient grounds for allowing an individual shareholder's claims to proceed. _See, e.g._, _Peck v. General Motors Corp._, 894 F.2d 844, 848 (6th Cir.1990) (denying standing to individual shareholders to proceed with corporation's claims partly because any claims the dealership might have been able to assert had already been released); _Schmitt-Norton Ford, Inc. v. Ford Motor Co._, 524 F.Supp. 1099, 1106 (D.Minn.1981) (holding that corporation's claims were barred because the corporation released all its claims, and that individual shareholders and officers of corporation "[a]fter many years of availing themselves of such protections [of operating as a corporate entity could] not now assert that they, as individuals, were the real parties in interest to the franchise agreement.").

Finally, acceptance of the Fiores' argument that their status as operators of McDonald's franchises created a personal relationship between them and McDonald's which mandates applying an exception to the general rule would require the Court to ignore the corporations to which the Fiores themselves assigned their rights as McDonald's licensees. _See_

_John Peterson Motors, Inc. v. General Motors Corp._, 613 F.Supp. 887, 902 (D.C.Minn.1985) (allowing claims of sole shareholder to proceed where the facts indicated that the corporation was utilized by the sole shareholder "for his own purposes and personal whims rather than as a fully independent business operation."). However, "[r]egardless of the identity of financial interests between corporation and shareholder, he cannot employ the corporate form to his advantage in the business world and then choose to ignore its separate entity when he gets to the courthouse." _Koal Ind. Corp. v. Asland, S.A._, 808 F.Supp. 1143, 1164 (S.D.N.Y.1992) (citation omitted). Plaintiffs have not presented the Court with any facts to support a theory that the Fiores and their corporations were simply alter egos, and the Court declines to carve out an exception to a well-accepted legal principle based on the facts pleaded by plaintiffs.

*4 Because plaintiffs have neither alleged any facts nor offered any cognizable legal theory in support of their argument that their status as operators of McDonald's restaurants established a unique relationship that would allow them to sue McDonald's in other than their shareholder capacity, this Court is bound by its original holding that the claims of plaintiffs Mr. and Mrs. Fiore must be dismissed due to their lack of standing.

C. The Release

Plaintiffs argue that the Court's holding that the claims of plaintiffs Mac Flower and Mac Highway were barred by the releases signed by these corporations was in error. Because release is an affirmative defense, plaintiffs' claim that dismissal on those grounds is appropriate only under "very rare circumstances," in which the basis for affirming the defense "clearly appears on the face of the Complaint." _Fortner v. Thomas_, 983 F.2d 1024, 1028 (11th Cir.1993). According to plaintiffs, the Court's decision that the releases barred their claims resulted from a misapplication of Illinois law as determined in _Carlile v. Snap-On-Tools_, 271 Ill.App.3d 833 (Ill.Ct.App.), _app. denied_,163 Ill.2d 550 (1995). Plaintiffs also argue that the Court's conclusion that they ratified the contracts by which the Long Island City and Kings Highway restaurants were sold when they failed to act promptly to repudiate them was incorrect because "under Illinois law, [plaintiffs] had no obligation to repudiate the release under any time limit shorter than the statue of limitations," and "the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 5
Not Reported in F.Supp., 1996 WL 331090 (E.D.N.Y.), 1996-2 Trade Cases P 71,493, RICO Bus.Disp.Guide 9064
(Cite as: Not Reported in F.Supp.)

mere passage of time *alone* cannot support a ratification." Plaintiffs' Memo. p. 11.

In *Snap-On-Tools,* where defendant's motion for summary judgment based upon a release signed by plaintiff was denied by the Illinois Appellate Court, the facts established that the defendant had represented to the plaintiff dealer that if he "ever wanted to get out of his dealership, Snap-on would buy back all his inventory and write him a check for the full amount." *Snap-On-Tools* at 835. However, when the plaintiff decided to terminate his dealership after suffering major losses, he was told that unless he signed a Termination Agreement which included a release he would not receive his refund for a considerable length of time. *Snap-On-Tools* at 836. Based on these facts, the court concluded that the payment received at the time the release was signed did not constitute consideration for the release, but payment for the inventory due the plaintiff under the original dealership agreement. Because plaintiff did not obtain any benefits from the release agreement other than monies already due him, his acceptance of this money did not constitute a ratification of the release. Unlike the present case, there was no issue in *Snap-On-Tools* of plaintiff's receipt of continued benefits obtained by the waiver agreement or his continued attempts to enforce the agreement containing the release. This Court's decision that the Fiores ratified the sales contracts of which the releases formed a part when they failed to act promptly to repudiate them is not inconsistent with the decision reached in *Snap-On-Tools.*

*5 Plaintiffs also cite *Hofferkamp v. Brehm,* 273 Ill.App.3d 263 (App.Ct.1994), *app. denied,*164 Ill.2d 563 (1995), for the proposition that "[a] defrauded party ... does not ratify the fraud by saying okay." However, the full citation from which plaintiffs ellipse is "[a] defrauded party, *especially one who is weak and ill,* does not ratify the fraud by saying 'okay.' " *Hofferkamp* at 273 (emphasis added). The portion of the quotation omitted by the plaintiffs is significant, for *Hofferkamp* involved a fraud perpetrated at the hospital bed of a decedent who, the evidence established, was not competent to sign the disputed papers. Given those circumstances, the court held that the decedent's failure to repudiate the contract before his death, and the failure of the plaintiff, his attorney-in-fact, to take immediate legal action, did not constitute ratification of the contract. The acts taken by the Fiores in this case fit squarely within the general rule enunciated in *Hofferkamp* that

"[r]atification of an act can be effected ... when it appears that the party to be charged with ratification clearly evinces an intent to abide and be bound by the act, with full knowledge of it." *Hofferkamp* at 273.

Numerous other Illinois cases lend support to the proposition that plaintiffs, because they failed to act promptly to repudiate the contracts containing the releases and continued to seek the benefits running to them under these contracts, are barred from claiming fraud or duress in the inducement because they ratified the contracts of which the releases formed a part. *See, e.g., In re Sherrick,* 214 Ill.App.3d 92, 95 (App.Ct.1991) ("Conduct, including an acceptance of benefits under a contract, may be sufficient to constitute a ratification binding on the party accepting the benefits as if the party had signed the contract").[FN7] The facts as pleaded by plaintiffs do not furnish any reason for the court to look beyond the general principle that a party who accepts the benefits of a contract ratifies it.

> FN7.*See also In re Kloster,* 127 Ill.App.3d 583, 585 (App.Ct.1984) ("An agreement, even if signed under duress alleged by one party, is binding if later conduct affirms it") (citing cases); *Butler v. Metz, Train, Olson & Youngren, Inc.,* 62 Ill.App.3d 424 (App.Ct.1978) ( "[w]here the issue of duress or business compulsion is raised it is pertinent to inquire whether the person charging duress has, by affirmative conduct or substantial delay following the transaction complained of, waived that defense") (citing cases).

Plaintiffs' arguments regarding defendant's alleged breach of the Long Island City contract contain no indication as to why the Court should reconsider its decision that the breach alleged did not void the contract or the release. Plaintiffs have not presented any facts or legal argument which would prompt the Court to reconsider its holding that plaintiffs' remedy for any alleged breach of the contract is to sue to enforce the contract, and that because the breach alleged involved a post closing obligation conditional on later occurrences, its nonoccurrence did not void the entire contract.

## D. *Tort Action for Breach of Duty of Good Faith*

Plaintiffs ask the Court to reconsider its decision

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                Page 6
Not Reported in F.Supp., 1996 WL 331090 (E.D.N.Y.), 1996-2 Trade Cases P 71,493, RICO Bus.Disp.Guide 9064
(Cite as: Not Reported in F.Supp.)

dismissing their tort claim for breach of the implied covenant of good faith and fair dealing, and argue that the Court should apply the Illinois Franchise Disclosure Act to this case because McDonald's specifically selected Illinois law to govern the contracts. As a preliminary matter, any tort claim enunciated by plaintiffs would be barred by the applicable two year Texas statute of limitations. *See, e.g., Ellis v. Great Southwestern Corp., 646 F.2d 1099, 1112 (5th Cir.1981); Willis v. Maverick, 760 S.W.2d 642, 644 (Tex.1988); see also* discussion *infra* p. 20. Furthermore, under Texas choice of law rules, New York law, and not Illinois law, controls the substantive merits of plaintiffs' tort claim. *Ellis v. Great Southwestern Corp., 646 F.2d at 1111* (applying "most significant relationship test" of the Restatement of Conflicts (2d) to determine which substantive law governs in a tort action) (quoting *Guiterrez v. Collins, 583 S.W.2d 312, 318-19* (Tex.1979); *Williams v. United States, 71 F.3d 502, 506 (5th Cir.1995); Levine v. CMP Publ., Inc., 738 F.2d 660, 667 (5th Cir.1984), reh'g denied,753 F.2d 1341 (5th Cir.1985)* (same). Plaintiffs have not disputed that under New York law their tort claim for breach of the implied covenant of good faith and fair dealing cannot stand. *See Durham Indus., Inc. v. North River Insur. Co., 673 F.2d 37 (2d Cir.), cert. denied,459 U.S. 827 (1982).* In addition, insofar as plaintiffs' tort claim arises under the Illinois Franchise Disclosure Act, the claim is subject to, and would be barred by, that Act's three year statute of limitations. *See*Ill.Rev.Stat. ch. 815, § 705/27.

**\*6** In any case, the tort claim enunciated by plaintiffs is not cognizable under Illinois law. *See Bonfield v. AAMCO Transmission, Inc., 708 F.Supp. 867, 888 (N.D.Ill.1989)* (declining to recognize tort claim for bad-faith dealing in the franchise context because "this Court is not free to reach out in this case far beyond anything the Illinois Supreme Court has held available as a remedy.").[FN9] Even the cases which recognize a tort claim for breach of the covenant of good faith dealing in the franchise context, based on Illinois public policy fail to help plaintiffs. *P & W Supply Co. v. E.I. Du Pont de Nemours & Co., 747 F.Supp. 1262, 1268 (N.D.Ill.1990)*, cited by plaintiffs, states that a claim for tortious breach of the duty of good faith may exist under Illinois law due to the "strong public policy that franchise agreements *should not be terminated* by franchisors absent good cause." (emphasis added). *See also Flynn Beverage, Inc. v. Joseph E. Seagram & Sons, 815 F.Supp. 1174 (C.D.Ill.1993).* Because

plaintiffs have not alleged that McDonald's wrongly terminated any of their franchises, the holdings in these cases are inapplicable.

> FN8. Numerous cases reflect the Illinois courts' reluctance to create new torts from contractual breaches. *See, e.g., Avedas, Inc. v. Intouch Group, Inc., Dkt. No. 94 C 6923, 1995 WL 234561 at *3 (N.D.Ill. Apr. 19, 1995)* ("Although Illinois courts have recognized that an obligation of good faith and fair dealing may give rise to a tort action, the courts have expressly refused to recognize such tort actions outside the limited fields of insurance law and employment law.") (citing cases); *Martin v. Federal Life Insur. Co., 109 Ill.App.3d 596, 607, 440 N.E.2d 998 (App.Ct.1982)* ("Care must be taken to prevent the transmutation of every breach of contract into an independent tort action through the bootstrapping of the general contract principle of good faith and fair dealing"); *Koehler v. First Nat'l Bank of Louisville, 232 Ill.App.3d 679, 597 N.E.2d 1261, 1264 (App.Ct.1992)* (citing cases).

*E. Antitrust Claims*

Plaintiffs ask that the Court reconsider its decision dismissing their antitrust claims as time-barred. Plaintiffs argue that because the amount of damages remained speculative until the Long Island City restaurant was sold on March 10, 1991, their claims did not accrue until that date which is within the statute of limitations period. Alternatively, plaintiffs ask for permission to replead facts which they allege would toll the statute of limitations. Plaintiffs will not be permitted to replead facts relating to the tolling issue, because in any event, plaintiffs have failed to state a cause of action under the antitrust laws.

Plaintiffs have charged that McDonald's conduct constitutes a combination or conspiracy in restraint of trade, and/or monopolization or attempted monopolization. Section One of the Sherman Act provides that, subject to certain limitations, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To establish a claim for restraint of trade under Section

Not Reported in F.Supp.                                                                                          Page 7
Not Reported in F.Supp., 1996 WL 331090 (E.D.N.Y.), 1996-2 Trade Cases P 71,493, RICO Bus.Disp.Guide 9064
(Cite as: Not Reported in F.Supp.)

One of the Sherman Act, a plaintiff must prove (1) that two or more defendants entered into a contract, combination or conspiracy, and (2) that the conspiracy was in restraint of trade in interstate commerce. *Belfiore v. New York Times Co., 826 F.2d 177, 181 (2d Cir.1987), cert. denied,*484 U.S. 1067 (1988) (citations omitted). Section One of the Sherman Act does not reach conduct that is wholly unilateral. *See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 767 (1984)* ("The conduct of a single firm is governed by section 2 alone"). Plaintiffs fail to allege any facts in support of concerted or collusive conduct by McDonald's, and therefore fail to make out a claim under Section One of the Sherman Act. Their assertions regarding transfer of restaurants to other franchisees are insufficient to establish concerted action. *See Oreck Corp. v. Whirlpool Corp., 639 F.2d 75 (2d Cir.1980), cert. denied,*454 U.S. 1083 (1981).

**\*7** Section Two of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states ... shall be deemed guilty of a felony." 15 U.S.C. § 2. Monopolization in violation of Section Two requires a showing of (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Belfiore v. New York Times Co., 826 F.2d at 180.* A relevant market cannot be limited to the market for the defendant's own product. *See United States v. E.I. DuPont deNemours, 351 U.S. 377 (1956); Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co., 614 F.2d 832 (2d Cir.1980).* The only relevant market the plaintiffs have alleged in their complaint is the resale market for McDonald's franchised restaurants. Plaintiffs have failed to sufficiently allege a relevant market that is required to make out a claim under Section Two of the Sherman Act.

In any case, plaintiffs have not demonstrated any new facts or law that would prompt this Court to reconsider its decision that plaintiffs' antitrust claims are barred by the statute of limitations. *Ansul Co. v. Uniroyal, Inc., 448 F.2d 872 (2d Cir.1971), cert. denied,*404 U.S. 1018 (1972), is cited by plaintiffs in support of their position that their antitrust claims did not accrue until the Long Island City restaurant was

sold. However, *Ansul,* applying *Zenith Radio Corp. v. Hazeltine Rsch., Inc.,* 401 U.S. 321 (1971), merely holds that claims relating to damages that cannot be proven at the time the cause of action accrues may be brought within the statute of limitations from the time that they can be ascertained. The only damages not fully ascertained with certainty by plaintiffs within the time period of the four year statute of limitations, to which the *Ansul* rule might apply in this case, relate to the Long Island City restaurant, and these claims are barred by the release signed in connection with the sale of that restaurant.

### F. RICO Claims

Plaintiffs also argue that their RICO claims are not barred by the statute of limitations because they did not accrue until the Long Island City restaurant was sold. Because plaintiffs' complaint fails to state a cause of action under RICO, plaintiffs will not be permitted to replead facts concerning these claims.

To state a cause of action under RICO, 18 U.S.C. § 1962(a)-(c), a plaintiff must show "(1) that the defendants (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.* 719 F.2d 5, 17 (2d Cir.1983), cert. denied,465 U.S. 1025 (1984). Plaintiffs' allegations are insufficient to satisfy these elements.

The plaintiffs allege that McDonald's committed extortion and mail and wire fraud. However, "the alleged wrongs are not pleaded with sufficient particularity to constitute the RICO predicate act of wire fraud or mail fraud." *Tel-phonic Services, Inc. v. TBS Intern., Inc.* 975 F.2d 1134, 1138 (5th Cir.1992). **\*8** Rule 9(b) requires particularity in pleading the 'circumstances constituting fraud.' This particularity requirement applies to the pleading of fraud as a predicate act in a RICO claim as well. At a minimum, Rule 9(b) requires allegations of the particulars of 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'

*Id.* at 1138-39 (citations omitted). Plaintiffs have failed to plead the alleged wrongs concerning wire

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                     Page 8
Not Reported in F.Supp., 1996 WL 331090 (E.D.N.Y.), 1996-2 Trade Cases P 71,493, RICO Bus.Disp.Guide 9064
(Cite as: Not Reported in F.Supp.)

and mail fraud with sufficient particularity so as to make out a claim for RICO violations.

Plaintiffs' complaint also fails to make out a case of extortion for purposes of a RICO claim. Extortion is defined as obtaining property from another without his consent, induced by the wrongful use of actual or threatened force, violence or fear, or under color of official right. 18 U.S.C. § 1951(b)(2). Plaintiffs' allegations regarding McDonald's conduct with respect to its reinvestment scheme are insufficient to demonstrate the "wrongful use of actual or threatened force, violence or fear" by McDonald's. The word "fear" as used in the Hobbs Act does not include every economic injury which might be tortious under state law. See Flowers v. Continental Grain Co., 775 F.2d 1051 (8th Cir.1985) (citing I.S. Joseph Co., Inc. v. J. Lauritzen A/S, 751 F.2d 265 (8th Cir.1984)).

Furthermore, as explained above, plaintiffs have failed to demonstrate that the Court's decision on the statute of limitations merits reconsideration.

### G. Loss of Business Through Fraud or Duress

Plaintiffs claim that the Court erred in dismissing their claim for loss of business through fraud or duress because "this decision ultimately depends on the ratification and standing issues noted above." Plaintiffs' Memo. p. 18. Given the Court's decision not to accept reargument on those issues, this claim need not be reconsidered.

### H. Repleading After Grant of a 12(b)(6) Motion

The Federal Rules of Civil Procedure mandate that leave to amend a complaint "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Thus, when a complaint is dismissed pursuant to Rule 12(b)(6) and the plaintiff requests permission to file an amended complaint, that request should ordinarily be granted. Ricciuti v. N.Y.C. Transit Authority, 941 F.2d 119, 123 (2d Cir.1991). Nevertheless, if "permitting leave to amend would serve no purpose," such leave should be denied. Jones v. Capital Cities/ABC Inc., 874 F.Supp. 626, 630 (S.D.N.Y.1995). See also Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir.1990); Albany Insur. Co. v. Esses, 831 F.2d 41, 45 (2d Cir.1987) ("the district court may deny leave to replead if the proposed amendments would be futile"). Plaintiffs have not presented the Court with any facts which, if

allowed to replead, would correct the deficiencies noted. Leave to replead therefore is denied.

### II. MOTION FOR SUMMARY JUDGMENT

*9 Also presently before the Court is defendant's motion for summary judgment on Count D of Plaintiffs' Amended Complaint, a claim that McDonald's breached its contractual duty of good faith and fair dealing.[FN9] Plaintiffs claim that McDonald's abused its contract rights by creating a risk of forfeiture of all the Fiores' franchises, and that McDonald's refusal to permit the sale of the Steinway and the Ditmar restaurants to the buyer of the Fiores' choice, and its reinvestment requirements for the renewal of the Long Island City restaurant, were in bad faith in violation of McDonald's contractual obligations to operate in good faith. First Amend. Complaint ¶¶ 60-62. Defendant argues that plaintiffs' claims are barred by the applicable statute of limitations.

> FN9. Originally, Count D also included a tort claim for breach of the duty of good faith and fair dealing. That claim was dismissed in the Court's February 23, 1996 Memorandum and Order. See discussion supra.

### A. Texas Statute of Limitations Applies

This action was originally filed in the federal district court in the Southern District of Texas on March 10, 1995. Jurisdiction in that court was based upon diversity of citizenship and federal causes of action. On June 30, 1995, the action was transferred to the Eastern District of New York from the Southern District of Texas pursuant to 28 U.S.C. § 1404(a). As the transferee court, this Court is bound to apply the choice of law rules applicable in the transferor court. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). Thus, Texas choice of law rules control in this action.

Under Texas law, "[s]tatutes of limitation are generally recognized to be procedural in nature, and therefore will usually come from Texas statute when the case is heard by a state or federal court in Texas." Johansen v. E.I. Dupont De Nemours & Co., 627 F.Supp. 968 (E.D.Tex.1985), aff'd in part, vacated in part,810 F.2d 1377 (5th Cir.), cert. denied,484 U.S. 849 (1987) (citation omitted). See also Ellis v. Great

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 9
Not Reported in F.Supp., 1996 WL 331090 (E.D.N.Y.), 1996-2 Trade Cases P 71,493, RICO Bus.Disp.Guide 9064
(Cite as: Not Reported in F.Supp.)

*Southwestern Corp., 646 F.2d 1099, 1111 (5th Cir.1981)* ("When confronted with a lawsuit in which the substantive law of another jurisdiction is to be applied, Texas courts will most often apply their own state's statute of limitations; this general principle is based on the theory that the foreign jurisdiction's statute of limitations is most often part of its procedural, rather than substantive, law.").

The fact that the contracts in this case are governed by Illinois law does not alter this analysis, as forum selection clauses are generally understood to incorporate substantive and not procedural law. *See FDIC v. Petersen, 770 F.2d 141, 142 (10th Cir.1985)* ("Absent an express statement of intent, a standard choice of law provision ... will not be interpreted as covering a statute of limitations"); *Colonial Penn Life Insur. Co. v. Assured Ent., Ltd., 151 F.R.D. 91 (N.D.Ill.1993); Phelps v. McClellan, 30 F.3d 658, 662 (6th Cir.1994)*.

### B. *Texas Statute of Limitations*

The Texas statute of limitations for breach of contract actions generally is four years. *See Williams v. Khalaf, 802 S.W.2d 651, 653 (Tex.1990); F.D. Stella Prod. Co. v. Scott, 875 S.W.2d 462 (Tex.Ct.App.1994); Hoover v. Gregory, 835 S.W.2d 668, 677 (Tex.Ct.App.1992); Sullivan v. Hoover, 782 S.W.2d 305 (Tex.Ct.App.1989). See also* Tex.Civ.Prac. & Rem. §§ 16.004, 16.051.

### C. *Plaintiffs' Claim is Barred Because of the Four Year Statute of Limitations*

*10 Plaintiffs' claim for breach of contractual duty of good faith and fair dealing is derived from McDonald's obligations under the franchise agreements entered into between the parties. Because all claims (other than a claim in Count A for post-contractual breach of contract) relating to the Long Island City restaurant and the Kings Highway restaurant are barred by the releases signed by plaintiffs Mac Flower Corp. and Mac Highway Corp., only the claims of plaintiffs Mac Jacqueline, Mac Ditmars, and Steinway Distrib. Corp., relating to the Steinway, Coney Island and Ditmars restaurants, remain in the case. It is not disputed that the Steinway, Coney Island, and Ditmars restaurants were all sold before March 10, 1991, and that plaintiffs Mac Highway, Mac Ditmars, and Steinway Distrib. Corp. ended their contractual relationships

with McDonald's before that date. Because McDonald's contractual duty of good faith necessarily ended when the parties contractual relationship ended, any claims of plaintiffs relating to McDonald's contractual duty of good faith and fair dealing necessarily accrued prior to March 10, 1991. Because all plaintiffs' claims in Count D accrued over four years before this action was commenced on March 10, 1995, plaintiffs' claims are time-barred. *See Hoover v. Gregory, 835 S.W.2d at 677* ("Contract claims generally accrue when the contract is breached. A breach occurs when a party fails to perform a duty required by the contract.") (internal citations omitted).

Nevertheless, plaintiffs attempt to circumvent the statute of limitations by arguing that their claims did not accrue until the Long Island City restaurant was sold, or, alternatively, that the statute of limitations should be tolled because of McDonald's fraudulently concealed from them the existence of a cause of action. However, as plaintiffs themselves agree, "the accrual of the cause of action in a contract case depends on the timing of when 'damages are suffered.' " Plaintiffs' Response in Opposition to McDonald's Motion for Summary Judgment on Count D p. 5 (quoting *F.D. Stella Prod. Co v. Scott, 875 S.W.2d 462 (Tex.App.1994)*. Because the Mac Ditmars Corp., Steinway Distrib. Corp., and Mac Jacqueline Corp., could not have been damaged after their McDonald's franchises were sold, plaintiffs' claims necessarily accrued four years before this action was brought and are time barred.

Where the defense of statute of limitations is established as a matter of law, it is plaintiffs' burden to come forward with proof raising an issue of fact with respect to fraudulent concealment. *Nichols v. Smith, 507 S.W.2d 518, 521 (Tex.1974)*. McDonald's alleged misrepresentation of facts concerning a double-drive through took place at the time the Long Island City restaurant was sold and cannot relate to damages suffered by the Coney Island, Steinway and Ditmars restaurants deriving from McDonald's breach of its duty of good faith and fair dealing in its contractual relationship with them. In addition, plaintiffs have not alleged a duty of disclosure that McDonald's violated when it failed to reveal facts relating to the double drive through. Fraudulent concealment under Texas law arises when the defendant is under a duty to make a disclosure but fraudulently conceals the existence of a cause of action from the one to whom it belongs. *Nichols v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 10
Not Reported in F.Supp., 1996 WL 331090 (E.D.N.Y.), 1996-2 Trade Cases P 71,493, RICO Bus.Disp.Guide 9064
(Cite as: Not Reported in F.Supp.)

_Smith,_ 507 S.W.2d 518 (citing cases). Plaintiffs' claim that McDonald's bad faith in demanding that the Fiores build a double drive through booth was fraudulently concealed until after the Long Island City restaurant was sold simply does not conceal facts relating to plaintiffs' claim that McDonald's breached its duty of good faith and fair dealing as such duty related to the Ditmars, Steinway, and Coney Island restaurants, to satisfy plaintiffs' burden of coming forward with proof raising an issue of fact with respect to fraudulent concealment. _See Borderlon v. Peck,_ 661 S.W.2d 907, 909 (Tex.1983) ("The estoppel of fraudulent concealment ends when a party learns of facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action. Knowledge of such facts is in law equivalent to knowledge of the cause of action."); _Sparano v. Southland Corp.,_ 94 C 2098, 1996 WL 272515 (N.D.Ill., May 17, 1996) *2 (quoting _Knox College v. Celotex Corp.,_ 88 Ill.2d 407, 415 (1981)).

*11 Because plaintiffs' claim for breach of contractual duty of good faith and fair dealing was commenced over four years after the accrual of cognizable injuries not otherwise barred, defendant's motion for summary judgment on Count D of plaintiffs' complaint is granted.

III. _MOTION TO DISMISS_

In January, 1996, after their complaint in Fiore v. McDonald's, Dkt. No. 95 CV 2708, had been removed to this Court from the Southern District of Texas, plaintiffs filed a substantially identical complaint in the Eastern District of New York, _Fiore v. McDonald's,_ Dkt. No. 96 CV 0376. Plaintiffs have stated that the second action was filed "for one reason and one reason only," to take advantage of New York's six year statute of limitations for breach of contract claims, which is two years longer than the statute of limitations applicable under Texas law. Plaintiffs' Response to Defendant's Motion to Dismiss p. 1.

The law is clear that "where there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience ... or ... special circumstances ... giving priority to the second." _First City Nat'l Bank & Trust Co. v. Simmons,_ 878 F.2d 76, 79 (2d Cir.1989) (quoting _Motion Picture Lab. Technicians Loc. 780 v._

_McGregor & Werner, Inc.,_ 804 F.2d 16, 19 (2d Cir.1986)). The "special circumstances" noted in this regard are cases where forum-shopping alone motivated the choice of situs for the first suit. _Columbia Pictures Ind., Inc. v. Schneider,_ 435 F.Supp. 742, 746-47 (S.D.N.Y.1977), _aff'd mem.,_ 573 F.2d 1288 (2d Cir.1978) (citing cases). Thus, not only does forum shopping fail to justify allowing a later filed suit to proceed; it provides for departure from the general rule that a later filed suit is abated in favor of previously initiated proceedings. _See Pacesetter Sys., Inc. v. Medtronic, Inc.,_ 678 F.2d 93, 94-95 (9th Cir.1982) (upholding district court's dismissal of second filed action in case involving same issues and same parties):

Normally sound judicial administration would indicate that when two identical actions are filed in courts of concurrent jurisdiction, the court which first acquired jurisdiction should try the lawsuit and no purpose would be served by proceeding with a second action.

(citing _Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.,_ 342 U.S. 180, 183-84 (1952)). _See also Upchurch v. Piper Aircraft Corp.,_ 736 F.2d 439 (8th Cir.1984) (upholding district court's dismissal of second filed action because of pending proceeding in separate federal district court); _Horn & Hardart Co. v. Burger King Corp.,_ 476 F.Supp. 1058, 1061 (S.D.N.Y.1979) ("When two actions involving the same issues are brought in two different federal district courts, the first court has power to enjoin the prosecution of the second action, and should exercise such power in its sound discretion in order to avoid the possibility of inconsistent results and the duplication of judicial effort") (citing cases).

*12 The principle that it is unjust and inefficient to allow two separate actions between identical parties and involving identical issues to proceed has also been applied when the two actions are pending in the same court. In _Sieling & Jarvis Corp. v. Nat'l Bulk Carriers,_ 190 F.2d 557 (2d Cir.1951), the Second Circuit dismissed a suit filed simply to preserve the plaintiff's right to a jury trial, where a practically identical suit was already pending in the same court. _See also Walton v. Eaton Corp.,_ 563 F.2d 66, 71 (3d Cir.1977) ("the court must insure that the plaintiff does not use the incorrect procedure of filing duplicative complaints for the purpose of circumventing the rules pertaining to the amendment of complaints ..." and holding that plaintiff had no right to maintain two separate actions involving the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 11
Not Reported in F.Supp., 1996 WL 331090 (E.D.N.Y.), 1996-2 Trade Cases P 71,493, RICO Bus.Disp.Guide 9064
(Cite as: Not Reported in F.Supp.)

same subject matter in the same court and against the same defendant); *Sutcliffe Storage & Warehouse Co. v. United States*, 162 F.2d 849 (1st Cir.1947) ("The pendency of a prior pending action in the same federal court is ground for abatement of the second action") (citations omitted); *In re Prudential Securities, Inc. Lmt'd Partnerships Litig.*, 158 F.R.D. 562, 570-71 (S.D.N.Y.1994) (applying *Walton v. Eaton*).

Because the complaint filed by the plaintiffs in the Eastern District of New York involves identical parties and identical issues to a case already pending in this Court, the second complaint, *Fiore v. McDonald's*, Dkt. No. 96 CV 0376, must be dismissed.

## IV. *MOTION TO STRIKE*

Finally, defendant has brought a motion under Fed.R.Civ.P. 12(f) to strike certain paragraphs from plaintiffs' First Amended Complaint. Fed.R.Civ.P. 12(f) provides in relevant part:
Upon motion made by a party before responding to a pleading ... or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

Resolution of Rule 12(f) motions is left to the court's discretion. *Food & Allied Serv. Trades v. Millfield Trading*, 841 F.Supp. 1386 (S.D.N.Y.1994). However, a motion to strike pursuant to Rule 12(f) should not be granted "unless it is clear that the portion of the pleading sought to be struck has no bearing on the subject matter of the litigation and that its inclusion will prejudice the defendant." *Grunwald v. Bornfreund*, 668 F.Supp. 128, 133 (E.D.N.Y.1987) (citations omitted). Because all claims in this case other than a claim in Count A for breach of the Long Island City contract have been dismissed by this Court, defendant argues that those portions of the First Amended Complaint which do not relate to Count A are no longer relevant to this case. As defendant would be prejudiced by having to answer allegations relating to claims that have been dismissed, it contends that such portions of the Amended Complaint that are irrelevant to Count A should be stricken.

*13 Defendant has asked that the Court strike paragraphs 6-32, 34-43, 45, 47, and 48 of the First Amended Complaint, arguing that none of these paragraphs relate to the claim in Count A. Defendant's motion is denied in part and granted in part. Paragraphs 44-48 relate to the claim in Count A for breach of the LIC contract and as the Court has not ruled on this Count of plaintiffs' complaint, these paragraphs will not be stricken. Paragraphs 6-32 contain allegations relating to the McDonald's system and the Fiores' participation in that system. Insofar as these paragraphs relate a sequence of events leading up to the sale of the Long Island City restaurant, they relate to plaintiffs' claim for breach of the contract of sale of that franchise, these paragraphs also will not be stricken. However, paragraphs 34-43 contain allegations relating to a fraudulent and extortionate scheme perpetrated by McDonald's employees. Insofar as the Court has dismissed plaintiffs' claims of fraud and extortion, the allegations in these paragraphs are no longer relevant to plaintiffs' complaint and furthermore are prejudicial to the defendant. Paragraphs 34-43 therefore should be struck.

## CONCLUSION

For the reasons discussed above, plaintiffs' motion to reconsider and vacate, or alternatively to replead, is hereby denied. Defendant's motion for summary judgment dismissing plaintiffs' claim for breach of contractual duty of good faith and fair dealing found in Count D of the Amended Complaint is granted. Defendant's motion to dismiss the action *Fiore v. McDonald's*, Dkt. No. 96 CV 0376, filed in the Eastern District of New York, is granted. As set forth more fully above, defendant's motion to strike portions of the Amended Complaint is granted in part and denied in part.

In light of today's decision and the decision reached in the February 23, 1996 Memorandum and Order, the only claim remaining in this case is plaintiff Mac Flower's claim in Count A for breach of the Long Island City contract. All other claims in this case are hereby dismissed.

SO ORDERED.

E.D.N.Y.,1996.
Fiore v. McDonald's Corp.
Not Reported in F.Supp., 1996 WL 331090 (E.D.N.Y.), 1996-2 Trade Cases P 71,493, RICO Bus.Disp.Guide 9064

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                              Page 12
Not Reported in F.Supp., 1996 WL 331090 (E.D.N.Y.), 1996-2 Trade Cases P 71,493, RICO Bus.Disp.Guide 9064
**(Cite as: Not Reported in F.Supp.)**


END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.